**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

|  |  |  |
|---|---|---|
| NEXCO S.A., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No. 22-00203 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT**

1.      Plaintiff NEXCO S.A. ("NEXCO") by and through its counsel hereby allege and state as follows:

**SUMMARY AND NATURE OF THIS ACTION**

2.      Plaintiff NEXCO is an Argentine exporter to the United States of raw honey that it sources from beekeepers in Argentina.  Plaintiff was subject to the affirmative final less-than-fair-value determination and antidumping duty order issued by the U.S. Department of Commerce, International Trade Administration ("Commerce") that is being challenged in this action.  Plaintiff contests three aspects of Commerce's *Final Determination*.

3.      <u>First</u>, Commerce erred in using NEXCO's acquisition costs (prices paid by NEXCO) to calculate the cost of production ("COP") of the merchandise when it had on the administrative record verified COP data from two of NEXCO's largest beekeepers and a middleman.  Commerce improperly conducted a below-cost test of NEXCO's acquisition costs using the beekeeper COP data when the beekeepers were not affiliated with NEXCO and the record confirmed that the acquisition costs were not a reasonable surrogate for the actual beekeeper costs on the record because acquisition costs included profit.  As Commerce had COP data from the actual producers of the subject merchandise, two of NEXCO's beekeepers, its

determination to use NEXCO's acquisition costs to calculate the COP was unsupported by substantial evidence and otherwise not in accordance with law.

4.    <u>Second</u>, Commerce unlawfully made sales comparisons between NEXCO's third country market sales and U.S. sales on a monthly basis because it reached the erroneous conclusion that NEXCO's dollar-denominated U.S. market sales and its dollar-denominated German market sales prices were affected by inflation in Argentina.  No record evidence could or did exist to support this conclusion.  The law and the regulations provide that sales comparisons should be made based on period of investigation ("POI") weighted average prices in original investigations.  Commerce can depart from this methodology only in certain exceptional circumstances such as when costs or prices in Argentine pesos were affected by hyper-inflation.  No departure is justified for the comparison of NEXCO's dollar-denominated sales because prices set in U.S. dollars are not subject to Argentine peso devaluations and there is no obstacle for Commerce to calculate inflated costs in pesos for the sales-below-cost test and compare POI weighted average prices in U.S. dollars.

5.    <u>Third</u>, in the alternative, Commerce's modified quarterly cost methodology did not compare NEXCO's U.S. and third country market sales on a quarterly basis.  Although Commerce claimed to be applying a quarterly cost methodology, which involves calculating the COP on a quarterly basis and matching U.S. sales to third country (or home market) sales on a quarterly basis, Commerce made monthly sales comparisons.  Commerce's failure to use actual quarterly averaged costs and prices is thus unsupported by substantial evidence and otherwise not in accordance with law.

## JURISDICTION

6.      NEXCO brings this action pursuant to 19 U.S.C. §§ 1516a(a)(2)(A)(i)(II) and (a)(2)(B)(i) to contest certain aspects of Commerce's final antidumping duty ("AD") determination in the AD investigation of raw honey from Argentina, Case No. A-357-823.  *Raw Honey From Argentina: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances,* 87 Fed. Reg. 22,179 (Dep't Commerce Apr. 14, 2022.) ("*Final Determination*") and accompanying Issues and Decision Memorandum ("*Final Determination* IDM*"*).  The *Final Determination* covers the period April 1, 2020 through March 31, 2021.

7.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c) because this action is commenced pursuant to 19 U.S.C. § 1516a.

## STANDING

8.      NEXCO exports raw honey from Argentina to the United States.  Plaintiff is therefore an interested party pursuant to 19 U.S.C. § 1516a(f)(3) and 19 U.S.C. § 1677(9)(A).

9.      Plaintiff was a party to the underlying investigation by Commerce and selected by Commerce as a mandatory respondent.  Plaintiff participated in the investigation by supplying questionnaire responses, including a verification questionnaire response, and by filing case and rebuttal briefs.  Accordingly, Plaintiff has standing pursuant to 28 U.S.C. § 2631(c) to commence this action.

## TIMELINESS OF THE ACTION

10.      On April 14, 2022, Commerce published in the *Federal Register* the challenged *Final Determination*.  On June 10, 2022, Commerce published in the *Federal Register* the antidumping duty order.  *Raw Honey From Argentina, Brazil, India, and the Socialist Republic*

*of Vietnam: Antidumping Duty Orders*, 87 Fed. Reg. 35,501 (Dep't Commerce June 10, 2022). Plaintiff timely filed a summons initiating this appeal on July 11, 2022, within thirty days of the publication of the *Final Results* in accordance with 19 U.S.C. § 1516a(a)(2)(A)(i)(II), 28 U.S.C. § 2636(c), and Rule 3(a)(2) of the Rules of this Court.  This complaint is being filed on August 8, 2022, which is within 30 days of the filing of the summons and is thus timely filed under Court of International Trade Rule 3(a)(2).

## STATEMENT OF FACTS

11.     On May 18, 2021, Commerce initiated an antidumping duty investigation into raw honey from Argentina in response to a petition filed by the American Honey Producers Association and the Sioux Honey Association (collectively, "Petitioners").  *Raw Honey From Argentina, Brazil, India, Ukraine, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations*, 86 Fed. Reg. 26,897 (Dep't Commerce May 18, 2021).

12.     On June 4, 2021, Commerce limited its examination of mandatory respondents to two companies out of a total of twenty-four exporters.  The two exporters selected were Asociación De Cooperativas Argentinas Cooperativa Limitada ("ACA") and Industrias Haedo S.A.  ("Haedo"), and they accounted for the largest volume of the subject merchandise from Argentina in accordance with 19 U.S.C. § 1677f–1(c)(2)(B).  Memorandum to James Maeder, Deputy Assistant Sec'y for Antidumping and Countervailing Duty Operations from Thomas Martin, Int'l Trade Compliance Analyst, Office IV, Antidumping and Countervailing Duty Operations, "Less-Than-Fair-Value Investigation of Raw Honey from Argentina:  Respondent Selection," (June 4, 2021).

13.     Haedo subsequently notified Commerce that it would not be participating in the investigation, which then led Commerce to select the next largest mandatory respondent –

Compañía Inversora Platense SA ("CIPSA").  Memorandum to James Maeder, Deputy Assistant

Sec'y for Antidumping and Countervailing Duty Operations from Thomas Martin, Int'l Trade

Compliance Analyst, Office IV, Antidumping and Countervailing Duty Operations,

"Antidumping Duty Investigation of Raw Honey from Argentina: Selection of Replacement

Mandatory Respondent," (June 16, 2021).

14.     CIPSA also notified Commerce that it would not be participating, and Commerce

subsequently selected NEXCO as the second mandatory respondent.  Memorandum to James

Maeder, Deputy Assistant Sec'y for Antidumping and Countervailing Duty Operations from Eva

Kim, Int'l Trade Compliance Analyst, Office IV, AD/CVD Operations, "Less-Than-Fair-Value

Investigation of Raw Honey from Argentina:  Selection of Additional Mandatory Respondent,"

(June 24, 2021).

15.     Commerce issued its antidumping questionnaire to NEXCO on June 24, 2021 and

requested that NEXCO provide its home market sales, U.S. sales, and COP data.  Letter to

NEXCO S.A. from Robert Bolling, Program Manager, AD/CVD Operations, Office IV (June 24,

2021).  As Argentina experienced high inflation as defined by Commerce during the POI,

Commerce issued NEXCO a "High Inflation" Section D COP questionnaire instead of issuing its

normal Section D COP questionnaire.  *Id.*

16.     From the outset of the investigation, NEXCO explained that it is an exporter and

processor of honey and is not itself a beekeeper, and it thus notified Commerce regarding the

difficulties it would face if Commerce required COP responses from beekeepers.  NEXCO,

along with the Government of Argentina, explained that many of the beekeepers in Argentina are

small, family-run businesses and collecting cost data may prove difficult.  Argentina was also

facing challenges in combatting COVID-19 at the time.  *See* Letter to Deputy Assistant Sec'y for

Policy and Negotiations from the Government of Argentina, "Raw Honey from Argentina,

Brazil, India, Ukraine, and the Socialist Republic of Vietnam – Case No. A-357-823:  Points

addressed in meeting on June 1st," (June 2, 2021); Letter to Sec'y Commerce from Morris,

Manning & Martin, LLP, "Raw Honey from Argentina, Case No. A-357-823: NEXCO's

Response to June 10, 2021 Request for Information," (June 17, 2021); Letter to Sec'y Commerce

from Morris, Manning & Martin, LLP, "Raw Honey from Argentina, Case No. A-357-823:

NEXCO's Notification of Reporting Difficulty – Initial Antidumping Duty Questionnaire

Response," (July 15, 2021).

17.     Accordingly, NEXCO requested that Commerce permit it to report its acquisition

costs of honey from beekeepers instead of requiring beekeepers to respond to COP

questionnaires.  *Id.*

18.     Nevertheless, NEXCO argued that if Commerce determined to obtain beekeeper

cost data instead of using NEXCO's acquisition cost data, it should review NEXCO's list of

beekeepers and select the two largest suppliers by quantity, consistent with the respondent

selection methodology set forth in 19 U.S.C. § 1677f–1(c)(2), the same statutory provision relied

upon by Commerce as the basis for limiting its examination to two exporter mandatory

respondents.  The selection of the largest beekeepers was also consistent with Commerce's

selection of beekeeper suppliers to the mandatory respondents in all prior administrative reviews

of honey from Argentina.  *Id.*

19.     One week later, Commerce issued a letter soliciting comments on the COP

reporting methodology to be used in the AD investigations on raw honey from Argentina, India,

Brazil, and Ukraine.  In its letter, Commerce noted that in some prior agricultural proceedings

where the exporter was not the producer of the subject merchandise, Commerce used the

acquisition costs from the non-affiliated suppliers for the agricultural product input to calculate COP. However, Commerce also noted that in the prior honey from Argentina proceedings, it had selected a certain number of beekeepers to obtain the actual costs associated with the production of honey for purposes of calculating COP. Letter to All Interested Parties from Neal M. Halper, Office Director, E&C, Office of Accounting, "Antidumping Duty Investigations of Raw Honey from India, Argentina, Brazil, and Ukraine: Request for Comments on the Raw Honey Cost of Production Reporting Methodology," (July 22, 2021).

20.     In response to Commerce's request for comments, NEXCO again argued that Commerce should use the exporters' acquisition costs to calculate the COP in these investigations. Letter to Sec'y Commerce from Morris, Manning & Martin, LLP, "Raw Honey from Argentina, Brazil, India, and Ukraine, Case Nos. A-357-823, A-351-857, A-533-903, and A-823-820: Asociación de Cooperativas Argentinas C.L. and NEXCO S.A.'s Response to Request for Comments on Cost of Production Reporting Methodology," (July 29, 2021).

21.     Petitioners filed comments urging Commerce to base the COP in all four market economy AD investigations on the beekeepers' actual cost of producing the honey. Petitioners requested that Commerce issue COP questionnaires to beekeepers that supplied each mandatory respondent and to at least one major middleman that supplied each respondent. Petitioners noted that doing so would be consistent with Commerce's prior antidumping investigation of honey from Argentina. Letter to Sec'y Commerce from Kelley Drye & Warren LLP, "Raw Honey from Argentina – Petitioners' Response to the Commerce Department's Request for Comments Regarding the Raw Honey Cost of Production Reporting Methodology," (July 29, 2021).

22.     Following receipt of these comments, Commerce issued no response but proceeded to select two of NEXCO's beekeepers and one of NEXCO's middlemen and issued

each of them COP questionnaires.  *See* Letter to Beekeeper 1 from Neal M. Halper, Director,

Office of Accounting, "Antidumping Duty Investigation of Raw Honey from Argentina

(NEXCO, S.A.)," (Aug. 10, 2021) ("Beekeeper 1 Questionnaire"); *See* Letter to Middleman from

Neal M. Halper, Director, Office of Accounting, Enforcement and Compliance, "Antidumping

Duty Investigation of Raw Honey from Argentina (concerning NEXCO S.A.)," (Aug. 10, 2021);

*See* Letter to Beekeeper 2 from Neal M. Halper, Director, Office of Accounting, "Antidumping

Duty Investigation of Raw Honey from Argentina (concerning NEXCO S.A.)," (Aug. 19, 2021)

("Beekeeper 2 Questionnaire").  Specifically, Commerce selected NEXCO's second largest

beekeeper ("Beekeeper 1"), the largest beekeeper supplier to NEXCO's third largest middleman

("Beekeeper 2"), and NEXCO's third largest middleman.

23.    Commerce stated in both beekeeper COP questionnaires that "You are selected as

a representative beekeeper and we are soliciting the information requested below to determine

whether the subject merchandise (honey) that you produced was in fact sold in, or to, the United

States at dumped prices during the period of investigation."  Beekeeper 1 Questionnaire at 1;

Beekeeper 2 Questionnaire at 1.

24.    Despite NEXCO's earlier expressed concerns regarding beekeeper COP

responses, Beekeeper 1, and Beekeeper 2, and the middleman each submitted timely responses to

Commerce's COP questionnaires.  Letter to Sec'y Commerce from Morris, Manning & Martin,

LLP, "Raw Honey from Argentina, Case No. A-357-823:  NEXCO S.A.'s First Beekeeper

Section D Questionnaire Response," (Sept. 20, 2021); Letter to Sec'y Commerce from Morris,

Manning & Martin, LLP, "Raw Honey from Argentina, Case No. A-357-823:  NEXCO S.A.'s

Second Beekeeper Section D Questionnaire Response," (Sept. 27, 2021); Letter to Sec'y

Commerce from Morris, Manning & Martin, LLP, "Raw Honey from Argentina, Case No. A-

357-823: NEXCO S.A.'s Middleman Honey Supplier Section D Questionnaire Response," (Sept. 20, 2021).

25.     Commerce subsequently issued several supplemental COP questionnaires to Beekeeper 1 and Beekeeper 2, and the beekeepers submitted timely responses to these questionnaires.  Letter to Sec'y Commerce from Morris, Manning & Martin, LLP, "Raw Honey from Argentina, Case No. A-357-823:  NEXCO S.A.'s Direct Beekeeper Supplemental Section D Questionnaire Response," (Oct. 26, 2021); Letter to Sec'y Commerce from Morris, Manning & Martin, LLP, "Raw Honey from Argentina, Case No. A-357-823:  NEXCO S.A.'s Middleman Supplier and Second Beekeeper Supplemental Section D Questionnaire Response," (Oct. 26, 2021); Letter to Sec'y Commerce from Morris, Manning & Martin, LLP, "Raw Honey from Argentina, Case No. A-357-823:  Second Supplemental Section D Questionnaire Response for NEXCO S.A., {Beekeeper 1}, and {Beekeeper 2}," (Dec. 6, 2021).

26.     On August 25, 2021, NEXCO submitted its initial sections B-D questionnaire responses, including NEXCO's acquisition cost data.  Letter to Sec'y Commerce from Morris, Manning & Martin, LLP, "Raw Honey from Argentina, Case No. A-357-823:  NEXCO S.A.'s Sections B-D Questionnaire Response," (Aug. 25, 2021) ("NEXCO's Initial B-D QR").

27.     As NEXCO's sales quantity to the home market constituted less than five percent of its U.S. sales quantity during the POI, NEXCO, with approval from Commerce, reported its third country market sales to Germany for purposes of determining normal value.  Memorandum to Abdelali Elouaradia, Director, Office IV, AD/CVD Operations, from Eva Kim, Analyst, Office IV, AD/CVD Operations, "Less-Than-Fair-Value Investigation of Raw Honey from Argentina:  Selection of Appropriate Third Country Market," (Aug. 11, 2021).

28.     Although Argentina was experiencing high inflation during the POI, NEXCO's

sales of honey to both Germany and the United States were invoiced and paid in U.S. dollars. NEXCO explained in its Section B and Section C questionnaire responses that Commerce therefore had no basis to depart from its normal methodology of comparing weighted average dollar prices by CONNUM for each market for the POI consistent with the Department's standard price comparison methodology in investigations.  The use of its inflation methodology (which would call for monthly price to price comparisons) would distort the U.S. dollar sales comparisons because the U.S. dollar prices were not and cannot be affected by inflation in Argentina.  NEXCO's Initial B-D QR at B-1, B-29, C-1, C-27 and Exhibits B-1 and C-1.

29.     On November 23, 2021, Commerce published the *Preliminary Determination* of its antidumping duty investigation in the *Federal Register.  Raw Honey From Argentina: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 86 Fed. Reg. 66,531 (Dep't Commerce Nov. 23, 2021) ("*Preliminary Determination*") and accompanying Issues and Decision Memorandum (Dep't Commerce Nov. 17, 2021) ("*Preliminary Determination* IDM").

30.     In the *Preliminary Determination*, Commerce calculated a 7.84 percent estimated weighted-average dumping margin for NEXCO and (1) found that the beekeepers are the actual producers of the subject merchandise but used NEXCO's acquisition costs to calculate the COP, (2) made monthly average price-to-price comparisons between NEXCO's U.S. and German U.S. dollar sales using its inflation methodology, and (3) applied a modified quarterly cost averaging methodology because NEXCO's acquisition costs experienced an increase of over 25 percent during the POI and there was a linkage between the cost of manufacturing changes and the sales prices during the POI.  *Id.*

31.     Even though Commerce stated that the cost data from NEXCO's beekeepers and middleman was fully compliant with their requests, Commerce declined to rely on the beekeeper costs to compute the COP of the honey re-sold by NEXCO.  Rather, Commerce adopted a new methodology without citation to any statute, regulation, or past precedent to support such a methodology.  Commerce used the COP data for raw honey reported by NEXCO's beekeeper suppliers to "test" whether NEXCO's acquisition costs were a "reasonably proxy" for the actual COP of the raw honey sold by NEXCO.  Memorandum to Neal M. Halper, Director, E&C, Office of Accounting from Heidi K. Schriefer, Senior Accountant, "Cost of Production and Constructed Value Calculation Adjustments for the Preliminary Determination – NEXCO S.A.," (Nov. 17, 2021) ("*Preliminary Determination* Cost Calculation Memo").  Commerce applied its affiliated supplier methodology even though these beekeepers and middlemen were not related to NEXCO and raw honey was not an input to the production of honey sold by NEXCO.  The acquisition costs (which included profit) increased dramatically over the period and vastly exceeded the COP of the beekeepers.  *Id.* at Attachments 1-3 and 5.

32.     In the *Preliminary Determination*, Commerce also conducted a full analysis of the cost of production questionnaires submitted by both beekeepers and the middleman.  Through this process, Commerce reviewed the cost calculations and allocations performed by Beekeeper 1 and Beekeeper 2.  *Preliminary Determination* Cost Calculation Memo at 2-3.  Commerce performed various alternative calculations and found that regardless of how expenses were allocated, the costs of Beekeeper 1 and Beekeeper 2 did not result in costs of production that were higher than NEXCO's acquisition costs.  *Id.*  Commerce further stated that "we do not find {Beekeeper 1 and Beekeeper 2's} calculations to be unreasonable."  *Id.*  In recognition of the reasonableness of the beekeeper's calculations, Commerce left open the possibility of using the

beekeeper's cost of production in the *Final Determination*.  *Id.*

33.     Nevertheless, Commerce determined in the *Preliminary Determination* for all four market economy honey investigations that the selection of the largest beekeepers was an inadequate option for obtaining a "representative" COP for the raw honey.  *See Preliminary Determination* IDM at 25-26; *Raw Honey From Brazil: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 86 Fed. Reg. 66,533 (Dep't Commerce Nov. 23, 2021) and accompanying Preliminary Decision Memorandum at 16-18; *Raw Honey from Ukraine: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 86 Fed. Reg. 66,524 (Dep't Commerce Nov. 23, 2021) and accompanying Preliminary Decision Memorandum at 18-20; *Raw Honey from India: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 86 Fed. Reg. 66,528 (Dep't Commerce Nov. 23, 2021) and accompanying Preliminary Decision Memorandum at 16-17.  As a result, Commerce used NEXCO's acquisition costs to calculate the COP.

34.     Besides explaining its standard high inflation methodology, Commerce did not address NEXCO's objections to using monthly sales comparisons in the *Preliminary Determination* instead of POI weighted average sales comparisons when sales to Germany and the United States were in U.S. dollars and not affected by inflation in Argentina.  *Preliminary Determination* IDM at 20.

35.     With regards to its modified quarterly cost methodology, Commerce determined that the factual record supported the usage of a quarterly cost methodology because NEXCO's

acquisition costs showed a significant increase (above 25 percent) during the POI and there was

a linkage between the cost of manufacturing and the sales prices. *Preliminary Determination*

IDM at 23-25. However, Commerce departed from the comparison of *quarterly* prices and costs

and instead applied *monthly* comparisons. Commerce calculated quarterly indexed and

weighted-average raw honey costs, but that cost was then deflated back to each month to derive a

monthly cost. Commerce calculated annual indexed other materials and conversion costs.

Commerce then deflated the annual average costs to the appropriate POI month. *Preliminary*

*Determination* Cost Calculation Memo at 4-6. In effect, the costs were then monthly costs, not

quarterly costs.

36.     Under Commerce's normal quarterly cost methodology, Commerce compares

quarterly average costs to quarterly average prices and utilizes quarterly price-to-price

comparisons when it chooses to use this methodology. This reflects the fact that quarterly

average costs, not annual average costs, are appropriate in certain circumstances. However,

under the modified methodology applied in this investigation, Commerce made monthly

comparisons of costs and also prices.

37.     Shortly after the *Preliminary Determination*, Commerce issued a questionnaire in

lieu of onsite verification to NEXCO, Beekeeper 1, and Beekeeper 2 to verify the information

submitted in previous questionnaire responses. Letter to NEXCO S.A., Beekeeper 1, and

Beekeeper 2 from Robert Bolling, Program Manager, AD/CVD Operations, Office IV,

Enforcement & Compliance (Dec. 6, 2021).

38.     NEXCO, Beekeeper 1, and Beekeeper 2 each submitted timely responses to the in

lieu of verification questionnaire with detailed narratives and dozens of exhibits to demonstrate

that the sales and cost data submitted was accurate and verifiable. As it relates to NEXCO's U.S.

and German sales, NEXCO submitted four sales trace packages – two for the United States and two for German – demonstrating that NEXCO's sales to these two markets were denominated in U.S. dollars. Commerce also requested and received expense invoices from Beekeeper 2 to demonstrate that certain expenses were correctly excluded from that beekeeper's COP. Letter to Sec'y Commerce from Morris, Manning & Martin, LLP, "Raw Honey from Argentina, Case No. A-357-823: Remote Verification Questionnaire Response for NEXCO S.A. and {Beekeeper 1 and Beekeeper 2}," (Dec. 14, 2021). Commerce noted no discrepancies with the in lieu of verification questionnaire responses submitted.

39.    On January 14, 2022, NEXCO submitted its case brief and made the following arguments. Letter to Sec'y Commerce from Morris, Manning & Martin, LLP, "Raw Honey from Argentina, Case No. A-357-823: Asociación de Cooperativas Argentinas C.L.'s and NEXCO S.A.'s Case Brief," (Jan. 14, 2022).

40.    <u>First</u>, NEXCO argued that the beekeeper costs were the best information on the record of actual beekeeper costs. Commerce had selected those beekeeper respondents, sent them questionnaires, and verified the responses and was not justified in disregarding them. Given the beekeepers' COP responses and the statute's clear preference for actual production costs for the subject merchandise, Commerce was required to rely on the information that it had collected. NEXCO further explained that using the beekeepers' COP data would also be in accord with Commerce's prior precedents in previous antidumping proceedings concerning honey in which Commerce selected two or three beekeepers of the mandatory respondents, and, in every administrative review where a sales below cost allegation was initiated on, the beekeeper data was used to determine the COP in the dumping margin calculation. Lastly, with respect to this issue, NEXCO argued that Commerce's justifications for not using beekeeper cost

data were unsupported by the record.  Commerce did select among the largest beekeepers and issued questionnaires to the beekeepers that Commerce itself called "representative."  *Id.* at 4-17.

41.     NEXCO also argued that Commerce's use of the beekeeper costs to conduct a below-cost-test for the acquisition prices paid by NEXCO was not in accordance with the law or regulations, which only authorized such a test in the case of affiliated parties.  Moreover, record evidence confirmed that the acquisition costs were not a reasonable proxy for production costs because acquisition costs were much higher due to beekeeper profit, which is not a cost of production.  Acquisition prices therefore were many times higher than the cost as beekeeper profit was rising along with international prices for honey (hence the quarterly correlation between acquisition costs and exporters' prices).

42.     Second, NEXCO argued that Commerce's inflation methodology did not permit a departure from annual sales comparisons when those prices were not affected by inflation because sales prices in both markets were denominated in U.S. dollars.  NEXCO explained that while acquisition costs required the use of a quarterly cost methodology because there was a dramatic increase (greater than 25 percent over the POI) and linkage between the cost and the sales prices, beekeeper costs did not show such a correlation.  *Id.* at 26-28.

43.     Third, NEXCO argued that if Commerce continues to use acquisition costs for purposes of calculating COP, it must adjust its methodology by using actual quarterly costs and making quarterly sales comparisons.  NEXCO explained that Commerce's modified quarterly cost methodology merely indexed honey costs by quarter and deflated them back to the month for use in the cost test.  However, this methodology did not calculate a true quarterly cost nor did it compare NEXCO's sales on a quarterly basis.  Since NEXCO's sales are all denominated and paid in U.S. dollars and not affected by Argentine Peso inflation, NEXCO argued that it was not

15

appropriate to make monthly sales comparisons in this investigation.  *Id.* at 30-31.

44.     Petitioners also submitted a case brief on January 14, 2022.  Letter to Sec'y Commerce from Kelley Drye & Warren LLP, "Petitioners' Case Brief," (Jan. 14, 2022).

45.     On January 31, 2022, NEXCO submitted a rebuttal brief and refuted Petitioners' arguments regarding Commerce's quarterly cost methodology, NEXCO's direct material cost for invoices booked after the POI, NEXCO's indirect selling expense ratio and other direct sales expenses, and the responses submitted by Beekeeper 1 and Beekeeper 2.

46.     Petitioners also submitted a rebuttal brief on January 31, 2022.  Letter to Sec'y Commerce from Kelley Drye & Warren LLP, "Petitioners' Rebuttal Brief," (Jan. 31, 2022).

47.     On February 25, 2022, Commerce held a meeting with Petitioners in lieu of a hearing to address issues raised by Petitioners in their case and rebuttal briefs.  On March 2, 2022, Commerce held a similar meeting with NEXCO to discuss issues raised by NEXCO in its case and rebuttal briefs.

48.     On April 14, 2022, Commerce published its *Final Determination*.  Commerce calculated a 9.17 percent weighted average dumping margin for NEXCO.  Commerce continued to (1) use NEXCO's acquisition costs to calculate the cost of production, (2) make monthly sales comparisons for NEXCO's U.S.-dollar denominated German and U.S. sales, and (3) apply a so-called quarterly cost methodology that was actually a monthly cost methodology to calculate COP.

49.     On June 10, 2022, Commerce published the antidumping duty order.  *Raw Honey From Argentina, Brazil, India, and the Socialist Republic of Vietnam: Antidumping Duty Orders*, 87 Fed. Reg. 35,501 (Dep't Commerce June 10, 2022).

50.     This appeal followed.

## STATEMENT OF CLAIMS

51.     Commerce's *Final Determination* is unsupported by substantial evidence and is otherwise not in accordance with law in the following respects:

### Count One

52.     Paragraphs 1 through 51 are incorporated by reference as if fully set forth herein.

53.     Commerce's determination to use NEXCO's acquisition costs to calculate COP instead of the verified COP data submitted by two representative beekeepers and one middleman is unsupported by substantial evidence and is otherwise not in accordance with law.  Commerce departed from its established methodology in past honey cases of relying on costs from the beekeepers that supplied the mandatory respondents.  Commerce's use of acquisition costs included profit, which is not an element of the COP.  This difference between beekeeper costs and acquisition prices reflects beekeeper profit, not costs.  Commerce had no legal basis for applying an affiliated supplier test to the sales of honey from the beekeepers to NEXCO.

### Count Two

54.     Paragraphs 1 through 53 are incorporated by reference as if fully set forth herein.

55.     Commerce's determination to make monthly sales comparisons pursuant to its high inflation methodology in an investigation where both the third country market and U.S. market sales were denominated in U.S. dollars and therefore not affected by hyper-inflation is unsupported by substantial evidence and is otherwise not in accordance with law.  Pursuant to 19 U.S.C. § 1677f-1(d)(1), Commerce normally will make POI average sales comparisons during an investigation.  While Argentina experienced high inflation during the POI, none of NEXCO's U.S. or German sales were denominated in Argentine pesos.  Thus, Commerce's determination to apply its high inflation methodology and make monthly sales comparisons when the U.S.

dollar sales prices were not affected by inflation in Argentina is unsupported by substantial evidence and otherwise not in accordance with law.

### Count Three

56.     Paragraphs 1 through 55 are incorporated by reference as if fully set forth herein.

57.     In the alternative, Commerce said it was applying a quarterly cost methodology but it actually failed to compare average quarterly costs and prices, and, therefore, its improper application of the quarterly costs and prices methodology is unsupported by substantial evidence and is otherwise not in accordance with law.  While Commerce made the requisite findings for using a quarterly cost methodology, *i.e.*, that NEXCO's acquisition costs experienced significant cost changes and that there was a linkage between NEXCO's cost of manufacturing and sales prices, Commerce did not follow through and apply the methodology.  As NEXCO's sales to Germany and the United States were in U.S. dollars, there was no need to modify Commerce's quarterly cost methodology by making monthly sales comparisons.

## DEMAND FOR JUDGMENT AND PRAYER FOR RELIEF

WHEREFORE, Plaintiff NEXCO respectfully requests that this Court:

a.   Hold Commerce's *Final Determination* unsupported by substantial record evidence and otherwise not in accordance with law;

b.   Remand the *Final Determination* to Commerce for a redetermination consistent with the judgment and findings of this Court; and

c.   Provide such other relief as this Court deems appropriate.

Respectfully submitted,

/s/ Julie C. Mendoza
Julie C. Mendoza
Donald B. Cameron
R. Will Planert
Brady W. Mills
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey

**MORRIS MANNING & MARTIN LLP**
1401 Eye Street, NW, Suite 600
Washington, D.C. 20005
(202) 216-4817

*Counsel to Plaintiff NEXCO S.A.*

Dated:  August 8, 2022

15288417–1