**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE**

|  |  |  |
|---|---|---|
| NEXCO S.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **NON-CONFIDENTIAL** |
| v. | ) | Proprietary Information of NEXCO |
| | ) | Removed from Pages 4, 6, 29, 30, 44 |
| UNITED STATES, | ) | and Exhibit 1 |
| | ) | |
| Defendant, | ) | Court No. 22-00203 |
| | ) | |
| AMERICAN HONEY PRODUCERS | ) | |
| ASSOCIATION AND SIOUX HONEY | ) | |
| ASSOCIATION, | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |
| | ) | |

**PLAINTIFF NEXCO S.A.'S BRIEF IN SUPPORT OF ITS**
**MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Julie C. Mendoza
Donald B. Cameron
R. Will Planert
Brady W. Mills
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey

November 18, 2022

**MORRIS, MANNING & MARTIN, LLP**
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005
(202) 216-4817

*Counsel to Plaintiff NEXCO S.A.*

## TABLE OF CONTENTS

I.   STATEMENT PURSUANT TO RULE 56.2 ........................................................ 1

II.  ISSUES OF LAW PRESENTED AND REASONS FOR CONTESTING THE
     ADMINISTRATIVE DETERMINATION ........................................................ 2

III. STATEMENT OF FACTS REGARDING THE PROCEDURAL HISTORY OF THE
     INVESTIGATION ........................................................................................... 3

     A.   The *Preliminary Determination* ............................................................ 3

     B.   The *Final Determination* ...................................................................... 4

IV.  SUMMARY OF ARGUMENT ....................................................................... 5

V.   STANDARD OF REVIEW ............................................................................. 7

VI.  ARGUMENT ................................................................................................... 7

     A.   Commerce Erred When It Refused To Base NEXCO's COP On The Verified
          Actual Costs Of Producing Raw Honey From The Beekeepers In Accordance
          With Its Established Practice And The Statute ...................................... 7

          1.   Statement of Relevant Facts........................................................ 7

          2.   Commerce Should Have Computed NEXCO's COP Based On The
               Verified Beekeeper Costs On The Record Or, Alternatively, Deducted
               Beekeeper Profit From The Acquisition Prices ...................... 14

          3.   Commerce May Not Disqualify The Verified Costs Of The Beekeepers
               That It Selected For Examination By Intentionally Disregarding The
               Statutory Selection Process ...................................................... 20

          4.   Commerce's Conclusion That The Beekeeper Costs On The Record Are
               Not "Representative" Is Unsupported By Substantial Evidence ............. 23

          5.   Commerce's Explanation For Why It Selected Beekeepers With The
               Lowest Annual Average Sales Prices To NEXCO Is Nonsensical ......... 25

          6.   Commerce Did Not Use Facts Available As Its Basis For Refusing To Use
               The Beekeepers' Costs ............................................................. 25

          7.   Contrary to Commerce's Determination, The Record Demonstrates That
               NEXCO's Acquisition Prices Are *Not* A Reasonable Proxy For The
               Actual Production Cost Of The Honey Because They Impermissibly
               Include Beekeeper Profit ......................................................... 27

     B.   Commerce's Limitation Of Price-To-Price Comparisons To The Same Month
          Rather Than Based On Quarterly Comparisons And The Use Of Monthly, Not
          Quarterly, Average Costs Is Contrary To Commerce's Quarterly Cost
          Methodology And Otherwise Unsupported By Substantial Evidence ................. 29

          1.   Statement of Relevant Facts...................................................... 29

          2.   The Use Of Monthly Costs And Monthly Price-to-Price Comparisons Is
               Not Supported By Either Commerce's Quarterly Cost Methodology Or
               Its High Inflation Methodology ............................................... 32

C.   If Commerce Uses The COP Of The Beekeepers, Commerce Should Make Price-To-Price Comparisons On A POI Weighted Average Basis Since German And U.S. Prices Are Both Made In U.S. Dollars And Thus Unaffected By Argentine Peso Inflation ...................................................................................... 36

1.   Statement of Relevant Facts ...................................................... 36

2.   Commerce Erred By Not Making Price-To-Price Sales Comparisons On A POI Weighted Average Basis As German And U.S. Prices Were Both Made In U.S. Dollars And Not Subject To Argentine Peso Inflation ..... 36

VII.   CONCLUSION AND RELIEF REQUESTED ................................................ 46

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bosun Tools Co. Ltd. v. United States*,
No. 2021-1929, 2022 WL 94172 (Fed. Cir. Jan. 10, 2022) .....................................................23

*Husteel Co., Ltd. v. United States*,
98 F. Supp. 3d 1315 (Ct. Int'l Trade 2015) ...........................................................................24

*Hyundai Steel Company v. United States*,
19 F.4th 1346 (Fed. Cir. 2021) ...............................................................................................27

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ...................................................................................................................18

*NMB Singapore Ltd. v. United States*,
557 F.3d 1316 (Fed. Cir. 2009) ...............................................................................................18

*Save Domestic Oil, Inc. v. United States*,
357 F.3d 1278 (Fed. Cir. 2004) ...............................................................................................18

*Shanxi Hairui Trade Co., Ltd. v. United States*,
503 F. Supp. 3d 1307 (Ct. Int'l Trade 2021) ..........................................................................23

*Thai Pineapple Canning Industry Corp. v. United States*,
273 F.3d 1077 (Fed. Cir. 2001) ...............................................................................................27

*Torrington Co. v. United States*,
19 CIT 403, 881 F. Supp. 622 (1995) ...............................................................................27, 28

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ..........................................................................................................7

19 U.S.C. § 1677(28) ......................................................................................................................17

19 U.S.C. § 1677b(b)(3) ..................................................................................................14, 16, 27

19 U.S.C. § 1677b(e) ......................................................................................................................27

19 U.S.C. § 1677b(f)(1)(A) ..................................................................................................8, 17, 26

19 U.S.C. § 1677e(a)(1) ..................................................................................................................25

19 U.S.C. § 1677f-1(a)(2) ...............................................................................................................44

19 U.S.C. § 1677f-1(c)(2) .................................................................................. *passim*

19 U.S.C. § 1677f-1(d)(1) ................................................................................37, 38

19 U.S.C. § 1677f-1(d)(2) ......................................................................................38

19 U.S.C. § 1677m(c)(2) .........................................................................................20

**Regulations**

19 C.F.R. § 351.413 ................................................................................................44

19 C.F.R. § 351.414(d)(3) .................................................................................39, 40

**Other Authorities**

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,373 (Dep't
    Commerce May 19, 1997) .................................................................................38

*Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of
    Korea: Notice of Preliminary Results of the Antidumping Duty Administrative
    Review*, 74 Fed. Reg. 46,110 (Dep't Commerce Sept. 8, 2009) ................................40

*Certain Pasta Final Results of the Sixth Administrative Review of the
    Antidumping Duty Order and Determination Not to Revoke in Part*, 69 Fed.
    Reg. 6,255 (Dep't Commerce Feb. 10, 2004) ............................................ 16-17, 18

*Certain Pasta From Italy: Notice of Final Results of Antidumping Duty Changed
    Circumstances Review and Revocation, in Part*, 74 Fed. Reg. 41,120 (Dep't
    Commerce Aug. 14, 2009) ..................................................................................40

*Certain Steel Nails From the People's Republic of China: Preliminary Results of
    the Antidumping Duty Administrative Review and Preliminary Determination
    of No Shipments; 2017-2018*, 84 Fed. Reg. 55,906 (Dep't Commerce Oct. 18,
    2019) ..................................................................................................................22

*Final Determination of Sales at Less Than Fair Value: Canned Pineapple Fruit
    From Thailand*, 60 Fed. Reg. 29,553 (Dep't Commerce June 5, 1995) ..................15

*Final Determination of Sales at Less Than Fair Value: Fresh and Chilled Atlantic
    Salmon from Norway*, 56 Fed. Reg. 7,661 (Dep't Commerce Feb. 25, 1991)..................15, 17

*Final Determination of Sales at Less Than Fair Value: Fresh Kiwifruit from New
    Zealand*, 57 Fed. Reg. 13,695 (Dep't Commerce Apr. 17, 1992) ......................15, 17

*Final Determination of Sales at Less Than Fair Value: Greenhouse Tomatoes
    From Canada*, 67 Fed. Reg. 8,781 (Dep't Commerce Feb. 26, 2002) ....................15

*Honey From Argentina: Final Results of Antidumping Duty Administrative Review*, 69 Fed. Reg. 30,283 (Dep't Commerce May 27, 2004) ............................................ 26

*Honey from Argentina: Final Results of Antidumping Duty Administrative Review and Determination Not to Revoke In Part*, 72 Fed. Reg. 25,245 (Dep't Commerce May 4, 2007) ............................................ 26

*Honey From Argentina: Preliminary Results of Antidumping Duty Administrative Review*, 69 Fed. Reg. 621 (Dep't Commerce Jan. 6, 2004) ............................................ 16

*Honey From Argentina: Preliminary Results of Antidumping Duty Administrative Review*, 76 Fed. Reg. 2,655 (Dep't Commerce Jan. 14, 2011) ............................................ 16

*Honey from Argentina: Preliminary Results of Antidumping Duty Administrative Review and Intent Not to Revoke in Part*, 71 Fed. Reg. 78,397 (Dep't Commerce Dec. 29, 2006) ............................................ 16

*Honey from Argentina: Preliminary Results of Antidumping Duty Administrative Review and Intent Not to Revoke in Part*, 72 Fed. Reg. 73,758 (Dep't Commerce Dec. 28, 2007) ............................................ 16

*Honey from Argentina: Preliminary Results of Antidumping Duty Administrative Review and Intent to Revoke Order in Part*, 73 Fed. Reg. 79,802 (Dep't Commerce Dec. 30, 2008) ............................................ 16

*Honey From Argentina: Preliminary Results of New Shipper Review*, 71 Fed. Reg. 67,850 (Dep't Commerce Nov. 24, 2006) ............................................ 16

*Notice of Final Determination of Sales at Less Than Fair Value: Certain Frozen and Canned Warmwater Shrimp From Brazil*, 69 Fed. Reg. 76,910 (Dep't Commerce Dec. 23, 2004) ............................................ 26

*Notice of Final Determination of Sales at Less Than Fair Value: Stainless Steel Sheet and Strip in Coils From the Republic of Korea*, 64 Fed. Reg. 30,664 (Dep't Commerce June 8, 1999) ............................................ 40

*Notice of Final Determinations of Sales at Less Than Fair Value: Certain Durum Wheat and Hard Red Spring Wheat from Canada*, 68 Fed. Reg. 52,741 (Dep't Commerce Sept 5, 2003) ............................................ 26

*Notice of Final Results of Antidumping Duty Administrative Review: Individually Quick Frozen Red Raspberries From Chile*, 70 Fed. Reg. 6,618 (Dep't Commerce Feb. 8, 2005) ............................................ 15

*Notice of Preliminary Determination of Sales at Less Than Fair Value: Greenhouse Tomatoes From Canada*, 66 Fed. Reg. 51,010 (Dep't Commerce Oct. 5, 2001) ............................................ 17

*Raw Honey From Brazil: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 86 Fed. Reg. 66,533 (Dep't Commerce Nov. 23, 2021)....................30

*Raw Honey from India: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 86 Fed. Reg. 66,528 (Dep't Commerce Nov. 23, 2021)....................30

*Raw Honey from Ukraine: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 86 Fed. Reg. 66,524 (Dep't Commerce Nov. 23, 2021)....................30

Statement of Administrative Action, Uruguay Round Agreements Act, H.R. Doc. No. 316. Vol. 1, 103d Cong. 2d Sess. 656, reprinted in 1994 U.S.C.C.A.N. 4040....................................................................................................22, 37, 38, 39

*Stainless Steel Plate in Coils from Belgium: Final Results of Antidumping Duty Administrative Review*, 73 Fed. Reg. 75,398 (Dep't Commerce Dec. 11, 2008) ........ 29-30, 33

*Stainless Steel Sheet and Strip in Coils from Mexico: Final Results of Antidumping Duty Administrative Review*, 75 Fed. Reg. 6,627 (Dep't Commerce Feb. 10, 2010)....................................................................29, 33

*Stainless Steel Sheet and Strip in Coils From Mexico; Final Results of Antidumping Duty Administrative Review*, 76 Fed. Reg. 2,332 (Dep't Commerce Jan. 13, 2011) ....................................................................33, 40

*Welded Carbon Steel Standard Pipe and Tube Products From Turkey: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015–2016*, 82 Fed. Reg. 49,179 (Dep't Commerce Oct. 24, 2017) ................................................38

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE**

| | |
|---|---|
| NEXCO S.A., )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES, )<br><br>Defendant, )<br><br>AMERICAN HONEY PRODUCERS<br>ASSOCIATION AND SIOUX HONEY<br>ASSOCIATION, )<br><br>Defendant-Intervenors. ) | **NON-CONFIDENTIAL**<br>Proprietary Information of NEXCO<br>Removed from Pages 4, 6, 29, 30, 44<br>and Exhibit 1<br><br>Court No. 22-00203 |

**PLAINTIFF NEXCO S.A.'S BRIEF IN SUPPORT OF**
**ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD**

In accordance with Rule 56.2 of the Rules of this Court, and the Scheduling Order, ECF

No. 22, Plaintiff NEXCO S.A. ("NEXCO" or "Plaintiff") files this brief in support of its Rule

56.2 Motion For Judgment Upon the Agency Record.  As discussed below, the U.S. Department

of Commerce's ("Commerce") *Final Determination* is unsupported by substantial evidence and

otherwise not in accordance with law.

## I.   STATEMENT PURSUANT TO RULE 56.2

The administrative determination under review is Commerce's *Final Determination* in

the antidumping duty ("AD") investigation of raw honey ("subject merchandise") from

Argentina.  *Raw Honey From Argentina: Final Determination of Sales at Less Than Fair Value*

*and Final Affirmative Determination of Critical Circumstances*, 87 Fed. Reg. 22,179 (Dep't

1

Commerce Apr. 14, 2022) ("*Final Determination*") (PR Doc. 444),[1] and accompanying Issues and Decision Memorandum ("*Final Determination* IDM"), (PR Doc. 438).

## II.  ISSUES OF LAW PRESENTED AND REASONS FOR CONTESTING THE ADMINISTRATIVE DETERMINATION

The issues of law presented include the following:

1.      Whether Commerce's determination to use NEXCO's acquisition prices for raw honey (prices paid by NEXCO to its beekeepers)[2] to calculate the cost of production of the merchandise in preference to the verified COP of two of the largest beekeeper suppliers to NEXCO and a middleman is unsupported by substantial evidence and is otherwise not in accordance with law?

2.      Whether Commerce's implementation of its quarterly sales and cost comparison methodology in a manner that restricted sales comparisons to a month and  averaged costs monthly, rather than quarterly, is unsupported by substantial evidence and is otherwise not in accordance with law?

3.      Whether Commerce's determination to restrict price-to-price comparisons to the same month on the basis that NEXCO's costs were subject to high inflation when both the third country market and U.S. market sales were denominated in U.S. dollars is unsupported by substantial evidence and is otherwise not in accordance with law?

---

[1] Citations to the administrative record shall be to the public or confidential record document number ("PR Doc." or "CR Doc.") followed by the page or exhibit number.

[2] Throughout this brief, NEXCO refers to its purchases of honey from beekeepers as the "acquisition prices."

III.   **STATEMENT OF FACTS REGARDING THE PROCEDURAL HISTORY OF THE INVESTIGATION**

On May 18, 2021, Commerce initiated an antidumping duty ("AD") investigation of raw honey from Argentina. *Raw Honey From Argentina, Brazil, India, Ukraine, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations*, 86 Fed. Reg. 26,897 (Dep't Commerce May 18, 2021), PR Doc. 60. Commerce's period of investigation ("POI") for this antidumping duty investigation was April 1, 2020 – March 31, 2021. *Id.* On June 4, 2021, Commerce limited its examination of mandatory respondents to two exporters out of a total of twenty-four exporters. CR Doc. 33 (PR Doc. 71). The two exporters selected were Asociación De Cooperativas Argentinas Cooperativa Limitada ("ACA") and Industrias Haedo S.A. ("Haedo"), and they accounted for the largest volume of the subject merchandise from Argentina in accordance with 19 U.S.C. § 1677f–1(c)(2)(B). *Id.* After Haedo and another selected exporter notified Commerce that they would not be participating in the investigation, Commerce selected the next largest mandatory respondent — NEXCO. PR Doc. 101. Commerce also selected three unaffiliated suppliers of raw honey to NEXCO, two beekeepers and one middleman, and requested that they provide cost of production ("COP") questionnaire responses detailing their costs of producing raw honey. CR Doc. 130 (PR Doc. 165), CR Doc. 131 (PR Doc. 166), and CR Doc. 166 (PR Doc. 185). Commerce similarly selected two beekeepers and a middleman who supplied raw honey to the other mandatory respondent, ACA. CR Doc. 128 (PR Doc. 163); CR Doc. 129 (PR Doc. 164); and CR Doc. 167 (PR Doc. 186).

A.   The *Preliminary Determination*

On November 23, 2021, Commerce published the *Preliminary Determination* of its AD investigation in the *Federal Register* and issued its Preliminary Decision Memorandum. PR Docs. 365 and 377. In the *Preliminary Determination*, Commerce calculated a 7.84 percent

estimated weighted-average dumping margin for NEXCO.  *Id.*  Because NEXCO had no home market sales, Commerce based normal value on NEXCO's third country exports of raw honey to Germany.  PR Doc. 365 at 22.  In the *Preliminary Determination*, Commerce determined that the beekeepers,[3] not NEXCO, were the actual producers of the raw honey under investigation but nevertheless used NEXCO's acquisition prices paid to the beekeepers, rather than the actual COP of the beekeepers, to calculate the COP of the honey exported by NEXCO to Germany.  *Id.* at 25-27.  Commerce calculated the dumping margin by comparing the weighted average monthly price of NEXCO's sales to Germany (which were made in U.S. dollars) to the weighted average monthly price of NEXCO's U.S. sales using its high inflation methodology.  *Id.* at 20-21. Additionally, Commerce stated that it was applying its quarterly cost averaging methodology because NEXCO's quarterly average raw honey acquisition prices, after adjusting for inflation, exhibited an increase of **[    ]** percent between the lowest and highest quarter during the POI, and there was a linkage between the acquisition price changes and the export sales price changes.  *Id.* at 23-25; CR Doc. 646 (PR Doc. 373) at 4.

      **B.**      **The *Final Determination***

On April 14, 2022, Commerce published its *Final Determination* and issued its Issues and Decision Memorandum.  PR Docs. 438 and 444.  Commerce calculated a 9.17 percent weighted average dumping margin for NEXCO.  *Id.*  Commerce continued to follow the same methodology as in the *Preliminary Determination*.  The increase in the margin was due to Commerce's changes in the treatment of certain selling expenses and revisions to NEXCO's reported direct materials costs (acquisition prices) as a result of corrections made in

---

[3] Throughout this brief, unless a different meaning is indicated, references to "beekeepers" shall include both beekeepers and middlemen.

supplemental questionnaire responses.  PR Doc. 438 at 6.  Commerce made no other material

changes to its *Preliminary Determination* methodology.

## IV.    SUMMARY OF ARGUMENT

1.    In calculating the COP of the raw honey NEXCO exported, Commerce used the

acquisition prices that NEXCO paid to the unaffiliated beekeepers who supplied the raw honey

to NEXCO, rather than the actual COP of the beekeepers.  Commerce solicited, obtained, and

verified actual COP information from two beekeepers and one middleman who supplied honey

to NEXCO, but declined to use that information to calculate COP.  Commerce's decision to use

the acquisition prices departed from its well-established policy of using actual beekeeper costs to

compute COP and departed from the statutory requirement to use the producer's cost

information.  Acquisition prices also dramatically overstated the COP of producing the honey

NEXCO exported because the acquisition prices included profit, which is not an element of

COP.  Commerce's *Final Determination* fails to provide any reasoned justification for its

departure from its established practice or the statute other than conclusory assertions that the

beekeeper data would not be "representative," and that acquisition prices are a "reasonable"

proxy for using beekeeper costs.  PR Doc. 438 at 12.  Record evidence, however, establishes that

the acquisition prices are more than double the verified actual beekeeper costs and vastly

overstate the actual COP of the raw honey because they include beekeeper profit.  The Court

should hold that Commerce must base COP on the actual, verified beekeeper cost data for the

honey supplied to NEXCO or, alternatively, that Commerce must adjust the acquisition prices by

subtracting beekeeper profits.

2.    Commerce's normal dumping margin methodology in investigations based on the

statute is to calculate COP on a weighted-average basis for the full POI.  However, where, as

here, Commerce finds that costs have increased by 25 percent or more between quarters,

Commerce will instead calculate COP on a quarterly average basis, and will also perform price-to-price comparisons on a quarterly basis. In this investigation, Commerce determined that real costs (acquisition prices) after accounting for inflation increased by [    ] percent and that its quarterly cost methodology therefore applied. In implementing that methodology, Commerce erred in using monthly, not quarterly average costs to conduct the sales-below-cost test. Commerce also erred by restricting sales price comparisons (*i.e.* the comparison of the German sales that passed the cost test to U.S. sales) to sales made in the same calendar month. This restriction on sales comparisons improperly prevented quarterly averaged U.S. sales to be matched to quarterly averaged third country prices, forcing those U.S. sales to be matched to constructed value ("CV").

Commerce sought to defend its monthly cost and price matching methodology with reference to the need to adjust costs for high inflation in Argentina. Where high inflation is present, Commerce adjusts costs denominated in local currency for inflation on a monthly basis. However, once Commerce had indexed the Argentine Peso-denominated COP (*i.e.* acquisition prices) for inflation, the costs were stated on a constant currency basis and should then have been averaged over the quarter to arrive at a quarterly cost. Commerce was also without justification for restricting sales price comparisons to the same month, instead of comparing sales prices on a quarterly-average basis as the quarterly cost methodology calls for. Normal value was based on NEXCO's third country sales to Germany, which were made in U.S. dollars and thus unaffected by Argentine Peso inflation. Thus, German sales passing the cost test should have been averaged on a quarterly basis and compared to U.S. dollar sales prices within the same quarter.

3. If the Court finds that Commerce should have used the COP of the beekeepers or should have deducted profit from beekeeper costs, then the COP does not vary by more than 25

percent, after adjusting for inflation. Hence, the quarterly cost methodology does not apply. The Court should direct Commerce on remand to make price-to-price comparisons on a POI weighted average basis. Commerce's normal practice in investigations is to make sales price comparisons on a POI-average basis, consistent with the requirements of the statute and its regulations. Because NEXCO had no home market sales, Commerce determined to base normal value on NEXCO's third country sales to Germany. Because those sales to Germany are denominated in U.S. dollars, the U.S. dollar prices were unaffected by the inflation of the Peso in Argentina, and there was no reason to restrict sales comparisons to the month. Accordingly, sales to Germany that are found to be above COP should be compared to NEXCO's U.S. market sales prices on a POI weighted average basis.

## V.  STANDARD OF REVIEW

In reviewing a challenge to Commerce's determination in an AD investigation, the Court "shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## VI.  ARGUMENT

### A.  Commerce Erred When It Refused To Base NEXCO's COP On The Verified Actual Costs Of Producing Raw Honey From The Beekeepers In Accordance With Its Established Practice And The Statute

#### 1.  Statement of Relevant Facts

NEXCO is an Argentine company that exports raw honey to the United States and third country markets. NEXCO has no home market sales. CR Doc. 39 (PR Doc. 92). NEXCO does not harvest raw honey as a beekeeper. CR Docs. 66-68 (PR Doc. 140) at A-8. Rather, NEXCO purchases raw honey from hundreds of unaffiliated beekeepers and middlemen (who in turn are supplied by beekeepers) from throughout Argentina. *Id.* at Exhibit A-11. Prior to exportation,

NEXCO performs certain processing steps such as homogenization, heating, filtering, and packing but otherwise sells the merchandise in the same condition in which it obtains it from the beekeepers.  CR Doc. 58 (PR Doc. 126) at 3-4.  After reviewing the processing performed by NEXCO, Commerce determined in the *Preliminary Determination* that NEXCO and the other respondent exporter are not the "producers" within the meaning of 19 U.S.C. § 1677b(f)(1)(A) of the raw honey they sold.  PR Doc. 365 at 25.  In such cases, Commerce's normal policy is to base an exporter's COP on the costs of the producers or growers of the subject merchandise (*i.e.*, the beekeepers).  CR Doc. 801 (PR Doc. 420) at 7-13.  Here, Commerce solicited and verified COP data from among the largest beekeeper suppliers to NEXCO.  PR Doc. 365 at 26; PR Doc. 438 at 2 and 12.  However, Commerce ultimately determined to base NEXCO's COP on the acquisition prices paid by NEXCO to the beekeepers on the grounds that (1) Commerce had experienced difficulties in obtaining usable COP data from beekeepers in a previous antidumping proceeding on honey from Argentina, and (2) the large number of beekeepers prevented Commerce from selecting beekeeper respondents who would be sufficiently "representative" of the beekeepers supplying NEXCO.  PR Doc. 438 at 9-13.

The Argentine honey industry has been comprised of thousands of individual beekeepers for more than 30 years.  This was true during the previous investigation of *Honey from Argentina* conducted in 2001 and during the investigation that is at issue in this appeal.  PR Doc. 438 at 9-10.  Between these two investigations, the number of beekeepers in Argentina, while still large, declined from 25,000 to 15,500.  *Id.* at 9-10.  Argentine beekeepers and exporters of honey are almost 100 percent dedicated to sales in export markets.  PR Docs. 1-17, Volume I, at 30; CR Doc. 38 (PR Doc. 91) at Attachment 1; CR Doc. 39 (PR Doc. 92) at Attachment 1.  There is very little honey commercially sold in the domestic Argentine market.  *Id.*  Commerce found that the

prices NEXCO paid for honey to its beekeepers reflected the export market prices of honey and that the acquisition prices and exporters' re-sales prices were tightly correlated.  CR Doc. 646 (PR Doc. 373) at 4-5 and Attachment 5.  The COP of the beekeepers supplying NEXCO selected by Commerce for examination was less than half the value of acquisition prices since acquisition prices included the beekeepers' profit.  CR Doc. 646 (PR Doc. 373) at Attachments 1, 3, and 6.

In antidumping cases involving agricultural products, where the respondent exporter is not the grower of the agricultural product under investigation, Commerce has an established practice of collecting and using actual production costs of the unaffiliated growers to calculate the exporter's COP.  CR Doc. 801 (PR Doc. 420) at 7-13 (and cases cited therein).  As noted, there was a previous AD case on raw honey from Argentina in 2001 and multiple administrative reviews of the resulting AD order were conducted between 2002 and 2012.  *Id.* at 10-13 (and cases cited therein).  In none of those previous proceedings did Commerce use the exporters' acquisition prices to calculate COP.  Rather, in all of the *Honey from Argentina* administrative reviews where Commerce initiated a sales-below-cost allegation,[4] Commerce issued beekeeper COP questionnaires to the beekeeper suppliers to the exporters for the largest volume that Commerce could reasonably examine.  *Id.*  And where it received usable responses from the beekeepers, it used them to compute the exporters' COP.

NEXCO explained to Commerce that it was not a beekeeper, but that, because it performs some processing of the raw honey prior to export, Commerce should treat NEXCO as the producer of the subject merchandise, use NEXCO's raw honey acquisition prices in computing

---

[4] The statute prior to the Trade Preferences Extension Act of 2015 required an allegation of sales-below-cost to be made before Commerce would investigate a producer/exporter's COP. With the enactment of the Trade Preference Extension Act of 2015, Commerce automatically investigates a producer/exporter's COP.

NEXCO's COP, and not require COP responses from NEXCO's unaffiliated beekeepers who had limited financial records.  *See* CR Doc. 58 (PR Doc. 126); PR Doc. 148; CR Doc. 36 (PR Doc. 89).  NEXCO argued that if Commerce did not find it to be a producer of honey and determined not to rely on acquisition prices, then it should select NEXCO's largest beekeepers consistent with the respondent selection methodology set forth in 19 U.S.C. § 1677f–1(c)(2) and Commerce's prior practice under the earlier AD order on *Honey from Argentina*.  CR Doc. 58 (PR Doc. 126) at 7-9.

Commerce issued a letter to parties soliciting comments on the COP reporting methodology to be used in the AD investigations on raw honey from Argentina, India, Brazil, and Ukraine.  PR Doc. 137.  Petitioners filed comments urging Commerce to base the COP in all four market economy AD investigations on the beekeepers' actual cost of producing the honey. PR Doc. 150.  Petitioners requested that Commerce issue COP questionnaires to beekeepers that supplied each mandatory respondent and to at least one major middleman that supplied each respondent.  *Id.*  Petitioners noted that doing so would be consistent with Commerce's prior AD investigation of honey from Argentina.  *Id.*  NEXCO argued that it should rely on acquisition prices for the reasons stated in its prior submissions.  PR Doc. 148.

Following receipt of these comments, Commerce selected two of the largest beekeeper suppliers to NEXCO and one of the largest middlemen suppliers to NEXCO and issued each of them COP questionnaires.  *See* CR Doc. 130 (PR Doc. 165); CR Doc. 131 (PR Doc. 166); CR Doc. 166 (PR Doc. 185).  For reasons that were not clarified at the time, Commerce selected NEXCO's second largest beekeeper ("Beekeeper 1") although the difference in volumes between the first and second beekeeper was not significant.  *Compare* CR Doc. 36 (PR Doc. 89) at Exhibit 3 *with* CR Doc. 130 (PR Doc. 165).  Commerce also selected NEXCO's third largest

middleman, and the largest beekeeper supplier to that middleman ("Beekeeper 2").  *Compare* CR Doc. 36 (PR Doc. 89) at Exhibit 3 *with* CR Doc. 131 (PR Doc. 166) and CR Doc. 166 (PR Doc. 185).  Prior to selecting the second beekeeper, Commerce requested that the selected middleman supplier to NEXCO identify its top five largest beekeepers.  CR Doc. 131 (PR Doc. 166) at 2.  If Beekeeper 2 had supplied NEXCO directly, it would have been NEXCO's largest beekeeper supplier.  *Compare* CR Doc. 36 (PR Doc. 89) at Exhibit 3 *with* CR Doc. 143 (PR Doc. 178) at Attachment 1.  Commerce did not issue any producer respondent selection memorandum or otherwise explain the legal or factual support for its beekeeper respondent selection process.

Commerce's beekeeper COP questionnaires, however, informed the beekeeper respondents that "You are s*elected as a representative beekeeper* and we are soliciting the information requested below to determine whether the subject merchandise (honey) that you produced was in fact sold in, or to, the United States at dumped prices during the period of investigation."  Beekeeper 1 Questionnaire, CR Doc. 130 (PR Doc. 165) at 1 (emphasis added); Beekeeper 2 Questionnaire, CR Doc. 166 (PR Doc. 185) at 1.  Commerce warned the beekeepers of the consequences for failing to respond to the questionnaires.  *Id.*  The "Section D {questionnaire} for Argentina Beekeepers Cost of Production" was, in all respects, virtually identical to the questionnaire sent in administrative reviews conducted under the previous AD order on *Honey from Argentina*.  CR Doc. 801 (PR Doc. 420) at 16.

Commerce issued to the beekeepers two supplemental questionnaires which were responded to in full.  *See* PR Doc. 365 at 6; *see also* CR Docs. 678-744 (PR Docs. 398-400) ("Verification QR").  In the *Preliminary Determination*, Commerce found no discrepancies in the responses and concluded that the beekeeper suppliers to NEXCO it had selected were fully cooperative and provided information to the best of their ability in terms of allocations between

11

beekeeper activities and other business activities.  PR Doc. 365; CR Doc. 646 (PR Doc. 373) at 2-3.

Despite these findings, Commerce did not use the beekeepers' costs to compute the COP of the honey exported by NEXCO in the *Preliminary Determination*.  Instead, Commerce asserted that it had not solicited the beekeeper costs for the purposes of calculating the exporters' COP, but rather, only for the limited purpose of using the beekeeper costs to validate the "reasonableness" of substituting exporters' acquisition prices in the place of the beekeeper COP. PR Doc. 365 at 25-26; CR Doc. 646 (PR Doc. 373) at 2-3.  According to Commerce, as long as NEXCO's acquisition prices were above the beekeeper costs on the record, they were a "reasonable proxy" for the actual COP of the raw honey from all unaffiliated suppliers to NEXCO.  PR Doc. 365 at 26; CR Doc. 646 (PR Doc. 373) at 3.  Commerce further asserted that for this purpose, Commerce had not followed the producer respondent selection process provided for in the statute, but rather had selected the beekeepers and middlemen who had the lowest average unit sales prices to NEXCO over the POI.  PR Doc. 365 at 26; CR Doc. 646 (PR Doc. 373) at 2.

In defending its decision to base COP on NEXCO's acquisition prices, Commerce cited difficulties in obtaining usable beekeeper cost data in the past investigation and reviews of *Honey from Argentina*.  PR Doc. 438 at 9-11.  Commerce also determined that due to the large number and dispersed nature of the beekeepers in Argentina, a "representative" beekeeper COP would be "unattainable" under either of the respondent selection methodologies provided for in 19 U.S.C. § 1677f-1(c)(2)—selecting the largest beekeepers or statistical sampling.  PR Doc. 365 at 25; PR Doc. 438 at 9-11.

In its case and rebuttal briefs to Commerce following the *Preliminary Determination*, NEXCO pointed out that the beekeepers had fully cooperated and provided useable cost responses.  CR Doc. 801 (PR Doc. 420) at 5-7; CR Doc. 806 (PR Doc. 427) at 32-54.  These responses confirmed that acquisition prices were clearly *not* an appropriate surrogate for beekeeper costs; acquisition prices were in fact substantially higher than the verified costs of the beekeepers because they included a substantial profit element.  CR Doc. 801 (PR Doc. 420) at 17 and 32-33.  Depending on the month analyzed, acquisition prices were twice or even three times higher than the beekeeper costs.  CR Doc. 646 (PR Doc. 373) at Attachments 1, 3, and 6. Acquisition prices substantially overstated the actual COP of the raw honey that NEXCO exported.  NEXCO pointed out that the beekeepers' sales prices, *i.e.*, NEXCO's acquisition prices, increased dramatically over the period in line with rising honey prices in international markets.  CR Doc. 801 (PR Doc. 420) at 17 and 32-33.  Beekeepers simply increased their profit on the sales to the exporters, and it was this profit that was driving the difference between the COP and the sales prices of the beekeepers.  *Id.*

In the *Final Determination*, Commerce continued to use acquisition prices to calculate the COP and continued to rely on the representative beekeepers' production costs to prove the "reasonableness" of substituting acquisition prices for the actual beekeepers' COP.  PR Doc. 438 at 8-14 and 25.  Commerce again found nothing wrong with the beekeepers' cost responses, which had been subject to verification in between the *Preliminary Determination* and the *Final Determination*.  *Id.* at 2 and 66-74.  In fact, Commerce rejected Petitioners' claim that adverse facts available should be applied to the beekeepers that supplied cost responses.  *Id.* at 66-74. Commerce held that it was able to confirm the costs reported by obtaining reconciliations and other documents kept in the ordinary course of business.  *Id.*

**2. Commerce Should Have Computed NEXCO's COP Based On The Verified Beekeeper Costs On The Record Or, Alternatively, Deducted Beekeeper Profit From The Acquisition Prices**

Commerce's use of acquisition prices rather than actual, verified costs of the beekeeper respondents represents a 180-degree turn away from its established practice in the previous *Honey from Argentina* proceeding and from its practice in agricultural cases generally. In every administrative review under the earlier *Honey from Argentina* AD order in which a sales-below-cost investigation was initiated, Commerce used beekeeper costs to calculate the COP of the honey exported by the respondents. Commerce here not only broke with its past practice, but it refused to use verified beekeepers' cost responses which were taken directly from the books and records of the beekeepers. Commerce also shrugged off the fact that acquisition prices included profit, a cost element that should not be included in the calculation of the cost of production. *See* 19 U.S.C. § 1677b(b)(3). At a minimum, if Commerce used the acquisition prices, it should have deducted profit from them.

Commerce claimed that its break from past practice and the statute could not be avoided because its limited resources and the "vast number" of beekeepers meant that Commerce was unable to select a "representative number" of beekeeper respondents. PR Doc. 438 at 12. Commerce did not elaborate on how many beekeepers would have been sufficient or how it would determine the representativeness of the beekeepers it selected. On this basis, Commerce excused itself from the obligation to follow the statutory requirements for the selection of respondents. *See* 19 U.S.C. § 1677f-1(c)(2).

14

a. **In Cases Involving Agricultural Products Generally, And, In** *Honey From Argentina* **In Particular, Commerce's Longstanding Practice Is To Use The Actual Production Costs Of The Unaffiliated Growers/Keepers To Calculate The COP Of The Exporter**

In AD cases involving agricultural products where the respondent exporter is not the grower (or keeper) of the agricultural product under investigation, Commerce has a well-established practice of collecting and using cost data from the unaffiliated growers to calculate the COP. *See* CR Doc. 801 (PR Doc. 420) at 8-13 (citing *Final Determination of Sales at Less Than Fair Value: Fresh and Chilled Atlantic Salmon from Norway*, 56 Fed. Reg. 7,661, 7,672 (Dep't Commerce Feb. 25, 1991) ("*Salmon from Norway*"); *Final Determination of Sales at Less Than Fair Value: Fresh Kiwifruit from New Zealand*, 57 Fed. Reg. 13,695, 13,696 (Dep't Commerce Apr. 17, 1992) ("*Kiwifruit from New Zealand*"); *Final Determination of Sales at Less Than Fair Value: Greenhouse Tomatoes From Canada*, 67 Fed. Reg. 8,781 (Dep't Commerce Feb. 26, 2002) and accompanying Issues and Decision Memorandum at Comment 7; *Notice of Final Determination of Sales at Less Than Fair Value: Live Cattle From Canada*, 64 Fed. Reg. 56,739 (Dep't Commerce Oct. 21, 1999)). Conversely, in those agricultural product cases where the exporter significantly processed the product under investigation, Commerce's practice is to treat the product purchased from the grower as a raw material in the production of the processed agricultural product. In those cases, Commerce's practice is to compute COP as the sum of the price paid to the unaffiliated grower plus the actual processing costs of the exporter. *See e.g.*, *Notice of Final Results of Antidumping Duty Administrative Review: Individually Quick Frozen Red Raspberries From Chile*, 70 Fed. Reg. 6,618 (Dep't Commerce Feb. 8, 2005) and accompanying Issues and Decision Memorandum at Comment 1; *Final Determination of Sales at Less Than Fair Value: Canned Pineapple Fruit From Thailand*, 60 Fed. Reg. 29,553, 29,561 (Dep't Commerce June 5, 1995).

15

With regard to honey in particular, in every previous administrative review and new shipper review of *Honey from Argentina* involving a sales-below-cost investigation, Commerce based COP on the actual production costs of the selected beekeepers that supplied the mandatory respondents.  In the first review, Commerce selected five beekeepers and one middleman to each mandatory respondent, and, in subsequent administrative reviews, Commerce selected two or three unaffiliated beekeepers and one middleman to each mandatory respondent and required them to respond to COP questionnaires.  In each of those reviews, Commerce relied on the questionnaire responses of the beekeepers for purposes of the calculation of COP under 19 U.S.C. § 1677b(b)(3).  *See Honey From Argentina: Preliminary Results of Antidumping Duty Administrative Review*, 69 Fed. Reg. 621, 624 (Dep't Commerce Jan. 6, 2004); *Honey from Argentina: Preliminary Results of Antidumping Duty Administrative Review and Intent Not to Revoke in Part*, 71 Fed. Reg. 78,397, 78,400 (Dep't Commerce Dec. 29, 2006); *Honey From Argentina: Preliminary Results of New Shipper Review*, 71 Fed. Reg. 67,850, 67,852 (Dep't Commerce Nov. 24, 2006); *Honey from Argentina: Preliminary Results of Antidumping Duty Administrative Review and Intent Not to Revoke in Part*, 72 Fed. Reg. 73,758, 73,762 (Dep't Commerce Dec. 28, 2007); *Honey from Argentina: Preliminary Results of Antidumping Duty Administrative Review and Intent to Revoke Order in Part*, 73 Fed. Reg. 79,802, 79,807 (Dep't Commerce Dec. 30, 2008); *Honey From Argentina:  Preliminary Results of Antidumping Duty Administrative Review*, 76 Fed. Reg. 2,655 (Dep't Commerce Jan. 14, 2011).

Even in non-agricultural cases, Commerce has confirmed its established practice to use the actual producer's cost of production, not acquisition prices, in cases involving unaffiliated sales to resellers.  *See Notice of Final Results of the Sixth Administrative Review of the Antidumping Duty Order and Determination Not to Revoke in Part*, 69 Fed. Reg. 6,255 (Dep't

Commerce Feb. 10, 2004), and accompanying Issues and Decision Memorandum at Comment 42 ("*Pasta from Italy*").

### b.  Commerce's Established Practice Is Based On The Statutory Language

The statute states that costs should be "based on the records of the exporter or producer of the merchandise."  19 U.S.C. § 1677b(f)(1)(A).  The statute then defines exporter or producer as "both the exporter of the subject merchandise and the producer of the same subject merchandise to the extent necessary to accurately calculate the total amount incurred and realized for costs."  19 U.S.C. § 1677(28).  In this case, Commerce held that the beekeepers were the producers of subject merchandise.  PR Doc. 365 at 25.  Commerce has previously explained that "it is necessary to use the producer's costs of production to accurately calculate the total costs and expenses incurred in producing subject merchandise. . . . An acquisition price for a finished product does not translate into a cost of production."  *Pasta from Italy*, Issues and Decision Memorandum at Comment 42.  Commerce has required unaffiliated suppliers of subject merchandise to the mandatory respondents to provide such COP information.  *See Salmon from Norway*, 56 Fed. Reg. at 7,672 (requiring salmon farmers who sold salmon to the mandatory respondent exporters to provide COP information and using the information provided to calculate COP); *Kiwifruit from New Zealand*, 57 Fed. Reg. at 13,696 (requiring Kiwi growers that supplied mandatory respondent exporters to provide COP information and using the information provided to calculate COP); *Notice of Preliminary Determination of Sales at Less Than Fair Value: Greenhouse Tomatoes From Canada*, 66 Fed. Reg. 51,010 (Dep't Commerce Oct. 5, 2001) (requiring tomato growers who supplied the mandatory respondent exporters to provide COP information and using the information provided to calculate COP).

### c. Commerce Departed From The Statute And Its Practice Without An Adequate Explanation

Commerce expressly acknowledged the statutory requirement and its practice of using the costs of the producer or grower of the merchandise and its applicability to the instant investigation.  In the *Final Determination*, Commerce explained that

> Over time, Commerce has come to interpret this section of the statute to mean that 'it is necessary to use the producer's costs of production to accurately calculate the total costs and expenses incurred in producing subject merchandise' and further that '{a}n acquisition price for a finished product does not translate into a cost of production.' Rather ''cost of production,' as used in section 773(b)(1) of the Act, means the cost to produce such merchandise, not the cost of purchasing such merchandise.'

PR Doc. 438 at 9 (citing *Pasta from Italy*).

Commerce nevertheless departed from its practice, concluding without elaboration that the use of acquisition prices "complies with the relevant statutory provision."  *Id.* at 8.  When an agency departs from its practice, it "is obligated to supply a reasoned analysis for the change." *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983).  Applying this administrative law principle to cases before Commerce, the Federal Circuit has explained that "if Commerce has a routine practice for addressing like situations, it must either apply that practice or provide a reasonable explanation as to why it departs therefrom."  *Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283-84 (Fed. Cir. 2004); *see also NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1328 (Fed. Cir. 2009).  Commerce departed from its past, consistent practice here and also failed to provide a reasonable explanation as to why it decided to depart therefrom.

### d. Commerce's Use Of NEXCO's Acquisition Prices To Calculate The COP Of The Honey Exported By NEXCO Is An Impermissible Departure From Its Established Practice And The Statute

Commerce failed to adequately explain how its reliance on acquisition prices could be squared with its longstanding interpretation of the statute, which references the costs of production and the "producer" of subject merchandise.[5]  Instead of elaborating on the basis for its new interpretation of the statute, Commerce argued that the problems in the past with collecting adequate beekeeper information led it to conclude that it would be unable to obtain reliable beekeeper COP data in this investigation.  PR Doc. 438 at 10-13.  Commerce also cited the fact that it was unable to obtain representative beekeeper data because it could not select a sufficient number of producer respondents, so it could not comply with its past practice or the statute.  *Id*.  On this basis, Commerce explained that it decided to use acquisition prices instead.

Commerce discusses the difficulties encountered in obtaining and using beekeeper costs in the previous *Honey from Argentina* proceedings:[6]

> Based on past case precedent for honey, Commerce normally would determine the COP of the honey purchases using the actual COP of the beekeepers and middlemen suppliers. However, because of the significant problems encountered in prior honey cases, *the similar facts that are present on this record*, and the comments submitted by the respondents at the beginning of the investigation, Commerce determined it would be more appropriate to consider the alternative of relying on the acquisition costs as a proxy of the honey COP.

---

[5]  In a footnote, Commerce asserts once that acquisition prices "were the only facts available cost information on the record."  PR Doc. 438 at 25.  However, the record does not support Commerce's claim since verified beekeeper cost data for NEXCO's beekeepers was on the record and found to be usable cost data by Commerce.  Commerce specifically rejected the use of "adverse facts available" for NEXCO's beekeepers when disputing Petitioners' argument that Commerce apply adverse facts available.  *Id.* at 66-74.

[6] This line of reasoning, if followed in other cases, would lead to untenable results.  Imagine if Commerce could simply refuse to select respondents in a future administrative review because some of the mandatory respondents had not responded in the investigation or had failed to respond fully.

{. . .}

> Additionally, these smaller beekeepers typically had limited records, or limited access to technology due to their remote locations, which meant more reliance on assumptions and estimates than *actual verifiable records*. Thus, where beekeepers did respond, Commerce was still plagued with *incomplete or unreliable cost data* that needed to be supplemented with public studies to calculate certain costs such as labor, land rent, and bee feed.

PR Doc. 438 at 8 and 10 (citations omitted) (emphases added).  While there is little question that

beekeepers do not have sophisticated accounting records, and might encounter difficulties in

responding fully to Commerce, Commerce never considered the possibility of finding a means to

collect the data that could achieve compliance.  *See* 19 U.S.C. § 1677m(c)(2).  In any event,

Commerce's speculative concerns about difficulties in obtaining reliable beekeeper cost data

proved unwarranted on the record of *this* investigation.  The beekeeper suppliers to NEXCO

selected by Commerce *did* have verifiable records, and Commerce specifically found that the

beekeepers' cost data was usable and reliable.  PR Doc. 438 at 71.  Commerce conducted a

thorough analysis of the COP questionnaire responses submitted by NEXCO's beekeepers and

stated that "we do not find {Beekeeper 1 and Beekeeper 2's} calculations to be unreasonable."

CR Doc. 646 (PR Doc. 373) at 2-3.

### 3. Commerce May Not Disqualify The Verified Costs Of The Beekeepers That It Selected For Examination By Intentionally Disregarding The Statutory Selection Process

Having set its sights on using acquisition prices, Commerce dispensed with the statutory

requirements for mandatory producer respondent selection.  Commerce explained its

methodology as follows: (1) the actual beekeeper costs on the record could not be used to

compute the COP of the honey because Commerce was unable to either select a sufficient

number of beekeepers or use statistical sampling, so the costs of the beekeepers Commerce did

select were not "representative;" (2) Commerce would select as representative beekeepers among

the top suppliers to NEXCO those with the lowest annual average price to NEXCO; (3) Commerce would use the (putatively unrepresentative) selected beekeeper costs to establish that the acquisition prices paid by NEXCO to all its suppliers were a "reasonable" surrogate for the actual COP of the honey (the beekeeper costs).   PR Doc. 438 at 10-13.

Commerce's argument that it was not possible to obtain representative beekeeper costs boils down to the assertion that it was "unable" to comply with either alternative in 19 U.S.C. § 1677f-1(c)(2), so the beekeeper costs that it did obtain were, by definition, unrepresentative. This argument is untenable under the statute.  Where Commerce determines not to calculate individual weighted average dumping margins for all exporters/producers or engage in statistical sampling, the only requirement is that Commerce examine a reasonable number of producers accounting for the largest volume of merchandise "that can be reasonably examined."  19 U.S.C. § 1677f-1(c)(2)(B).[7]  Thus, the test is reasonableness under the circumstances, which would take into consideration both the number of suppliers and Commerce's resource limitations. Accordingly, Commerce's conclusion that in this case it was "unable" to comply with the statute is a *non sequitur* and should be rejected by this Court.  The statute does not permit Commerce to rely on a criterion not in the statute – representativeness – as a basis for refusing to examine beekeepers who accounted for the largest volume that can reasonably be examined.  Commerce's

---

[7] The full statutory provision of 19 U.S.C. § 1677f-1(c)(2) states that "If it is not practicable to make individual weighted average dumping margin determinations under paragraph (1) because of the large number of exporters or *producers* involved in the investigation or review, the administering authority may determine the weighted average dumping margins for a reasonable number of exporters or producers by limiting its examination to (A) a sample . . . or (B) exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined." (emphasis added).

argument that it had no choice but to ignore the statute and therefore "adopted a pragmatic approach" is unfounded and impermissible.  PR Doc. 438 at 12.

Moreover, Commerce has never held in previous cases that "representativeness" is a factor in selecting respondents outside of the sampling context.  While Commerce considers representativeness when exercising its authority to select respondents using statistically valid sampling under 19 U.S.C. § 1677f-1(c)(2)(A), such an analysis is not part of Commerce's normal respondent selection process in AD investigations where it determines to limit respondents under section 1677f-1(c)(2)(B).[8]  It would be difficult to determine at the beginning of a case whether two, three, or seven respondents would be "representative," let alone define what "representative" means in that case.  Instead, when Commerce acts under 19 U.S.C. § 1677f-1(c)(2)(B), it selects respondents by choosing the exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined.  In virtually every case decided by Commerce in recent years, including this one, Commerce has selected two or at the most, three, of the largest exporters to the United States, irrespective of the total number of producers or percentage of total exports accounted for by the producers selected.  Daniel L. Porter, James P. Durling & Claudia D. Hartleben, *Congratulations, You Have Now Been Chosen: Evolving Practice and Emerging Issues for*

---

[8] The Statement of Administrative Action ("SAA") explains that when opting to select respondents under 19 U.S.C. 1677f-1(c)(2)(A), "Commerce will employ a sampling methodology designed to give *representative* results based on the facts known at the time the sampling method is designed."  Statement of Administrative Action, Uruguay Round Agreements Act, H.R. Doc. No. 316. Vol. 1, 103d Cong. 2d Sess. 656, 872, reprinted in 1994 U.S.C.C.A.N. 4040 (emphasis added); *see also Certain Steel Nails From the People's Republic of China: Preliminary Results of the Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2017-2018*, 84 Fed. Reg. 55,906 (Dep't Commerce Oct. 18, 2019) and accompanying Decision Memorandum at 19 ("Because Commerce is constructing a sample that is intended to be representative of the population as a whole . . .").

*Mandatory Respondent Selection in Antidumping Cases*, 23 Tul. J. Int'l & Comp. L. 399, 402, 407-408 (2015).  Counsel is unaware of any case where Commerce has found that the exporters or producers accounting for the largest volume that can reasonably be examined cannot serve as the basis for calculating a dumping margin because such exporters or producers would not be "representative."  To the contrary, Commerce has argued successfully to this Court and the Federal Circuit that once it chooses mandatory respondents, they are deemed to be representative of all uninvestigated respondents.  *Bosun Tools Co. Ltd. v. United States*, No. 2021-1929, 2022 WL 94172 at *6 (Fed. Cir. Jan. 10, 2022); *Shanxi Hairui Trade Co., Ltd. v. United States*, 503 F. Supp. 3d 1307, 1321-1322 (Ct. Int'l Trade 2021).

**4.    Commerce's Conclusion That The Beekeeper Costs On The Record Are Not "Representative" Is Unsupported By Substantial Evidence**

The record in this case offers no support for Commerce's unprecedented determination that examining only two beekeeper respondents and one middleman respondent is *per se* unrepresentative or that the beekeepers selected were unrepresentative.  Commerce offers no indication of what number of beekeeper respondents would constitute a "representative number of producer respondents" or how it would even determine what number of respondents would be required.  PR Doc. 438 at 12.  Ironically, in the context of the selection of mandatory exporter respondents, Commerce specifically rejected NEXCO's suggestion that it select four mandatory exporter respondents at the beginning of the case to ensure a more diverse group of exporters and honey producers.  Commerce explained its reasoning:

> Regarding Nexco's claim that Commerce would ensure a representative sample of Argentinian honey producers and adequate coverage of the honey produced in Argentina by picking four respondents, Nexco's claim is entirely speculative. Nexco provided no information to support its argument. Nexco has not claimed, and may not know, if ACA and Haedo ship raw honey to the United States produced by diverse types of beekeepers, or perhaps even the very same beekeepers that produce the raw honey shipped by the third and fourth largest exporters. Moreover, the record has no information on whether there is any

23

> connection between beekeeping diversity and export sales quantity (*i.e.,* there is no evidence that Commerce would obtain a greater diversity of beekeepers in Argentina merely by picking additional top shippers to the United States).

CR Doc. 33 (PR Doc. 71) at 5.  In other words, Commerce rejected as "speculative" the notion that selecting more exporters would lead to more diversity of exporters or honey producers.

There is also no evidence on this record that the COP of the beekeepers Commerce did select is in fact unrepresentative of the COP of beekeepers supplying NEXCO.  Commerce found that there are no meaningful physical differences in the honey NEXCO purchased from different beekeepers.  CR Doc. 646 (PR Doc. 373); *Cf. Husteel Co., Ltd. v. United States*, 98 F. Supp. 3d 1315, 1331-32 (Ct. Int'l Trade 2015).  Commerce averaged the price of all of the honey purchased by NEXCO because none of the CONNUM characteristics made any meaningful difference to the cost of the honey purchased.  CR Doc. 646 (PR Doc. 373) at 5-7 and Attachments 6-7.

Finally, Commerce's assertion of unrepresentativeness rings hollow in view of the fact that it used beekeepers' cost data for the purpose of determining whether the acquisition prices NEXCO paid to all of its beekeepers were a "reasonable proxy" for the beekeeper costs.  PR Doc. 438 at 12.  Commerce made this "reasonableness" determination by comparing the selected beekeepers' production costs to all of the acquisition prices paid by NEXCO to its beekeeper and middlemen suppliers to confirm that the acquisition prices were above cost.  Nowhere does Commerce explain how the same beekeeper cost data can be found to be "unrepresentative" for purposes of computing the COP of the honey exported by NEXCO but nevertheless usable for the purpose of establishing that all of NEXCO's acquisition prices are above the beekeepers' COP.  At a minimum, Commerce should have used the selected beekeeper data to deduct profit from the acquisition prices paid by NEXCO to all of its suppliers.

### 5.   Commerce's Explanation For Why It Selected Beekeepers With The Lowest Annual Average Sales Prices To NEXCO Is Nonsensical

Commerce throughout its *Preliminary* and *Final Determinations* rejects the use of *annual* average costs and prices in all other contexts due to the high rate of inflation prevailing in Argentina.  PR Doc. 365 at 23-25; PR Doc. 438 at 24-28.[9]  But it somehow concluded that annual average prices would be a reasonable basis to select producer beekeeper respondents.  PR Doc. 438 at 12; CR Doc. 646 (PR Doc. 373) at 2.  This explanation would appear to be nothing other than a *post-hoc* rationalization for substituting the substantially higher acquisition prices paid by NEXCO for the verified, actual beekeeper costs in computing the COP of the honey exported by NEXCO.

### 6.   Commerce Did Not Use Facts Available As Its Basis For Refusing To Use The Beekeepers' Costs

While Commerce references "facts available" only once in a footnote as its basis for using NEXCO's acquisition prices, PR Doc. 438 at 25, fn.127, it is difficult to see what other legal grounds it could assert for doing so.  Even here, Commerce ignores the statutory framework for justifying the use of facts available.  Commerce has authority under 19 U.S.C. § 1677e(a)(1) to apply facts available "if necessary information is not available on the record."  Commerce did not base its decision to resort to facts available on the beekeepers having failed to provide all necessary information requested by Commerce.  To the contrary, Commerce held that

---

[9] This basis for selection based on annual prices is completely inconsistent with Commerce's findings in this case that annual price levels were not indicative of real prices but only nominal prices.  In other words, beekeeper suppliers who sold at the beginning of the POI would appear to have lower prices than suppliers at the end of the POI solely because of Argentine inflation.  Moreover, acquisition prices could reflect the profit margin charged by an individual beekeeper, not its costs.

NEXCO's beekeepers had fully cooperated and had provided verified and "usable" cost data. PR Doc. 438 at 12 and 66-73.

Section 1677b(f)(1) requires that Commerce use the books and records of the producer so long as they are kept in accordance with the generally accepted accounting principles of the producing country and "reasonably reflect the costs associated with the production and sale of the merchandise." Commerce has confirmed that the beekeepers' books and records did accurately represent its costs. PR Doc. 438 at 66-73. The beekeepers provided extensive information regarding the basis of their allocations as requested in two separate supplemental questionnaires and a verification questionnaire. *Id.*

In past cases where Commerce has concluded that the beekeepers acted to the best of their ability and supplied sufficient data, but certain items were not found in beekeepers' books and records, Commerce has "filled in the gaps" with other data sources. *Honey From Argentina: Final Results of Antidumping Duty Administrative Review*, 69 Fed. Reg. 30,283 (Dep't Commerce May 27, 2004) and accompanying Issues and Decision Memorandum at 17-18; *Honey from Argentina: Final Results of Antidumping Duty Administrative Review and Determination Not to Revoke In Part*, 72 Fed. Reg. 25,245 (Dep't Commerce May 4, 2007) and accompanying Issues and Decision Memorandum at 18-21. This has also been Commerce's consistent approach in other agricultural proceedings. *See Notice of Final Determinations of Sales at Less Than Fair Value: Certain Durum Wheat and Hard Red Spring Wheat from Canada*, 68 Fed. Reg. 52,741 (Dep't Commerce Sept 5, 2003) and accompanying Issues and Decision Memorandum at 22-23; *Notice of Final Determination of Sales at Less Than Fair Value: Certain Frozen and Canned Warmwater Shrimp From Brazil*, 69 Fed. Reg. 76,910 (Dep't Commerce Dec. 23, 2004) and accompanying Issues and Decision Memorandum at Cmt. 6.

**7.   Contrary to Commerce's Determination, The Record Demonstrates That NEXCO's Acquisition Prices Are *Not* A Reasonable Proxy For The Actual Production Cost Of The Honey Because They Impermissibly Include Beekeeper Profit**

The record is unequivocal that Commerce's use of acquisition prices substantially overstated the actual COP of the honey exported by NEXCO because those prices included the profit of the beekeepers.  The profit of the producer of subject merchandise is not a permissible element of COP under the statute.  19 U.S.C. § 1677b(b)(3).  Consequently, even assuming that Commerce may lawfully use the acquisition prices, those prices must be adjusted by subtracting the beekeeper profit.

COP is defined in the statute as composed of three elements:  materials and fabrication costs ("the cost of materials and of fabrication or other processing of any kind employed in producing the foreign like product"); selling, general, and administrative expenses ("SG&A"); and the cost of containers and other expenses incidental to packing the goods for shipment. 19 U.S.C. § 1677b(b)(3).  This is distinct from the computation of CV, which includes the same elements of cost plus profit.  *See* 19 U.S.C. § 1677b(e).  This Court and the Federal Circuit have found that the statute is clear on its face with regard to these definitions.  The COP does not include profit; only CV includes profit.  *See Hyundai Steel Company v. United States*, 19 F.4th 1346, 1350 (Fed. Cir. 2021) (reciting the statutory definition of COP provided in 19 U.S.C. § 1677b(b)(3) and noting that "Section 1677b(e) contains a similar methodology for calculating the constructed value of a product, although constructed value also includes an amount for profits."); *Thai Pineapple Canning Industry Corp. v. United States*, 273 F.3d 1077, 1080 (Fed. Cir. 2001) (reciting definition of cost of production and constructed value in 19 U.S.C. § 1677b(b)(3) and 19 U.S.C. § 1677b(e) and noting "realized profits" are included in constructed value calculation); *Torrington Co. v. United States*, 19 CIT 403, 425-426, 881 F. Supp. 622, 643

(1995).  Therefore, the statute requires that the COP of raw honey under investigation includes only materials, labor, overhead, SG&A expenses, and any cost of containers and other expenses incidental to packing goods for shipment.  Commerce's Section D questionnaire to the beekeepers solicited COP information which included raw materials costs, labor costs, overhead and sale costs, and general and administrative expenses – not profit.

NEXCO's honey acquisition prices were two to three times larger than the actual beekeeper costs.[10]  CR Doc. 646 (PR Doc. 373) at Attachments 1, 3, and 6.  The difference is the profits of the beekeepers.  Commerce specifically recognized that the increase in acquisition prices over the POI far exceeded the rate of inflation.[11]  *Id.*

Therefore, even assuming that Commerce had the statutory authority to use acquisition prices as the basis for computing COP, Commerce was obligated to adjust those prices by subtracting beekeeper profit.  By simply deducting an average of the percentage profit of NEXCO's two beekeepers from NEXCO's total acquisition prices, it could arrive at a reasonable approximation of NEXCO's beekeeper COP.  Certainly, on remand this is a reasonable means to correct Commerce's error.

---

[10] Commerce explained in its *Preliminary Determination* calculation memorandum that "Our hypothetical calculations show that even unreasonably assuming that all farm labor and all common costs are related to beekeeping, the beekeeping COPs are still below NEXCO's acquisition costs for the honey."  PR Doc. 438 at 72 (citing CR Doc. 646 (PR Doc. 373) at Attachments 1 and 3).

[11] Beekeeper COP reflected costs in Argentine pesos subject to domestic economic factors, not export prices.

**B. Commerce's Limitation Of Price-To-Price Comparisons To The Same Month Rather Than Based On Quarterly Comparisons And The Use Of Monthly, Not Quarterly, Average Costs Is Contrary To Commerce's Quarterly Cost Methodology And Otherwise Unsupported By Substantial Evidence**

**1.  Statement of Relevant Facts**

In calculating NEXCO's dumping margin, Commerce determined that the use of quarterly average costs was appropriate in this case because NEXCO's costs, as measured by the acquisition prices, increased by [    ] percent in real terms (*i.e.*, after adjusting for inflation), during the POI.  PR Doc. 365 at 23-25; CR Doc. 646 (PR Doc. 373) at 4 and Attachment 5. However, in calculating NEXCO's dumping margin, Commerce actually averaged costs and performed sales price comparisons on a monthly, not quarterly basis.  Commerce averaged the already inflation adjusted indexed costs monthly, rather than on a quarterly basis, and used that monthly cost for the sales-below-cost test.[12]  PR Doc. 438 at 28 and 37; CR Doc. 818 (PR Doc. 440) at Attachments 2-3.  And for those sales that passed the sales-below-cost test, Commerce restricted the price-to-price comparisons of third country sales to Germany with U.S. sales to averaged prices only within the same calendar month.  *Id.*  Commerce's normal methodology in an investigation is to use POI weighted average sales comparisons and costs.  However, Commerce has also established a practice of using an alternative averaging methodology (quarterly averaging) in situations where a reliance on its normal annual weighted average method would be "distortive" due to significant cost and prices changes.  *Stainless Steel Sheet and Strip in Coils from Mexico: Final Results of Antidumping Duty Administrative Review*, 75 Fed. Reg. 6,627 (Dep't Commerce Feb. 10, 2010), and accompanying Issues and Decision

---

[12]   If COP were based on the verified beekeeper costs or based on acquisition prices after subtraction of beekeeper profit, then the criteria for using quarterly costs would no longer be met in this case.  Beekeeper costs did not increase by over 25 percent after adjusting for inflation. This alternative argument is addressed in the next section of the brief.

Memorandum at Comment 6 ("*Stainless Steel from Mexico*"); *Stainless Steel Plate in Coils from Belgium: Final Results of Antidumping Duty Administrative Review*, 73 Fed. Reg. 75,398 (Dep't Commerce Dec. 11, 2008) and accompanying Issues and Decision Memorandum at Comment 4 ("*Stainless Steel Plate from Belgium*").

      Commerce's quarterly cost methodology is applied when (1) it finds that an exporter's costs increased significantly (more than 25 percent between the highest and lowest quarter) over the annual period and that (2) sales prices followed the same trend (*i.e.*, there is a linkage between the cost changes and U.S. and home market (or third country market) sales prices).  If these two criteria are met, Commerce uses quarterly average costs for purposes of the sales-below-cost test.  And, as a corollary, price-to-price comparisons are then limited to sales in the same quarter.  *Id.*

      In this case, Commerce analyzed NEXCO's "costs" (acquisition prices) and determined that the record supported the usage of the quarterly cost methodology.   NEXCO's acquisition prices increased by [   ] percent during the POI, after adjusting for inflation, and there was a linkage between NEXCO's "costs" and NEXCO's sales prices.  PR Doc. 365 at 23-25; CR Doc. 646 (PR Doc. 373) at 4 and Attachment 5.  Commerce also applied its quarterly cost methodology in all of the concurrent market economy honey AD investigations without high inflation, due to rapidly increasing export prices in Brazil, India, and Ukraine as well.  *Raw Honey From Brazil: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 86 Fed. Reg. 66,533 (Dep't Commerce Nov. 23, 2021) and accompanying Decision Memorandum at 15-16; *Raw Honey from Ukraine: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 86 Fed.

Reg. 66,524 (Dep't Commerce Nov. 23, 2021) and accompanying Decision Memorandum at 17-

18; *Raw Honey from India: Preliminary Affirmative Determination of Sales at Less Than Fair*

*Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final*

*Determination, and Extension of Provisional Measures*, 86 Fed. Reg. 66,528 (Dep't Commerce

Nov. 23, 2021) and accompanying Decision Memorandum at 14-15.

Notwithstanding its determination to use its quarterly cost methodology, Commerce

departed from the comparison of *quarterly* prices and costs and instead restricted comparisons to

the month.  PR Doc. 438 at 28 and 37; CR Doc. 818 (PR Doc. 440) at Attachments 2-3.  The

only "quarterly" element applied to the methodology was to apply a quarterly index to the

acquisition prices.  PR Doc. 438 at 35-36. That is, Commerce calculated quarterly indexed and

weighted-average raw honey costs, but that cost was then deflated back to each month to derive a

monthly cost.  Commerce calculated annual indexed other materials and conversion costs.

Commerce then deflated the annual average costs to the appropriate POI month.  This monthly

cost was then used for purposes of the sales-below-cost test.  CR Doc. 818 (PR Doc. 440) at

Attachments 2-3.  In effect, the costs were then monthly costs, not quarterly costs, and thus the

dramatic increase in costs and prices between quarters was not fully captured under Commerce's

modified methodology.  Commerce also did not make any sales comparisons on a quarterly

basis.  Instead, it made monthly sales comparisons.  PR Doc. 438 at 28.

NEXCO argued in its case brief that if Commerce continued to use acquisition prices for

purposes of calculating COP, then consistent with its stated quarterly cost methodology, it must

weight average these "costs" on a quarterly basis for purposes of applying the sales-below-cost

test, and must permit price-to-price comparisons to be made on a quarterly, not monthly basis.

CR Doc. 801 (PR Doc. 420) at 30-31.  NEXCO argued that its comparison market sales and U.S.

sales were both made in dollars, and U.S. dollars were not affected by Argentine Peso inflation

and there was thus no basis to restrict comparisons to the same month. *Id*

### 2. The Use Of Monthly Costs And Monthly Price-to-Price Comparisons Is Not Supported By Either Commerce's Quarterly Cost Methodology Or Its High Inflation Methodology

Commerce claimed to have applied its quarterly cost methodology on top of its high

inflation methodology to calculate NEXCO's dumping margin. Commerce repeatedly mixes the

two methodologies in attempting to justify the use of monthly costs and monthly sales

comparisons. PR Doc. 438 at 35-37. The result of using a monthly, rather than a true quarterly,

methodology was that many U.S. sales were not matched to above-cost third country sales, and

were instead forced to CV. As discussed in Section VI.A., above, the costs being used for COP

and CV were really acquisition prices that significantly overstated the actual cost of producing

the honey. Thus, forcing more U.S. sales to CV had the consequence of significantly overstating

NEXCO's dumping margin as many U.S. sales were compared to an inflated COP plus the

SG&A expenses and profits of NEXCO rather than being compared to contemporaneous, above-

cost third country sales made in the same quarter.

In addressing the monthly averaging issue in the *Final Determination*, Commerce

repeatedly confused issues pertaining to its high inflation adjustment (which uses a monthly

indexing methodology to restate nominal Argentine Peso prices on a consistent basis) with those

pertaining to the quarterly cost methodology, which concerns increases in *real* costs over the

POI. PR Doc. 438 at 34-37. The high inflation methodology results in monthly average costs

stated on a consistent currency basis. NEXCO argued that the quarterly cost methodology then

calls for weight-averaging those inflation-adjusted costs on a quarterly basis. CR Doc. 801 (PR

Doc. 420) at 30-31. Neither the high inflation adjustment to Argentine Peso-denominated costs

nor the quarterly cost methodology provides any justification for limiting price-to-price

comparisons of U.S. dollar-denominated sales to the same calendar month.  As discussed further in Section VI.C., *infra*, because the third country sales to Germany were made in U.S. dollars, above-cost sales to Germany can be directly compared to U.S. sales without any currency conversion, and with no need to account for Argentine Peso inflation.

The rationale behind Commerce's quarterly cost methodology is that when sales and costs are both increasing or decreasing significantly, the use of a single annual average to compare costs to prices can result in distortions.  *Stainless Steel from Mexico* at Comment 6; *Stainless Steel Plate from Belgium* at Comment 4.  For the same reasons, when Commerce uses its quarterly cost methodology, it also does its price-to-price sales comparisons on a quarterly average basis in calculating the dumping margin.  *Id*.  Thus, the purpose of Commerce's quarterly cost methodology is to use quarterly averaging periods to account for significant changes in real prices and costs between quarters.

NEXCO argued that to properly apply Commerce's quarterly cost methodology, Commerce had to calculate quarterly average costs and then match above-cost sales to U.S. sales in the same calendar quarter.  CR Doc. 801 (PR Doc. 420) at 30-31.  This is the essence of the quarterly methodology, and the finding that real costs varied on a quarterly basis provides no justification for restricting price comparisons to only sales made in the same month.  Because prices in both markets were in U.S. dollars and thus, not affected by inflation, the high inflation adjustment also fails to support the use of monthly price comparisons.  Once Commerce had indexed the monthly costs for inflation, by definition, they were now on a constant currency basis and should have been averaged on a quarterly basis.  NEXCO's argument is that Commerce had to take the last step in its calculation of costs or else Commerce had not

implemented the quarterly cost methodology it had found to be applicable.  Commerce thus

needed to perform one more step to achieve quarterly costs.[13]

Commerce explicitly found that inflation-adjusted costs did not vary between months in

excess of 25 percent.  PR Doc. 438 at 19; CR Doc. 818 at 1 and Attachment 1.  Thus, there is no

record support for reducing the cost-averaging period from a quarterly to a monthly basis, and

averaging the prices over the quarter would not introduce any distortions.  NEXCO provides in

**Exhibit 1** a demonstration of the final step that needed to be conducted for the quarterly costs to

be used for the sales-below-cost test.  This worksheet is sourced from Commerce's *Final Results*

cost calculation memorandum at Attachment 2, and NEXCO simply added the final step of

quarterly averaging the inflation-adjusted monthly costs and highlighted in yellow and green the

homogenized and non-homogenized costs.  *See* **Exhibit 1**.

Commerce's discussion of this point in the *Final Determination* never addressed the

substance of NEXCO's arguments.  Commerce simply asserted that average costs used in the

cost test *were* quarterly costs and no changes needed to be made.  PR Doc. 438 at 34-37.

Commerce claimed that it had refined the definition of quarterly costs in light of its high inflation

methodology to mean monthly costs and monthly price comparisons.  This assertion fails to

explain why the already inflation-adjusted costs should not be averaged on a quarterly, rather

than monthly basis.  And it provides no support whatsoever for restricting sales comparisons to

sales made in the same month.

Commerce's only explanation for performing monthly cost averaging was that it needed

to index costs to each month in order to carry out its inflation methodology and that the

---

[13] Commerce should have created a quarterly-averaged TOTCOM regardless of whether it
indexed it to the end of the POI in the case of other costs or the end of the quarter for DIRMAT.

"alternative cost averaging method in this case {does not} negate{} the need to account for inflation." PR Doc. 438 at 37. Similarly, Commerce asserts that its quarterly cost methodology does not warrant "abandoning our well-established high inflation practice of using monthly comparisons." PR Doc. 438 at 37. But the issue of quarterly averaging costs is in fact wholly distinct from the issue of indexing costs and prices for inflation. NEXCO is not disputing Commerce's indexing methodology. NEXCO is arguing that once Commerce had indexed costs to the month in accordance with its high inflation methodology, then it needed to average those costs to derive quarterly average costs for use in the sales-below-cost test. Then, once the above-cost German sales were determined, it needed to conduct the sales comparisons on a quarterly basis. Commerce's failure to do so is unsupported by substantial evidence.

Commerce implies that because it had to index costs monthly, it had to restrict price-to-price comparisons to sales made in the same month. PR Doc. 438 at 37. However, there is no basis for such a conclusion since once the German sales were found to be above cost, those sales could be compared on a quarterly average basis. And the cost indexing issue is entirely irrelevant to the period for price-to-price comparisons because, as discussed further in Section VI.C., *infra,* third country sales and U.S. sales are in U.S. dollars. Commerce has never found that its cost comparison periods and sales comparison periods need to be the same. Commerce explicitly disagreed with Petitioners that it is a prerequisite that the averaging period for production costs must match the averaging period for third country prices or U.S. prices. PR Doc. 438 at 18.

**C. If Commerce Uses The COP Of The Beekeepers, Commerce Should Make Price-To-Price Comparisons On A POI Weighted Average Basis Since German And U.S. Prices Are Both Made In U.S. Dollars And Thus Unaffected By Argentine Peso Inflation**

**1. Statement of Relevant Facts**

Because NEXCO had no sales of honey in Argentina, Commerce used NEXCO's third country sales in Germany to calculate normal value. CR Doc. 132 (PR Doc. 167) at 2. Those sales were made in U.S. dollars. CR Docs. 66-68 (PR Doc. 140) at Exhibits A-6 and A-7; CR Docs. 168-207 and 209-217 (PR Docs. 203-205) at B-1, B-29, and Exhibit B-1. In the *Preliminary Determination* and *Final Determination*, Commerce conducted the sales-below-cost test on a monthly basis. However, Commerce improperly compared U.S. dollar-denominated German and U.S. sales on a monthly basis. PR Doc. 365 at 21, 23-24, and 28-29; PR Doc. 438 at 28 and 37. Commerce repeatedly relied on the fact that NEXCO's costs were affected by inflation as the reason for why NEXCO's U.S. dollar-denominated sales prices must also be compared monthly. PR Doc. 438 at 26-27. Commerce also explained that high inflation experienced in Argentina was in fact impacting U.S. dollar-denominated sales prices for honey sold to the United States and Germany. PR Doc. 438 at 26.

**2. Commerce Erred By Not Making Price-To-Price Sales Comparisons On A POI Weighted Average Basis As German And U.S. Prices Were Both Made In U.S. Dollars And Not Subject To Argentine Peso Inflation**

If this Court finds that Commerce improperly relied on acquisition prices in place of beekeeper costs or failed to adjust acquisition prices for beekeeper profit, then quarterly costs are not justified as beekeepers' costs, after adjusting for inflation, did not increase by more than 25 percent. In this case, the Court should also find that Commerce erred in not comparing weighted average sales prices over the entire POI in accordance with the statute. The statute states that

sales comparisons in an investigation should normally be based on weighted average prices in both markets.  19 U.S.C. § 1677f-1(d)(1); SAA at 842-843.

The issue presented does not concern the question of whether Argentine peso costs should be indexed.[14]  NEXCO is not challenging the indexing of Argentine peso costs or the comparison of indexed costs to each German sale for the sales-below-cost test.  The issue is what happens next.  NEXCO maintained to Commerce that it should follow the statutory preference and regulatory confirmation to use weighted average sales comparisons over the POI.  CR Doc. 801 (PR Doc. 420) at 26-28.

This is a case of first impression since Commerce has never previously examined the proper sales comparison methodology in (1) an investigation (2) in a case experiencing high inflation affecting local currency costs (3) where the sales prices for both the U.S. and comparison market (Germany) were made exclusively in U.S. dollars.  It is not the common case that normal value is based on third country prices and those prices are in U.S. dollars.  Commerce's antidumping manual describes that, in the normal case, home market sales prices are also in the local currency:

> Similarly, the price to home market customers purchasing the same domestic like product will be expressed at a lower nominal value at the beginning of the POI/POR than at the end of the POI/POR.

Antidumping Manual, Chapter 9: Cost of Production and Constructed Value, p. 31.

Commerce, in other contexts, has recognized that purchases and sales in U.S. dollars are not affected by inflation and do not need to be indexed.  Commerce's dumping manual discusses this as follows:

---

[14] NEXCO maintains as explained in Section VI.A of this brief that Commerce should have used beekeeper costs, not acquisition prices.

> Where inputs are purchased in U.S. dollars, or for an unspecified amount in
> foreign currency corresponding to a stated amount of U.S. dollars, we may use the
> dollar acquisition cost because the dollar is not subject to major inflation.

Antidumping Manual, Chapter 9: Cost of Production and Constructed Value, p. 37.

Commerce routinely reverts to comparing the prices in U.S. dollars when the third

country market or home market prices are in U.S. dollars.  As explained in the 2015-2016 AD

administrative review of *Standard Pipe from Turkey 15-16 AR*,

> Here, we have converted the dollar-denominated home market sales into Turkish
> lira only for purposes of the sales-below-cost test. For purposes of calculating the
> margin, we have left the dollar-denominated home market sales in U.S. dollars.

*Welded Carbon Steel Standard Pipe and Tube Products From Turkey: Final Results of*

*Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015–*

*2016*, 82 Fed. Reg. 49,179 (Dep't Commerce Oct. 24, 2017) and accompanying Issues and

Decision Memorandum at 10.  Commerce should have followed 19 U.S.C. § 1677f-1(d)(1) and

conducted POI wide weighted average comparisons of NEXCO's German and U.S. prices.

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,373 (Dep't Commerce May

19, 1997) (explaining that the regulation maintains "a preference for period-wide averaging").

Commerce's justifications for departing from this statutory preference are not supported

by the law.  Commerce cites to the SAA.  PR Doc. 438 at 25, fn.121.  Commerce quotes the

SAA at 843 in regard to "New section 777A(d)(2)."  Section 777A(d)(2) is codified as 19 U.S.C.

§ 1677f-1(d)(2).  However, this provision describes Commerce's determinations of less than fair

value in *administrative reviews.*  SAA at 843.  This language in no way supports Commerce's

conclusion that Congress endorsed the use of shorter sales comparisons periods in *investigations*.

The SAA says just the opposite.  The language there is instructive:

> The Agreement reflects the express intent of the negotiators that the preference
> for the use of an average-to-average . . . be limited to the 'investigation phase' of

> an antidumping proceeding. . . . {T}he preferred methodology in reviews will be
> to compare average to individual export prices.

*Id.*  Congress then goes on to explain that in the case of transaction-specific comparisons in

reviews, comparisons should be done on a monthly basis.  NEXCO views the fact that Congress

found it necessary to clarify that comparisons *in a review* might be limited to a month strongly

suggests that Congress intended for weighted average prices to be compared over the entire POI

in an investigation.

> Commerce will limit its averaging of prices to a period not exceeding the
> *calendar month* that corresponds most closely to the *calendar month* of the
> individual export sale. When constructed value is used for normal value, it is
> normally based on yearly data. *However, when costs are rapidly changing, it may
> be appropriate to use shorter periods, such as quarters or months, which may
> allow a more appropriate association of costs with sales prices.*

*Id.*

Commerce continues to express its confusion regarding the correct statutory provision it

should be examining.  It appears to draw a parallel between the cited language above referring to

rapidly changing costs in a review and Commerce's regulation allowing departures from period-

wide *sales* comparisons in investigations discussed below.  PR Doc. 438 at 24-25.  However, this

particular citation in the SAA is to the proper period over which *costs* should be calculated in a

review.  Congress uses the term "yearly costs," but allows for shorter periods if costs are rapidly

changing in a review.

Commerce next argues that it has discretion to depart from this statutory preference in

investigations and has adopted a regulation – 19 C.F.R. § 351.414(d)(3) – which provides for a

limited exception under certain specified circumstances when it is appropriate to limit *sales*

*comparisons* to shorter periods.  PR Doc. 438 at 24-25.  Commerce maintains that this regulation

provides support for its sales comparison methodology in this case.  Commerce has not relied

previously on 19 C.F.R. § 351.414(d)(3) before this Court to defend its high inflation methodology.  In fact, Commerce has rarely relied on this regulation before this Court in any context.  In a few cases, Commerce has relied on this provision as support for its quarterly cost methodology and once relied on it for its authority to divide an annual period into two segments due to a dramatic drop in the exchange rate over an annual period that affected the exporter's prices.  *Stainless Steel Sheet and Strip in Coils From Mexico; Final Results of Antidumping Duty Administrative Review*, 76 Fed. Reg. 2,332 (Dep't Commerce Jan. 13, 2011) and accompanying Issues and Decision Memorandum at Comment 3; *Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea: Notice of Preliminary Results of the Antidumping Duty Administrative Review*, 74 Fed. Reg. 46,110 (Dep't Commerce Sept. 8, 2009) and accompanying Issues and Decision Memorandum at Comment 3; *Certain Pasta From Italy: Notice of Final Results of Antidumping Duty Changed Circumstances Review and Revocation, in Part*, 74 Fed. Reg. 41,120 (Dep't Commerce Aug. 14, 2009) and accompanying Issues and Decision Memorandum at Comment 5; *Notice of Final Determination of Sales at Less Than Fair Value: Stainless Steel Sheet and Strip in Coils From the Republic of Korea*, 64 Fed. Reg. 30,664, 30,670 (Dep't Commerce June 8, 1999).

Even if the Court finds that the regulation might in theory give Commerce the authority to depart from period-wide average sales comparisons in a high inflation setting, the exception does not apply to the facts of this case.  The purpose of the regulatory exception is to allow for shorter sales comparison periods when NV or U.S. *prices* increased significantly, rendering POI average price comparisons distortive.  NEXCO's prices in Germany and the United States both followed a consistent upward trend reacting to increases in the international price of honey.  CR

Docs. 168-207 and 209-217 (PR Docs. 203-205) at Exhibits B-1, C-1, and D-15.  POI averages

would not be distortive.

Commerce's remaining justifications for restricting sales comparisons to the month all

revolve around inflation in Argentina.  Commerce's arguments repeatedly revert to focusing on

NEXCO's *costs* as its justification for its *sales* comparison methodology:

> Thus, while sale prices may have been conducted in U.S. dollars, record evidence
> shows that the costs that . . . NEXCO incurred in operating in a high inflation
> economy were still impacted by inflation.

PR Doc. 438 at 27.  This observation regarding NEXCO's costs is factually and legally irrelevant

to the determination of the proper sales comparison methodology.[15]  Argentine Peso inflation

costs and sales values in U.S. dollars are moving in totally separate universes.[16]  Commerce's

citations to case law are also misplaced:

> {T}he CIT has found that in a high inflation case where the respondents' costs
> and prices show massive increases over the POI, distorting price and cost
> comparisons across different periods within the POI, 'it is reasonable for the
> Department to be concerned about straying too far from the month of each U.S.
> sale in trying to find a NV {normal value} based on comparison market sales
> prices.'

PR Doc. 438 at 27 (quoting *Union Steel Manufacturing Company, Ltd. v. United States*, 190. F.

Supp. 3d 1326, 1336-1337 (Ct. Int'l Trade 2016).  Commerce's methodology from a case

involving normal values in local currency, which were not affected by high inflation, does not

address the fact pattern at hand.  *Union Steel* was not a case where respondents' costs showed

massive increases over the POI due to high inflation, nor was it a case where home market (or

---

[15] Commerce also makes a rather nonsensical comparison to its methodology of converting
home market sales from local currency to U.S. dollars to prove that inflation affects U.S. dollar
prices.  PR Doc. 438 at 26.

[16] Inflation rates and exchange rates are intertwined, but perfect parity between movements in
inflation and in exchange rates is not the norm.

third country market) sales and U.S. sales were both denominated in U.S. dollars.  NEXCO's acquisition prices/beekeeper costs were inflated because they were denominated in Argentine pesos.  Of course, as noted earlier, if those costs had been denominated in U.S. dollars, Commerce's policy is not to adjust them because there is no basis to adjust "dollar acquisition cost because the dollar is not subject to major inflation."  *See* Antidumping Manual, Chapter 9: Cost of Production and Constructed Value, p. 37.

NEXCO's argument that U.S. dollar prices by definition are not affected by Argentine peso devaluation and inflation in Argentina is simply met with the assertion that U.S. dollar prices *are* affected by inflation.  PR Doc. 438 at 26.  There are two separate assertions here.  First, Commerce is saying that inflationary costs in Argentina caused export prices to rise.  Commerce has no record evidence of inflationary changes in the beekeepers' peso-denominated costs within Argentina as the cause of increases in dollar-denominated sales prices to Germany and the United States.  Commerce found that sales prices of honey were rising globally as evidenced by the fact that Commerce used its quarterly cost methodology in all four market economy antidumping duty investigations.  The other countries subject to the antidumping duty investigation did not experience high inflation.

Commerce's second argument is that U.S. dollar prices are themselves subject to Argentine peso inflation.  PR Doc. 438 at 26.  This is unsupported by record evidence or economic principles.  U.S. dollar prices are subject to inflation in the United States, not by peso inflation in Argentina.  Expressing prices in U.S. dollars removes the uncertainty of the effects of inflation on Argentine peso prices.  It no longer matters what changes occur in the value of the Argentine peso because the price will be paid in U.S. dollars.  This is a common business strategy in countries with unstable local currency.

Commerce also argues that the demands of its high inflation methodology to calculate

costs monthly require it to rely on monthly sales comparisons.  PR Doc. 438 at 26-27.  It cites the

need to index costs and construct monthly costs for the sales-below-cost test.  This argument

ignores the fact that the German prices being compared to U.S. prices have *already* been

determined to be above-cost.  Of course, for purposes of the sales-below-cost test, costs in

Argentine pesos were being compared to German prices.[17]  However, after this step of

Commerce's analysis, *i.e.,* once any below-cost sales have been dropped form the pool of sales

to be compared to U.S. prices, there is no reason why such above-cost, U.S. dollar-denominated

sales prices to Germany should not be weight-averaged on a POI basis and compared to U.S.

dollar-denominated U.S. sales prices averaged over that same period.

Commerce also argues that it cannot adjust the difference in merchandise adjustment

("DIFMER") to a period-wide sales comparison methodology and this prevents it from adopting

a period-wide averaging methodology.  PR Doc. 438 at 28.  However, Commerce itself has

developed a methodology that allows it to construct a DIFMER in high inflation cases when the

German product and the U.S product were produced in different months of the POI.  Policy

Bulletin 94.5, "Differences in merchandise calculations in hyperinflationary economies," *U.S.*

*Department of Commerce*, (Mar. 25, 1994).[18]  Commerce already has a means to construct a

---

[17] Commerce converts the German sales in U.S. Dollars to Argentine pesos for purposes of
conducting the sales-below-cost test.

[18] NEXCO explained that since Commerce had derived a variable cost of manufacturing
("VCOM") and total cost of manufacturing ("TOTCOM") separately for homogenized honey
and non-homogenized honey on a POI average indexed basis, the very minimal DIFMER could
be applied on similar matches.  CR Doc. 801 (PR Doc. 420) at 28-30.  Commerce's policy
bulletin amending its DIFMER analysis in hyperinflation cases concludes that the cost of
producing merchandise can be indexed to allow for inflation corrected values that can then be
compared between months.  Policy Bulletin 94.5, "Differences in merchandise calculations in
hyperinflationary economies," *U.S. Department of Commerce*, (Mar. 25, 1994).

DIFMER by indexing the differences in costs. The statute and regulations even give Commerce

the authority to ignore DIFMER adjustments. 19 U.S.C. § 1677f–1(a)(2); 19 C.F.R. § 351.413.

However, this issue is the tail wagging the dog since the only DIFMER is for homogenization, a

cost that does not vary by CONNUM, so Commerce calculated an indexed period-wide average

which represented less than [                    ] of the total costs of honey. CR Doc. 818 (PR Doc.

440) at Attachment 3 (sum of DIRLAB2, VOH2, and FOH2 divided by TOTCOM).[19]

Commerce's remaining arguments are equally unreasonable. At one point in its response

to Comment 3, Commerce asserts that because U.S. prices and German sales prices are not

adjusted for Argentine inflation, it must do monthly sales comparisons:

> … But because gross unit *price comparison market and U.S. market prices* are
> not adjusted for inflation, Commerce maintains the closest contemporaneity by
> limiting the matches by month, to limit the impact of inflation on these prices.

PR Doc. 438 at 27 (emphasis added). Commerce adds the confounding conclusion that monthly

comparisons limit the impact of inflation on "these prices" referring to NEXCO's U.S. dollar

prices. This has no support in the record or logic. Commerce concludes this surprising

justification for monthly price comparisons by suggesting that CV would be more appropriate in

high inflation cases because CV is based on costs, which are adjusted for inflation while German

prices are not:

> The mandatory respondents are correct that having fewer price-to-price
> comparisons may increase the use of CV as NV. However, unlike prices, CV is
> based on the respondents' COP which can be adjusted for inflation (as we have
> done in this case) allowing for both accurate calculation of the dumping margin
> and contemporaneity.

PR Doc. 438 at 27.

---

[19] DIRLAB refers to direct labor. VOH refers to variable overhead. FOH refers to fixed
overhead.

Commerce lacks substantial evidence for its decision to impose a shorter comparison period for NEXCO's U.S. and German sales price comparisons. The need for a contemporaneous comparison of inflated costs and third country prices disappears once the sales-below-cost test is completed and above-cost sales are identified. Commerce should have proceeded to apply its normal AD investigation methodology by comparing weighted average German prices with weighted average U.S. dollar-denominated prices over the entire POI. This would have been consistent with the statutory preference for weighted average sales comparisons over the POI in investigations. It would have also had no distortive effect due to inflation. Finally, it is patently unconvincing to suggest that U.S. dollar to U.S. dollar sales comparisons are suboptimal, are somehow affected by Argentine peso inflation, or that Commerce can justify limiting sales comparisons for the specific purpose of increasing comparisons to inflation-adjusted CV.

## VII.   CONCLUSION AND RELIEF REQUESTED

Based on the foregoing, NEXCO respectfully requests that this Court (i) hold that

Commerce's *Final Determination* is unsupported by substantial evidence and otherwise not in

accordance with the law; (ii) remand the case to Commerce with instructions to correct the errors

identified by the Court; and (iii) for such other relief that the Court deems just and proper.

Respectfully submitted,

/s/ Julie C. Mendoza
Julie C. Mendoza
Donald B. Cameron
R. Will Planert
Brady W. Mills
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey

**MORRIS, MANNING & MARTIN, LLP**
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005
(202) 216-4817

*Counsel to Plaintiff NEXCO S.A.*

46

**CERTIFICATE OF COMPLIANCE**

The undersigned hereby certifies that the foregoing brief complies with the Standard

Chambers Procedures of the U.S. Court of International Trade in that it contains 13,880 words

including text, footnotes, and headings and excluding the table of contents, table of authorities

and counsel's signature block, according to the word count function of Microsoft Word 2016

used to prepare this brief.

<div align="right">

/s/ Julie C. Mendoza
Julie C. Mendoza

</div>

**Exhibit 1**

NON-CONFIDENTIAL

**Raw Honey from Argentina** — **A-357-823**
**NEXCO S.A.** — **Business Proprietary**
**Final Cost Calculation Memorandum** — **Attachment 2**

Homogenized (yellow)
Non-homoegenized (green)

**CALCULATION OF QUARTERLY WEIGHTED-AVERAGE DIRMAT COSTS**

**FINAL STEP MISSED BY DOC**

| | Homogenized & Filtered | PRODQTY | Consumption Quantities | Honey Unit Acquisition Cost | Extended Acquisition Cost Using PRODQTY | Monthly PPI | Quarter End PPI | Honey Acquisition Costs Inflated to QTR End | QTR Average Yielded Cost in Monthly Currencies | Extended & Inflated Acq. Cost Using Consumption Quantities | QTR Average Yielded Cost in Monthly Currency Multiplied by Consumption Quantities | Quarterly Average Homogenized (Sum of Homogenized H divided by sum of consumption quantities for same homogenized rows) | Quarterly Average Non-Homogenized (Sum of non-homogenized H divided by sum of consumption quantities for non homogenized rows) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Source* | | *D-22 Section D (Column D)* | *D-22 Section D (Column G)* | *D-52 Dec 6 SDQR (Column M)* | *Calculated* | *SBM-8 GNA-Intex (Excel Row 31)* | *SBM-8 GNA-Intex (Excel Row 31)* | *Calculated* | *Calculated* | ***ALT METHOD FOR COMPARISON PURPOSES*** | | | |
| *Formula* | | *A* | *Acons* | *B* | *G=A*B* | *C* | *D* | *E=G*(D/C)* | *F=QTR AVE * (C/D)* | *G=(Acons*B)*(D/C)* | H = F * Acons | | |
| **POI QTR 1** | | | | | | | | | | | | | |
| 202004 | [ | | | | ] | 446.85 | 465.97 | [ | | ] | [ | | ] |
| 202004 | [ | | | | ] | 446.85 | 465.97 | [ | | ] | [ | | ] |
| 202005 | [ | | | | ] | 448.22 | 465.97 | [ | | ] | [ | | ] |
| 202005 | [ | | | | ] | 448.22 | 465.97 | [ | | ] | [ | | ] |
| 202006 | [ | | | | ] | 465.97 | 465.97 | [ | | ] | [ | | ] |
| 202006 | [ | | | | ] | 465.97 | 465.97 | [ | | ] | [ | | ] |
| TOTALS | | [ | | | ] | | | [ ] | | [ ] | | | |
| QTR AVERAGE Acquisition Cost (ΣE/ΣA) | | | | | | | | [ ] | | [ ] | | | |
| Homogenized TOTALS | | [ | ] | | | | | | | | | | |
| Homogenized QTR Yield (Yld = Hom ΣA/Hom Σacons) | | | [ ] | | | | | | | | | | |
| QTR AVERAGE Yielded Acq Cost (QC/Yld) | | | | | | | | [ ] | [ | ] | | | |
| **POI QTR 2** | | | | | | | | | | | | | |
| 202007 | [ | | | | ] | 484.48 | 528.79 | [ | | ] | [ | | ] |
| 202007 | [ | | | | ] | 484.48 | 528.79 | [ | | ] | [ | | ] |
| 202008 | [ | | | | ] | 506.18 | 528.79 | [ | | ] | [ | | ] |
| 202008 | [ | | | | ] | 506.18 | 528.79 | [ | | ] | [ | | ] |
| 202009 | [ | | | | ] | 528.79 | 528.79 | [ | | ] | [ | | ] |
| 202009 | [ | | | | ] | 528.79 | 528.79 | [ | | ] | [ | | ] |
| TOTALS | | [ | | | ] | | | [ ] | | [ ] | | | |
| QTR AVERAGE Acquisition Cost (ΣE/ΣA) | | | | | | | | [ ] | | [ ] | | | |
| Homogenized TOTALS | | [ | ] | | | | | | | | | | |
| Homogenized QTR Yield (Yld = Hom ΣA/Hom Σacons) | | | [ ] | | | | | | | | | | |
| QTR AVERAGE Yielded Acq Cost (QC/Yld) | | | | | | | | [ | | ] | | | |
| **POI QTR 3** | | | | | | | | | | | | | |
| 202010 | [ | | | | ] | 560.76 | 614.82 | [ | | ] | [ | | ] |
| 202010 | [ | | | | ] | 560.76 | 614.82 | [ | | ] | [ | | ] |
| 202011 | [ | | | | ] | 587.64 | 614.82 | [ | | ] | [ | | ] |
| 202011 | [ | | | | ] | 587.64 | 614.82 | [ | | ] | [ | | ] |
| 202012 | [ | | | | ] | 614.82 | 614.82 | [ | | ] | [ | | ] |
| 202012 | [ | | | | ] | 614.82 | 614.82 | [ | | ] | [ | | ] |
| TOTALS | | [ | | | ] | | | [ ] | | [ ] | | | |
| QTR AVERAGE Acquisition Cost (ΣE/ΣA) | | | | | | | | [ ] | | [ ] | | | |
| Homogenized TOTALS | | [ | ] | | | | | | | | | | |
| Homogenized QTR Yield (Yld = Hom ΣA/Hom Σacons) | | | [ ] | | | | | | | | | | |
| QTR AVERAGE Yielded Acq Cost (QC/Yld) | | | | | | | | [ ] | | [ ] | | | |
| **POI QTR 4** | | | | | | | | | | | | | |
| 202101 | [ | | | | ] | 654.40 | 712.38 | [ | | ] | [ | | ] |
| 202101 | [ | | | | ] | 654.40 | 712.38 | [ | | ] | [ | | ] |
| 202102 | [ | | | | ] | 689.30 | 712.38 | [ | | ] | [ | | ] |
| 202102 | [ | | | | ] | 689.30 | 712.38 | [ | | ] | [ | | ] |
| 202103 | [ | | | | ] | 712.38 | 712.38 | [ | | ] | [ | | ] |
| 202103 | [ | | | | ] | 712.38 | 712.38 | [ | | ] | [ | | ] |
| TOTALS | | [ | | | ] | | | [ ] | | [ ] | | | |
| QTR AVERAGE Acquisition Cost (ΣE/ΣA) | | | | | | | | [ ] | | [ ] | | | |
| Homogenized TOTALS | | [ | ] | | | | | | | | | | |
| Homogenized QTR Yield (Yld = Hom ΣA/Hom Σacons) | | | [ ] | | | | | | | | | | |
| QTR AVERAGE Yielded Acq Cost (QC/Yld) | | | | | | | | [ ] | | [ ] | | | |