**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE**

_____

|  |  |  |
|---|---|---|
| NEXCO S.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No. 22-00203 |
| | ) | PUBLIC VERSION |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| AMERICAN HONEY PRODUCERS | ) | |
| ASSOCIATION, ET. AL., | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

_____)

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S RULE 56.2
MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

<table>
<tr><td></td><td>BRIAN M. BOYNTON<br>Principal Deputy Assistant Attorney General</td></tr>
<tr><td></td><td>PATRICIA M. McCARTHY<br>Director</td></tr>
<tr><td>OF COUNSEL</td><td>REGINALD T. BLADES, JR.<br>Assistant Director</td></tr>
<tr><td>SAVANNAH MAXWELL<br>Attorney<br>Office of the Chief Counsel<br>  For Trade Enforcement and Compliance<br>U.S. Department of Commerce<br>Washington, D.C.</td><td>KARA M. WESTERCAMP<br>Trial Attorney<br>U.S. Department of Justice<br>Commercial Litigation Branch<br>P.O. Box 480<br>Ben Franklin Station<br>Washington, D.C.  20044<br>Tel:  (202) 305-7571<br>Fax: (202) 514-8264<br>Email: kara.m.westercamp@usdoj.gov</td></tr>
</table>

March 3, 2023                                 *Attorneys for Defendant United States*

# TABLE OF CONTENTS

**PAGE**

STATEMENT PURSUANT TO RULE 56.2 ................................................................ 2

    I.    The Administrative Determination Under Review ............................... 2

    II.   Statement Of The Issues................................................................... 2

STATEMENT OF FACTS ...................................................................................... 2

    I.    Initiation Of Investigation And Respondent Selection ....................... 2

    II.   Preliminary Determination ............................................................ 4

    III.   Administrative Case Briefs ........................................................... 6

    IV.   Final Determination ..................................................................... 7

SUMMARY OF THE ARGUMENT .......................................................................... 10

ARGUMENT ...................................................................................................... 12

    I.    Standard of Review ..................................................................... 12

    II.   Commerce's Determination To Use NEXCO's Acquisition Costs For The Cost Of Production Is Supported By Substantial Evidence And In Accordance With Law ........................................................................................ 14

        A.    Legal Framework ............................................................. 14

        B.    Commerce's Past Practice In Other Agricultural Cases, Including The Previous Honey From Argentina Investigation, Informed Its Determination Here ............................................................. 15

        C.    Substantial Evidence Supports Commerce's Reliance On Acquisition Costs In Calculating The Cost Of Production........................... 19

        D.    NEXCO's Arguments Do Not Undermine Commerce's Determination.. 21

    III.   Commerce's Reliance On Its High Inflation Methodology In Conjunction With Its Alternative Cost-Averaging Methodology Is In Accordance With Law And Supported By Substantial Evidence ................................................. 29

        A.    Legal Framework ............................................................. 30

B.   Commerce's Application Of Its High Inflation Methodology In Conjunction With Its Alternative Cost Averaging Methodology Is Reasonable ........................................................................................ 32

C.   NEXCO's Arguments Do Not Undermine Commerce's Determination.. 36

CONCLUSION ........................................................................................................... 42

## **TABLE OF AUTHORITIES**

**CASES**                                                                                                         **PAGE(S)**

*Atl. Sugar, Ltd. v. United States,*
   744 F.2d 1556 (Fed. Cir. 1984) ...................................................................... 12

*Bebitz Flanges Works Private Limited v. United States,*
   433 F. Supp. 3d 1309 (Ct. Int'l Trade 2020) ................................................... 39

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
   467 U.S. 837 (1984) .............................................................................12, 13, 30

*Consol. Edison Co. v. NLRB,*
   305 U.S. 197 (1938) ...................................................................................... 12

*Consol. Fibers, Inc. v. United States,*
   535 F. Supp. 2d 1345 (Ct. Int'l Trade 2008) .................................................. 14

*Consolo v. Fed. Mar. Comm'n,*
   383 U.S. 607 (1966) ...................................................................................... 12

*Corus Staal BV v. United States,*
   502 F.3d 1370 (Fed. Cir. 2007) ...............................................................27, 28

*Dongtai Peak Honey Indus. v. United States,*
   777 F.3d 1343 (Fed. Cir. 2015) ...................................................................... 14

*DuPont Teijin Films China Ltd. v. United States,*
   7 F. Supp. 3d 1338 (Ct. Int'l Trade 2014) ................................................ 41, 42

*Fujitsu General, Ltd. v. United States,*
   88 F.3d 1034 (Fed. Cir. 1996) ...................................................................... 13

*Icdas Celik Enerji Tersane Ve Ulasim Sanayi, A.S. v. United States,*
   429 F. Supp. 3d 1353–71 (Ct. Int'l Trade 2020) ............................................ 22

*Itochu Bldg. Prods. v. United States,*
   733 F.3d 1140 (Fed. Cir. 2013) ...................................................................... 28

*JBF RAK LLC v. United States,*
   790 F.3d 1358 (Fed. Cir. 2015) ...................................................................... 13

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ........................................................................................ 22

*Nippon Steel Corp. v. United States,*
   458 F.3d 1345 (Fed. Cir. 2006) ............................................................. 12

*PAM S.p.A. v. United States,*
   463 F.3d 1345 (Fed. Cir. 2006) ............................................................. 14

*Pastificio Garofalo, S.P.A. v. United States,*
   469 Fed. App'x 901 (Fed. Cir. 2012) .............................................36, 37

*Pastificio Lucio Garofalo, S.p.A. v. United States,*
   783 F. Supp. 2d 1230 (Ct. Int'l Trade 2011) ...................................... 36

*Paul Muller Industrie GmbH & Co. v. United States,*
   502 F. Supp. 2d 1271 (Ct. Int'l Trade 2007) ...................................... 27

*Rhone Poulenc, Inc. v. United States,*
   899 F.2d 1185 (Fed. Cir. 1990) ............................................................. 27

*SeAH Steel Corp. v. United States,*
   704 F. Supp. 2d 1353 (Ct. Int'l Trade 2010) .....................31, 32, 33, 34

*SKF USA Inc v. US,*
   630 F.3d 1365 (Fed. Cir. 2011) ......................................................15, 16

*SKF USA, Inc. v. United States,*
   263 F.3d 1369 (Fed. Cir. 2001) ............................................................. 22

*Sunpreme Inc. v. United States,*
   946 F.3d 1300 (Fed. Cir. 2020) .....................................................28, 29, 30

*Thai Pineapple Canning Indus. Corp. v. United States,*
   273 F.3d 1077 (Fed. Cir. 2001) .....................................................30, 39, 42

*Timken Co. v. United States,*
   354 F.3d 1334 (Fed. Cir. 2004) .....................................................13, 30

*Union Steel Manuf'g Co. v. United States,*
   190 F. Supp. 3d 1326 (Ct. Int'l Trade 2010) ..............................37, 38

*United States v. Eurodif S.A.,*
   555 U.S. 305 (2009) ....................................................12, 13, 30, 31

## <u>STATUTES</u>

19 U.S.C. §1677 ................................................................... 11, 15, 21, 22

19 U.S.C. §1677f-1 ............................................................... 11, 24, 25, 26, 30

19 U.S.C. § 1516a .................................................................... 12

19 U.S.C. § 1677b ...............................................................14, 23, 24, 26, 37, 42

19 U.S.C. § 1677e ................................................................... 23

## <u>REGULATIONS</u>

19 C.F.R. § 351.309 .................................................................. 27

19 C.F.R. § 351.414 ...............................................................11, 31, 34, 35

## <u>OTHER</u> <u>AUTHORITIES</u>

*Brass Sheet and Strip from the Netherlands*,
    65 Fed. Reg. 742 (Dep't of Commerce Jan. 6, 2000)....................................40, 41

*Certain Preserved Mushrooms From Indonesia*,
    66 Fed. Reg. 36,754 (Dep't of Commerce July 13, 2001) ................................. 19

*Honey from Argentina*,
    66 Fed. Reg. 50,611 (Dep't of Commerce Oct. 4, 2001)................................... 16

*Silicomanganese From Brazil*,
    68 Fed. Reg. 61,185 (Dep't of Commerce Oct. 27, 2003) ................................. 35

*Silicomanganese From Brazil*,
    69 Fed. Reg. 13,813 (Dep't of Commerce Mar. 24, 2004)................................. 35

*Honey from Argentina*,
    69 Fed. Reg. 30,283 (Dep't of Commerce May 27, 2004) ................................. 17

*Certain Frozen and Canned Warmwater Shrimp From Thailand*,
    69 Fed. Reg. 47,100 (Dep't of Commerce Aug. 4, 2004) ...................... 19, 20, 21

*Honey from Argentina,*
   69 Fed. Reg. 62,624 (Dep't of Commerce Jan. 6, 2004) ...................................................... 17

*Individually Quick Frozen Red Raspberries From Chile,*
   70 Fed. Reg. 6,618 (Dep't of Commerce Feb. 8, 2005)....................................................... 19

*Honey from Argentina,*
   71 Fed. Reg. 78,397 (Dep't of Commerce Dec. 29, 2006) ................................................... 17

*Honey from Argentina,*
   72 Fed. Reg. 25,245 (Dep't of Commerce May 4, 2007)...................................... 17, 18, 19

*Stainless-Steel Plate in Coils from Belgium,*
   73 Fed. Reg. 75,398 (Dep't of Commerce Dec. 11, 2008) ................................................... 39

*Honey from Argentina,*
   73 Fed. Reg. 79,802 (Dep't of Commerce Dec. 30, 2008) ................................................... 17

*Stainless Steel Sheet and Strip in Coils from Mexico,*
   74 Fed. Reg. 6,365 (Dep't of Commerce Feb. 9, 2009) ....................................................... 40

*Stainless Steel Sheet and Strip in Coils from Mexico,*
   75 Fed. Reg. 6,627 (Dep't of Commerce Feb. 10, 2010) ..................................................... 38

*Honey from Argentina,*
   76 Fed. Reg. 2,655 (Dep't of Commerce Jan. 14, 2011) ..................................................... 17

*Polyethylene Terephthalate Film, Sheet and Strip from Taiwan,*
   77 Fed. Reg. 46,704 (Dep't of Commerce Aug. 6, 2012)..................................................... 42

*Honey from Argentina,*
   77 Fed. Reg. 77,029 (Dep't of Commerce Dec. 31, 2012)................................................... 17

*Polyethylene Terephthalate Film, Sheet and Strip from Taiwan,*
   78 Fed. Reg. 9,668  (Dep't of Commerce Feb. 11, 2013).................................................... 42

*Circular Welded Carbon Steel Standard Pipe and Tube Products from Turkey,*
   86 Fed. Reg. 15,190 (Dep't of Commerce Mar. 22, 2021) .................................................. 35

*Raw Honey From Argentina, Brazil, India, Ukraine, and the Socialist Republic of Vietnam,*
   86 Fed. Reg. 26,897 (Dep't of Commerce May 18, 2021)................................................. 2-4

*Raw Honey From Argentina,*
   86 Fed. Reg. 66,531 (Dep't of Commerce Nov.23, 2021) ................................................... 4

*Raw Honey from Argentina*,
    87 Fed. Reg. 22,179 (Dep't of Commerce Apr. 14, 2022) .................................................. 2

Statement of Administrative Action,
    H.R. Doc. No. 103-316, *reprinted in* 1994 U.S.C.C.A.N. 4040 (1994)......................... 15

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE**

_____

|  |  |  |
|---|---|---|
| NEXCO S.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No. 22-00203 |
| | ) | PUBLIC VERSION |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| AMERICAN HONEY PRODUCERS | ) | |
| ASSOCIATION, ET. AL., | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

_____)

**DEFENDANT'S RESPONSE TO PLAINTIFF'S**
**MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Defendant, the United States, respectfully submits this response to the Rule 56.2 motion

for judgment on the agency record filed by plaintiff, NEXCO, S.A. (NEXCO or plaintiff),

NEXCO Br., ECF Nos. 25 and 26, challenging certain aspects of the final determination of the

U.S. Department of Commerce (Commerce) in the antidumping duty investigation covering raw

honey from Argentina.  As we demonstrate below, Commerce's final determination is supported

by substantial evidence and is in accordance with law.  Accordingly, we respectfully request that

the Court deny plaintiff's motion and enter judgment in favor of the United States.

## STATEMENT PURSUANT TO RULE 56.2

### I.   Administrative Determination Under Review

The administrative determination under review is the final determination in the antidumping duty investigation covering raw honey from Argentina.  *See Raw Honey from Argentina*, 87 Fed. Reg. 22,179 (Dep't of Commerce Apr. 14, 2022) (final LTFV determ.) (P.R. 444),[1] and accompanying Issues and Decision Memorandum (IDM) (P.R. 438).  The period of investigation is April 1, 2020, through March 31, 2021.

### II.   Statement Of The Issues

1.   Whether Commerce's reliance on NEXCO's acquisition costs as proxies for the actual cost of production of the raw honey it purchased from beekeepers is supported by substantial evidence and in accordance with law.

2.   Whether NEXCO failed to exhaust its argument that Commerce should have deducted beekeeper profit from the acquisition costs.

3.   Whether Commerce's application of its high inflation methodology combined with its alternative cost averaging methodology in calculating NEXCO's dumping margin is supported by substantial evidence and in accordance with law.

## STATEMENT OF FACTS

### I.   Initiation Of Investigation And Respondent Selection

On May 18, 2021, Commerce initiated an antidumping duty investigation covering raw honey from Argentina.  *See Raw Honey From Argentina, Brazil, India, Ukraine, and the Socialist Republic of Vietnam*, 86 Fed. Reg. 26,897 (Dep't of Commerce May 18, 2021)

---

[1] Citations to the public record (P.R.) and confidential record (C.R.) refer to the record of the antidumping duty investigation.

(initiation notice) (P.R. 54).  Commerce selected Asociacio´n De Cooperativas Argentinas

Cooperativa Limitada (ACA) and NEXCO as mandatory respondents.  *See* Respondent Selection

Memorandum (P.R.71); Selection of Additional Respondent Memorandum (P.R. 101).

The mandatory respondents' early submissions clarified that they do not produce the

subject merchandise, but instead have numerous suppliers of raw honey.  *See* NEXCO Request

for Information (RFI) Resp. at 3 (June 17, 2021) (P.R. 89); ACA RFI Resp. at 2 (June 17, 2021)

(P.R. 90).  They also notified Commerce that their sales of the foreign-like product in the home

market (by volume) during the period of investigation fell under the threshold of five percent of

U.S. sales.  NEXCO Home Market Notification at 2 (June 21, 2021) (P.R. 92, C.R. 39); ACA

Home Market Notification at 2 (June 21, 2021) (P.R. 91, C.R. 38).  After both respondents

submitted timely responses to Commerce's request for third country market information,

Commerce selected Germany for NEXCO's comparison market and Japan for ACA's

comparison market.  *See* Selection of Appropriate Third Country Market (Aug. 11, 2021) (P.R.

167, C.R. 132).

Recognizing early in the proceeding that the raw honey industry in Argentina comprises

more than 15,500 small beekeepers, Commerce sought information from interested parties

regarding how to calculate cost of production.  *See* Commerce's Request for Comments on the

Raw Honey Cost of Production Reporting Methodology (July 22, 2021) (P.R.137).  In response,

both the Government of Argentina (GOA) and the mandatory respondents repeatedly advocated

for Commerce to rely on acquisition costs.  *See* GOA Virtual Meeting Response Letter (June 2,

2021) (P.R. 69); NEXCO RFI Resp. at 3; ACA RFI Resp. at 2; ACA and NEXCO Comments on

Cost of Reporting Methodology at 3 (July 29, 2021) (P.R. 148).  The GOA explained that none

of the largest exporters had any affiliated beekeepers; thus, all transactions were made at arm's

length and yielded an accurate reflection of total beekeeper costs including profit. *See generally* GOA Virtual Meeting Response Letter.

The GOA also argued that "{g}iven the generally small nature of these beekeeping operations, the lack of diversification in their operations, the revenue from these operations is crucial to the livelihood of the beekeeper's family. It is inconceivable that these operations are selling their honey below their full cost of production plus profit." *Id.* at 3. NEXCO agreed that because small family-owned businesses are involved, it was very unlikely that beekeepers were selling the product at below the cost of production. *See* NEXCO RFI Resp. at 3. Specifically, at the outset of the proceeding, NEXCO requested that Commerce use acquisition cost. *Id.*

Additionally, the respondents explained that although the purchased raw honey is in scope, the product supplied cannot be exported in the form that it is received. *See* ACA and NEXCO Comments on Cost of Reporting Methodology at 6. Thus, they argued that the additional processing and testing performed by NEXCO and ACA warranted the use of acquisition costs in this case. *Id.* at 3.

## II.  Preliminary Determination

On November 17, 2021, Commerce published the preliminary determination. *See Raw Honey From Argentina*, 86 Fed. Reg. 66,531 (Dep't of Commerce Nov.23, 2021) (prelim. LTFV determ.) (P.R. 364), and accompanying Preliminary Determination Memorandum (PDM) (P.R. 365). In evaluating how to approach the cost calculation methodology, Commerce considered the interested party comments, the fact that the beekeeper suppliers are the producers of the raw honey, the dispersed nature of the honey industry, and Commerce's limited resources. PDM at 25. Commerce also determined that both sampling and the selection of the largest beekeepers

were either impossible or ineffective options for obtaining a representative cost of production for the raw honey purchased by NEXCO.[2]  *See* NEXCO Preliminary Cost Memo. (Nov. 18, 2021) (C.R. 646).

Consequently, as an alternative, Commerce adopted the respondents' proposal to rely on their acquisition costs.  PDM at 25-26.  But to confirm the cost of production, Commerce also selected and requested cost information from several raw honey suppliers with the aim of determining whether reliance on NEXCO's acquisition costs as a proxy for the actual cost of production of the raw honey purchased was reasonable.  *See id.* at 25-26.  In doing so, Commerce focused on the largest suppliers and those that Commerce determined would have the highest likelihood of selling below their cost of production for raw honey.  *Id.* at 26.  Specifically, of NEXCO's larger suppliers, Commerce selected those with the lowest average period of investigation sales prices to NEXCO (or NEXCO's acquisition costs).  *See* NEXCO Preliminary Cost Memo.  After examining the data, Commerce preliminarily determined that it was reasonable to rely on acquisition costs as a proxy for the cost of producing honey because "the acquisition prices paid by NEXCO were higher than the actual {cost of production} incurred by its raw honey suppliers."  PDM at 26.

Additionally, in calculating the cost of production, Commerce applied its high inflation methodology and its alternative cost averaging methodology.  *See id.* at 23-24.  With respect to the high inflation methodology, Commerce explained that because of the high inflation in Argentina, respondents were required to report monthly replacement costs for direct materials and monthly averages for conversion costs.  *Id.*  These monthly costs were "indexed to the end of

---

[2]  Because no party challenges any aspect of the antidumping duty margin Commerce assigned to ACA, we mainly address the relevant facts related to NEXCO.

the {period of investigation} to calculate a constant currency annual weighted-average {cost of production} that is then restated in the respective {period of investigation} monthly currencies. *Id.* at 24.  Commerce also applied its alternative cost methodology, after finding (1) that there were significant cost changes between the high and low quarterly cost of manufacturing during the period of investigation (with these comparisons done with inflation adjusted figures), and (2) a linkage between the cost of manufacturing changes and the respondents' sales prices during the period of investigation.  *Id.* at 24-25.

To wit, Commerce determined that, with 25 percent as the threshold between the high- and low-quarter cost of manufacturing during the period of investigation, "record evidence shows that after restatement of {the respondents'} costs into a constant currency, both ACA and NEXCO experienced significant cost changes between the high and low quarterly {cost of manufacturing} during the {period of investigation}." *Id.* at 24.  Also, regarding linkage between sales and cost information, Commerce determined that the changes in cost of manufacturing were "significant" and that its comparison between the cost of manufacturing changes and the respondents' sales prices during the period of investigation preliminarily demonstrated a "linkage," and that a "shorter cost-averaging period approach, based on an inflation-adjusted quarterly-average {cost of manufacturing} restated in the appropriate monthly currencies" was an appropriate methodology.  *Id.* at 24-25.

### III.    Administrative Case Briefs

Following the preliminary determination, the respondents and petitioners timely submitted administrative case and rebuttal briefs.  *See* NEXCO and ACA Admin. Case Br. (Jan. 18, 2022) (P.R. 420, C.R. 801); Petitioners' Admin. Case Br. (Jan. 18, 2022) (P.R. 421, C.R.

802); ACA and NEXCO's Rebuttal Br. (Feb. 1, 2022) (P.R. 427, C.R. 806); Petitioners' Rebuttal Br. (Feb. 1, 2022) (P.R. 426, C.R. 805).

In its administrative case brief, NEXCO argued that Commerce should not rely on acquisition costs, but that Commerce was required to use the beekeeper and middlemen costs of producing honey to calculate NEXCO's cost of production. NEXCO and ACA Admin. Case Br. at 4-14. NEXCO also argued that Commerce's high inflation methodology does not require the use of monthly sales comparisons in investigations when sales prices in both markets are denominated in U.S. dollars and when the only difference in merchandise adjustment has been weight-averaged over the period. *Id.* at 24-28. NEXCO also argued that Commerce should use quarterly costs and compare quarterly prices in accordance with its quarterly cost methodology. *Id.* at 30-32.

In the petitioners' rebuttal brief, they argued that Commerce's reliance on acquisition costs was reasonable based on the record and was consistent with the relevant statutory provisions. *See* Petitioners' Rebuttal Br. at 7-14. Petitioners also argued that the limited beekeeper supplier cost of production information on the record cannot be used to derive a representative supplier cost of production. *Id.* at 14-24. Petitioners also supported Commerce's reliance on its high inflation methodology and argued that Commerce should continue to match U.S. sale prices to normal value limited to the month of the U.S. sale. *Id.* at 40-48.

## IV.    <u>Final Determination</u>

On April 14, 2022, Commerce published the final determination. *See* IDM. Commerce continued to rely on NEXCO's acquisition costs to calculate the cost of production, and continued to apply both its high inflation methodology and alternative cost methodology. *Id,* at 15-19.

First, in determining that NEXCO's acquisition cost was a reasonable proxy for the beekeepers' cost of production, Commerce determined that because it "sourced all raw honey from thousands of unaffiliated middlemen and beekeepers during" the period of investigation, and considering the "significant problems encountered in prior honey cases," Commerce determined that "it would be more appropriate to consider the alternative of relying on the acquisition costs as a proxy of the honey {cost of production}." *Id.* at 8.  Commerce considered the "sheer volume of beekeepers in Argentina," and the GOA's insistence that it was "inconceivable" that small, family beekeepers would be "selling their honey below their full cost of production plus profit," in determining that "the prices charged by the unaffiliated beekeeper/middlemen suppliers" was a "reasonable proxy for the beekeeper/middlemen's cost of production." *Id.* at 10-12.

Faced with "no easy solution," Commerce determined that it could not select a representative sample of honey producers, as it normally would. *Id.* at 11-12.  Instead, Commerce "adopted a pragmatic approach to collecting limited beekeeper {cost of production} information" by soliciting data from one direct beekeeper supplier, one middleman, and one middle-man beekeeper in order to ensure the general accuracy of NEXCO's cost of production. *Id.* at 11-12.  And in its examination of that data, Commerce determined that "there is no reason to believe that NEXCO's beekeepers sold raw honey below their {cost of production}" and "that the reliance on the acquisition prices" as a "proxy for the actual cost of producing honey is reasonable and does not contravene the calculation of an accurate dumping margin." *Id.* at 13.

Turning to Commerce's cost of production methodology, Commerce explained that its use of "both the high inflation and alternative cost average methods" was not arbitrary. *Id.* at 15.  Although Commerce conceded that the use of both methods "adds complexity" to its

calculations, it explained why "each of these methods address issues that are separate from one another." *Id.* To wit, Commerce explained that "to even out swings in production costs experienced by respondents over short periods of time, Commerce has developed a practice of using a single weighted-average {cost of production}" that applies to the entire annual period of investigation and this is the "normal method" it uses. *Id.* But Commerce also has a "practice of applying an alternative cost averaging method in instances" when the annual costs during the period of investigation "would lead to skewed data and inappropriate comparisons." *Id.* at 15-16. And in using that alternative cost averaging method, Commerce "shrinks the cost averaging periods" and essentially "uses quarterly-weighted averages for the direct material costs and continues to use annual weighted averages for all other production cost components." *Id.*

Then, in order to account for high inflation, Commerce uses its high inflation methodology which accounts for not only a respondent's cost of production indexed to "account for the change in nominal costs of production, but Commerce also makes other changes in its normal dumping analysis, such as matching U.S. prices with a normal value from the same month as the U.S. sale." *Id.* at 16. Once Commerce has determined that high inflation exists during the period of investigation, Commerce instructs respondents to "report monthly nominal costs rather than annual average costs to mitigate the distortive impact of inflation on the dumping calculations." *Id.* at 16-17. After Commerce receives monthly replacement values for direct materials, such as "purchases prices, rather than consumption costs based on inventory values, and nominal monthly production costs for all other production cost components," Commerce uses "monthly inflation indices to restate the reported monthly costs into a constant inflation-index level (*e.g.*, at the end-of-period inflation-index level)." *Id.* at 17. Once the "costs

reflect a constant inflation-index level, Commerce follows its normal practice of calculating an annual weighted-average cost" for each control number (CONNUM)-specific cost. *Id.*

With respect to Commerce's use of the alternative cost averaging method, Commerce explained that it was appropriate to calculate quarterly-average costs for direct materials (DIRMAT), which were the inputs that experienced "significant cost changes and annual average costs for all other cost elements." *Id.* at 34; *id.* at 35 ("It is Commerce's normal practice to use shorter cost averaging periods for the input with significant cost changes but continue to use {its} normal annual averages for all other reported costs."). Commerce declined to use quarterly-average costs for all costs, as NEXCO advocated for, because such a method would introduce "distortions in the calculations by failing to appropriately allocate expenses to total production." *Id.* at 35-36.

## SUMMARY OF THE ARGUMENT

First, Commerce's reliance on NEXCO's acquisition costs of raw honey purchased from its suppliers as a basis on which to calculate NEXCO's cost of production is supported by substantial evidence and in accordance with law. Commerce considered multiple factors before deciding on a cost of production methodology including the concerns raised by the parties early in the proceeding; the lessons learned from the prior investigation of *Honey from Argentina*, where the unaffiliated beekeeper respondents frequently refused to respond to requests for information, or if responsive, they were unable to provide usable cost data because of their small size, unsophisticated nature, and limited records; and that Commerce's analysis showed that even the largest producers still represented only a small percentage of total honey supplied to the respondents.

In this investigation, after Commerce tested the beekeepers' costs of production to the respective acquisition costs NEXCO had paid, Commerce determined that a reliance on NEXCO's acquisition costs was an accurate gauge of costs of production. Thus, Commerce determined that a reliance on NEXCO's acquisition costs ensured the capture of all costs, expenses, and profits of the beekeepers and middlemen involved in the production and collection of raw honey in accordance with section 19 U.S.C. §1677(28). Relatedly, although NEXCO now argues that Commerce should deduct beekeeper profit from NEXCO's acquisition prices, NEXCO failed to exhaust its administrative remedies with respect to this argument, and the Court should decline to consider this argument.

Second, Commerce's application of its high inflation methodology combined with its alternative cost averaging methodology is supported by substantial evidence and in accordance with law. Although the relevant statutory provision, 19 U.S.C. §1677f-1(d)(1), is silent concerning the time periods over which to calculate weight-averaged U.S. prices and normal values in an investigation, Commerce's regulations provide that it may calculate weight-averages over shorter periods when normal values or U.S. prices change significantly over the period of investigation, for example, in a market experiencing high inflation. *See* 19 C.F.R. § 351.414(d)(3). Because Argentina's economy experienced high inflation during the period of investigation, Commerce limited its comparisons of U.S. sale prices to calculated normal value during the same month in which the U.S. sale occurred.

Commerce applied its test under this methodology and after accounting for inflation found 1) that there were significant cost changes between the high and low quarterly cost of manufacturing during the period of investigation, and 2) that there was a linkage between the cost of manufacturing changes and NEXCO's sales prices during the period of investigation.

Accordingly, Commerce determined that it was appropriate to use a shorter cost-averaging period approach for the cost of direct materials, based on an inflation-adjusted quarterly-average cost of manufacturing restated in the appropriate monthly currencies, in order to account for the high inflation.

## ARGUMENT

## I.   Standard Of Review

The Court sustains any determination, finding, or conclusion by Commerce unless it is unsupported by substantial evidence upon the record, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B); *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009). "Substantial evidence" connotes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence may also be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from evidence upon the record does not render Commerce's findings unsupported by substantial evidence.  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).  Thus, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation and internal quotation marks omitted), and the Court sustains Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from the agency's conclusions.  *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

The Court examines Commerce's statutory interpretations under the two-pronged test established in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). The Court first examines "whether Congress has directly spoken to the precise question at issue,"

and if it has, the agency must comply with Congress's clear intent. *Id*. at 842-43. If "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id*. at 843. In such cases, "{a}ny reasonable construction of the statute is a permissible construction," *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004) (citation and quotation marks omitted), and Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." *Eurodif*, 555 U.S. at 316 (citation omitted). The Court "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron*, 467 U.S. at 843 n.11. Indeed, "the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency." *Eurodif*, 555 U.S. at 316 (citation and quotation marks omitted).

The Court affords Commerce an especially great deal of deference "when a statute fails to make clear 'any Congressionally mandated procedure or methodology for assessment of the statutory tests.'" *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015) (quoting *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1362 (Fed. Cir. 1996)). In that circumstance, "Commerce 'may perform its duties in the way it believes most suitable.'" *Id*. (quoting *U.S. Steel Grp.*, 96 F.3d at 1362). Consequently, Commerce receives "tremendous deference" that is "both greater than and distinct from that accorded the agency in interpreting the statutes it administers" when it exercises its technical expertise to select and apply methodologies to implement the dictates of the trade statute. *Fujitsu General, Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996).

Finally, the Court reviews Commerce's conduct of its administrative proceedings for abuse of discretion. *See Dongtai Peak Honey Indus. v. United States*, 777 F.3d 1343, 1350 (Fed. Cir. 2015). The Court "(1) must consider whether {Commerce's} decision was based on a consideration of relevant factors and whether there has been a clear error of judgment, and (2) analyze whether a rational connection exists between {Commerce's} factfindings and its ultimate action." *Consol. Fibers, Inc. v. United States*, 535 F. Supp. 2d 1345, 1354 (Ct. Int'l Trade 2008). The Court has recognized that it is within the discretion of a court or an administrative agency to relax or to modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it. *PAM S.p.A. v. United States*, 463 F.3d 1345, 1348 (Fed. Cir. 2006).

## II.   Commerce's Determination To Use NEXCO's Acquisition Costs For The Cost Of Production Is Supported By Substantial Evidence And In Accordance With Law

Commerce's calculation of the cost of production for NEXCO using its acquisition costs of raw honey from beekeepers is supported by substantial evidence and in accordance with law. *See* IDM at 8-14. As we explain below, NEXCO's arguments in opposition are meritless.

### A.   Legal Framework

To properly determine appropriate antidumping duties for a given product, Commerce must first identify the normal value or, when the normal value cannot be determined, the constructed value, of the merchandise in the exporting country. 19 U.S.C. § 1677b(a). Constructed value is calculated from (1) "the cost of materials and fabrication or other processing of any kind employed in producing the merchandise," (2) "selling, general, and administrative expenses," and (3) "the cost of all containers and coverings ... and all other expenses incidental to placing the subject merchandise in condition packed ready for shipment to the United States." *Id.* § 1677b(e). In making a normal value calculation, the statute

defines "the term 'exporter or producer' {to} include{ } both the exporter of the subject merchandise and the producer of the same subject merchandise to the extent necessary to accurately calculate the total amount incurred and realized for costs, expenses, and profits in connection with production and sale of that merchandise." 19 U.S.C. § 1677(28).

The Statement of Administrative Action (SAA) further explains that the purpose of this section "is to clarify that where different firms perform the production and selling functions, Commerce may include the costs, expenses, and profits of each firm in calculating cost of production and constructed value." H.R. Doc. 103-316 at 835, vol. 1, 103d Cong. 2d Sess. 656 (1994), *reprinted* in 1994 U.S.C.C.A.N. 4040, 4172. The "intent of the statute is to ensure that Commerce has the authority to capture all costs and profits in situations where various companies are engaged in the production and sale of {the merchandise under consideration}." IDM at 11.

In this regard, although "the statute does not mandate that Commerce must use actual cost data, it unambiguously allows Commerce to prefer the actual production costs of unaffiliated suppliers of finished subject merchandise over acquisition costs." *SKF USA Inc v. US*, 630 F.3d 1365, 1371 (Fed. Cir. 2011). Thus, in the final determination, Commerce determined it "has the discretion to rely on acquisition costs where such reliance does not contravene {its} responsibility to apply the antidumping law in a manner that prevents the evasion of antidumping duties." IDM at 11-12.

## B.   Commerce's Past Practice In Other Agricultural Cases, Including The Previous Honey From Argentina Investigation, Informed Its Determination Here

As Commerce explained in the final determination, "{u}nder normal circumstances, whereby a reseller merely purchases the subject merchandise from unaffiliated parties rather

than produces the subject merchandise, Commerce obtains the costs from the actual producer to ensure that resellers have not acquired merchandise at less than its {cost of production} and thereby avoided the reach of the antidumping law." IDM at 12. However, the circumstances presented in this case did not allow Commerce to use that approach.

For example, although Commerce selected the largest exporters of raw honey as mandatory respondents, neither of them produce raw honey. *See* NEXCO RFI Resp. at 7 (explaining that "NEXCO does not function as a beekeeper and has never produced its own raw honey as it does not maintain any beehives."). Instead, the producers are scores of small unsophisticated beekeepers not economically tied to NEXCO, who in turn purchased and exported the subject merchandise. IDM at 10. Additionally, the market is fragmented in such a way that even the largest beekeeper suppliers do not produce enough honey to be deemed representative of NEXCO's total honey purchases. *Id.*

Commerce faced similar issues in previous agricultural cases, specifically, the prior *Honey from Argentina* investigation. In the investigation of *Honey from Argentina*, Commerce selected 12 independent, unaffiliated beekeepers out of a potential field of approximately 25,000 honey producers to calculate a country-wide cost. *See Honey from Argentina,* 66 Fed. Reg. 50,611 (Dep't of Commerce Oct. 4, 2001) (final LTFV determ.), and accompanying IDM at Comment 1. Ultimately, none of the selected beekeepers responded, and because it was determined that none were affiliated with or even supplied the two exporter-respondents, Commerce relied on public studies to calculate a cost of production for the subject merchandise as facts available. *Id.*

In the later administrative reviews covering honey from Argentina,[3] Commerce determined that the Argentine honey industry was becoming more fragmented, such that the selection of the largest beekeeper suppliers in later reviews provided less coverage of the exporter-respondents' total honey purchases. *See, e.g.*, *Honey from Argentina*, 69 Fed. Reg. 62,624 (Dep't of Commerce Jan. 6, 2004) (prelim. admin. review); *Honey from Argentina*, 71 Fed. Reg. 78,397, 78,400 (Dep't of Commerce Dec. 29, 2006) (prelim. admin. review); *Honey from Argentina*, 73 Fed. Reg. 79,802, 79,807 (Dep't of Commerce Dec. 30, 2008) (prelim. admin. review); *Honey from Argentina*, 76 Fed. Reg. 2,655, 2,659 (Dep't of Commerce Jan. 14, 2011) (prelim. admin. review).  Additionally, as Commerce explained in this case, it had determined that "these smaller beekeepers typically had limited records, or limited access to technology due to their remote locations, which meant more reliance on assumptions and estimates {rather} than actual verifiable records." IDM at 10.  Thus, even when beekeepers responded, "Commerce was still plagued with incomplete or unreliable cost data that needed to be supplemented with public studies to calculate certain costs such as labor, land rent, and bee feed." *Id.*; *see, e.g.*, *Honey from Argentina*, 69 Fed. Reg. 30,283 (Dep't of Commerce May 27, 2004) (final admin. review), and accompanying IDM at Comments 1, 2, 3, 9, and 10; *Honey from Argentina*, 72 Fed. Reg. 25,245 (Dep't of Commerce May 4, 2007) (final admin. review), and accompanying IDM at Comment 4.

Armed with this understanding of the difficulties in the prior honey investigation and administrative reviews, "Commerce approached this new investigation with this history in mind." IDM at 10.  Commerce explained that "it was abundantly clear" that "due to sheer

---

[3] The antidumping duty order covering honey from Argentina was revoked in 2012 due to non-interest by the domestic industry.  *See Honey from Argentina*, 77 Fed. Reg. 77,029 (Dep't of Commerce Dec. 31, 2012) (revocation order).

volume of beekeepers in Argentina, a statistically valid random sample was not possible. *Id.*
For example, during the current investigation, there were more than 15,500 beekeepers (honey
producers) in Argentina. *Id.* (citing GOA Virtual Meeting Response Letter).

Indeed, the actual number of beekeeper suppliers to NEXCO reflects a massive
number; NEXCO reported [ ███ ███ ███ ] suppliers. *See* NEXCO RFI Resp. at Exh. 3
(C.R. 36). Consequently, Commerce recognized that it did not have the resources to rely on a
statistically valid sample because that would require the collection and analysis of cost data
from scores of beekeepers. *See* PDM at 25. Moreover, because of the generally small nature
of the beekeepers' operations and size of the respondents, the additional option offered by the
statute, *i.e.*, selecting the largest supplier producers, would also fail to capture a significant or
representative portion of the raw honey supplied to NEXCO. *See* PDM at 25; IDM at 11.

Notably, in the early stages of this proceeding, both the GOA and NEXCO repeatedly
petitioned Commerce to rely on acquisition costs. *See* GOA Virtual Meeting Response Letter;
NEXCO RFI Resp. at 3; ACA and NEXCO Comments on Cost of Reporting Methodology at
3. The GOA argued that "{g}iven the generally small nature of these beekeeping operations,
the lack of diversification in their operations, the revenue from these operations is crucial to
the livelihood of the beekeeper's family. It is inconceivable that these operations are selling
their honey below their full cost of production plus profit." GOA Virtual Meeting Response
Letter at 3. NEXCO agreed that because of the many small, family-owned businesses
involved, it was very unlikely that beekeepers would be selling the product at below the cost
of production. *See* NEXCO RFI Resp. at 3. Specifically, at the outset of the proceeding,
NEXCO requested that Commerce use acquisition cost, stating,

> the acquisition cost in this case is appropriate under 19 U.S.C. §
> 1677(28), which provides that total cost of production for both the

> producer and exporter must be included in the total cost of
> production for the sales-below-cost test but does not mandate the
> methodology for achieving the construction of a total cost.  If the
> acquisition cost properly represents the full costs of the beekeeper
> including the profit of the beekeepers, then the statute is satisfied.

*Id.*

Additionally, NEXCO explained that although the purchased raw honey is in scope,

the product supplied cannot be exported in the form that it is received.  ACA and NEXCO

Comments on Cost of Reporting Methodology at 6.   Thus, NEXCO argued that the additional

processing and testing that it performed warranted the use of acquisition costs in this case.  *Id.*

at 3 (citing multiple cases "where Commerce has relied on the acquisition prices from non-

affiliated suppliers for the agricultural product input because certain processing took place

after the exporter received the input product from the nonaffiliated supplier."); *see also*

*Individually Quick Frozen Red Raspberries From Chile*, 70 Fed. Reg. 6,618 (Dep't of

Commerce Feb. 8, 2005) (final admin. review), and accompanying IDM at Comment 1

(determining that the "purchase prices paid by {the respondent} raspberry processors to

unaffiliated growers for fresh raspberries are appropriate to use for the 'cost of materials' in

the {cost of production} calculation."); *Certain Preserved Mushrooms From Indonesia*, 66

Fed. Reg. 36,754 (Dep't of Commerce July 13, 2001) (final admin. review), and

accompanying IDM at Comment 2 (using acquisition price of mushrooms); *Certain Frozen*

*and Canned Warmwater Shrimp From Thailand*, 69 Fed. Reg. 47,100, 47,107 (Dep't of

Commerce Aug. 4, 2004) (prelim. LTFV determ.).

### C.    Substantial Evidence Supports Commerce's Reliance On Acquisition Costs In Calculating The Cost Of Production

As explained above, Commerce considered multiple factors before deciding on a cost of

production methodology including the concerns raised by the parties early in the proceeding;

the lessons learned from the prior investigation of *Honey from Argentina*, where the unaffiliated

beekeeper respondents frequently refused to respond to requests for information, or if

responsive, they were unable to provide usable cost data because of their small unsophisticated

nature and limited records; and that Commerce's analysis showed that even the largest

producers still represented only a small percentage of total honey supplied to the respondents.

*See* IDM at 12-13.   Thus, Commerce weighed its responsibility to apply the antidumping law in

a manner that prevents the evasion of antidumping duties with whether to continue with its

precedent in obtaining the cost of production of raw honey from unaffiliated producers and

determined that that was not possible.  *Id.*  To wit, Commerce determined that it was unable to

select a representative number of beekeepers and decided instead to rely on NEXCO's

acquisition costs.  *Id.* at 11-12.

       Further, to test that NEXCO's acquisition costs were reliable for purposes of calculating

cost of production, Commerce adopted a "pragmatic approach" to collecting limited beekeeper

cost of production information.  *See* PDM at 26; IDM at 12.   Commerce limited its solicitation

of cost of production information to "one direct beekeeper supplier, one middleman, and one

middleman-beekeeper supplier" from NEXCO and "focused on the largest honey suppliers"

because they were "more likely to have the ability to provide the data." IDM at 12.  Commerce

then "selected the suppliers with the lowest sales prices" because they had the "highest risk to

be selling at below their {cost of production} for the raw honey" and were actual suppliers to

NEXCO.  *Id.*  Therefore, Commerce reasoned that if these beekeepers were selling above their

cost of production for the raw honey, "Commerce could reasonably determine that a reliance on

acquisition costs would not result in missing costs."  *Id.*

Next, Commerce compared the beekeepers' costs of production to the respective acquisition costs that NEXCO paid to its suppliers. *Id*. Based on these comparisons, Commerce found that there was "no reason to believe that NEXCO's beekeepers sold raw honey below their {cost of production}." *Id*. at 13. Thus, Commerce determined that a "reliance on NEXCO's acquisition costs does not result in missing costs," but rather "ensures the capture of all costs, expenses, and profits of the beekeepers and middlemen involved in the production and collection of raw honey" in accordance with section 19 U.S.C. §1677(28). *Id*.

In summary, Commerce also explained that using NEXCO's acquisition costs as a "proxy for the actual cost of producing honey is reasonable and does not contravene the calculation of an accurate dumping margin." *Id*. In this case, with unaffiliated suppliers in the thousands, Commerce determined that "the 'actual cost' of producing honey continues to be illusive because of the impossibility of performing an accurate sampling of beekeeper suppliers and the impossibility of gaining coverage by obtaining information from enough of the 'largest' quantity suppliers to truly gain representative coverage." *Id*. In addition, even when beekeepers participated, "they are largely comprised of families and small farms, wherefor, they are not required to maintain the types of detailed accounting records that are necessary to calculate product-specific {costs of production}." *Id*.

Thus, substantial evidence supports Commerce's determination to use NEXCO's acquisition costs of honey to calculate its cost of production. *See id*. at 10-13.

**D.   NEXCO's Arguments Do Not Undermine Commerce's Determination**

NEXCO makes numerous arguments that Commerce's reliance on the acquisition costs is not in accordance with law, *see* NEXCO Br., but these arguments are meritless.

First, NEXCO argues that Commerce has impermissibly deviated from its practice of collecting and using cost data from unaffiliated growers in agricultural cases, citing cases spanning from 1992 to 2005, including segments of the prior *Honey from Argentina* proceedings. *See* NEXCO Br. at 14-16.  Contrary to NEXCO's assertion that Commerce failed to explain why it was departing from its prior practice, *id.* at 18, Commerce explained at length the issues that it had faced in those prior proceedings, which, combined with NEXCO's *own* request to use its acquisition prices, informed its decision to deviate from that practice in this case.  *See* IDM at 10-12; NEXCO RFI Resp. at 3.

Moreover, NEXCO ignores both the facts of this case and the product at issue in this investigation when it asserts that Commerce is departing from its past practice without an adequate explanation.  *See* NEXCO Br. at 18.  When an agency changes its practice, it is obligated to provide an adequate explanation for the change, which Commerce did in this case. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42 (1983); *SKF USA, Inc. v. United States,* 263 F.3d 1369, 1382 (Fed. Cir. 2001).  In this case, Commerce acknowledged early in the proceeding that it had concerns with how to calculate NEXCO's cost of production.  *See* IDM at 10-11.  Due to this concern, Commerce requested parties' comments on the most appropriate methodology to calculate NEXCO's cost of production and considered NEXCO's own arguments for relying on its acquisition prices in calculating the cost of production, rather than the beekeepers' cost of production.  *Id.*  As such, Commerce's past practice of using the beekeepers' cost of production does not "foreclose{} Commerce's ability" to use NEXCO's acquisition costs as a reasonable proxy when "the situations differ in key respects."  *Icdas Celik Enerji Tersane Ve Ulasim Sanayi, A.S. v. United States*, 429 F. Supp. 3d 1353, 1370–71 (Ct. Int'l Trade 2020).  In any event, NEXCO does not

22

explain *how* Commerce's explanation to use NEXCO's acquisition cost, rather than the beekeeper suppliers' cost of production, was in any way insufficient, NEXCO Br. at 14-18, especially when NEXCO *itself* had advocated for that approach before Commerce and Commerce thoroughly explained its rationale for the change in practice. *See* IDM at 10-14; NEXCO RFI Resp. at 3.

Second, NEXCO argues that 19 U.S.C. § 1677b(f)(1)(A) requires Commerce to use the beekeeper suppliers' cost of production to calculate NEXCO's cost of production, and that Commerce did not use "facts available" as its basis for refusing to use the beekeepers' costs. NEXCO Br. at 26. Also, NEXCO argues that Commerce "ignores the statutory framework for justifying the use of facts available" with its use of NEXCO's acquisition costs. *Id.* at 25-26. This argument is a red herring because Commerce plainly did not use facts available pursuant to the statute in determining to use NEXCO's acquisition prices for the raw honey. *See* IDM at 8-14; 19 U.S.C. § 1677e(a)(1). In a footnote, Commerce explained that its sampling of the middlemen and beekeeper suppliers "was neither a statistical sample nor a largest supplier sample, and thus the results do not necessarily represent the actual costs of the greater population in Argentina." IDM at 25 n.127. Then, somewhat inartfully,[4] Commerce explained that it could not "extrapolate the results of these few suppliers to other non-selected suppliers, and thus the acquisition costs remain the only *facts available* cost information on the record." *Id.* (emphasis added). But the Court should reject NEXCO's meritless argument because Commerce relied on NEXCO's acquisition costs and did not apply "facts available" in doing so. IDM at 13; *see also*

---

[4] Perhaps the confusion arises because Commerce *did* use facts available for ACA's non-responsive direct beekeeper supplier and middleman beekeeper supplier, IDM at 44-47, but Commerce expressly stated that NEXCO's beekeepers were cooperative, *id.* at 13, which NEXCO also acknowledges in its brief. *See* NEXCO Br. at 25-26.

*id.* at 25 (continuing to "find that {Commerce's} decision to utilize acquisition costs after considering sampling difficulties and comparing raw honey suppliers' cost information with ACA's and NEXCO's acquisition costs to be reasonable.").

In any event, NEXCO incorrectly asserts that 19 U.S.C. § 1677b(f)(1)(A) "requires that Commerce use the books and records of *the producer* so long as they are kept in accordance with the generally accepted accounting principles of the producing country and 'reasonably reflect the costs associated with the production and sale of the merchandise.'" NEXCO Br. at 26 (emphasis in original). But NEXCO misquotes the statute, because it actually states that "{c}osts shall normally be calculated based on the records of the *exporter or producer* of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably *reflect the costs associated with the production and sale of the merchandise*." 19 U.S.C. § 1677b(f)(1)(A) (emphasis added).

In this case, Commerce explained that it calculated costs based on the records of NEXCO, specifically its acquisition costs of the raw honey. IDM at 12. Moreover, Commerce also relied on the beekeeper suppliers' data when it used that data to test whether NEXCO's acquisition costs were reliable. *Id*. Therefore, Commerce's methodology is consistent with the requirements of the statute: by using NEXCO's acquisition costs, Commerce's cost of production calculation reflected the costs associated with the production and sale of the raw honey. *Id*. at 13.

Third, NEXCO argues that Commerce "excused itself from the obligation to follow statutory requirements for the selection of respondents-19 U.S.C. § 1677f-1(c)(2)." NEXCO Br. at 14, 21-22. NEXCO also argues that Commerce's conclusion that the beekeeper costs on the

record are not "representative" is not supported by substantial evidence. *Id.* at 23-24.  The

"general rule" pursuant to 19 U.S.C. § 1677f-1(c)(1) is that Commerce "shall determine the

individual weighted average dumping margin for each known exporter and producer of the

subject merchandise."  Subsection (c)(2) provides that Commerce can limit the number of

individually examined exporters or producers by either "a sample of exporters, producers, or

types of products that is statistically valid based on the information available to the administering

authority at the time of selection," or Commerce may examine "exporters and producers

accounting for the largest volume of the subject merchandise from the exporting country that can

be reasonably examined."  19 U.S.C. § 1677f-1(c)(2).

Effectively, NEXCO asks this Court to treat the beekeeper suppliers as the mandatory

respondents, irrespective of Commerce's determination that these suppliers represented only a

small portion of NEXCO's total raw honey consumption during the period of investigation.

IDM at 13.  Moreover, NEXCO alone reported [██████ ██ ██ ████████    NEXCO RFI Resp.

at Exh. 3.  NEXCO's argument, thus, ignores that Commerce selected the largest *exporters* of

raw honey as mandatory respondents in this investigation (*i.e.*, ACA and NEXCO), consistent

with 19 U.S.C. §1677f-1(c)(2).  *See* PDM at 2.  Because neither of the mandatory respondents

produce raw honey, Commerce determined that the beekeepers are the actual producers of the

raw honey, which NEXCO does not contest.  *See* PDM at 25; IDM at 10-11; *see generally*

NEXCO Compl.

Considering these facts, and consistent with the statute, Commerce explained that the

population of beekeeper and middleman suppliers was too large to sample accurately and would

have required an unmanageable number of producers to achieve a statistically valid sample.  *See*

IDM at 13; 19 U.S.C. §1677f-1(c)(2).  In the final determination, Commerce explained at length

why it determined to rely on NEXCO's acquisition costs, and further explained that because the selected beekeeper suppliers' sales represented only a small portion of NEXCO's total raw honey consumption during the period of investigation, it would not be representative to rely on the beekeepers' cost of production to calculate NEXCO's cost of production. *See id.* at 10-13.

Fourth, NEXCO argues that it was "nonsensical" for Commerce to select beekeepers with the lowest annual average sales prices. NEXCO Br. at 25. But Commerce explained that its logic in doing so was because "those were the suppliers with the highest risk to be selling at below their {cost of production} for the raw honey and were actual suppliers" to NEXCO. IDM at 12. Thus, "if these beekeepers were selling above their {cost of production} for the raw honey, Commerce could reasonably determine that a reliance on acquisition costs would not result in missing costs." *Id.*

Finally, NEXCO argues, in the alternative, that should this Court determine it was acceptable for Commerce to use NEXCO's acquisition costs, then this Court should remand Commerce's determination to include beekeeper profit in NEXCO's acquisition prices because it is not a permissible element of cost of production under the statute. *See* NEXCO Br. at 27 (citing 19 U.S.C. § 1677b(b)(3)).[5]

As an initial matter, NEXCO failed to argue before Commerce that it should deduct beekeeper profit from the acquisition prices. *Compare* NEXCO Br. at 27-28, *with* NEXCO

---

[5] 19 U.S.C. § 1677b(b)(3) states: "CALCULATION OF COST OF PRODUCTION.— For purposes of this subtitle, the cost of production shall be an amount equal to the sum of— (A) the cost of materials and of fabrication or other processing of any kind employed in producing the foreign like product, during a period which would ordinarily permit the production of that foreign like product in the ordinary course of business; (B) an amount for selling, general, and administrative expenses based on actual data pertaining to production and sales of the foreign like product by the exporter in question; and); (C) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the foreign like product in condition packed ready for shipment."

Admin. Case Br. at 33, and NEXCO Admin. Rebuttal Br. at 47.  In the underlying proceeding,

NEXCO raised the inclusion of beekeeper profit in the acquisition prices, but *only* as a means to

argue that Commerce should have lagged its acquisition costs by two months.  NEXCO Admin.

Case Br. at 33.  Also, in NEXCO's rebuttal brief, it rejected petitioners' assertion that cost

allocations for the beekeepers "cannot be correct because it results in a high profit for honey and

a low profit for farming."  NEXCO Rebuttal Admin. Br. at 47.  At no point did NEXCO argue

that Commerce should deduct beekeeper profit from its acquisition costs.

By failing to raise this argument before Commerce, NEXCO failed to exhaust its

administrative remedies and is precluded from now making this argument.  *See* 19 C.F.R.

§ 351.309(c)(2) (stating that a party's case brief to Commerce "must present all arguments that

continue in the submitter's view to be relevant to {Commerce's} . . . final results."); *Corus Staal*

*BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007) (recognizing that the exhaustion

requirement protects administrative agency authority and promotes judicial efficiency).  Indeed,

the Court has held that a party's obligation to exhaust its administrative remedies in proceedings

before Commerce applies both to broad issues and arguments related to those issues.  *See Rhone*

*Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990) (disagreeing with

contention that courts can consider new arguments so long as the general issue was raised at the

agency level); *Paul Muller Industrie GmbH & Co. v. United States,* 502 F. Supp. 2d 1271, 1275

(Ct. Int'l Trade 2007) (holding that when a party raises a general issue but fails to incorporate a

specific argument among other arguments that relate to the same issue, it fails to exhaust

administrative remedies with respect to that argument).  Exceptions to the exhaustion

requirement are limited,[6] as such the Court "generally takes a 'strict view' of the requirement that parties exhaust their administrative remedies before the Department of Commerce in trade cases." *Corus Staal BV*, 502 F.3d at 1379. In any event, NEXCO's argument with respect to including the beekeepers' profit in NEXCO's acquisition costs is without merit.

In this case, early in the proceeding NEXCO advocated that Commerce should use its acquisition prices, precisely because they included all of the costs of the beekeepers, including profit. *See* NEXCO RFI Resp. at 3 ("If the acquisition cost properly represents the full costs of the beekeeper including the profit of the beekeepers, then the statute is satisfied"). And as Commerce explained in the final determination, it found "that a reliance on NEXCO's acquisition costs does not result in missing costs, but rather the use of acquisition costs ensures the capture of all costs, expenses, and profits of the beekeepers and middlemen involved in the production and collection of raw honey{}." IDM at 13.

At bottom, NEXCO's arguments ignore that NEXCO itself argued for the methodology that Commerce adopted. *See generally* NEXCO's RFI Resp. Ultimately, NEXCO's arguments amount to nothing more than disagreement with Commerce's chosen methodology. *See Sunpreme Inc. v. United States*, 946 F.3d 1300, 1308-09 (Fed. Cir. 2020) ("Commerce's findings 'may still be supported by substantial evidence even if two inconsistent conclusions can be drawn from the evidence.'" (citation omitted)). Thus, Commerce's determination to use NEXCO's acquisition costs of raw honey is supported by substantial evidence and in accordance with law.

---

[6] None of the exceptions to the exhaustion requirement are applicable in this case. The exceptions include futility, pure question of law, lack of timely access to the confidential record, no administrative procedure to exhaust, or new interpretation from an intervening judicial decision. *See Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1146 (Fed. Cir. 2013).

**III.    Commerce's Reliance On Its High Inflation Methodology In Conjunction With Its Alternative Cost-Averaging Methodology Is In Accordance With Law And Supported By Substantial Evidence**

It is undisputed that Argentina's economy experienced high inflation (*i.e.*, annual change in the producer price index of more than 25 percent) during the period of investigation.  *See* PDM at 25.  Specifically, Commerce determined that NEXCO experienced significant changes in the total cost of manufacturing during the period of investigation, when those costs are indexed to account for domestic high inflation, and that the change in the total costs of manufacturing is primarily attributable to the price volatility of raw honey, the subject merchandise input that NEXCO purchased and consumed in the production of the merchandise under consideration that it exports.  *See* NEXCO Preliminary Cost Memo at 4 (P.R. 373, C.R. 646); IDM at 24-28.  The record evidence indicates that raw honey prices increased by [ █ ] percent throughout the period of investigation, after accounting for the impact of inflation. *See* NEXCO Preliminary Cost Memo. at Att. 5 (C.R. 645).

To calculate normal value, Commerce applied its high inflation and quarterly cost-averaging period methodology at the same time.  To do so, Commerce accounted for inflation then calculated quarterly average direct material costs and annual average conversion costs, and then restated the averages to monthly values using the inflation indices.  IDM at 37.  Consistent with its practice, Commerce applied its high inflation methodology by limiting its comparisons of U.S. sale prices to calculated normal value during the same month in which the U.S. sale occurred.  *Id.* at 24.  Commerce applied the methodology to prevent distortions in its calculation, because this methodology minimizes the extent to which calculated dumping margins are overstated or understated due solely to inflation.  PDM at 23.  This application is supported by substantial evidence and in accordance with law.  *See id.* at 23-24; IDM at 36-37.

NEXCO argues that Commerce's using monthly costs and monthly price-to-price comparisons is not supported by Commerce's alternative cost averaging methodology, which NEXCO refers to as the quarterly cost methodology, or its high inflation methodology.  *See* NEXCO Br. at 30-35.  NEXCO also argues that Commerce should have made price-to-price sales comparisons on a period of investigation weighted-average basis because German and U.S. prices were both made in U.S. dollars and not subject to Argentinian peso inflation.  *See id.* at 36-45.  These arguments are without merit.

A.    **Legal Framework**

The relevant statutory provision is silent concerning the time periods used to calculate weight-average U.S. prices and weighted-average comparison market prices or weighted-average costs of production as the basis for normal values in an investigation.  19 U.S.C. §1677f-1(d)(1); *see also Thai Pineapple Canning Indus. Corp. v. United States*, 273 F.3d 1077, 1084 (Fed. Cir. 2001) ("We do not read the statutory language as specifying the period to be used when determining costs, and no other statute or regulation provides further guidance. Moreover, the statute does not dictate the methodology for calculating cost of production and constructed value or for matching those costs against sales.").

If "the statute is silent . . . with respect to the specific issue," as it is for this issue , then "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843.  In such cases, "{a}ny reasonable construction of the statute is a permissible construction," *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004) (citation and quotation marks omitted), and Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." *Eurodif*, 555 U.S. at 316 (citation

omitted).  In this case, Commerce exercised its discretion in determining the time periods over which to calculate weight-average U.S. prices and weighted-average comparison market prices and weighted-average costs of production as the basis for normal values.

Further, Commerce's regulations explicitly provide that Commerce may depart from the standard period-wide weighted averages in an investigation to calculate weight-averages over shorter periods when normal values or U.S. prices change significantly over the period of investigation, for example, in a market experiencing high inflation.  *See* 19 C.F.R. § 351.414(d)(3) ("{W}hen normal values, export prices, or constructed export prices differ significantly over the course of the period of investigation, the Secretary may calculate weighted averages for such shorter period as the Secretary deems appropriate").  Indeed, Commerce's application in this case is consistent with Congress's intention.  In the SAA, Congress explicitly authorized Commerce to calculate prices and costs over shorter periods when prices and costs vary significantly, as is the case in high inflation economies:  "When costs are rapidly changing, it may be appropriate to use shorter periods, such as quarters or months, which may allow a more appropriate association of costs with sales prices."  SAA, 1994 U.S.C.C.A.N. at 4178.  Additionally, this Court has previously upheld Commerce's use of a "shortened contemporaneity period" when matching U.S. sales to normal value in a case involving Commerce's alternative cost averaging methodology.  *SeAH Steel Corp. v. United States*, 704 F. Supp. 2d 1353, 1377 (Ct. Int'l Trade 2010); *id.* at 1363 ("The statute does not dictate the method by which Commerce may calculate costs of production, nor define the {time period over which the calculation is to be made}, and Commerce is afforded considerable discretion in formulating its practices in this regard." (internal quotation and alteration marks and citation omitted)).

**B.      Commerce's Application Of Its High Inflation Methodology In Conjunction With Its Alternative Cost Averaging Methodology Is Reasonable**

Because Argentina's economy experienced high inflation (*i.e.*, above 25 percent) during the period of investigation, consistent with Commerce's practice, Commerce limited its comparisons of U.S. sale prices to calculated normal value during the same month in which the U.S. sale occurred.  PDM at 20.  "This methodology minimizes the extent to which calculated dumping margins are overstated or understated due solely to inflation."  *Id.*  Therefore, Commerce required NEXCO "to report monthly replacement costs for direct materials and monthly averages for conversion costs."  *Id.* at 23.  These monthly costs were then "indexed to the end of the {period of investigation} to calculate a constant currency annual weighted-average {cost of production} that is then restated in the respective {period of investigation} monthly currencies."  *Id.* at 23-24.

However, Commerce recognized that although this methodology accounted for inflation, it needed to determine whether there would nonetheless be distortions if it relied on an annual weighted average cost.  *Id.* at 24.  As Commerce explained, "distortions may still persist in times of significant cost changes since {its} normal high inflation methodology ultimately relies on an annual weighted-average cost."  *Id.*  Therefore, Commerce also considered whether to apply its alternative cost averaging methodology in addition to its high inflation methodology.  *Id.*

Commerce considers two criteria in determining whether to deviate from its normal methodology of calculating an annual weighted-average cost:  (1) whether there were "significant" changes in the cost of manufacturing during the period of investigation, and (2) whether there is a linkage between these changes in both costs and sales information.  *Id.* at 24; *see* IDM at 26.  Both of these criteria were met in this case.

For the first part of the test, consistent with its practice, a difference of 25 percent is the threshold (between the high- and low-quarter cost of manufacturing) during a period of 12 months for determining that the changes in cost of manufacturing are significant enough to warrant a departure from Commerce's standard annual-average cost approach. PDM at 24. In this case, record evidence established that after restatement of costs into a constant currency, NEXCO experienced significant cost changes between the high and low quarterly cost of manufacturing during the period of investigation. *Id.* at 24-25. Commerce determined that the purchased raw honey, on average, represents approximately [   ] percent of NEXCO's total cost of manufacturing, and thus raw honey is the primary driver of the overall fluctuation in cost of manufacturing. NEXCO Prelim. Cost Memo at 4. Commerce measured the effect that this volatility had on total cost of manufacturing using the five highest-sales volume CONNUMs sold in the comparison and U.S. markets. *Id.* The outcome of this analysis showed the percentage difference between the high- and low-quarterly cost of manufacturing, after accounting for the impact of inflation, exceeded 25 percent for [   ] of the 10 selected CONNUMs. NEXCO Prelim. Cost Memo at 5. Thus, Commerce determined that the change in cost of manufacturing for NEXCO was significant enough to warrant a departure from its standard annual cost averaging approach. *See* IDM at 26-27.

For the test's second part, Commerce then evaluated whether there was reasonable linkage between the quarterly average unit costs and sales prices during the shorter cost periods. *See* PDM at 24; IDM at 26. In establishing linkage, Commerce considers evidence such as the existence of a surcharge or pricing mechanism that provides for a link between prices and costs; or alternatively Commerce considers evidence of a clear pattern that changes in selling prices reasonably correlate to changes in unit costs. NEXCO Prelim. Cost Memo at 5. When applying

this alternative analysis, Commerce evaluated the five highest volume CONNUMs in the comparison market and the five highest volume CONNUMs in the U.S. market.  IDM at 27.  For each of the 10 selected CONNUMs, Commerce compared the quarterly average prices and costs over the period of investigation.  *Id.*

In this case, NEXCO submitted quarterly average sales and cost summary information for all 10 CONNUMs with the highest sales volume in the comparison and U.S. markets during the period of investigation so that Commerce could determine whether there was a reasonable correlation between changing costs and final net sale prices.  *Id.*  Commerce "compared NEXCO's weight-averaged net home or comparison market sale prices, by quarter, with the reported quarterly {cost of manufacturing}."  *Id.*; *see also* NEXCO Prelim. Cost Memo at 4 (citing NEXCO's Section D Questionnaire Resp. at Exh. D-41 (Oct. 12, 2021) (P.R. 297, C.R. 433-36)).  Commerce found that nine of the 10 CONNUMs had cost and sales data for at least two of the quarters of the period of investigation, and because all nine "showed a correlation, {Commerce} found that a linkage between NEXCO's sales and costs does exist."  *Id.*

Based on this analysis, Commerce determined that NEXCO's honey acquisition costs were changing significantly during the period of investigation, and that its sales prices experienced significant changes that corresponded with the changes in input costs, which warranted the application of Commerce's alternative cost averaging methodology.  *See* NEXCO Prelim. Cost Memo; NEXCO Final Cost Calculation Memo (P.R. 440, C.R. 818).  Thus, consistent with 19 C.F.R. § 351.414(d)(3), Commerce applied a shorter cost-averaging period approach, based on an inflation-adjusted quarterly-average cost of manufacturing restated in the appropriate monthly currencies.  *See* PDM at 25; IDM at 27.  Commerce explained that in such an environment comparing period of investigation average sales prices could have a distortive impact on

Commerce's margin calculations that would be dependent on the timing of the sale, rather than on NEXCO's actual pricing behavior. *See* IDM at 26-27. Commerce determined that its analysis of the significant changes in both the costs and prices of raw honey was informative and provided additional support for comparing prices within shorter time periods. *See id.*

Under the alternative cost averaging methodology, Commerce restates a respondent's cost in each month's currency levels and matches U.S. sales to normal value by month. *See* IDM at 37. This methodology to compare U.S. sales prices to a normal value within the same month is well supported by administrative precedent. *See, e.g.*, *Circular Welded Carbon Steel Standard Pipe and Tube Products from Turkey*, 86 Fed. Reg. 15,190 (Dep't of Commerce Mar. 22, 2021) (final admin. review), and accompanying IDM at 9-10 ("As a matter of practice, when Commerce uses its high-inflation methodology, we index the costs reported in each {period of review} month, even if inflation was absent during certain portions of the period for which the costs were reported (*i.e.*, the {period of review}), and make sales comparisons on a monthly average basis, rather than on a {period of review} average basis, in order to minimize the effects of inflation on our analysis."); *Silicomanganese From Brazil*, 68 Fed. Reg. 61,185 (Dep't of Commerce Oct. 27, 2003) (prelim. admin. review) ("Because Brazil's economy experienced significant inflation during the {period of review}, as is Department practice, we limited our comparisons to home-market sales made during the same month in which the U.S. sale occurred"), unchanged in *Silicomanganese From Brazil*, 69 Fed. Reg. 13,813 (Dep't of Commerce Mar. 24, 2004) (final admin. review). Indeed, as this Court explained, "{b}ecause Commerce's gap-filling methodology—that {period of review}-wide cost averaging is the preferred norm, but where significant cost changes are evident, quarterly cost averages may be used if sales can be accurately linked with the concurrent quarterly costs—is not unreasonable,

it is therefore not contrary to law." *Pastificio Lucio Garofalo, S.p.A. v. United States*, 783 F. Supp. 2d 1230, 1236 (Ct. Int'l Trade 2011), *aff'd sub nom. Pastificio Garofalo, S.P.A. v. United States*, 469 Fed. App'x 901 (Fed. Cir. 2012) (unpublished).

As Commerce explained in the final determination, "{a}s a matter of practice, where a country meets Commerce's criteria for high inflation, {Commerce} index{es} the costs reported in each month, even if inflation was absent during certain portions of the period for which costs were reported," and then makes "sales comparisons on a monthly average basis, rather than on an annual average basis, in order to minimize the effects of inflation on {its} analysis." IDM at 37. Commerce determined that it was appropriate to use the alternative cost averaging method in this case and its "well-established high inflation practice of using monthly comparisons." *Id.* With this "simultaneous application of {Commerce's} alternative cost and high inflation methods," Commerce found it "appropriate to use quarterly-average costs that have been restated to {period of investigation} monthly currency levels." *Id.*

Therefore, Commerce's "simultaneous application" of the alternative cost and high inflation methodologies is supported by substantial evidence and in accordance with law. *See* IDM at 24-28, 36-37.

## C.    NEXCO's Arguments Do Not Undermine Commerce's Determination

NEXCO's various arguments opposing Commerce's methodology are without merit. First, NEXCO argues that Commerce's use of monthly costs and monthly price-to-price comparisons is not supported by Commerce's alternative cost averaging methodology nor its high inflation methodology. *See* NEXCO Br. at 32. NEXCO argues that Commerce erred by using a monthly, rather than quarterly methodology, because it resulted in many U.S. sales that were not matched to above-cost third country sales, and thus these sales went to constructed

value, which allegedly overstates NEXCO's dumping margin. *Id.* at 32. However, Commerce

explained that "in high inflation cases, contemporaneity is more important to the accuracy of the

dumping margins than ensuring that there will be identical or similar price- to-price

comparisons." IDM at 27. Commerce seeks price-to-price comparisons first pursuant to the

statutory preference for price-to-price comparisons. *See* PDM at 27-28 ("On a product-specific

basis, pursuant to {19 U.S.C. 1677b(b)}, {Commerce} compared the weighted-average {costs of

production} to the third country market sales prices of the foreign like product, in order to

determine whether the sales prices were below the {costs of production}."). Because "gross unit

price comparison market and U.S. market prices are not adjusted for inflation, Commerce

maintains the closest contemporaneity by limiting the matches by month, to limit the impact of

inflation on these prices." IDM at 27. Commerce agreed with NEXCO that having "fewer price-

to-price comparisons may increase the use of {constructed value} as {normal value}," but

"unlike prices, {constructed value} is based on {NEXCO's} cost of production which can be

adjusted for inflation (as {Commerce did} in this case) allowing for both accurate calculation of

the dumping margin and contemporaneity." *Id.* This Court has affirmed this approach in a high

inflation case in which the respondents' costs and prices showed massive increases over the

period of investigation, distorting price and cost comparisons across different periods within the

period of investigation; the Court found that "it is reasonable for {Commerce} to be concerned

about straying too far from the month of each U.S. sale in trying to find a {normal value} based

on comparison market sales prices." *Union Steel Manuf'g Co. v. United States*, 190 F. Supp. 3d

1326, 1336-37 (Ct. Int'l Trade 2010); *see also id.* at 1338 ("Congress identified both a preference

for identical matches and a preference for contemporaneity as considerations underlying the

concept of accuracy in the determination of a dumping margin.").

Second, NEXCO argues that normal value was based on NEXCO's third country sales to Germany, which were made in U.S. dollars and thus unaffected by Argentine peso inflation. NEXCO Br. at 42.  But Commerce explained that even though both the comparison market and the U.S. market sales were conducted in U.S. dollars, NEXCO's sales prices were affected by high inflation during the period of investigation because of the impact on its cost of production. IDM at 26.   Because Argentina experienced high inflation during the period of investigation, "Commerce adjusted {NEXCO's cost of production} by employing {its} high inflation methodology, which requires that respondents report monthly replacement costs for direct materials costs and monthly averages for conversion costs." *Id.*   Commerce then "indexes these monthly costs to the end of the {period of investigation} to calculate a constant currency annual weighted-average {cost of production} that is then restated in the respective {period of investigation} monthly currency levels." *Id.*  As explained above, substantial evidence supports Commerce's determination that even after the restatement of "NEXCO's costs into a constant currency level," it "experienced significant cost changes when measured by the difference between the highest quarterly {cost of manufacturing} and the lowest quarterly {cost of manufacturing} during the {period of investigation}." *Id.* at 26-27.  Thus, although sale prices may have been conducted in U.S. dollars, record evidence shows that NEXCO's costs "incurred in operating in a high inflation economy were still impacted by inflation." *Id.* at 27. Additionally, Commerce's standard margin calculation converts any foreign currency prices to U.S. dollars on the date of the U.S. sale when performing comparisons, and therefore, the basic premise of Commerce's high inflation practice is that U.S. dollar sales prices do not neutralize the impact of inflation. *See Stainless Steel Sheet and Strip in Coils from Mexico*, 75 Fed. Reg. 6,627 (Dep't of Commerce Feb. 10, 2010) (final admin. review), and accompanying IDM at

Comment 6; *see also Stainless-Steel Plate in Coils from Belgium*, 73 Fed. Reg. 75,398 (Dep't of

Commerce Dec. 11, 2008) (final admin. review), and accompanying IDM at Comment 4.

Consequently, Commerce found it necessary to appropriately match price-to-price comparisons

over short time periods so that the high inflation experienced in the Argentinian economy would

not distort the dumping analysis. *See* IDM at 24; *Thai Pineapple*, 273 F.3d at 1084-85 ("While

we agree that the statutory language leaves room for some discretion by Commerce in

determining the cost period, the standard methodology may not be permissible in all scenarios

because Commerce has recognized that certain circumstances warrant exceptions.").[7]

Third, NEXCO argues that there is no support for Commerce's restriction of price-to-

price comparisons to sales made in the same month, because once the German sales were found

to be above cost, those sales could be compared on a quarterly average basis.  NEXCO Br. 35.

Specifically, NEXCO proposes a quarterly cost calculation in which all costs are restated in end-

of-quarter pesos, weight-averaged, and restated in monthly pesos, then these monthly "real

costs" would be weight-averaged by quarter to derive a quarterly cost that is compared to third

country market prices for the cost test. *Id.* at 34.  Setting aside the high inflation issue

momentarily, Commerce explained that the cost differences that "far exceeded" inflation and

resulted in the use of the alternative cost averaging method are those reported in the direct

materials cost field, or "DIRMAT."  IDM at 35.

---

[7] Additionally, in making these arguments, NEXCO cites to an outdated Antidumping
Duty Manual, which is not on the record of the underlying proceeding, as additional support for
its argument.  First, the manual, which is no longer relied upon by Commerce's Enforcement and
Compliance (E&C) division, states that "{t}his manual is for the internal training and guidance
of {E&C} personnel only . . . {and} {t}his manual cannot be cited to establish {Commerce}
practice."  Ch. 1 at 1.  Second, this court has found that it is not a "binding legal document."
*Bebitz Flanges Works Private Limited v. United States*, 433 F. Supp. 3d 1309, 1323 (Ct. Int'l
Trade 2020) (citation omitted).

However, NEXCO argues that *all* elements of total cost of manufacturing should be calculated on a quarterly basis, not just the direct materials, *i.e.*, the input that experienced the significant cost changes.  NEXCO Br. at 34 n.13.   Commerce's normal practice is to use shorter cost averaging periods for the raw material inputs but continue to use its normal annual averages for all other reported costs. *Stainless Steel Sheet and Strip in Coils from Mexico*, 74 Fed. Reg. 6,365 (Dep't of Commerce Feb. 9, 2009) (final admin. review), and accompanying IDM at Comment 5 (respondent reported quarterly costs for materials, which was the primary driver of the significant changes in cost of manufacturing throughout the period of review, while all other costs reflect annual weighted average costs); *Brass Sheet and Strip from the Netherlands*, 65 Fed. Reg. 742 (Dep't of Commerce Jan. 6, 2000) (final admin. review), and accompanying IDM at Comment 2 (Commerce calculated monthly metal costs, but used annual fabrication costs because it "found no significant fluctuations in {the respondent's} fabrication costs that would require averaging periods of less than a year.").

Indeed, Commerce's "long-standing practice of using annual average costs evens out any swings in the production costs experienced by the respondents over short periods of time."  IDM at 35.   " By using annual averages {Commerce} smooth{s} out the effect of erratic production levels, major repairs and maintenance, seasonality, *etc.*, and ensure{s} that costs are representative of the actual cost of producing the goods that were sold during the period."  *Id.* at 35-36.   Therefore, Commerce explained that "when it is necessary to apply {its} alternative cost averaging method, {Commerce} only resort{s} to shorter cost averaging periods for the inputs that are experiencing such significant cost changes that reliance on an annual average would distort rather than enhance {the} comparisons."  *Id.* at 36.  In other words, Commerce applies the

alternative cost averaging method to *only* the specific input, in this case, the direct materials input, that is affected by the price swings. *See id.*

Commerce also explained that "NEXCO's proposed quarterly cost averaging methodology introduces distortions in the calculations by failing to appropriately allocate expenses to total production." *Id.* As Commerce explained, "{i}n this case, with a seasonal product and respondents who in their normal books and records do not allocate production costs to products, but rather expense costs as incurred, it is particularly important that an annual average is used for the non-{direct material} costs." *Id.* For example, under NEXCO's "proposed quarterly cost averaging method, supplies purchased and reported as an expense in the first quarter of the {period of investigation}, but actually consumed in multiple quarters of the {period of investigation}, would only be allocated to first quarter production." *Id.* "Similarly, expenses that are only recognized in a single month, such as labor bonuses or fiscal year-end accruals, would only be allocated to production in the specific quarter in which they were expensed." *Id.* "Moreover, even expenses that are incurred routinely throughout the year, such as fixed labor expenses, depreciation expenses, fixed utility expenses, *etc.*, would on a shortened cost averaging period, be over- or under- allocated to products" because of the "seasonal fluctuations in monthly production levels." *Id.* Commerce explained that it was appropriate to calculate quarterly direct material costs "due to the significant cost changes in the input," but that it continued to use an annual average of the non-direct material costs. *Id.* Indeed, NEXCO has not shown that its "proposed alternative methodology is clearly less distortive," *DuPont Teijin Films China Ltd. v. United States*, 7 F. Supp. 3d 1338, 1354 (Ct. Int'l Trade 2014), than Commerce's practice of using the alternative shorter cost averaging periods for *only* the input with significant cost changes.

Thus, this determination is consistent with Commerce's practice in applying the alternative cost averaging method and "is compliant with the statute's express preference for using costs that reasonably reflect the cost of producing the merchandise under consideration." *Id.*; *see also* 19 U.S.C. § 1677b(f)(1)(A); *Thai Pineapple*, 273 F.3d at 1084 (explaining that "in order to better match costs with prices{, o}ne adjustment made by Commerce is the use of shorter cost reporting periods when, for example, prices have moved significantly during the period of review."); *Polyethylene Terephthalate Film, Sheet and Strip from Taiwan*, 77 Fed. Reg. 46,704, 46,708 (Dep't of Commerce Aug. 6, 2012) (prelim. admin. review), unchanged in *Polyethylene Terephthalate Film, Sheet, and Strip from Taiwan*, 78 Fed. Reg. 9,668 (Dep't of Commerce Feb. 11, 2013) (final admin. review) (Commerce used quarterly average purified terephthalic acid and mono ethylene glycol but used annual weighted-average fabrication costs).

Accordingly, Commerce's application of its high inflation and alternative cost methodology is supported by substantial evidence and in accordance with law. *See* IDM at 24-28, 36-37.

## CONCLUSION

For these reasons, we respectfully request that the Court deny plaintiff's motion for judgment on the agency record and to enter judgment for the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General


PATRICIA M. McCARTHY
Director

/s/ Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:

SAVANNAH MAXWELL
Attorney
Office of the Chief Counsel
    for Trade Enforcement & Compliance
U.S. Department of Commerce

March 3, 2023

/s/ Kara M. Westercamp
KARA M. WESTERCAMP
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Email: kara.m.westercamp@usdoj.gov

<u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains 11,973 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

<u>s/ Kara M. Westercamp</u><br>
KARA M. WESTERCAMP<br>
Trial Attorney

**THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE**

_____
|                                               )
| NEXCO S.A.,                                   )
|                                               )
|                  Plaintiff,                   )
|                                               )
|            v.                                 )            Court No. 22-00203
|                                               )
| UNITED STATES,                                )
|                                               )
|                  Defendant,                   )
|                                               )
|            and                                )
|                                               )
| AMERICAN HONEY PRODUCERS                      )
| ASSOCIATION, ET. AL.,                         )
|                                               )
|                  Defendant-Intervenors.       )
_____)

**PROPOSED ORDER**

Upon consideration of the plaintiff's motion for judgment upon the agency record,

defendant's response, and all other pertinent papers, it is hereby

ORDERED that the plaintiff's motion is denied; and it is further

ORDERED that judgment is entered for the United States.


DATE: _____            _____

New York, New York             CLAIRE R. KELLY, JUDGE