NONCONFIDENTIAL

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| NEXCO S.A., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | |
| ) | Court No. 22-00203 |
| Defendant, ) | |
| ) | |
| AMERICAN HONEY PRODUCERS ) | |
| ASSOCIATION and SIOUX HONEY ) | |
| ASSOCIATION, ) | |
| ) | |
| Defendant-Intervenors. ) | |
| ) | |

**DEFENDANT-INTERVENORS' RESPONSE IN OPPOSITION TO PLAINTIFF'S
MOTION FOR JUDGMENT ON THE AGENCY RECORD**

R. ALAN LUBERDA
MELISSA M. BREWER
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC  20007
(202) 342-8400

Counsel to American Honey Producers
Association and Sioux Honey Association

March 3, 2023

NONCONFIDENTIAL
VERSION

## Table of Contents

Page

STATEMENT PURSUANT TO RULE 56.2 ...................................................................1

ISSUES PRESENTED AND SUMMARY OF ARGUMENT ......................................2

    1.    Whether Commerce properly relied on NEXCO's acquisition cost for raw honey to calculate the cost of production instead of the cost of production of two of NEXCO's many raw honey suppliers? ........................................2

    2.    Whether Commerce appropriately applied its high inflation and quarterly cost methodologies to NEXCO?? ..........................................3

    3.    Whether Commerce's matching of U.S. sales and normal values within the same month was in accordance with law? ......................3

STANDARD OF REVIEW ...........................................................................................4

ARGUMENT ................................................................................................................5

I.    COMMERCE REASONABLY RELIED ON NEXCO'S ACQUISITION COSTS IN CALCULATING COST OF PRODUCTION ...................................5

    A.    Statement of Facts Related to the Cost of Production Calculation .........6

    B.    Commerce's Determination That Collecting Representative Beekeeper Costs of Production For NEXCO Was Infeasible Is Supported By Record Evidence ......................................................11

        1.    Commerce Reasonably Determined that It Could Not Collect A Representative Sample of Beekeeper Costs ..............................11

        2.    Commerce's Findings Were Not Based on Speculation ...........................14

    C.    Commerce's Use of Acquisition Costs Was Adequately Explained And Does Not Contravene The Statute ...................................15

    D.    The Limited Supplier COP Data On the Record Cannot Be Used In Lieu of NEXCO's Acquisition Costs ...................................19

        1.    The Unrepresentativeness of the Limited Supplier COP Information on the Record Is Relevant .......................................19

**Table of Contents**
**(continued)**

Page

2.      Commerce's Reasonably Determined That the Limited Supplier COP Information on the Record Is Not A Representative COP That Can Be Extrapolated To All Suppliers ...................................................................................22

E.      NEXCO's Other Arguments For Using the Limited Supplier COP Information on the Record in Lieu of Acquisition Cost Similarly Fail .........................................................................................................25

F.      The Court Should Dismiss NEXCO's Arguments Concerning Beekeeper Profit...........................................................................................28

II.    COMMERCE CORRECTLY APPLIED ITS HIGH INFLATION METHODOLOGY AND QUARTERLY COST-AVERAGING METHODOLOGY .........................................................................................29

A.      Legal Background And Summary of Commerce's High Inflation Methodology and Quarterly Cost-Averaging Methodology...................29

1.      The High Inflation Methodology ...............................................30

2.      Quarterly Cost Averaging Methodology ....................................31

B.      Commerce Averaged Costs by Quarter in The Final Determination....................32

C.      Commerce Correctly Matches U.S. Sales to Normal Value By Month In Accordance With Its Well-Established Practice in High Inflation Cases ......................................................................................36

1.      Commerce's Use of a Monthly Contemporaneity Period Is Consistent With The Statute and Its Regulations ......................36

2.      Commerce's Application Of A Quarterly Cost-Averaging Methodology Does Not Negate The Need For A Monthly Contemporaneity Condition Due to High Inflation ...................39

3.      Monthly Contemporaneity Periods Do Not Distort the Margins ........................................................................................40

4.      NEXCO's USD-Denominated Selling Prices Are Affected By Argentine High Inflation .......................................................41

NONCONFIDENTIAL

## Table of Contents
## (continued)

Page

     5.     Commerce Correctly Made the Cost and Price Comparison
          Periods Identical...................................................................................44

III.    CONCLUSION.............................................................................................46

NONCONFIDENTIAL

## TABLE OF AUTHORITIES

Page(s)

### Cases

Am. Silicon Techs. v. United States,
    261 F.3d 1371 (Fed. Cir. 2001)....................................................................................5

Bosun Tools Co. v. United States,
    No. 2021-1929, 2022 WL 94172 (Fed. Cir. Jan. 10, 2022) ...................................20

Chevron U.S.A. Inc. v. Natural Res. Def. Council,
    467 U.S. 837 (1984).........................................................................................36, 38

Consol. Bearings Co. v. United States,
    348 F.3d 997 (Fed. Cir. 2003)........................................................................ 28-29

Corus Staal BV v. Department of Commerce,
    395 F.3d 1343 (Fed. Cir. 2005)..................................................................................38

Diamond Sawblades Manufs. Coal. v. United States,
    359 F. Supp. 3d 1374 (Ct. Int'l Trade 2019) ...................................................... 22-23

Dillinger France S.A. v. United States,
    981 F.3d 1318 (Fed. Cir. 2020)..................................................................................26

Dorbest Ltd. v. United States,
    604 F.3d 1363 (Fed. Cir. 2010)..................................................................................28

Eregli Demir ve Celik Fabrikalari T.A.S v. United States,
    308 F. Supp. 3d 1297 (Ct. Int'l Trade 2018) .......................................................20

Florida Citrus Mut. v. United States,
    550 F.3d 1105 (Fed. Cir. 2008)........................................................................ 18-19

Husteel Co. v. United States,
    98 F. Supp. 3d 1315 (Ct. Int'l Trade 2015) ...................................................... 13-14

Husteel Co. v. United States,
    491 F. Supp. 2d 1283 (Ct. Int'l Trade 2007) ........................................................5

Hyundai Heavy Indus. v. United States,
    332 F. Supp. 3d 1331 (Ct. Int'l Trade 2018) .......................................................12

Hyundai Heavy Indus. v. United States,
    399 F. Supp. 3d 1305 (Ct. Int'l Trade 2019),
    aff'd, 819 Fed. Appx. 937 (Fed. Cir. 2020) .......................................................17

Longkou Haimeng Mach. Co. v. United States,
    581 F. Supp. 2d 1344 (Ct. Int'l Trade 2008) .........................................................12

Matsushita Elec. Indus. Co. v. United States,
    750 F.2d 927 (Fed. Cir. 1984)...............................................................................5

Motor Vehicle Mfrs. Ass'n v. State Farm Mut.,
    463 U.S. 29 (1983).............................................................................................4-5

Nippon Steel Corp. v. United States,
    458 F.3d 1345 (Fed. Cir. 2006)........................................................................5, 27

Noviant OY v. United States,
    451 F. Supp. 2d 1367 (Ct. Int'l Trade 2006) .........................................................4

PSC VSMPO-Avisma Corp. v. United States,
    688 F.3d 751 (Fed. Cir. 2012)........................................................................45, 46

Rhone Poulenc, Inc. v. United States,
    899 F.2d 1185 (Fed. Cir. 1990).............................................................................21

Schaeffler Italia S.r.L. v. United States,
    781 F. Supp. 2d 1358 (Ct. Int'l Trade 2011) ........................................................23

Shanxi Hairui Trade Co. v. United States,
    503 F. Supp. 3d 1307, 1321-22 (Ct. Int'l Trade 2021),
    aff'd, Appeal No. 21-2067 (Fed. Cir. July 6, 2022) ...........................................20

SKF USA Inc. v. United States,
    630 F.3d 1365 (Fed. Cir. 2011)................................................................... 15-16, 20

Suramerica de Aleaciones Laminadas, C.A. v. United States,
    44 F.3d 978 (Fed. Cir. 1994).................................................................................4

Tesoro Hawaii Corp. v. United States,
    405 F.3d 1339 (Fed. Cir. 2005).............................................................................37

Torrington Co. v. United States,
    82 F.3d 1039 (Fed. Cir. 1996)...............................................................................38

Union Steel Manufacturing Co. v. United States,
    190 F. Supp. 3d 1326, 1339 (Ct. Int'l Trade 2016) .......................................... 44-45

United States Steel Group v. United States,
    96 F.3d 1352 (Fed. Cir. 1996)...............................................................................5

Vicentin S.A.I.C. v. United States,
    404 F. Supp. 3d 1323 (Ct. Int'l Trade 2019) .......................................................35

YC Rubber Co. v. United States,
No. 21-1489, 2022 WL 3711377 (Fed. Cir. Aug. 29, 2022) ....................................23

## Statutes and Regulations

19 U.S.C. § 1516a(b)(1)(B)(i)..........................................................................................4

19 U.S.C. § 1677(28) ....................................................................................................16

19 U.S.C. § 1677a(c)......................................................................................................44

19 U.S.C. § 1677b(a)(6) ................................................................................................44

19 U.S.C. § 1677b(b)(3) and (e) ...................................................................................29

19 U.S.C. § 1677b(f)(1)(A)...........................................................................................26

19 U.S.C. § 1677e(a)..........................................................................................17, 26, 27

19 U.S.C. § 1677f–1(a) ........................................................................................... 19-22

19 U.S.C. § 1677f–1(b) ...........................................................................................19, 20

19 U.S.C. § 1677f–1(b) ...........................................................................................20, 27

19 U.S.C. § 1677f–1(c)(2) ..................................................................................19-20, 23

19 U.S.C. § 1677f–1(c)(2)(B) ..............................................................................19, 23

19 U.S.C. § 1677f–1(d)(2) .............................................................................................37

19 U.S.C. § 1677f-1(d)(1) .............................................................................................36

19 U.S.C. § 1677m(c)(1)................................................................................................17

19 U.S.C. § 1677m(c)(2)............................................................................................25-26

19 C.F.R. § 351.309(c)(2)..............................................................................................28

19 C.F.R. § 351.414(d)(3)..................................................................................... *passim*

## Legislative

Statement of Administrative Action,
   Uruguay Round Agreements Act,  H.R. Doc. No. 316.
   Vol. 1, 103d Cong. 2d Sess. 656 (1994) .............................................................................16, 37

## Administrative Determinations

Biodiesel From Argentina:
   Final Determination of Sales at Less Than Fair Value and Final Affirmative
   Determination of Critical Circumstances, in Part, 83 Fed. Reg. 8,837
   (Dep't Commerce Mar. 1, 2018) and accompanying Issues and Decision
   Memorandum ...........................................................................................................30

Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of
   Korea: Notice of Final Results of the Fifteenth Administrative Review,
   75 Fed. Reg. 13,490 (Dep't Commerce Mar. 22, 2010) and accompanying
   Issues and Decision Memorandum ................................................................... 31-32

Certain Porcelain-on-Steel Cookware From Mexico:
   Final Results of Antidumping Duty Administrative Review,
   62 Fed. Reg. 42,496 (Dep't Commerce Aug. 7, 1997) .....................................31, 40

Certain Steel Concrete Reinforcing Bars From Turkey;
   Final Results of Antidumping Duty Administrative Review,
   66 Fed. Reg. 56,274 (Dep't Commerce Nov. 7, 2001) and accompanying
   Issues and Decision Memorandum ...........................................................................43

Circular Welded Carbon Steel Standard Pipe and Tube Products from Turkey:
   Final Results of Antidumping Duty Administrative Review and Final
   Determination of No Shipments; 2018-2019,
   86 Fed. Reg. 15,190 (Dep't Commerce Mar. 22, 2021) ..........................................31

Dioctyl Terephthalate From the Republic of Korea:
   Final Determination of Sales at Less Than Fair Value and Final Negative
   Determination of Critical Circumstances, 82 Fed. Reg. 28,824
   (Dep't Commerce June 26, 2017) and accompanying
   Issues and Decision Memorandum ...........................................................................32

Final Determination of Sales at Less Than Fair Value:
   Fresh and Chilled Atlantic Salmon from Norway, 56 Fed. Reg. 7,661
   (Dep't Commerce Feb. 25, 1991) .............................................................................25

Final Determination of Sales at Less Than Fair Value:
Greenhouse Tomatoes From Canada, 67 Fed. Reg. 8,781
(Dep't Commerce Feb. 26, 2002) and accompanying
Issues and Decision Memorandum ............................................................. 12-13, 19

Honey From Argentina:
Preliminary Results of Antidumping Duty Administrative Review,
69 Fed. Reg. 621 (Dep't Commerce Jan. 6, 2004)
("Honey from Argentina 2001-02")...........................................................13, 20, 21

Honey from Argentina:
Final Results of Antidumping Duty Administrative Review and Determination
Not to Revoke In Part, 72 Fed. Reg. 25,245 (Dep't Commerce May 4, 2007) ......................22

Light-Walled Rectangular Pipe and Tube From Turkey:
Notice of Final Determination of Sales at Less Than Fair Value,
69 Fed. Reg. 53,675 (Dep't Commerce Sept. 2, 2004) and accompanying
Issues and Decision Memorandum ......................................................30, 31, 34, 39

Notice of Final Determination of Sales at Less Than Fair Value;
Honey From Argentina, 66 Fed. Reg. 50,611 (Dep't Commerce Oct. 4, 2001)
and accompanying Issues and Decision Memorandum ................................................... 17-18

Notice of Final Determinations of Sales at Less Than Fair Value:
Certain Durum Wheat and Hard Red Spring Wheat from Canada,
68 Fed. Reg. 52,741 (Dep't Commerce Sept. 5, 2003) and accompanying
Issues and Decision Memorandum .................................................................... 17-18

Notice of Preliminary Determination of Sales at Less Than Fair Value; Certain
Cold-Rolled Carbon Steel Flat Products From Turkey, 67 Fed. Reg. 31,264,
31,265 (Dep't Commerce May 9, 2002), unchanged in 67 Fed. Reg. 62,126
(final determination) ...............................................................................43

Raw Honey From Argentina:
Final Determination of Sales at Less Than Fair Value and Final Affirmative
Determination of Critical Circumstances, 87 Fed. Reg. 22,179
(Dep't Commerce Apr. 14, 2022) (PR 444) and accompanying
Issues and Decision Memorandum for the Final Affirmative Determination in
the Less-Than-Fair-Value Investigation of Raw Honey from Argentina
(Apr. 7, 2022) ("IDM") (PR 438) ................................................................... passim

**NONCONFIDENTIAL**

Raw Honey From Argentina:
    Preliminary Affirmative Determination of Sales at Less Than Fair Value,
    Preliminary Affirmative Determination of Critical Circumstances,
    Postponement of Final Determination, and Extension of Provisional Measures,
    86 Fed. Reg. 66,531 (Dep't Commerce Nov. 23, 2021) (PR 377) and
    accompanying Decision Memorandum (Nov. 17, 2021)
    ("Prelim. Decision Memo.") (PR 365). .......................................................... *passim*

Silicomanganese From Brazil:
    Final Results of Antidumping Duty Administrative Review,
    69 Fed. Reg. 13,813 (Dep't Commerce Mar. 24, 2004) 2004), and
    accompanying Issues and Decision Memorandum.....................................30, 31, 35

**NONCONFIDENTIAL**

This memorandum of law is submitted on behalf of the American Honey Producers Association ("AHPA") and Sioux Honey Association ("SHA") (collectively, "Defendant-Intervenors" or "Petitioners" below), in opposition to the Rule 56.2 Motion for Judgement on the Agency Record and accompanying Memorandum of Law (ECF Nos. 25-26)[1] (hereinafter, "NEXCO's Br.") submitted by NEXCO S.A. ("NEXCO" or "Plaintiff"). For the reasons set forth below, Defendant-Intervenors respectfully urge this Court to deny NEXCO's motion for judgment on the agency record and affirm the U.S. Department of Commerce's ("Commerce") final determination.

<u>**STATEMENT PURSUANT TO RULE 56.2**</u>

NEXCO challenges aspects of the Commerce's final affirmative determination in the less-than-fair-value investigation of raw honey from Argentina. <u>Raw Honey From Argentina: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances</u>, 87 Fed. Reg. 22,179 (Dep't Commerce Apr. 14, 2022) (hereinafter, "<u>Final Determination</u>") (PR 444), and accompanying <u>Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Raw Honey from Argentina</u> (Apr. 7, 2022) (hereinafter, "<u>IDM</u>") (PR 438).[2]

---

[1] Documents in the administrative record are cited by their confidential and/or public record number (<u>i.e.</u>, "(CR__)" and "(PR __)") provided in the Index to the Administrative Record filed with the Court on September 15, 2022 (ECF No. 20).

[2] <u>See also</u> <u>Raw Honey From Argentina: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures</u>, 86 Fed. Reg. 66,531 (Dep't Commerce Nov. 23, 2021) (hereinafter, "<u>Preliminary Determination</u>") (PR 377), and accompanying Decision Memorandum (Nov. 17, 2021) (hereinafter, "<u>Prelim. Decision Memo.</u>") (PR 365).

NONCONFIDENTIAL

## ISSUES PRESENTED AND SUMMARY OF ARGUMENT

1.   **Whether Commerce properly relied on NEXCO's acquisition cost for raw honey to calculate the cost of production instead of the cost of production of two of NEXCO's many raw honey suppliers?**

Yes.  Where the respondent is not the producer of the merchandise under consideration, Commerce would normally collect cost of production ("COP") data from the respondent's suppliers of the major input – in this case raw honey.  At NEXCO's urging, Commerce concluded that the large number of very small beekeepers, the inadequacy of those producers' record-keeping practices, the likely difficulty in obtaining responses from such suppliers, and the lack of resources at the agency would make it infeasible to collect and evaluate sufficient beekeeper COPs to obtain a statistically valid and representative COP for NEXCO.  Commerce instead adopted NEXCO's proposal to rely on NEXCO's acquisition costs in lieu of beekeeper COPs.  Commerce solicited COP data from a limited set of suppliers only for purposes of testing the completeness of NEXCO's acquisition costs.

Having prevailed on Commerce to forego the collection of data from a more extensive selection of suppliers to calculate a representative, statistically valid beekeeper COP, the Court should deny NEXCO's attempt to now force Commerce to rely on the very limited beekeeper COP information on the record.  The statute provides Commerce with discretion in formulating an alternative cost methodology when accurate, non-distortive actual costs are not available, and that includes the use of NEXCO's acquisition costs.  Commerce reasonably determined that the supplier costs on the record, which accounted for only [      ] percent of NEXCO's honey supply, are inadequate for determining a representative COP.  As a result, Commerce had to calculate costs using an alternative method and reasonably relied on NEXCO's acquisition costs (for which Commerce has 100 percent coverage).  Commerce's determination that it could not

NONCONFIDENTIAL

extrapolate accurate costs for all of NEXCO's suppliers from such a small, unrepresentative subset of NEXCO's suppliers is reasonable.   Because assigning evidentiary weight falls exclusively within Commerce's authority, the Court should defer to Commerce's determination.

Finally, the Court should reject NEXCO's arguments regarding excluding beekeeper profit from COP because NEXCO failed to exhaust available administrative remedies.

**2.**   **Whether Commerce appropriately applied its high inflation and quarterly cost methodologies to NEXCO??**

Yes.  NEXCO is mistaken that Commerce averaged costs by months rather than by quarters.  Because Argentina experienced high inflation, Commerce followed its normal practice and used the Argentine Producer Price Index ("PPI") to translate NEXCO's reported monthly costs into constant currencies.  Once in constant currencies, Commerce averaged those monthly costs *by quarter*.   Commerce then restated the quarterly average costs into each month's currency level in order to state prices and costs in a currency of approximately the same value to compare to each other.  That prevents the comparisons of prices and costs from being distorted by the rapidly changing currency levels in an economy experiencing high inflation, as occurred in Argentina.  Because Commerce, in fact, averaged NEXCO's costs by quarter as stated, NEXCO's arguments are unfounded.

**3.**   **Whether Commerce's matching of U.S. sales and normal values within the same month was in accordance with law?**

Yes.  Pursuant to its well-established high inflation methodology, Commerce "match{ed} U.S. sale prices to normal value within the same month."  Because the statute is silent concerning the time periods over which Commerce should calculate price averages in an investigation, Commerce correctly concluded it has the discretion to determine what those time periods should be as implemented by its regulations at 19 C.F.R. § 351.414(d)(3).   The

NONCONFIDENTIAL

regulations explicitly allow Commerce to "calculate weighted averages for such shorter period as {Commerce} deems appropriate" in cases where "normal values, export prices, or constructed export prices differ significantly over the course of the period of investigation," which is the case here.

While NEXCO argues that its U.S. dollar-denominated selling prices are insulated from the effect of inflation in Argentina, the Department found that NEXCO's inflation-driven costs are linked to its selling prices. NEXCO does not contest that finding. Moreover, while NEXCO alleges that its selling prices are affected by an unspecified "international price," NEXCO provides no support for this claim.

## STANDARD OF REVIEW

This Court must sustain Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence means "'more than a mere scintilla' and 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). "'As long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology.'" Noviant OY v. United States, 451 F. Supp. 2d 1367, 1377 (Ct. Int'l Trade 2006) (quoting Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 404-05 (1986)). The standard requires Commerce to "examine relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found

and the choice made." Motor Vehicle Mfrs. Ass'n v. State Farm Mut., 463 U.S. 29, 43 (1983); Husteel Co. v. United States, 491 F. Supp. 2d 1283, 1291-93 (Ct. Int'l Trade 2007).

The court may not reweigh the evidence and assume the role of the Commerce Department as the finder of fact. Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984). Nor is it appropriate for the court to substitute its judgment or its interpretation of the evidence for that of the agency. Id. at 936. The role of the court is not to question the agency's decisions about the weight or quality of the evidence. See United States Steel Group v. United States, 96 F.3d 1352, 1356-57 (Fed. Cir. 1996) (it is the agency's task to evaluate and assign weight to the evidence). "Under the substantial evidence standard, when adequate evidence exists on both sides of an issue, assigning evidentiary weight falls exclusively within the authority of {the agency}." Nippon Steel Corp. v. United States, 458 F.3d 1345, 1358 (Fed. Cir. 2006) (bracketed material added); see also Am. Silicon Techs. v. United States, 261 F.3d 1371, 1376 (Fed. Cir. 2001).

## **ARGUMENT**

### I.   **COMMERCE REASONABLY RELIED ON NEXCO'S ACQUISITION COSTS IN CALCULATING COST OF PRODUCTION**

All parties agree that Commerce's "normal" practice is to base COP on the costs of the producer, in this case, the beekeepers. IDM at 8 (PR 438). The question before this Court, however, is whether Commerce appropriately deviated from that normal practice and used the exporters' acquisition costs, having found that beekeeper costs were inadequate and unrepresentative.

During the investigation, NEXCO originally urged Commerce not to collect beekeeper costs, and to instead rely on its acquisition costs. Once Commerce agreed to do so, NEXCO

reversed its position and now urges this Court to force Commerce to rely on the COP data from an insignificant fraction of the company's massive number of small beekeeper suppliers. Id. at 12-13. Commerce reasonably determined these beekeeper-supplier costs were insufficient and unrepresentative to calculate NEXCO's COP, and reasonably relied on NEXCO's honey acquisition costs instead. Id. at 11-12. Contrary to NEXCO's claims, each finding that Commerce made in support of its COP methodology was supported by substantial evidence and in accordance with law.

A.    <u>Statement of Facts Related to the Cost of Production Calculation</u>

NEXCO is an Argentine exporter of raw honey, the merchandise under consideration ("MUC") in the underlying antidumping investigation, and it was a mandatory respondent investigated by Commerce. Prelim. Decision Memo. at 2 (PR 365). Commerce found that NEXCO's beekeeper-producers were the producers of the raw honey NEXCO exports, meaning that the agency normally would calculate COP based on NEXCO's beekeeper producers' costs. IDM at 8 (Comment 1) (PR 438). Given the "massive" number of beekeeper-producers involved for each mandatory respondent, Commerce requested all parties comments on the cost collection methodology. Letter From Neal M. Halper To All Interested Parties, Re: "*Antidumping Duty Investigations of Raw Honey from India, Argentina, Brazil, and Ukraine: Request for Comments on the Raw Honey Cost of Production Reporting Methodology*" (July 22, 2021) (PR 137).

In response to that request, the two cooperative mandatory exporter-respondents, NEXCO and ACA, and the Government of Argentina ("GOA"), each urged Commerce to collect the exporters' acquisition costs rather than COP data from Argentina's thousands of individual beekeepers. IDM at 10 (PR 438). NEXCO argued that it "would face extreme difficulties if the Department required cost of production data from its beekeepers" and that obtaining

representative beekeeper COP data would be infeasible.  Letter From Morris, Manning & Martin, LLP To Sec'y Commerce, Re: "*Raw Honey from Argentina. Case No. A-357-823: NEXCO's Notification of Reporting Difficulty - Initial Antidumping Duty Questionnaire Response*," at 4 (July 16, 2021) (hereinafter, "NEXCO's July 16 Letter") (PR 126).  NEXCO attributed these difficulties, in part, to an endemic lack of recordkeeping by beekeepers and the effects of the COVID-19 pandemic, which it argued would "make it extraordinarily difficult for beekeepers to compile all of the detailed cost information requested by the Department, assuming that the beekeepers even maintain this information in the ordinary course of business." Id. at 5 (PR 126). NEXCO further argued that the "sheer number of beekeepers that supply honey to NEXCO" would lead to an inability to obtain accurate and representative costs. Id.  NEXCO further referenced the GOA's similar plea not to seek beekeeper COP because of the problems created by "the records, or lack thereof, that these beekeepers maintain." Id. at 6 (PR 126).  As the GOA explained, "{t}rying to collect cost information from beekeepers who do not maintain these records will not yield any fruitful results for the Department."  Letter From GOA to Sec'y Commerce, Re: "*Raw Honey from Argentina, Brazil, India, Ukraine, and the Socialist Republic of Vietnam -- Case No. A-357-823: Points addressed in the meeting on June 1st*," at Annex at 2 (June 2, 2021) (hereinafter, "GOA's June 2 Letter") (PR 69).

Commerce ultimately agreed with NEXCO, finding that (1) the massive number of beekeepers that supplied NEXCO and other Argentine exporters would make collection and assessment of such records difficult given Commerce's resource limitations; (2) the resources of the beekeepers would prevent them from accurately responding to the cost questionnaire, and (3) the poor quality of the record keeping of beekeepers due to their size would render such costs unusable even if collected.  See IDM at 12 (PR 438); Prelim. Decision Memo. at 25 (PR 365).

Based on the respondents' proffered evidence concerning the state of the current Argentine market and Commerce's similar experience in a past case on Argentine honey, Commerce found that it would be infeasible to determine a representative cost of production from NEXCO's Argentine beekeeper-suppliers.  IDM at 8, 10-12 (PR 438).

While Commerce indicated that its rationale was informed in part by its prior experience in a honey from Argentina investigation, it explained that it ultimately based its decision on the facts of record in the investigation under appeal.  Id.  Commerce explained that it would not be possible to derive "a statistically valid random sample" on this record from Argentina's more than 15,500 beekeepers, a "massive" number of which supplied NEXCO.  Id. at 10 (PR 438) (citing NEXCO June 17, 2021 RFI Response at Exh. 3 (CR 36; PR 89)); id. at 13 (PR 438).  The record shows that NEXCO, in fact, had [

] See Sept. 1 SAQR at Exh. A-21 (CR 222; PR 215).  Commerce also found that the relatively small size of the individual beekeeper suppliers compared to the size of the respondent's sales meant that even selecting the largest supplier producers "fails to capture a significant or representative portion of the raw honey supplied to the exporter-respondents."  IDM at 10 (PR 438).

Commerce drew on its experience with similar facts during an earlier antidumping investigation of honey from Argentina, which supported the use of an alternative methodology. Id. at 9-10.  Consistent with the concern raised by NEXCO in the current POI, there was also a history of unresponsiveness by small unsophisticated producers who were unable to provide Commerce with usable information in the previous investigation.  Id. at 12.  According to NEXCO, "the same non-responsiveness would likely result in this investigation."  NEXCO's July 16 Letter at 6 (PR 126).

Having determined that it could not collect representative or statistically valid sample costs for the POI, Commerce made the reasoned decision not to attempt to do so. Prelim. Decision Memo. at 25 (PR 365). That left Commerce in need of an alternative cost methodology. Based on the foregoing facts, Commerce "adopted ACA and NEXCO's proposal to rely on the respondents' acquisition costs." Id. at 26. This methodology ensured that Commerce accounted for all of the costs of the exporter, something that it could not do with an unrepresentative or statistically invalid sample from only a few of NEXCO suppliers. IDM at 12-13 (PR 438).

Commerce explained that it took the further step of testing the reasonableness of using NEXCO's acquisition costs as a proxy for beekeeper costs by collecting COP data from only one of NEXCO's "massive" number of beekeeper-suppliers, data from one middleman (who purchased from multiple suppliers), and data from one beekeeper supplier to the selected middleman. Prelim. Decision Memo. at 26 (PR 365); IDM at 12 (PR 438). The record shows that the actual beekeeper-producer COP data came from one of NEXCO's [      ] direct beekeeper suppliers and from one of the [            ] beekeepers that supplied one of NEXCO's [    ] middlemen suppliers. Memorandum From Heidi K. Schriefer Through Taija A. Slaughter To Neal M. Halper, Re: "*Cost of Production and Constructed Value Calculation Adjustments for the Preliminary Determination – NEXCO S.A.*," at 1 (Nov. 17, 2021) (hereinafter, "Prelim. COP Memo.") (CR 646; PR 373). Commerce explained that it chose the COP from these two suppliers to validate NEXCO's acquisition costs because they (1) were among NEXCO's larger suppliers and therefore "they were more likely to have the ability to provide the data"; and (2) had among the lowest prices and thus were those "with the highest risk to be selling at below their COP." IDM at 12 (PR 438). As Commerce explained, its "selection

of middlemen and beekeepers suppliers was neither a statistical sample nor a largest supplier sample, and thus the results do not necessarily represent the actual costs of the greater population in Argentina" Id. at 25, n.127.   NEXCO admits as much.   See NEXCO's Brf. at 10-11. NEXCO's records show these beekeepers accounted for only [    ] percent of NEXCO's total POI purchases of raw honey.   Sept. 1 SAQR at Exh. A-21 (CR 222; PR 215); Petitioners' Rebuttal Brief at 21 (Jan. 31, 2022) (CR 805; PR 426).   Thus, cost data were not collected for NEXCO's largest beekeeper suppliers, and the two beekeeper-suppliers providing costs did not represent – nor did Commerce intend them to represent - a statistically valid sample of all of NEXCO's suppliers. IDM at 12-13 (PR 438).

Commerce found that it cannot extrapolate the results of these few suppliers to other non-selected suppliers, leaving the acquisition costs as the only remaining facts available costs on the record. Id. at 25, n.127.   Thus, there is also no record evidence to support NEXCO's claim that these data can be used to infer that acquisition costs were made at prices that were multiple times the average or representative cost of production of the honey for all of its beekeepers or that the beekeepers were including "increasing profits" in their sales to NEXCO over the POI.   NEXCO Brf. at 13.   The record contains no evidence concerning profitability trends of the huge number of missing beekeepers or the few reporting beekeepers.   Commerce found only that NEXCO's acquisition costs from the reporting suppliers were higher than the reported costs for the same suppliers, and concluded that NEXCO's acquisition costs therefore were a reliable basis on which to base the exporters' cost of production because they captured all of NEXCO's costs. IDM at 13 (PR 438); see also Memorandum From Heidi K. Schriefer Through Taija A. Slaughter To Neal M. Halper, Re: "*Cost of Production and Constructed Value Calculation Adjustments for the Final Determination – NEXCO S.A.*," at 1 (Apr. 7, 2022) (hereinafter, "Final COP Memo.")

(CR 818; PR 440) (citing Prelim. COP Memo. at Att. 1 and Att. 3 (CR 646; PR 373)).  As

NEXCO urged Commerce, NEXCO's acquisition costs were also a reasonable proxy for COP in

this case because NEXCO was required to significantly process the honey for exportation (IDM

at 11 (PR 438)), and essentially all of its honey was exported.  See Prelim. Decision Memo. at 22

(PR 365) (NEXCO did not have a viable home market).  Thus, the methodology captured all

costs associated with the production and sale of the exported raw honey.

### B.  Commerce's Determination That Collecting Representative Beekeeper Costs of Production For NEXCO Was Infeasible Is Supported By Record Evidence

#### 1.  Commerce Reasonably Determined that It Could Not Collect A Representative Sample of Beekeeper Costs

Commerce found that calculating a COP from "a statistically valid random sample was

not possible" due to the "massive" number of beekeepers in the POI for each mandatory

respondent.  IDM at 10 (PR 438).  This finding is supported by the record evidence as NEXCO

had [

], during the POI.  See NEXCO Sept. 1 SAQR at Exh. A-21 (CR 222;

PR 215).

Commerce also determined that it could not simply select the largest of these producers

and rely on their costs because "selecting the largest supplier producers, also fails to capture a

significant or representative portion of the raw honey supplied to the exporter-respondents."

IDM at 10 (PR 438).  NEXCO submitted a listing of all of its suppliers and the volumes

purchased from each, which showed that even NEXCO's [

] – accounted for [

], of NEXCO's aggregate honey purchases during the POI.

Sept. 1 SAQR at Exh. A-21 (CR 222; PR 215).  Based on the large number of beekeeper

suppliers and the small size of each supplier, Commerce reasonably concluded that it did not have sufficient resources to review the necessary data from the "scores of beekeepers" it would take to create such a statistically valid COP.  IDM at 10 (PR 438) (emphasis added).[3]

Commerce also explained that its resource constraints were due in part to the need to individually examine two mandatory respondents in each of the other four concurrent honey investigations, in addition to its other obligations.  IDM at 12 n.64 (PR 438).  Commerce's evaluation of its available resources should be accorded deference, as this Court has held that "any assessment of Commerce's operational capabilities or deadline rendering must be made by the agency itself."  Longkou Haimeng Mach. Co. v. United States, 581 F. Supp. 2d 1344, 1353 (Ct. Int'l Trade 2008).

NEXCO's citation to cases in which Commerce found that it had the resources to obtain a representative supplier COP are distinguishable on their facts, and generally support Commerce's choice in this case.  NEXCO's Br. at 15-16.[4]  For example, NEXCO cites to the Final Determination of Sales at Less Than Fair Value: Greenhouse Tomatoes From Canada, where Commerce solicited COP information from "the growers accounting for the largest volume {Commerce} could reasonably examine." 67 Fed. Reg. 8,781 (Dep't Commerce Feb. 26, 2002), and accompanying Issues and Decision Memorandum at Comment 16 (hereinafter,

---

[3]   NEXCO's claim that Commerce did not indicate how many suppliers it would have to poll to reach a representative sample is therefore incorrect.  NEXCO Brf. at 14.

[4]   That Commerce found it had the resources to obtain a representative supplier COP in difference proceedings with different facts does not establish that Commerce could or should do so in the instant proceeding.  See Hyundai Heavy Indus. v. United States, 332 F. Supp. 3d 1331, 1342 (Ct. Int'l Trade 2018) (a respondent may not rely on factual findings in other proceedings as each proceeding is based on the particular record before the agency) (citing Jiaxing Bro. Fastener Co. v. United States, 822 F.3d 1289, 1299 (Fed. Cir. 2014); Shandong Huarong Mach. Co. v. United States, 29 CIT 484, 491 (2005)).

"Tomatoes Canada IDM").   In that case, however, the two growers Commerce selected to provide COP information "represent{ed} a **substantial** portion of the supply of greenhouse tomatoes to this mandatory respondent. . ." Id. at Comment 16 (emphasis added).   Here, Commerce reasonably found that it could not collect data from "a significant or representative portion of the raw honey supplied to the exporter respondent." IDM at 10 (PR 438).   That finding is supported by substantial record evidence given that the COP data Commerce did collect from beekeepers represented only [      ] percent of NEXCO's honey purchases – which Commerce could readily find was not a "substantial portion" of NEXCO's purchases from its [      ] direct beekeeper suppliers.  Sept. 1 SAQR at Exh. A-21 (CR 222; PR 215).

Further, NEXCO's citation to an administrative review in the earlier case on Honey From Argentina also supports Commerce determination rather than NEXCO's claims.  NEXCO Brf. at 16 (citing Honey From Argentina: Preliminary Results of Antidumping Duty Administrative Review, 69 Fed. Reg. 621, 624 (Dep't Commerce Jan. 6, 2004) (hereinafter, "Honey from Argentina 2001-02")).   In that review, each exporter-respondent had "approximately 20 to 300 beekeeper suppliers and 8 to 20 intermediary suppliers," [          ] than NEXCO had in this case.  Honey from Argentina 2001-02, 69 Fed. Reg. at 624.   Commerce determined in Honey from Argentina 2001-02 that it could obtain a "representative COP" by "selecting five beekeepers that supplied the largest quantity of honey to each exporter."  Id.  In the instant case, however, NEXCO had [

] See Sept. 1 SAQR at Exh. A-21 (CR 222; PR 215).

Commerce also had a much longer 18-month time period for the Honey from Argentina 2001-02 administrative review than it has for this investigation, further impinging its resources.  Husteel Co. v. United States, 98 F. Supp. 3d 1315, 1327-28, 1335-37 (Ct. Int'l Trade 2015) ("{T}he

statutory deadlines for completing an investigation are shorter than the deadlines for completing a review, and Commerce is required to conduct a verification of respondents' submissions.  As a general matter, 'Commerce has more work to do in less time' when conducting an investigation.") (citation omitted).  As such, Commerce's finding that it would have had to collect COP data from "scores" of NEXCO's producers to obtain costs for a substantial or representative portion of NEXCO's purchases is supported by record evidence.  IDM at 10 (PR 438).

Accordingly, Commerce's determination concerning the infeasibility of obtaining a representative beekeeper COP is supported by substantial record evidence.

### 2.    Commerce's Findings Were Not Based on Speculation

NEXCO nonetheless largely ignores this thorough explanation by Commerce, and the evidence that supports it, and alleges that Commerce's conclusion is "speculative" because it was purportedly based almost solely on Commerce's experience in the previous antidumping investigation of honey from Argentina, rather than on record evidence in this case.  NEXCO's Br. at 19 and n.6.  As is clear from the record above, however, the agency focused its analysis on the record in this investigation.

Importantly, Commerce's consideration of its earlier experience was in the context of evaluating the evidence in this POI and the facts of record show that it explicitly did so at the repeated urging of NEXCO and the other respondents.  IDM at 10 (PR 438).  NEXCO argued that conditions in the current investigation were similar to those in the prior investigation and any attempt to obtain cost data from all of its beekeepers lead to the same result – a lack of useable cost data:

> {I}n the prior investigation of honey from Argentina, the Department issued cost questionnaires to 12 random beekeepers and they all failed to provide the requested information. Many beekeepers in Argentina still do not maintain adequate books and records to respond to the Department's detailed cost questionnaire and ***the same non-responsiveness would likely result in this investigation***.

NEXCO's July 16 Letter at 6 (emphasis added) (PR 126).  NEXCO attributed these difficulties to an endemic lack of recordkeeping by beekeepers (historically and currently) and the effects of the COVID-19 pandemic – both of which were current POI issues.  Id.  Thus, at NEXCO's urging, Commerce used its historical experience to help it evaluate the current market in light of its resources.  That is not speculation.

## C.     Commerce's Use of Acquisition Costs Was Adequately Explained And Does Not Contravene The Statute

Because Commerce fully explained its inability to collect representative sample costs from "the vast number of producers," it was required to select another methodology to calculate NEXCO's COP.  IDM at 12 (PR 438).  Commerce's choice of NEXCO's acquisition costs as COP is reasonable and consistent with the statute.

Commerce was not required by the statute or its past practice to use the actual reported costs of an insignificant sample of NEXCO's honey producers as the proxy for the COP for all of the company's honey suppliers, and NEXCO's arguments to the contrary should be rejected. NEXCO Br. at 17-18.  As Commerce explained, the U.S. Court of Appeals for the Federal Circuit ("CAFC") has held that while "*the statute does not mandate that Commerce must use actual cost data*, it unambiguously allows Commerce to prefer the actual production costs of unaffiliated suppliers of finished subject merchandise over acquisition costs." IDM at 11 (PR 438) (quoting SKF USA Inc. v. United States, 630 F.3d 1365, 1371 (Fed. Cir. 2011) (emphasis

added)).  Commerce correctly reasoned that, exercising this same discretion, it may also choose to use acquisition costs for the calculation of COP in appropriate circumstances.  Id.

NEXCO's claim that Commerce "failed to provide a reasonable explanation" for why using acquisition cost complied with the statute is incorrect.  NEXCO's Br. at 18-19.  Commerce explained in detail that while it normally prefers to use actual costs over the acquisition costs of a reseller, 19 U.S.C. § 1677(28) and the Statement of Administrative Action to the URAA ("SAA") require Commerce to ensure to "capture all costs in situations where various companies are engage in the production and sale of MUC."  IDM at 11 (PR 438).  Section 1677(28) provides that "the term 'exporter or producer' includes both the exporter of the subject merchandise and the producer of the same subject merchandise to the extent necessary to accurately calculate the total amount incurred and realized for costs, expenses, and profits in connection with production and sale of that merchandise." 19 U.S.C. § 1677(28).  The Statement of Administrative Action further clarifies that "{t}he purpose of section 771(28) . . . is to clarify that where different firms perform the production and selling functions, Commerce may include the costs, expenses, and profits of each firm in calculating cost of production and constructed value."  Statement of Administrative Action, H.R. Doc. No. 103-465, vol. 1, at 835 (1994) ("SAA").  Commerce reasonably interprets this authority as part of its responsibility to "apply the antidumping law in a manner that prevents the evasion of antidumping duties."  IDM at 11 (PR 438) (citing Tung Mung Development Co. v. United States, 354 F.3d 1371, 1377-78 (Fed. Cir. 2004) and SAA at 870).  Because Commerce found that the specific COP data that it collected from a fraction of NEXCO's suppliers "is not representative of the total population of beekeeper suppliers" and did not account for a statistically valid sample, use of that data alone

**NONCONFIDENTIAL**

could not ensure that all costs were accounted for and that the evasion of antidumping duties was prevented.  See IDM 12-13 (PR 438).

Where "necessary information is not available on the record" the Department "shall . . . use the facts otherwise available in reaching the applicable determination."   19 U.S.C. § 1677e(a).  Commerce explained that it engaged in such a gap-filling exercise in using acquisition costs:

> We note that our selection of middle-men and beekeeper suppliers was neither a statistical sample nor a largest supplier sample, and thus the results do not necessarily represent the actual costs of the greater population in Argentina.  We cannot extrapolate the results of these few suppliers to other non-selected suppliers, and thus the *acquisition costs remain the only facts available cost information on the record.*

IDM at 25 n.127 (PR 438) (emphasis added).[5]

Commerce did not have the option of using market-wide government cost studies as a proxy for beekeeper costs as it had available in some other agricultural products cases.  See Notice of Final Determination of Sales at Less Than Fair Value; Honey From Argentina, 66 Fed. Reg. 50,611 (Dep't Commerce Oct. 4, 2001), and accompanying Issues and Decision Memorandum (Sept. 24, 2001) at Comment 2 (relying on the 1999 *Gestion Apicola* beekeeper

---

[5]     NEXCO invoked 19 U.S.C. § 1677m(c)(1), a type of facts available provision, claiming that it could not respond to the Commerce COP questionnaire with comprehensive beekeeper costs in the form and manner requested.  NEXCO's July 16 Letter at 6 (PR 126).  NEXCO instead urged that the provision of "acquisition cost data instead of beekeeper cost data is a reasonable alternative . . ." Id.  Having invoked § 1677m(c)(1) to avoid more fully responding to the questionnaire, NEXCO should not now be heard to argue that it is entitled to have the Department rely on less than the total COP data originally requested.   Doing so would contravene the statute by allowing it to manipulate the record by providing less than complete information.  See Hyundai Heavy Indus. v. United States, 399 F. Supp. 3d 1305, 1313 & n.11 (Ct. Int'l Trade 2019) (finding that selective reporting by a respondent is not permitted as "It is Commerce, not the respondents, that decides what information must be provided.") (internal citations omitted), aff'd, 819 Fed. Appx. 937 (Fed. Cir. 2020).

cost studies in Argentina to calculate the COP because the honey producers failed to provide COP data); see also Notice of Final Determinations of Sales at Less Than Fair Value: Certain Durum Wheat and Hard Red Spring Wheat from Canada, 68 Fed. Reg. 52,741 (Dep't Commerce Sept. 5, 2003) and accompanying Issues and Decision Memorandum at Comments 11 and 12 (Commerce relied on "provincial crop planning guides" to determine seed costs and labor costs, among others). Commerce, therefore, correctly applied its discretion to base COP on acquisition cost and linked it to substantial evidence showing that the agency "does not contravene {its} responsibility to apply the antidumping law in a manner that prevents the evasion of antidumping duties." IDM at 11-12 (PR 438). Because such evasion occurs if NEXCO's acquisition cost did not fully capture NEXCO's beekeepers' COPs, Commerce concluded that if NEXCO's acquisition cost *does* fully capture the beekeepers' COPs, then those acquisition costs are a reasonable proxy for NEXCO's COP. Id. at 11-13.

Solely to test whether NEXCO's acquisition costs fully captured the beekeepers COP, the Department collected "limited beekeeper COP information" from a small number of NEXCO's "suppliers with the highest risk to be selling at below their COP for the raw honey." Id. at 12. Because NEXCO's suppliers with the "highest risk of selling below cost" did not do so, the Department determined that "there is no reason to believe that NEXCO's beekeepers sold raw honey below their COP." Id. at 13. Indeed, NEXCO does not address the above explanations and reasoning by Commerce in its brief. See NEXCO's Br. at 18-19. Nor does NEXCO dispute that its acquisition costs capture the full COP of its beekeeper suppliers. NEXCO otherwise fails to identify any flaw with Commerce's explanations, and the Court should uphold the determination. See Florida Citrus Mut. v. United States, 550 F.3d 1105, 1111 (Fed. Cir. 2008)

("Commerce's methodologies for calculating dumping margin are 'presumptively correct.'") (citation omitted).

> **D.** **The Limited Supplier COP Data On the Record Cannot Be Used In Lieu of NEXCO's Acquisition Costs**
>
> **1.** **The Unrepresentativeness of the Limited Supplier COP Information on the Record Is Relevant**

NEXCO argues that Commerce erred in not using the limited beekeeper COP information on the record in lieu of NEXCO's acquisition costs as a proxy for all of its costs, despite Commerce's finding those costs unrepresentative. NEXCO's Br. at 20-23. NEXCO claims that concerns about "representativeness" are not relevant once Commerce invokes § 1677f–1(c)(2)(B) to select "a reasonable number" of "exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined." Id. at 22-23 (citing 19 U.S.C. § 1677f–1(c)(2)(B)). NEXCO, however, misapprehends the purpose of § 1677f–1(c)(2). That section is not controlling of Commerce's sampling and averaging methodology in the calculation of export price or normal value; which are instead governed by 19 U.S.C. § 1677f–1(a) and (b). See Tomatoes Canada IDM at Comment 16 ("{T}he selection of growers for purposes of determining normal value is governed by sections 777A(a) and (b) of the Act."). Section 1677f–1(c)(2) governs the selection of "exporters and producers" for which Commerce determines an "individual weighted average dumping margin." 19 U.S.C. § 1677f–1(c)(2). Because Commerce did not select any beekeeper-producer or middleman suppliers to receive an "individual weighted average dumping margin," § 1677f–

1(c)(2) does not control.[6]   Section 1677f–1(a) provides that for calculating export price, constructed export price, or normal value in an investigation, "the administering authority may – (1) use averaging and statistically valid samples if there is a significant volume of sales of the subject merchandise or a significant number or types of products . . ." 19 U.S.C. § 1677f–1(a). In applying this provision, § 1677f–1(b) provides that "{t}he authority to select averages and statistically valid samples shall rest exclusively with the Administering Authority." 19 U.S.C. § 1677f–1(b).   Thus, Commerce has the exclusive discretion in developing a sampling methodology for calculating costs, including determining whether it will even pursue "actual cost data." SKF USA Inc., 630 F.3d at 1371 ("the statute does not mandate that Commerce must use actual cost data"). This court has recognized that Commerce has the discretion "to develop a suitable methodology for calculating the costs of production." Eregli Demir ve Çelik Fabrikalari T.A.S. v. United States, 308 F. Supp. 3d 1297, 1322 (Ct. Int'l Trade 2018).

Commerce therefore did not ignore a required statutory selection process because the statute does not prescribe such a process for purposes of formulating a cost methodology. NEXCO's Br. at 20-22.   While Commerce may rely on the criteria of § 1677f–1(c)(2) for guidance on how to formulate a cost methodology by selecting a limited number of producers, Commerce explicitly rejected doing so as infeasible in the instant case. IDM at 9-10 (PR 438).

---

[6]    In fact, both of the cases to which NEXCO cites stand for the proposition that § 1677f–1(c)(2) governs the selection of exporters and producers for which Commerce will calculate "individual weighted average dumping margin" and do not mention the cost calculation methodology.   NEXCO's Br. at 23 (citing Bosun Tools Co. v. United States, No. 2021-1929, 2022 WL 94172 at *7-8 (Fed. Cir. Jan. 10, 2022) (considered the correctness assigning dumping margin for non-individually examined companies based on the dumping margins for the individually examined companies) and Shanxi Hairui Trade Co. v. United States, 503 F. Supp. 3d 1307, 1321-22 (Ct. Int'l Trade 2021), aff'd, Appeal No. 21-2067 (Fed. Cir. July 6, 2022) (considered rates for non-individually examined companies)).

NONCONFIDENTIAL

Commerce did not pursue a selection process for obtaining a representative supplier COP for the reasons discussed above in section I.B.  As a result, instead of selecting suppliers for purposes of determining a representative supplier COP, Commerce collected only limited supplier COP information for purposes of testing the reasonableness of NEXCO's proposed alternative to use acquisition cost.  IDM at 12 (PR 438).  While Commerce's letter requesting such limited COP data may have identified the beekeeper-producers as "representative" for purposes of this limited spot-check (NEXCO Br. at 11), Commerce properly found that they were not representative as a proxy for NEXCO's total costs.  IDM at 12 and 25 n.127 (PR 438).

In arguing that Commerce should have used the limited supplier COP on the record in lieu of NEXCO's acquisition costs (NEXCO's Br. at 19), NEXCO contends that Commerce should have extrapolated that limited and unrepresentative data to all NEXCO's suppliers.  This is contrary to the statutory requirement that Commerce seek a statistically valid sample or average if it is relying on less than all of the data.  19 U.S.C. § 1677f–1(a); see also Honey from Argentina 2001-02, 69 Fed. Reg. at 624 (confirming the purpose of the cost methodology Commerce developed was to calculate a "*representative* COP") (emphasis added).  Commerce also has an overarching obligation to calculate as accurate a dumping margin as possible.  Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990) ("the basic purpose of the statute" is to "determin{e} current margins as accurately as possible.").  It could not therefore reasonably rely on cost data that it found to be unrepresentative of NEXCO's actual total costs.

Accordingly, contrary to NEXCO's contention, the "representativeness" of the supplier COP information on the record is relevant to Commerce's determination in this case.

NONCONFIDENTIAL

2.    **Commerce's Reasonably Determined That the Limited Supplier COP Information on the Record Is Not A Representative COP That Can Be Extrapolated To All Suppliers**

Commerce's determination -- that the limited supplier COP information on the record "is not representative of the total population of beekeeper suppliers" -- is reasonable and supported by substantial record evidence. IDM at 12 (PR 438). First, under 19 U.S.C. § 1677f–1(a)(1), using anything less than a statistically valid sample of large datasets for purposes of determining export price, constructed export price, or normal value is presumptively unreasonable. Commerce selected [        ] of suppliers among NEXCO's larger suppliers because they had the "lowest sales prices" to NEXCO. Prelim. Decision Memo. at 26 (PR 365). Because they were selected for a limited purpose based on this one factor, the selection process was not a "a statistically valid sampling method (i.e., stratified, random, or systematic sampling)" for determining NEXCO's actual COP. Honey from Argentina: Final Results of Antidumping Duty Administrative Review and Determination Not to Revoke In Part, 72 Fed. Reg. 25,245 (Dep't Commerce May 4, 2007), and accompanying Issues and Decision Memorandum at 16 (Comment 3).

Second, the Department determined that its "selection from the pool of the largest middleman and beekeeper suppliers still only represents a small portion of each respondent's total raw honey consumption during the POI" and those data cannot be extrapolated to represent all suppliers. IDM at 13 and 25, n.127 (PR 438). The single direct beekeeper and single middleman supplier that provided COP responses together compose [        ] of NEXCO's total purchases from all honey suppliers. See Sept. 1 SAQR at Exh. A-21 (CR 222; PR 215). Such limited supplier COP information on the record is not a "fair sample or large part of the exporter and producer pool." Diamond Sawblades Manufs. Coal. v. United States, 359 F.

NONCONFIDENTIAL

Supp. 3d 1374, 1381 (Ct. Int'l Trade 2019).  Accordingly, Commerce's determination -- that the

limited supplier COP information on the record reflects only a negligible portion of NEXCO's

producer pool and is, therefore, not representative -- is reasonable and supported by substantial

record evidence.

Even if § 1677f–1(c) controlled Commerce's formulation of a cost methodology, the

limited supplier COP information on the record does not conform to § 1677f–1(c)(2)(B), which

unambiguously requires examination of the "exporters and producers accounting for the *largest*

volume."  19 U.S.C. § 1677f–1(c)(2)(B) (emphasis added).  The selected suppliers -- [

] and [          ] -- were [

] See Sept. 1 SAQR at Exh. A-21

(CR 222; PR 215).[7]  Note that NEXCO does not argue that Commerce should have collected

costs from its largest producers, only that it should use the costs of the producers from which it

did collect costs because they are relatively large.  NEXCO Brf. at 10-11.  Nor does Commerce's

finding that the limited supplier COP information on the record is unrepresentative conflict with

Commerce's decision concerning the selection of exporters for individual examination.  Id. at

23-24.  Commerce's construction of a cost methodology was not subject to the requirements of §

1677f–1(c)(2).  See section I.D.1, supra.  Further, when Commerce initially selected as

---

[7]     Furthermore, in interpreting § 1677f–1(c)(2) on the number of producers or exporters that
should be selected, the CAFC has held that "a 'reasonable number' is generally more than one."
YC Rubber Co. v. United States, No. 21-1489, 2022 WL 3711377, at *4 (Fed. Cir. Aug. 29,
2022).  In the same vein, the CIT has held that "{t}he plural term 'reasonable number of
exporters or producers,' read according to its plain meaning, does not encompass a quantity of
one."  Schaeffler Italia S.r.L. v. United States, 781 F. Supp. 2d 1358, 1362-63 (Ct. Int'l Trade
2011) (quoting 19 U.S.C. § 1677f-l(c)(2)).  Accordingly, a single direct beekeeper COP and a
single middleman-beekeeper COP is not a valid substitute under § 1677f–1(c)(2)(B) for
individually examining all NEXCO's direct beekeepers and middlemen, respectively.

NONCONFIDENTIAL

mandatory respondents the two largest exporters -- ACA and Industrias Haedo S.A. -- those two exporters together accounted for a substantial [                ] of subject merchandise that entered the United States during the POI.  <u>See</u> Letter From Thomas Martin Through Abdelali Elouaradia To James Maeder, Re: *Less-Than-Fair-Value Investigation of Raw Honey from Argentina: Respondent Selection*, at 5 (June 4, 2021) (hereinafter, "Respondent Selection Memo.") (CR 33; PR 71); <u>see also</u> Memorandum From Thomas Martin To The File, Re: *Release of U.S. Customs and Border Protection Data*, at Attachment (May 5, 2021) (CR 27; PR 49). That differs materially from the [                ] of supplier COP data that is on the record.

NEXCO's claim that the limited supplier COP on the record should be considered representative because "Commerce found that there are no meaningful physical differences in the honey NEXCO purchased from different beekeepers" is likewise unsupported by the record. NEXCO's Br. at 24 (citing to the <u>Prelim. COP Memo.</u> at 5-7 and Atts. 6-7 (CR 646; PR 373)). Commerce made no specific finding regarding the similarity or differences among honey NEXCO purchased from different beekeepers.  <u>Prelim. COP Memo.</u> at 5-7 (CR 646; PR 373). Even assuming there were no physical differences in the honey, that does not mean that there were no meaningful cost differences based on other factors such as producer, location, or hive yield.

For example, the record shows that NEXCO's many suppliers are [


].  <u>See</u> Sept. 1 SAQR at Exh. A-21 (CR 222; PR 215).  However, the limited supplier COP information on the record are

[

           ]  See id.  By contrast, in <u>Final Determination of Sales at Less Than Fair</u>
<u>Value: Fresh and Chilled Atlantic Salmon from Norway</u>, the sample of COP information on the
record "contain{ed} small, medium and large producers as well as farms from both the northern
and southern regions of Norway" and was chosen "to achieve geographic balance between
northern and southern farms for exporters who purchased from farms in both these areas."  56
Fed. Reg. 7,661, 7,672 (Dep't Commerce Feb. 25, 1991).

Further, [                              ] -- the source of the direct beekeeper COP on the record
– [                                                                                    ]
Letter From Kelley Drye & Warren LLP To Sec'y Commerce, Re: "*Raw Honey from Argentina*
*– Petitioners' Supplemental Comments in Advance of the Department's Upcoming Preliminary*
*Determination*," at Att. 2 (Nov. 2, 2021) (CR 575; PR 345).  It would not be reasonable to
extrapolate to all NEXCO's [                              ] based on the cost structure of a
[                                                            ]

### E. NEXCO's Other Arguments For Using the Limited Supplier COP Information on the Record in Lieu of Acquisition Cost Similarly Fail

NEXCO's repeated claims that Commerce verified the supplier COP information on the
record are irrelevant.  See, e.g., NEXCO's Br. at 8.  That the two supplier costs collected might
have been accurate for those producers does not mean that they were representative of all of
NEXCO's costs.

Moreover, citing to § 1677m(c)(2), NEXCO faults Commerce for "never consider{ing}
the possibility of finding a means to collect the {cost} data that could achieve compliance."  Id.
at 20.  The statute states that Commerce "shall take into account any difficulties experienced by

interested parties" and "shall provide to such interested parties any assistance that is practicable in supplying {requested} information." 19 U.S.C. § 1677m(c)(2). NEXCO does not explain what additional assistance was necessary, or how such assistance would have changed the COP information available on the record. NEXCO's Br. at 20. The only assistance NEXCO sought was allowing it to report acquisition costs in lieu of beekeeper costs, the very result it now appeals. NEXCO's July 16 Letter at 6 (PR 126).

Additionally, citing to § 1677b(f)(1), NEXCO implies that Commerce must use the limited supplier COP information on the record because that COP information derives from the books and records of the producer. NEXCO's Br. at 26. Pursuant to § 1677b(f)(1)(A), Commerce shall normally calculate costs based "on a producer's or exporter's books and records if they are in accordance with GAAP {Generally Accepted Accounting Principles} *and reasonably reflect the costs of production*." Dillinger France S.A. v. United States, 981 F.3d 1318, 1323 (Fed. Cir. 2020) (citing 19 U.S.C. § 1677b(f)(1)(A)) (emphasis added). Commerce expressly found that the limited beekeeper costs provided did not accurately represent costs for all of NEXCO's suppliers. IDM at 12 (PR 438). The Department reasonably concluded that those costs could therefore not reasonably reflect the COP for NEXCO's entire purchases of honey, as required by § 1677b(f)(1)(A). Moreover, the acquisition costs Commerce used in the Final Determination "is sourced from NEXCO's books and records that it maintains in the ordinary course of business and in accordance with Argentine generally accepted accounting principles." NEXCO's July 16 Letter at 6 (PR 126).

NEXCO is also incorrect when it argues that Commerce cannot disregard the limited supplier COP information on the record because Commerce did not adequately support facts-available ("FA") under § 1677e(a). NEXCO's Br. at 25. Commerce clearly found that necessary

information to calculate representative costs from beekeepers could not be collected, requiring a gap-filling exercise. See section I.C supra; IDM at 12 and 25 n.127 (PR 438) ("acquisition costs remain the only facts available cost information on the record").

Finally, NEXCO's claim that Commerce does not have legal grounds other than FA to use acquisition cost is also wrong. NEXCO's Br. at 25. Contrary to NEXCO's argument, Commerce is not required to accept and limitlessly extrapolate from any piece of information on the record, absent an explicit FA finding under § 1677e(a). Commerce adequately explained its conclusion that it "cannot extrapolate the results of these few suppliers {that provided COP information} to other non-selected suppliers." IDM at 25 n.127 (PR 438). Commerce determined that NEXCO's acquisition cost (for which Commerce has 100 percent coverage[8]) is more probative than the limited supplier-COP information on the record (for which Commerce has [                    ] coverage). See Sept. 1 SAQR at Exh. A-21 (CR 222; PR 215). It is the agency's task to evaluate and assign weight to the evidence. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1358 (Fed. Cir. 2002) ("assigning evidentiary weight falls exclusively within the authority of {the agency}."). In this case, the statute also vests all authority concerning the use of averages and sampling with Commerce. 19 U.S.C. § 1677f–1(b) ("The authority to select averages and statistically valid samples shall rest exclusively with the administering authority.").

---

[8]    Letter From Morris, Manning & Martin, LLP To Sec'y Commerce, Re: "*Raw Honey from Argentina, Case No. A-357-823: NEXCO S.A.'s Sections B-D Questionnaire Response*," at D-29 (Aug. 25, 2021) (Section B portion referred to as "BQR"; Section C portion referred to as "CQR"; and Section D portion referred to as "DQR") (CR 216; PR 205) (NEXCO reported its material costs using "all honey purchase invoices during the POI").

NONCONFIDENTIAL

**F.    The Court Should Dismiss NEXCO's Arguments Concerning Beekeeper Profit**

NEXCO contends than in using acquisition cost, Commerce impermissibly included NEXCO's suppliers' profit in NEXCO's COP.  NEXCO's Br. at 27-28.  NEXCO claims that Commerce should have used the limited supplier COP information to derive a supplier profit and then subtracted that amount from NEXCO's acquisition cost.  Id.  NEXCO failed to raise this argument in its case brief to the agency, and the argument is therefore barred under the doctrine of exhaustion.  NEXCO concedes that Commerce's cost methodology was the same in both the Preliminary Determination and the Final Determination.  NEXCO's Br. at 4-5 (In the Final Determination, "Commerce continued to follow the same methodology as in the *Preliminary Determination*.").  "{T}he prescribed administrative remedy for challenging aspects of the preliminary results with which a party disagrees" is for the party to set forth its objections in its administrative case brief filed with the agency.  See Dorbest Ltd. v. United States, 604 F.3d 1363, 1375 (Fed. Cir. 2010) (holding that failure to raise an issue in a case brief constitutes failure to exhaust administrative remedies); see also 19 C.F.R. § 351.309(c)(2) ("The case brief must present all arguments that continue in the submitter's view to be relevant to the Secretary's final determination or final results, including any arguments presented before the date of publication of the preliminary determination or preliminary results.").  NEXCO did not argue that Commerce should deduct supplier profit from its acquisition costs in the administrative case brief it submitted to Commerce.  See, generally, Letter From Morris, Manning & Martin, LLP To Sec'y Commerce, Re: "*Raw Honey from Argentina, Case No. A-357-823: Asociación de Cooperativas Argentinas C.L.'s and NEXCO S.A.'s Case Brief*" (Jan. 14, 2022) (CR 801; PR 420).  Accordingly, because NEXCO did not "exhaust available administrative remedies,

'judicial review of {Commerce's actions} is inappropriate.'" Consol. Bearings Co. v. United States, 348 F.3d 997, 1003 (Fed. Cir. 2003) (citation omitted).

NEXCO's argument also fails on the merits. First, because the limited supplier COP information on the record is not representative (see section I.D, supra), it cannot be used to extrapolate a representative supplier profit. Second, the difference between NEXCO's COP, calculated pursuant to § 1677b(b)(3), and NEXCO's constructed value ("CV"), calculated pursuant to § 1677b(e), is that the latter includes *NEXCO's* profit (i.e., "the specific exporter or producer being examined in the investigation"). 19 U.S.C. § 1677b(b)(3) and (e). That is, the calculation of COP should not include NEXCO's profit and Commerce did not include NEXCO's profit in NEXCO's COP. Prelim. COP Memo. at 7 (CR 646; PR 373). NEXCO has pointed to no precedent that would bar the inclusion of NEXCO's suppliers' profit in NEXCO's COP, given those profits are necessarily a part of NEXCO's costs that are being compared to its export prices.

\*   \*   \*   \*   \*

Based on the foregoing, Commerce has properly exercised its discretion to apply a cost methodology in this case that is consistent with the statute, its practice and its regulations and is supported by substantial evidence. Commerce's determination should therefore be upheld.

## II.     COMMERCE CORRECTLY APPLIED ITS HIGH INFLATION METHODOLOGY AND QUARTERLY COST-AVERAGING METHODOLOGY

### A.     Legal Background And Summary of Commerce's High Inflation Methodology and Quarterly Cost-Averaging Methodology

In an investigation, Commerce's regulations state that it "*normally* will calculate weighted averages for the entire period of investigation." 19 C.F.R. § 351.414(d)(3) (emphasis added). The regulation, however, explicitly allows for an exception, reading:

> However, when normal values, export prices, or constructed export prices differ significantly over the course of the period of investigation, the Secretary may calculate weighted averages for such shorter period as the Secretary deems appropriate.

Id. There are two well-established circumstances in which Commerce invokes this exception, both of which Commerce properly applied in this case: the high inflation methodology and the quarter cost-averaging methodology. IDM at 25-32 (PR 438).

### 1. The High Inflation Methodology

If the exporting or producing country experienced inflation of more than 25 percent during the period of investigation, Commerce applies its high inflation ("HI") methodology. Biodiesel From Argentina: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part, 83 Fed. Reg. 8,837 (Dep't Commerce Mar. 1, 2018), and accompanying Issues and Decision Memorandum at 33 (Comment 6) (Feb. 20, 2018). "When an economy experiences high inflation, the value of the country's currency is rapidly deteriorating, resulting in each unit of local currency having substantially less real value as time passes." Light-Walled Rectangular Pipe and Tube From Turkey: Notice of Final Determination of Sales at Less Than Fair Value, 69 Fed. Reg. 53,675 (Dep't Commerce Sept. 2, 2004) and accompanying Issues and Decision Memorandum at 25 (Comment 8) (hereinafter, "Rectangular Pipe and Tube Turkey IDM"). Commerce's concern is that the rapidly changing currency values cause the *timing* of sales and production to distort Commerce's dumping margin calculation. Silicomanganese From Brazil: Final Results of Antidumping Duty Administrative Review, 69 Fed. Reg. 13,813 (Dep't Commerce Mar. 24, 2004), and accompanying Issues and Decision Memorandum at 13-14 (Comment 4) (hereinafter, "Silicomanganese Brazil IDM") (illustrating the potential for distortion using the sales-below-

cost analysis as an example).  To preclude these timing-related distortions, Commerce "make{s} {its} price-to-price, price-to-CV, and price-to-COP comparisons over shorter time periods"; for example, Commerce "limit{s} {its} averaging of exporting country sales to sales that occur within the same month as the U.S. sale to which they will be compared." Rectangular Pipe and Tube Turkey IDM at 26 (Comment 8).  Thus, to limit the effect of inflation on Commerce's margin calculation, Commerce enforces a stricter contemporaneity requirement by using *monthly* periods.  Certain Porcelain-on-Steel Cookware From Mexico: Final Results of Antidumping Duty Administrative Review, 62 Fed. Reg. 42,496, 42,504 (Dep't Commerce Aug. 7, 1997) (Comment 12) (hereinafter, "Cookware from Mexico") (in high inflation cases, "it is important that {Commerce} use as a basis for NV home market prices that are as contemporaneous as possible with the date of the U.S. sale."); see also Circular Welded Carbon Steel Standard Pipe and Tube Products from Turkey: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019, 86 Fed. Reg. 15,190 (Dep't Commerce Mar. 22, 2021), and accompanying Issues and Decision Memorandum at 9-10 (Comment 1) (Mar. 15, 2021)

Commerce additionally indexes costs to put them on a constant-currency basis before weight-averaging in order to ensure that the resulting average is not affected by the rapidly changing currency values. Silicomanganese Brazil IDM at 14.  Petitioners discuss this aspect of the methodology in greater detail in section II.B below.

## 2. Quarterly Cost Averaging Methodology

Commerce usually employs an annual-averaged COP.  Certain Corrosion-Resistant Carbon Steel Flat Products from the  Republic of Korea: Notice of Final Results of the Fifteenth Administrative Review, 75 Fed. Reg. 13,490 (Dep't Commerce Mar. 22, 2010), and

accompanying Issues and Decision Memorandum at 14-15 (Comment 3) (Mar. 15, 2010). However, when a respondent's material costs changed significantly (i.e., by more than 25 percent) and there is a reasonable linkage between those costs and the respondent's sales prices, Commerce instead calculates *quarterly*-averaged material costs. Id. at 16-19. When it does so, Commerce performs "price-to-price comparisons . . . within the shorter cost averaging period to lessen the margin distortions caused by changes in sales price which result from significantly changing costs." Id. at 20; see also Dioctyl Terephthalate From the Republic of Korea: Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances, 82 Fed. Reg. 28,824 (Dep't Commerce June 26, 2017) and accompanying Issues and Decision Memorandum at 5-7 (Comment 1) (June 19, 2017). Thus, Commerce employs a stricter contemporaneity requirement – of using quarterly periods – to prevent the timing of significantly changing prices from distorting its margin calculation.

**B.   Commerce Averaged Costs by Quarter in The *Final Determination***

NEXCO erroneously argues that while Commerce stated that it employed a quarterly cost averaging methodology in the Final Determination, Commerce deviated from this decision by averaging costs by month instead of by quarter. NEXCO's Br. at 29-35. The record demonstrates that Commerce in fact employed a quarterly cost-averaging methodology.

Commerce's methodology for calculating NEXCO's quarterly-averaged material costs is provided in Attachment 2 of Commerce's final COP memorandum. See NEXCO's Br. at Exh. 1 (citing Final COP Memo. at Att. 2 (CR 818; PR 440)). Petitioners discuss Commerce's methodology using the first quarter of the POI (i.e., April 2020 to June 2020) as an example. The column labeled G ("Extended Acquisition Cost Using PRODQTY") shows NEXCO's

monthly nominal extended acquisition costs.  Id.  Thus, the [                    ]⁹ April 2020

extended cost of [            ] Argentine pesos ("ARS") reflects the April 2020 currency level,

while the [            ] May 2020 extended cost of [            ] ARS reflects the May

2020 currency level.  Id.  In the column labelled E ("Honey Acquisition Costs Inflated to QTR

End"), Commerce uses the Argentine Producer Price Index ("PPI") to put the April 2020, May

2020, and June 2020 costs in June 2020 (i.e., quarter-end) currency levels.  Id.  As a result, the

[                    ] April 2020 extended cost becomes [            ] ARS, which is the

original [            ] ARS cost restated to be in June 2020 currency levels.  Id.  At this point,

the April 2020, May 2020, and June 2020 costs are in constant currencies (i.e., all costs reflect

the June 2020 currency level).  Id.

NEXCO argues that, "{o}nce Commerce had indexed the monthly costs for inflation, by

definition, they were now on a constant currency basis and should have been averaged on a

quarterly basis."  NEXCO's Br. at 33.  Commerce did exactly that.  Specifically, Commerce

sums the constant-currency April 2020, May 2020, and June 2020 extended costs and divides by

the first quarter's production quantity to arrive at an average cost of [            ] ARS per kilogram

for the first quarter of the POI.  Id. at Exh. 1 (row labelled "QTR AVERAGE Acquisition Cost

(ΣE/ΣA)").  As explained above, this quarterly average for April to June 2020 reflects June 2020

currency levels.  Id.  In the column labelled F ("QTR Average Yielded Cost in Monthly

Currencies"), Commerce then restates this quarterly average cost into each month's currency

---

⁹    NEXCO processes some of the purchased honey by homogenizing and filtering it, which
involves yield loss.  NEXCO's July 16 Letter at 4 (PR 126).  Commerce calculates both
homogenized costs (accounting for NEXCO's yield loss for the homogenization process), and
un-homogenized cost (which has no yield loss).  Final COP Memo. at Att. 2 (CR 818; PR 440).

NONCONFIDENTIAL

level so that they can be compared to monthly prices. Id.[10] Thus, as Commerce explained in the Final Determination, "the monthly amounts do reflect the quarterly-average DIRMATs but are merely restated in each month's nominal currency in accordance with {Commerce's} high inflation method." IDM at 37 (PR 438).

Failure to restate the quarterly-averaged cost back into each month's currency level would distort the price-to-cost comparisons. For example, the sale price for an April sale would reflect April 2020 currency levels, while, as explained above, the quarterly-averaged cost for the same sale would be stated in June 2022 currency levels. The comparison, therefore, would be distorted by the rapidly changing currency levels driven by Argentina's high inflation. See Rectangular Pipe and Tube Turkey IDM at 25. To prevent that, Commerce's high inflation methodology performs "price-to-price, price-to-CV, and price-to-COP comparisons" in such a way that "home market (or third country) sales, U.S. sales, and costs are stated in a currency of approximately the same value when they are compared to each other." Id. at 26. Thus, Commerce restates the quarterly-averaged cost of [      ] ARS per kilogram into April 2020 currencies (resulting in a cost of [      ] ARS per kilogram). NEXCO's Br. at Exh. 1. Commerce can then compare the comparison market sale price in April 2020 stated in April 2020 currency levels to the quarterly-averaged cost of [      ] ARS per kilogram for April to June 2020 restated to be in April 2020 currency levels – without that comparison being distorted by the rapidly changing currency levels in Argentina.

---

[10]   For example, Commerce calculates an [               ] cost of [      ] ARS per kilogram for April 2020, which is the April-to-June quarterly-averaged cost of [      ] ARS per kilogram, restated to be in April 2020 currency levels instead of June 2020 currency levels. Id. Similarly, Commerce calculates an [               ] cost of [      ] ARS per kilogram for May 2020, which is the April-to-June quarterly-averaged cost of [      ] ARS per kilogram, restated to be in May 2020 currency levels. Id.

NONCONFIDENTIAL

NEXCO, however, argues that, after Commerce has restated the quarterly-averaged costs into each month's currency, it should average the resulting values by quarter. NEXCO's Br. at 35. In Exhibit 1 of its brief, NEXCO adds this additional step in which it weight-averages the values in the column labelled F ("QTR Average Yielded Cost in Monthly Currencies") by quarter. Id. at 34 and Exh. 1. NEXCO's proposed additional calculation step is nonsensical. First, as explained above, this additional step is unnecessary because the values in column F are already quarterly-averaged costs (simply restated into each POI month's currency level). Second, as also explained above, the values in column F are not in constant currencies, but have been restated into each POI month's currency level. By mixing different currency levels together, the resulting average NEXCO calculates is distorted by the rapidly changing currency levels in Argentina. Commerce employs indexing as part of its high inflation methodology to avoid such distortions. Silicomanganese Brazil IDM at 14; Vicentin S.A.I.C. v. United States, 404 F. Supp. 3d 1323, 1343 n.22 (Ct. Int'l Trade 2019) ("Commerce 'restates the respondent's reported costs in a constant currency basis. . . using monthly inflation indices and then calculates the period average {costs of production} and {constructed values},' in an effort to 'neutralize the impact of inflation on the calculation of the annual average costs.'"). NEXCO, further, does "not disput{e} Commerce's indexing methodology." NEXCO's Br. at 35.

In sum, because Commerce determined that NEXCO's constant-currency costs changed significantly, Commerce averaged those costs over quarters instead of over the entire annual POI. Final COP Memo. at 2 and Att. 2 (CR 818; PR 440). Correctly understood, therefore, Commerce properly employed the averaging methodology it described in the Final Determination.

C.   **Commerce Correctly Matches U.S. Sales to Normal Value By Month In Accordance With Its Well-Established Practice in High Inflation Cases**

1.   **Commerce's Use of a Monthly Contemporaneity Period Is Consistent With The Statute and Its Regulations**

In the <u>Final Determination</u>, Commerce "match{ed} U.S. sale prices to normal value within the same month, in accordance with {its} well-established practice in cases involving high inflation." <u>IDM</u> at 24 (PR 438). Citing to § 1677f-1(d)(1), NEXCO's argues that the use of a monthly contemporaneity condition for matching prices is inconsistent with a "statutory preference" for the POI-wide averaging of prices. NEXCO's Br. at 37-38. Commerce found that it has statutory discretion to determine the time periods over which to calculate weight average normal values and prices in an investigation." <u>IDM</u> at 24 (PR 438). The statute states, in relevant part, that "the administering authority shall determine whether the subject merchandise is being sold in the United States at less than fair value . . . by comparing the weighted average of the normal values to the weighted average of the export prices (and constructed export prices) for comparable merchandise . . ." 19 U.S.C. § 1677f-1(d)(1). This language does not mandate a time period that must be applied when using an average-to-average comparison methodology for determining a dumping margin in an investigation, allowing Commerce to fill that gap through its regulations. <u>Chevron U.S.A. Inc. v. Natural Res. Def. Council</u>, 467 U.S. 837, 843-44 (1984) ("If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation."). Commerce has filled this gap by promulgating 19 C.F.R. § 351.414(d)(3) of its regulations. That regulation expresses a preference for POI averaging in investigations, but provides an exception for weight-averages over shorter periods "when normal

NONCONFIDENTIAL

values or U.S. prices change significantly over the POI." 19 C.F.R. § 351.414(d)(3); <u>IDM</u> at 24-25 n.121 (PR 438).

The statute and SAA both state that in an administrative review, the time period over which Commerce averages prices may not exceed a month. 19 U.S.C. § 1677f–1(d)(2) and SAA at 843. Contrary to NEXCO's claim, Commerce's reliance in part on the language from the SAA at 843 to justify a departure from the POI-wide weight-averaging in this case is not misplaced. NEXCO's Br. at 38-39 (citing IDM at 24-25, n. 121). First, while the SAA language focuses on the calculation of constructed values in administrative reviews, it still stands for the general proposition that Congress sought to ensure that Commerce would make price comparisons based on appropriate periods that would not distort the margin calculation. <u>See</u> SAA at 843.

Second, NEXCO's inference from the timing directive in reviews that POI weight averages are required in investigations does not logically follow. NEXCO's Br. at 39. The lack of such specific direction for investigations does not mandate any time period, and supports Commerce's conclusion that it has "statutory discretion" to determine the time period for investigations. <u>IDM</u> at 24 (PR 438).

NEXCO deems 19 C.F.R. § 351.414(d)(3) as irrelevant because Commerce allegedly "has rarely relied on this regulation before this Court in any context." NEXCO's Br. at 39-40. The language of the regulation is clear and unquestionably speaks directly to the issue. It should be enforced according to its clear terms. <u>Tesoro Hawaii Corp. v. United States</u>, 405 F.3d 1339, 1347 (Fed. Cir. 2005) (citing <u>Gibson v. United States</u>, 194 U.S. 182, 185 (1904)). Commerce's interpretation of its regulation is entitled to deference. While the regulation explains that in an investigation Commerce "*normally* will calculate weighted averages for the entire period of

investigation," it also expressly allows Commerce to "calculate weighted averages for such shorter period as {Commerce} deems appropriate" in case where "normal values, export prices, or constructed export prices differ significantly over the course of the period of investigation." 19 C.F.R. § 351.414(d)(3).  Further, the issue is not how often Commerce relies on a regulation, but whether that regulation is a permissible construction of the statute.  Chevron U.S.A., 467 U.S. at 843 ("if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."); see also Corus Staal BV v. Department of Commerce, 395 F.3d 1343, 1346 (Fed. Cir. 2005).  Because NEXCO has not provided any basis for the Court to conclude that Commerce's regulation is an impermissible construction of the statute, or that Commerce has applied the regulation incorrectly under the facts of this case, the Court should defer to Commerce's construction.  Torrington Co. v. United States, 82 F.3d 1039, 1044 (Fed. Cir. 1996).

Finally, NEXCO argues that prices did not increase significantly enough to trigger the shorter time periods of 19 C.F.R. § 351.414(d)(3) and that "POI averages would not be distortive" in this case.  NEXCO's Br. at 40-41.  The record evidence does not support NEXCO's claims, as the changes in NEXCO's U.S. and comparison market prices are [

].  In aggregate, NEXCO's USD-denominated U.S. prices increased by [     ] percent over the POI and its USD-denominated comparison market prices increased by [     ] percent over the POI. Petitioners' Rebuttal Brief at Att. 2 (Jan. 31, 2022) (CR 805; PR 426).[11]  Accordingly, the record

---

[11]  Petitioners provided Commerce with an analysis on a CONNUM-specific basis which showed the same trends across CONNUMS.  See Petitioners' Case Brief at Att. 2 (Jan. 14, 2022) (CR 802; PR 421).

shows that the relevant prices "differ significantly over the course of the period of investigation." 19 C.F.R. § 351.414(d)(3).

> ### 2. Commerce's Application Of A Quarterly Cost-Averaging Methodology Does Not Negate The Need For A Monthly Contemporaneity Condition Due to High Inflation

NEXCO contends that, in enforcing a monthly contemporaneity requirement, Commerce departed from its standard quarterly cost-averaging methodology, which instead requires quarterly contemporaneity. See, e.g., NEXCO's Br. at 31.

While Commerce usually matches U.S. prices to normal value by quarter when applying its quarterly cost-averaging methodology (see section II.A.2, supra), here, Commerce employed its quarterly cost-averaging methodology on top of its high inflation methodology because Commerce found that NEXCO's costs changed significantly even after putting them into constant currencies (i.e., "after accounting for the impact of inflation"). Prelim. COP Memo. at 4 and Att. 5 (CR 646; PR 373). Commerce also found these significant cost changes to be linked with NEXCO's selling prices. Id. at 5; IDM at 25 n.127 and 26 (PR 438). As a result, Commerce quarterly averaged NEXCO's constant-currency costs, instead of annually averaging them as Commerce would do in a typical high inflation case. Prelim. COP Memo. at 5 (CR 646; PR 373); Rectangular Pipe and Tube Turkey IDM at 26. Thus, the instant case required the quarterly cost-averaging methodology on top of the high inflation methodology because the increases in costs were even greater than those typically encountered in high inflation cases. As Commerce explained, its use of the "alternative {quarterly} cost averaging method does not change the impact of high inflation, but rather further justifies why shorter comparison periods are *especially appropriate in this case.*" IDM at 26 (PR 438) (emphasis added).

### 3.    Monthly Contemporaneity Periods Do Not Distort the Margins

NEXCO argues that Commerce's use of a monthly contemporaneity requirement forced certain U.S. sales to match to constructed value ("CV") instead of a normal value that is based on comparison market prices, which allegedly "significantly overstat{ed}" its dumping margin. NEXCO's Br. at 32.   NEXCO, however, provides no evidence to demonstrate the alleged distortion of the margin.   Id.  While a stricter contemporaneity requirement can reduce price-to-price matches and, therefore, increase the use of CV, Commerce determined that "in high inflation cases, contemporaneity is more important to the accuracy of the dumping margins than ensuring that there will be identical or similar price-to-price comparisons." IDM at 27 (PR 438). NEXCO has provided no evidence to undermine that finding.

Contrary to NEXCO's claims, Commerce did not find that there is a statutory preference for CV.  NEXCO's Br. at 44.  In fact, Commerce's point was that a *contemporaneous* CV is preferable to a ***non****-contemporaneous* comparison market price for normal value.  IDM at 27 (PR 438).   In this case, Commerce first sought to match a U.S. sale to a contemporaneous comparison-market price, before resorting to CV.  Id.; see also Prelim. Decision Memo. at 28-29 (PR 365).  Commerce merely explained that because NEXCO's U.S. and comparison market prices are not adjusted for inflation, it must enforce monthly contemporaneity when matching prices to prevent distortions from the price inflation that incurred in the intervening time period between the U.S. and home market sales.  IDM at 27 (PR 438); see also Cookware from Mexico, 62 Fed. Reg. at 42,504 ("This methodology serves to minimize the extent to which calculated dumping margins are overstated or understated due solely to price inflation that incurred in the intervening time period between the U.S. and home market sales.").  Commerce also explained

that because CV is based on COP, it can use its indexing methodology to calculate a contemporaneous CV for each month of the POI.  IDM at 27 (PR 438).

### 4.  NEXCO's USD-Denominated Selling Prices Are Affected By Argentine High Inflation

NEXCO contends that because its comparison market (i.e., Germany) and U.S. prices are denominated in USD, those prices are necessarily unaffected by inflation, which makes a monthly contemporaneity period unnecessary.  NEXCO's Br. at 41-42.  In contrast, Commerce found that "{e}ven the {U.S. dollar} sales prices of both mandatory respondents were impacted by high inflation during the POI due to the impact on the respondents' COP."  IDM at 26 (PR 438).  NEXCO, however, contends that its costs are "factually and legally irrelevant" because "Argentine Peso inflation costs and sales values in U.S. dollars are moving in totally separate universes."  NEXCO's Br. at 41.  NEXCO provides no evidentiary support for its claims.  Id.

Commerce recognized that honey price increases were "attributable to inflation" as well as to other causes.  IDM at 32-33 (PR 438).  NEXCO concedes that its "acquisition prices/beekeeper costs were inflated because they were denominated in Argentine pesos." NEXCO's Br. at 42; see also NEXCO's Case Brief at 35 (Jan. 14, 2022) (CR 801; PR 420) ("price increases in the acquisition costs far exceed the rate of inflation but certainly fully reflected inflation").  Commerce, further, found that those acquisition costs are "reasonably linked" with NEXCO's selling prices based on an examination of each CONNUM with sufficient data for comparison.  IDM at 27 (PR 438); Prelim. COP Memo. at 5 (CR 646; PR 373).  NEXCO does not dispute this record evidence linking NEXCO's costs and sales prices; to the contrary, NEXCO cites to this very finding to argue that its acquisition costs and its selling prices are "tightly correlated."  NEXCO's Br. at 9.  Because NEXCO's inflation-driven costs are

linked to its selling prices, Commerce reasonably concluded that NEXCO's prices are also affected by inflation. IDM at 26-27 (PR 438).

This finding also defeats NEXCO's claim that Commerce's conclusion is unsupported by "economic principles." NEXCO's Br. at 42. The linkage between costs and prices shows that Argentine exporters did not set prices in a vacuum. Regardless of the market or currency in which NEXCO earns sales revenue, NEXCO must return that revenue to Argentina and convert it into ARS in order to recoup its inflation-driven, ARS-denominated costs. See BQR at B-30 (CR 209; PR 203); CQR at C-28 (CR 212; PR 204) (NEXCO converts the USD-denominated sales revenue from Germany and the United States into pesos). As Commerce found, NEXCO's USD sales prices do not immunize those prices from inflationary pressures. IDM at 26 (PR 438) (citing to Petitioners' Rebuttal Brief at 52-54 and Att. 1 (Jan. 31, 2022) (CR 805; PR 426) (demonstrating how the effect of high inflation on a company's costs puts inflationary pressure on its selling prices, even when those selling prices are denominated in USD)).

While NEXCO alternatively attributes the changes in its USD selling prices solely to movements in the "international price of honey," NEXCO's record citations for this assertion do not compare its selling prices to an "international price," or even identify to what "international price" NEXCO is referring. NEXCO's Br. at 40-41 (citing BQR at Exh. B-1; CQR at Exh. C-1; DQR at Exh. D-15 (CR 168-207; PR 203-205)). By contrast, Petitioners submitted regressions showing that ACA's and NEXCO's USD-denominated selling prices were driven by Argentine inflation, not the "international price of honey." IDM at 23 (PR 438) (summarizing Petitioners' Rebuttal Brief at 57-60 and Atts. 3-5 (Jan. 31, 2022) (CR 805; PR 426)). Regardless of reason, NEXCO's selling prices increased dramatically over the POI. Id. at 32 (noting the dramatic increase in the price of honey). This increase warrants the use of shorter time periods for weight-

averaging to prevent the timing of sales from distorting Commerce's price comparisons.  Id. at 27.

NEXCO's selling in USD in the comparison market is not unique and Commerce has applied this high inflation methodology of matching prices on a monthly basis in other cases. See Certain Steel Concrete Reinforcing Bars From Turkey; Final Results of Antidumping Duty Administrative Review, 66 Fed. Reg. 56,274 (Dep't Commerce Nov. 7, 2001), and accompanying Issues and Decision Memorandum at Comment 4; Notice of Preliminary Determination of Sales at Less Than Fair Value; Certain Cold-Rolled Carbon Steel Flat Products From Turkey, 67 Fed. Reg. 31,264, 31,265 (Dep't Commerce May 9, 2002) (preliminary determination), unchanged in 67 Fed. Reg. 62,126 (final determination).  Accordingly, the instant case is not without administrative precedent, and Commerce appropriately did not eschew the use of monthly contemporaneity periods because of the presence of USD-denominated comparison-market prices in prior cases.

Finally, while NEXCO focuses on the fact that its comparison-market *gross* prices and U.S. *gross* prices are in USD, Commerce calculates dumping margins by comparing net prices, not gross prices.  Prelim. Decision Memo. at 21, 29 (PR 365) (explaining Commerce's price adjustments to calculate export price and normal value).  [

] Final Analysis Memo.,

transmitting the comparison market program at lines 1431, 1437, 1459 (CR 817, 827; PR 441)

and BQR at Exh. B-2 (CR 209; PR 203).  Similarly, [

] <u>Final Analysis Memo.</u>, transmitting the margin

program at lines 434-439 (CR 817, 828; PR 441) and CQR at Exh. C-2 (CR 212; PR 204).

Argentine high inflation affects Commerce's price comparisons directly through these ARS-

denominated price adjustments, which are mandated by statute.  <u>See</u> 19 U.S.C. § 1677a(c) and §

1677b(a)(6).

> **5.      Commerce Correctly Made the Cost and Price Comparison Periods Identical**

While Commerce averaged NEXCO's costs over quarters, it restated the quarterly-

averaged costs into the currency level of each month of the POI.  Commerce then compares a

comparison market sale in a particular month to the cost that has been restated in that same

month's currency level.  <u>See</u> section II.B <u>supra</u>.  NEXCO, however, contends that "Commerce

has never found that its cost comparison periods and sales comparison periods need to be the

same."  NEXCO's Br. at 35.  NEXCO is incorrect; in <u>Union Steel Manufacturing Co. v. United</u>

<u>States</u> (hereinafter, "<u>Union Steel</u>"), for example, Commerce explained the need to compare

prices and costs on the same basis because:

> if it considers it inappropriate to compare sales prices with
> quarterly COPs or CVs incurred outside of the quarter in which the
> sale occurred, then it is similarly inappropriate to compare U.S.
> sales prices occurring in a given quarter to NVs based on
> comparison market sales prices occurring in a quarter outside of
> that in which the U.S. sale occurred.

190 F. Supp. 3d 1326, 1339 (Ct. Int'l Trade 2016).  The Court upheld Commerce's practice to match U.S. sales to normal value using the same shorter time periods that Commerce uses to match comparison market sales to costs, finding that "it was reasonable for Commerce to regard changing production costs, as generally reflected in prices, to relate to the question of the timing, i.e., the contemporaneity, of price-to-price comparisons between U.S. and home market sales." See id., 190 F. Supp. 3d at 1340-41.  That would apply to quarterly or monthly price comparisons.  While Union Steel addressed Commerce's quarterly cost-averaging methodology, not its high inflation methodology, the same principles should apply in both circumstances given that both address situations in which rapidly changing costs and prices potentially distort the dumping calculations.  NEXCO points to nothing in the statute that would require Commerce to use NEXCO's preferred methodology over the methodology the Court upheld in Union Steel and Commerce applied in this case.

NEXCO also argues that Union Steel does not apply because the respondent's normal values were allegedly denominated in the local currency, but it fails to provide any precedent for this claim.  NEXCO's Br. at 41-42.  The currency in which prices are denominated are not relevant give that NEXCO's selling prices increased significantly, whether denominated in USD (Petitioners' Rebuttal Brief at Att. 2 (Jan. 31, 2022) (CR 805; PR 426)), or ARS.  DQR at Exh. D-15 (CR 217; PR 205).  The currency does not, therefore, affect the validity of concerns for contemporaneity in price-to-price matches.

As the Federal Circuit has recognized, "the antidumping statute reveals tremendous deference to the expertise of the Secretary of Commerce in administering the antidumping law." PSC VSMPO-Avisma Corp. v. United States, 688 F.3d 751, 764 (Fed. Cir. 2012) (internal citations and quotations omitted).  "This deference is both greater than and distinct from that

accorded the agency in interpreting the statutes it administers, because it is based on Commerce's technical expertise in identifying, selecting and applying methodologies to implement the dictates set forth in the governing statute, as opposed to interpreting the meaning of the statute itself where ambiguous.as master of the dumping laws" Id. (internal citations omitted). Commerce has chosen a reasonable methodology that is consistent with the statute and thoroughly explained its reasons for applying it. Commerce's methodology is therefore presumptively correct given that NEXCO cites to nothing that undermines it. Id., 688 F.3d at 764 (quoting Thai Pineapple Pub. Co. v. United States, 187 F.3d 1362, 1365 (Fed. Cir.1999)).

III.   **CONCLUSION**

For the reasons set forth above, Petitioners respectfully urge this Court to reject NEXCO's arguments and to affirm Commerce's Final Determination in its entirety.

Respectfully submitted,

R. ALAN LUBERDA
MELISSA M. BREWER
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC 20007
(202) 342-8400

Counsel to Defendant-Intervenors

Dated: March 3, 2023

**CERTIFICATE OF COMPLIANCE**
**WITH COURT OF INTERNATIONAL TRADE**
**STANDARD CHAMBERS PROCEDURES**


Pursuant to the Court of International Trade Standard Chambers procedures, counsel for

Defendant-Intervenors the American Honey Producers Association ("AHPA") and Sioux Honey

Association ("SHA") certify that the attached Response Brief contains 13,973 words, including

footnotes.  The word count certification is made in reliance on the word-count feature contained

in Microsoft Word Office 2016.


Respectfully submitted,


/s/ R. Alan Luberda
R. ALAN LUBERDA
MELISSA M. BREWER
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC  20007
(202) 342-8400

Counsel to Defendant-Intervenors


Dated:  March 3, 2023