**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE**

| | |
|---|---|
| NEXCO S.A.,                     ) | |
|                                 ) | |
|                    Plaintiff,   ) | |
|                                 ) | **NON-CONFIDENTIAL** |
|          v.                     ) | Proprietary Information of NEXCO |
|                                 ) | Removed from Pages 4 and 5, and |
| UNITED STATES,                  ) | from Exhibit 1 |
|                                 ) | |
|                   Defendant,    ) | Court No. 22-00203 |
|                                 ) | |
| AMERICAN HONEY PRODUCERS         ) | |
| ASSOCIATION AND SIOUX HONEY      ) | |
| ASSOCIATION,                     ) | |
|                                 ) | |
|        Defendant-Intervenors.   ) | |

**PLAINTIFF NEXCO S.A.'S REPLY BRIEF IN SUPPORT OF
ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD**

<div align="right">

Julie C. Mendoza
Donald B. Cameron
R. Will Planert
Brady W. Mills
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey

**MORRIS MANNING & MARTIN LLP**
1401 Eye Street, NW, Suite 600
Washington, D.C. 20005
(202) 216-4817

*Counsel to Plaintiff NEXCO S.A.*

</div>

Dated:  March 24, 2023

## <u>TABLE OF CONTENTS</u>

I.      ARGUMENT ................................................................................................................... 2

      A.     The Government Fails To Justify Commerce's Use Of Honey Acquisition Prices For NEXCO's Cost Of Production Instead Of The Statutorily Preferred Verified Beekeepers' Actual Costs ....................................................................................... 2

      B.     NEXCO Exhausted Its Administrative Remedies ................................................ 13

      C.     The Government Fails To Justify Commerce's Use Of Monthly Costs And Price Comparisons In Its Quarterly Cost Calculations ................................................... 16

      D.     The Government Fails To Justify Commerce's Refusal To Compare Dollar-Denominated Prices On A POI Weighted Average Basis ................................... 18

II.     CONCLUSION.............................................................................................................. 22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bosun Tools Co. Ltd. v. United States*,
    No. 2021-1929, 2022 WL 94172 (Fed. Cir. Jan. 10, 2022) ....................................................10

*Consol. Bearings Co. v. United States*,
    166 F. Supp. 2d 580 (Ct. Int'l Trade 2001) ............................................................................15

*Luoyang Bearing Corp. (Grp.) v. United States*,
    450 F. Supp. 3d 1402 (Ct. Int'l Trade 2020) .........................................................................15

*Shanxi Hairui Trade Co., Ltd. v. United States*,
    503 F. Supp. 3d 1307 (Ct. Int'l Trade 2021) ........................................................................10

*SKF USA, Inc. v. United States*,
    630 F.3d 1365 (Fed. Cir. 2011)...............................................................................................13

*Union Steel Mfg. Co. v. United States*,
    190 F. Supp. 3d 1326 (Ct. Int'l Trade 2010) ................................................................... 20-21

**Statutes**

19 U.S.C. § 1677(28) ........................................................................................................................12

19 U.S.C. § 1677b(b)(3) .........................................................................................................12, 14, 15

19 U.S.C. § 1677b(f)(1)(A)..............................................................................................................2

19 U.S.C. § 1677f-1(c)(2) ..........................................................................................................3, 10

**Regulations**

19 C.F.R. § 351.414(d)(3).............................................................................................................20

**Other Authorities**

*Honey from Argentina: Final Results of Antidumping Duty Administrative Review
    and Determination Not to Revoke In Part*,
    72 Fed. Reg. 25,245 (Dep't Commerce May 4, 2007) ............................................................3

*Honey From Argentina: Preliminary Results of Antidumping Duty Administrative
    Review*,
    69 Fed. Reg. 621 (Dep't Commerce Jan. 6, 2004) ..................................................................8

*Honey from Argentina: Preliminary Results of Antidumping Duty Administrative Review and Intent Not to Revoke in Part*,
71 Fed. Reg. 78,397 (Dep't Commerce Dec. 29, 2006) ...........................................8

*Honey from Argentina: Preliminary Results of Antidumping Duty Administrative Review and Intent Not to Revoke in Part*,
72 Fed. Reg. 73,758 (Dep't Commerce Dec. 28, 2007) ...........................................8

*Honey from Argentina: Preliminary Results of Antidumping Duty Administrative Review and Intent to Revoke Order in Part*,
73 Fed. Reg. 79,802 (Dep't Commerce Dec. 30, 2008) ...........................................8

*Honey From Argentina: Preliminary Results of Antidumping Duty Administrative Review*,
76 Fed. Reg. 2,655 (Dep't Commerce Jan. 14, 2011) ...........................................8

Import Admin., U.S. Dep't Commerce, Differences in Merchandise Calculations in Hyperinflationary Economies, Policy Bulletin 94.5 (Mar. 25, 1994)..................................19

*Live Cattle from Canada. Notice of Final Determination of Sales at Less Than Fair Value: Live Cattle From Canada*,
64 Fed. Reg. 56,739 (Dep't Commerce Oct. 21, 1999) ...........................................10

*Notice of Final Results of Antidumping Duty Administrative Review: Individually Quick Frozen Red Raspberries From Chile*,
70 Fed. Reg. 6,618 (Dep't Commerce Feb. 8, 2005)...........................................2, 6

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| NEXCO S.A., ) <br><br> Plaintiff, ) <br><br> v. ) <br><br> UNITED STATES, ) <br><br> Defendant, ) <br><br> AMERICAN HONEY PRODUCERS ) <br> ASSOCIATION AND SIOUX HONEY ) <br> ASSOCIATION, ) <br><br> Defendant-Intervenors. ) | **NON-CONFIDENTIAL** <br> Proprietary Information of NEXCO <br> Removed from Pages 4 and 5, and <br> from Exhibit 1 <br><br> Court No. 22-00203 |

## PLAINTIFF NEXCO S.A.'s REPLY BRIEF IN SUPPORT OF
## ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of this Court, and the January 18, 2023 Amended

Scheduling Order, ECF No. 28, Plaintiff NEXCO S.A. ("NEXCO" or "Plaintiff") hereby files its

reply brief in opposition to the March 3, 2023 response briefs filed by Defendant, the United

States, and Defendant-Intervenors, American Honey Producers Association and Sioux Honey

Association. *See* Defendant's Response to Plaintiff's Motion for Judgment on the Agency

Record, *NEXCO S.A. v. United States*, No. 22-00203 (Ct. Int'l Trade Mar. 3, 2023), ECF Nos.

30-31 ("Def.'s Br."); Defendant-Intervenor's Response to Plaintiff's Motion for Judgment on the

Agency Record, *NEXCO S.A. v. United States*, No. 22-00203 (Ct. Int'l Trade Mar. 3, 2023), ECF

Nos. 32-33 ("Def.-Int.'s Br.").  As discussed more fully below, Defendant and Defendant-

Intervenors' arguments do not justify the departures made by the U.S. Department of Commerce

("Commerce") from the requirements of the antidumping statute, its regulations, and consistent

past practice.  Defendant also fails to persuasively explain how Commerce's inflation methodology justifies Commerce's departure from the regulatory preference and consistent practice of Commerce in investigations to compare weighted average prices over the period of investigation ("POI") given that prices in both markets are set in U.S. dollars and thus unaffected by inflation in Argentina.

I.    **ARGUMENT**

    A.  **The Government Fails To Justify Commerce's Use Of Honey Acquisition Prices For NEXCO's Cost Of Production Instead Of The Statutorily Preferred Verified Beekeepers' Actual Costs**

       Commerce's consistent practice has been to interpret the applicable statutory provision, 19 U.S.C. § 1677b(f)(1)(A), as providing that cost of production ("COP") should be based on the actual costs of the entity producing the merchandise.  NEXCO's Initial Br. at 17 and 26.  As applied to agricultural products, where the mandatory respondent is the exporter, rather than the producer, of the merchandise under investigation, Commerce has without exception held that the COP is to be based on costs of the growers or cultivators who supplied the product under investigation to the exporter.[1]  *Id.* at 15-17.

---

[1] A different rule applies when Commerce determines that the exporter, rather than the grower of the agricultural product, is the producer of the product under investigation.  In those cases, the raw agricultural product is merely an input into the production of the subject merchandise (*e.g.*, an exporter who exports frozen raspberries produced from fresh raspberries supplied by the growers).  In such a case, the COP is based on the transformation costs of the exporter, such as processing and freezing, plus the acquisition price of the fresh raspberries.  *See Notice of Final Results of Antidumping Duty Administrative Review: Individually Quick Frozen Red Raspberries From Chile*, 70 Fed. Reg. 6,618 (Dep't Commerce Feb. 8, 2005) and accompanying Issues and Decision Memorandum at Comment 1.  In this case, however, Commerce determined that NEXCO is *not* the producer of the raw honey under investigation, but rather, that the beekeepers are the producers, a point the Government emphasizes in its brief. Def.'s Br. at 25; *see also* PR Doc. 365 at 25.

The Government does not dispute that this is Commerce's established practice or that Commerce has followed this approach consistently in previous antidumping proceedings involving agricultural products not produced by the exporter, including the prior antidumping proceedings on *Honey from Argentina*.  *See* Def.'s Br. at 15-16; *see also* NEXCO's Initial Br. at 15-16 and cases cited therein.  Nor does it dispute that § 1677f-1(c)(2)(B) is the statute under which Commerce selects both exporters and producers.[2]  Def.'s Br. at 25.  And it is uncontested that in this investigation, Commerce solicited and received COP information from two unaffiliated beekeeper/middlemen who supplied raw honey to NEXCO and who Commerce designated "representative" beekeepers.  CR Doc. 130 (PR Doc. 165) at 1; CR Doc. 166 (PR Doc. 185) at 1.  It is also uncontested that Commerce verified the raw honey COP data supplied by the beekeepers and found it to be reliable.  PR Doc. 438 at 12 and 66-73.  Commerce nevertheless took the opposite approach from all of its prior cases and elected to base NEXCO's COP on the acquisition prices NEXCO paid to the beekeepers rather than use the actual beekeepers' COP that had been requested and verified by Commerce.

---

[2] Defendant-Intervenors' argument that this section of the statute does not apply to the selection of beekeepers in this case is simply wrong.  Def.-Int.'s Br. at 19.  Section 1677f-1(c)(2)(B) refers to Commerce's selection of "exporters *and* producers" accounting for the largest volume of subject merchandise that can reasonably be examined. 19 U.S.C. § 1677f-1(c)(2)(B) (emphasis added).  In the previous *Honey from Argentina* proceeding, Commerce cited to 19 U.S.C. § 1677f-1(c)(2)(B) as the statutory provision under which it was selecting beekeeper respondents.  *See Honey from Argentina: Final Results of Antidumping Duty Administrative Review and Determination Not to Revoke In Part*, 72 Fed. Reg. 25,245 (Dep't Commerce May 4, 2007) and accompanying Issues and Decision Memorandum at comment 3 ("our decision to select the three beekeepers that supplied the largest volume of honey to Seylinco during the POR is in accordance with section 777A(c)(2)(B) of the Tariff Act and Department practice where we have selected cost respondents . . . .").  Commerce cited the same statutory provision in the 2008-2009 *Honey from Argentina* administrative review when determining to select the two largest honey producers supplying the mandatory respondent as cost respondents.  *See* CR Doc. 58 (PR Doc. 126) at 8 (quoting the cost respondent selection memorandum issued in the 2008-2009 administrative review).

The Government's defense is to artfully assert that Commerce's consistent prior practice "informed" its determination in this case.  Def.'s Br. at 15 and 22.  That statement is true only to the limited extent that Commerce made a conscious decision to disregard its prior practice.  The question presented is whether Commerce, rather than abide by its own established interpretation of the statute and consistent prior practice, could instead elect to take "a pragmatic approach," based on its consideration of "multiple factors."  Def.'s Br. at 8, 19.

Commerce's failure to follow the statute and its practice is clear legal error.  There is certainly nothing "pragmatic" about disregarding the actual, verified costs of producing the merchandise under investigation provided by the beekeepers that Commerce itself selected as mandatory respondents, in favor of the acquisition prices paid by NEXCO.  Commerce knew that those acquisition prices were not a good "surrogate" for beekeeper costs since it made a point of establishing that those acquisition prices *far exceeded* the actual cost of producing the honey.  PR Doc. 365 at 26; CR Doc. 646 (PR Doc. 373) at 2-3.  Commerce's own analysis demonstrated that the acquisition prices it relied upon ranged from [                                        ] whereas beekeeper costs ranged from [                                        ]).  *See* **Exhibit 1** (containing a copy of certain spreadsheets attached in CR Doc. 646 (PR Doc. 373), CR Docs. 531-538 (PR Doc. 325), and CR Docs. 539-541 (PR Doc. 326)). As demonstrated therein, there is no mystery as to what accounts for this difference.  Commerce calculated the beekeepers' full COP and compared it to the acquisition prices for NEXCO's beekeepers.  *Id.* Commerce even presented an alternative cost calculation where it allocated additional costs to the beekeepers' COP and there still remained a significant difference between the beekeepers' COP and the acquisition price.  *Id.* Commerce's analysis clearly shows that the profit of the

beekeepers accounts for the difference between the beekeeper costs and the acquisition prices paid by NEXCO.  *Id.*

This substitution of acquisition prices for beekeeper COP had a dramatic effect on NEXCO's dumping margin.  Purchased raw honey constituted approximately [    ] percent of NEXCO's cost of manufacturing ("COM") as calculated by Commerce.  CR Doc. 646 (PR Doc. 373) at 4.  The "pragmatic" decision to replace the actual cost of producing the honey with acquisition prices that include beekeeper profits, combined with Commerce's decision not to compare U.S. dollar denominated sales in Germany with U.S. sales prices on a POI average basis, accounted for the entire dumping margin determined for NEXCO.

In its response brief, the Government defends Commerce's "pragmatic" substitution of acquisition prices for beekeeper costs on three grounds: (1) that NEXCO had argued at the beginning of the investigation that it should be considered a producer of raw honey and therefore its acquisition prices should be used in calculating its COP; (2) Commerce's speculative "findings" that it would be likely to encounter difficulties in receiving reliable questionnaires from beekeepers; and (3) that Commerce correctly concluded it would have been impossible to have obtained beekeeper costs that are "representative."  Def.'s Br. at 17-25.  The first two arguments rely on events, arguments, and potential difficulties identified at the very beginning of the investigation, which had been superseded by events and plainly contradicted by the record at the time of the *Preliminary Determination*.  The third is unsupported by substantial evidence.

In the early stages of the case NEXCO argued that it, and not the beekeepers, should be considered the producer of the raw honey that was the subject of the investigation, and therefore should be permitted to report its acquisition costs. *See* NEXCO's Initial Br. at 8-10; CR Doc. 58 (PR Doc. 126) at 2-4 and 7-8.  NEXCO also argued that, in the event that Commerce determined

to rely on the production costs of the beekeepers, Commerce should select two beekeepers and adopt a more simplified questionnaire as it had done in past *Honey from Argentina* proceedings in recognition of the small size and limited financial books and records of the beekeepers.

> NEXCO submits that the processing and testing that it conducts before the honey is exported makes this case akin to *Individually Quick Frozen Red Raspberries from Chile*, …. {T}he Department used the acquisition prices from non-affiliated suppliers for the agricultural product input because certain processing took place after the exporter received the input product from the non-affiliated supplier. The same is true in this case. The honey exported by NEXCO is a more advanced product than the honey it receives from the beekeepers. . . All of this additional processing and testing of the honey after NEXCO receives the honey from the beekeepers warrants the use of NEXCO's acquisition costs for honey….
>
> In the alternative, if the Department proceeds to request costs from beekeepers, NEXCO requests that the Department … select the two largest suppliers …Finally, NEXCO also requests that the Department clarify whether a full Section D Questionnaire Response will be required from NEXCO … in past cases the Department has designed and sent a special form of "Section D" in those instances for beekeepers and/or middlemen. . . .

*Id.* at 2-4. Instead of following NEXCO's proposed approach, Commerce selected "representative" beekeepers and issued a full standard section D questionnaire to the beekeepers it selected, followed by two supplemental questionnaires and a verification questionnaire. CR Doc. 130 (PR Doc. 165); CR Doc. 166 (PR Doc. 185); CR Doc. 438 (PR Doc. 292); CR Doc. 439 (PR Doc. 293); CR Doc. 648 (PR Doc. 379); CR Doc. 653 (PR Doc. 385).

Significantly, NEXCO also argued that if Commerce did decide to collect beekeeper information, then it must follow the statute's directive of selecting the "producers accounting for the largest volume of the subject merchandise . . . that can be reasonably examined." CR Doc. 58 (PR Doc. 126) at 7 (citing 19 U.S.C. § 1677f–1(c)(2)). NEXCO cited Commerce's findings from the previous administrative review of *Honey from Argentina* in which Commerce selected beekeeper cost respondents, stating "This is consistent with prior practice in the history of this order and avoids the inherent risk in selecting small beekeepers unable to respond to our

information requests." CR Doc. 58 (PR Doc. 126) at 8 (quoting the cost respondent selection memorandum issued in the 2008-2009 administrative review). By the time of the *Preliminary Determination*, Commerce had decided that NEXCO was not a producer of honey. PR Doc. 365 at 25. Consistent with this precedent and Commerce's determination that the beekeepers are the producers of the honey exported, NEXCO argued in its case brief that Commerce is obligated to use the verified beekeeper costs on the record to calculate COP, and NEXCO maintains that position on appeal.[3] CR Doc. 801 (PR Doc. 420) at 4-23.

As to the second rationale argued by Defendant – that based on its experience in prior honey antidumping proceedings, Commerce reasonably concluded it was no longer feasible to obtain beekeeper production data – the record of the investigation contradicts that conclusion. Defendant emphasizes events of more than twenty years ago during the initial investigation phase of the previous *Honey from Argentina* proceeding, in which Commerce selected 12 beekeepers and none responded, forcing Commerce to rely on public studies as facts available. Def.'s Br. at 16. But as the Government implicitly concedes, in subsequent reviews of the resulting antidumping duty order, Commerce was able to use beekeeper costs. Defendant nevertheless argues that as the honey industry became more fragmented, the selection of the largest beekeeper suppliers in subsequent reviews provided less coverage of honey purchases. *Id.* at 17. However, any actual decline in industry coverage in those reviews is likely attributable to Commerce's decision to select fewer beekeeper respondents, not to the increased fragmentation of the honey industry.[4] Commerce selected five beekeepers per exporter

---

[3] NEXCO's position regarding the use of acquisition prices or beekeeper COP changed to reflect Commerce's legal decisions and the development of the record during the investigation. It seems that Commerce's decisions were unaffected by either.

[4] The Government fails to substantiate its assertion that the percentage of honey purchases covered by the selected beekeeper respondents declined. The citations in Defendant's brief to

respondent for which a cost allegation was initiated in the first review and then three in the third and fourth reviews and then two beekeepers in the fifth and seventh reviews.[5]  *Honey From Argentina: Preliminary Results of Antidumping Duty Administrative Review*, 69 Fed. Reg. 621, 624 (Dep't Commerce Jan. 6, 2004); *Honey from Argentina: Preliminary Results of Antidumping Duty Administrative Review and Intent Not to Revoke in Part*, 71 Fed. Reg. 78,397, 78,400 (Dep't Commerce Dec. 29, 2006); *Honey from Argentina: Preliminary Results of Antidumping Duty Administrative Review and Intent Not to Revoke in Part*, 72 Fed. Reg. 73,758, 73,762 (Dep't Commerce Dec. 28, 2007); *Honey from Argentina: Preliminary Results of Antidumping Duty Administrative Review and Intent to Revoke Order in Part*, 73 Fed. Reg. 79,802, 79,807 (Dep't Commerce Dec. 30, 2008); *Honey From Argentina: Preliminary Results of Antidumping Duty Administrative Review*, 76 Fed. Reg. 2,655, 2,659 (Dep't Commerce Jan. 14, 2011).

And, whatever the trend in the Argentine honey industry may have been at the time of those earlier administrative reviews, the record of this investigation indicates that the industry had become more consolidated than in prior proceedings, not more fragmented.  The number of beekeepers in the industry declined from 25,000 in 2001 to around 15,500 in 2021.  PR Doc. 438

---

four different *Preliminary Results* issued in the previous *Honey from Argentina* proceeding are to the descriptions of the cost methodology used in those proceedings.  Def.'s Br. at 17.  Nothing in those notices discusses the alleged fragmented nature of the industry nor do they evidence a concern about low coverage of the exporter-respondents' total honey purchases.

[5] Defendant-Interveners present their own calculations to try to demonstrate that obtaining a beekeeper coverage in this investigation at a level comparable to those earlier proceedings was not possible.  Def.-Int.'s Br. at 13, 24, and 27.  But Commerce did not rely on any of those calculations nor was there any specific indication in those earlier honey proceedings as to what number of respondents Commerce considered "representative."  The issue was not discussed. Further demonstrating the irrelevance of their calculations, Defendant-Intervenors used an exhibit from September 1, 2021, which post-dated Commerce's issuance of the beekeeper and middlemen questionnaires by several weeks.  Def.-Int.'s Br. at 11.

at 9-10.  There is thus no evidence that the industry Commerce faced in the instant investigation is more fragmented than it was during reviews conducted under the previous *Honey from Argentina* antidumping proceedings, in which Commerce successfully used beekeeper data to calculate COP.  In short, the "difficulties" Commerce allegedly experienced in the prior Argentine honey proceedings do not withstand scrutiny and wholly fail to support Commerce's failure to follow the cost methodology it used in that proceeding.

In any event, whatever difficulties in collecting usable beekeeper data may have been anticipated at the outset of this investigation, Commerce in fact selected beekeeper suppliers to NEXCO as mandatory respondents, and by the time of the *Preliminary Determination*, Commerce had received usable cost data from both the beekeepers and middlemen that Commerce had decided to investigate.  PR Doc. 365 at 6. Those responses were then verified by Commerce.  PR Doc. 438 at 2 and 71. Thus, Defendant's assertion that the circumstances present in this investigation "did not allow" Commerce to use its normal approach to collecting actual production costs rings hollow.  Def.'s Br. at 8, 16, 18.  It was only once Commerce had already obtained and analyzed the actual beekeeper production costs from NEXCO's suppliers that Commerce concocted the unprecedented construct that the beekeeper costs were not to be used as the actual cost of production, but would be used solely to confirm that NEXCO's acquisition prices were a "reasonable proxy" for actual costs.  PR Doc. 438 at 12.  Defendant fails to cite any prior proceeding – whether involving honey, other agricultural products, or any other product – in which Commerce has similarly found that the actual costs of producing a product should be

used not to compute the COP of that product, but only to support the use of a different data source as a "proxy" for those actual production costs.[6]

Defendant's contention that Commerce was justified in disregarding the actual beekeeper production costs because it had no way of establishing that such costs were "representative" of all beekeepers who supplied NEXCO also fails.  Def.'s Br. at 8, 18 and 25-26.  As discussed in NEXCO's principal brief, Commerce did not exercise its discretion to engage in statistical sampling under 19 U.S.C. § 1677f-1(c)(2)(A); but rather proceeded under § 1677f-1(c)(2)(B), which calls for selecting producers accounting for the largest volume that can reasonably be examined.  NEXCO's Initial Br. at 20-22.  Only when engaging in statistical sampling is Commerce directed to consider representativeness in selecting respondents.  *See* NEXCO's Initial Br. at 22 and fn.8.  When selecting respondents under § 1677f-1(c)(2)(B), Commerce deems the largest exporters or producers to be *per se* representative of all investigated suppliers. *Bosun Tools Co. Ltd. v. United States*, No. 2021-1929, 2022 WL 94172 at *6 (Fed. Cir. Jan. 10, 2022); *Shanxi Hairui Trade Co., Ltd. v. United States*, 503 F. Supp. 3d 1307, 1321-1322 (Ct. Int'l Trade 2021).

Commerce's practice under § 1677f-1(c)(2)(B) has never involved determining the number of mandatory respondents it selects in proportion to the total number of exporters under investigation, but rather selects the largest number it can examine consistent with its resource constraints.  NEXCO's Initial Br. at 22-23.  In its brief to the Court, the Government makes no attempt to define what it means by "representative" in the context of selecting beekeeper

---

[6] Commerce did use acquisition prices as facts available in *Live Cattle from Canada*.  *Notice of Final Determination of Sales at Less Than Fair Value: Live Cattle From Canada*, 64 Fed. Reg. 56,739, 56,752 (Dep't Commerce Oct. 21, 1999) ("{T}he application of non-adverse facts available is warranted.").

respondents other than in the most general and imprecise terms:  as requiring some number

beyond its resources to investigate.  At a minimum, this approach, untethered to any statutory

definition or requirement, is too vague to support such a dramatic departure from Commerce's

own interpretation of its obligations under the statute.

Furthermore, Defendant fails to address, let alone resolve, the internal contradiction

inherent in Commerce's position regarding the "representativeness" of the selected beekeeper

respondents.  Commerce determined that the verified beekeeper costs on the record are

sufficiently representative of all of NEXCO's beekeeper suppliers for purposes of establishing

that NEXCO's acquisition prices were above the beekeeper's costs, but at the same time

determined that they are not sufficiently representative of NEXCO's beekeeper suppliers to serve

as a basis for measuring the costs themselves!  Other than repeating Commerce's gratuitous

assertions in this regard from the *Final Determination*, Defendant makes no serious attempt to

defend the mental and logical gymnastics embedded in those two determinations.[7]

 Defendant is left with its assertion that it can adopt a "pragmatic approach" that departs

from established practice even where it is supported by any statutory authority.  Importantly, the

Government admits that Commerce was not exercising its authority to apply "facts available" to

fill in for missing data.  Def.'s Br. at 23.[8]

---

[7]  As discussed in NEXCO's principal brief, Commerce's explanation that it appropriately
selected the lowest price suppliers because they would be most likely to be selling below cost
lacks any logical or factual support.  NEXCO Initial Br. at 25.  Commerce measured the "lowest
price" supplier based on a comparison of annual average prices over the period of investigation.
This despite Commerce's own findings – vigorously defended by the Government elsewhere in
its brief – that peso inflation in Argentina and real increases in raw honey prices over the course
of the POI required costs and prices to be compared strictly on a monthly basis.  Def.'s Br. at 29,
34-42.

[8] Defendant-Intervenors contradict the Defendant's brief and insist that Commerce did resort
to facts available.  Def't-Intervenors' Br. at 17 and 26-27.  However, Commerce has now
disavowed any intent to impose facts available.  Def't Br. at 23 ("Commerce plainly did not use

The statute defines COP as (i) the costs of materials, and fabrication or other processing; (ii) selling, general and administration expenses; and (iii) the costs of preparing the goods for exportation.  19 U.S.C. § 1677b(b)(3).  In the case of raw honey, the cost of materials, fabrication, and processing are incurred by the beekeepers, not by NEXCO.  As discussed, Commerce's interpretation of the statute and its past practice in proceedings on *Honey from Argentina* and in other agricultural cases therefore has been to calculate COP as the sum of the keeper or growers actual COP and the exporter's additional expenses of exportation.  *See* NEXCO's Initial Br. at 15-17. Here, instead of the actual materials, fabrication and processing incurred in producing the honey, Commerce based NEXCO's "cost of production" on the acquisition *prices* it paid to unaffiliated beekeepers.  The record demonstrates that those acquisition prices are double or triple the actual production costs of the beekeeper on the record.  *See* **Exhibit 1**.  The difference between the actual costs of the beekeepers and the acquisition prices is profit.  The Government argues that the intent of the statute is to capture all costs of the producer and the exporter.  Def.'s Br. at 11 and 15.  However, producer profit is not a permitted element of COP under the statute.[9]

---

facts available pursuant to the statute in determining to use NEXCO's acquisition prices for raw honey.").

[9] Defendant references 19 U.S.C. § 1677(28), Def.'s Br. at 11, which refers to the calculation of the "the total amount incurred and realized for costs, expenses, and profits in connection with production and sale of that merchandise," 19 U.S.C. § 1677(28).  That provision, however, defines the term "exporter or producer," not COP, and it applies to the determination of normal value generally, with regard to the "production *and sale*" of the subject merchandise.  19 U.S.C. § 1677(28) (emphasis added).  The reference to capturing "profits" makes sense in that context because while profit is not an element of COP, profit *is* an element of the home market or third country sale prices that are used to establish normal value.  As discussed in the following section, Defendant does not attempt to argue that profit is a proper element of COP under 19 U.S.C. § 1677b(b)(3).

The Federal Circuit's decision in *SKF USA, Inc. v. United States*, 630 F.3d 1365 (Fed. Cir. 2011), does not grant unlimited discretion to Commerce to develop its practice and its interpretation of the statute on a case by case basis.  In *SKF*, Commerce argued it was seeking to bring the proceeding at issue into conformity with its reseller methodology, including in agricultural cases (*e.g.*, honey), where it had always investigated producers of in scope merchandise.  *Id.* at 1369.  In the context of the facts of that case, the Court held that the statute did not require actual producers' COP, but that the constructed value statute did require that the specific producer be examined to determine SG&A and profit.  *Id.* at 1370-71 ("Under § 1677b(e), CV is calculated {using}… the actual amounts incurred and realized *by the specific exporter or producer being examined in* the investigation or review for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product.'") (emphasis added).  Commerce here has improperly combined elements of COP and constructed value by using acquisition prices.  Based on the court's finding in *SKF*, Commerce cannot incorporate profit without the specific producer costs, and the law requires that cost of production of the honey not include profit.  *See* NEXCO's Initial Br. at 27. Therefore, Commerce may not use acquisition prices or at a minimum, on remand, it must adjust COP to exclude profit.

**B.  NEXCO Exhausted Its Administrative Remedies**

The Government and Defendant-Intervenors assert that NEXCO failed to argue before Commerce that it would be improper to rely on acquisition prices because these prices far exceeded actual beekeeper costs and included profit.  Def.'s Br. at 26-28; Def.-Int.'s Br. at 28-29.  Accordingly, they argue that NEXCO failed to exhaust its administrative remedies and is barred from presenting this argument now.  Def.'s Br. at 26-28; Def.-Int.'s Br. at 28-29.

13

The Government and Defendant-Intervenors' positon is without merit.  First, there is no dispute that NEXCO argued before Commerce that acquisition prices should not be used because they substantially overstated the beekeepers actual cost of producing the honey.  CR Doc. 801 (PR Doc. 420) at 17.  And the sole difference between the beekeeper costs and the prices at which the beekeepers sell the honey to NEXCO is beekeeper profit.  If there was any doubt about that point, Commerce's own analysis of the comparison between beekeeper costs and acquisition prices demonstrates this expressly.  In Attachments 1 and 3 to the cost calculation memorandum, which are attached to this brief as **Exhibit 1**, Commerce compared the costs of production (which included the beekeeper and middlemen SG&A)[10] and called this "COP," and compared it to the acquisition prices paid by NEXCO.  Commerce itself cited to the statutory provisions for the calculation of COP and constructed value which clearly distinguish between the two.  PR Doc. 365 at 25; PR Doc. 438 at 9 and 15.  There is thus no plausible basis for the Government to pretend that NEXCO did not object before Commerce to the inclusion of beekeeper profits in the calculation of NEXCO's COP.  Indeed, as Defendant concedes, in the *Final Determination*, Commerce held that "reliance on NEXCO's acquisition costs . . .  ensures the capture of all costs, expenses, and *profits* of the beekeeper and middlemen." Def.'s Br. at 28 (emphasis added).[11]

---

[10] These are the elements prescribed for in the statute.  19 U.S.C. § 1677b(b)(3)(A)-(B).

[11] The Government also reiterates its argument that NEXCO argued in the early phases of the investigation for using acquisition prices and had itself observed that doing so would capture beekeeper profit.  Def.'s Br. at 28.  Defendant thus unwittingly concedes that NEXCO *did* raise the issue of beekeeper profit before Commerce.  As already discussed, however, NEXCO advocated using acquisition prices only if Commerce determined that NEXCO was the producer of the subject merchandise – a position that Commerce rejected below and that the Government reaffirms in its brief here.  Def.'s Br. at 25.  It is thus inaccurate and disingenuous to claim that "NEXCO itself argued for the methodology that Commerce adopted."  *Id.* at 28.

In its brief to this Court, NEXCO argued, in the alternative, that even if Commerce could base NEXCO's COP on NEXCO's acquisition prices, it must still adjust those prices by removing the beekeeper profit.  NEXCO's Initial Br. at 28.  That amount had already been calculated by Commerce.  **Exhibit 1**.  To the extent that the Court deems this a new argument, it falls squarely within the exception to the exhaustion doctrine for pure questions of law.[12]  *See Consol. Bearings Co. v. United States*, 166 F. Supp. 2d 580, 586-587 (Ct. Int'l Trade 2001) ("{T}he question is one of law and does not require further factual development.").  In order to qualify for this exception, the Plaintiff must (1) raise a new argument; which (2) is of a purely legal nature; (c) the inquiry shall require neither further agency involvement nor additional fact finding or opening up the record; and (d) the inquiry shall neither create undue delay nor cause expenditure of scarce party time and resources.  *Consol. Bearings*, 166 F. Supp. 2d at 587.  Whether 19 U.S.C. § 1677b(b)(3), which defines the elements to be included in COP, may include producer profit is a purely legal question of statutory construction.  Resolving that legal question requires no fact finding by Commerce as Commerce's cost analysis memorandum specifically isolates the beekeeper profits.  *See* **Exhibit 1**.  Furthermore, consideration of this legal question will not create undue delay nor cause expenditure of scare party time and resources.

Significantly, other than its erroneous invocation of the exhaustion doctrine, Defendant offers no defense – not even a "pragmatic" one – for computing NEXCO's COP in a manner that self-evidently includes the profit of the producer of the merchandise under investigation (*i.e.*, the

---

[12] The four exceptions to the exhaustion doctrine are "(1) futility; (2) a subsequent court decision that may impact the agency's decision; (3) a pure question of law; or (4) when plaintiff had reason to believe the agency would not follow established precedent."  *Luoyang Bearing Corp. (Grp.) v. United States*, 450 F. Supp. 3d 1402, 1410 (Ct. Int'l Trade 2020).

beekeepers).  It is not overstating the matter to say that Commerce's sole purpose in reviewing

and analyzing the beekeeper cost data on the record was to *ensure* that NEXCO's COP would

include the producer's profit.  That is the necessary consequence of Commerce's position that it

wanted to ensure that NEXCO's acquisition prices were above the beekeepers' costs.  It is thus

disingenuous for Defendant to now suggest that NEXCO's objection to the inclusion of

beekeeper profits in NEXCO's COP is a "new" argument, and the failure to offer any legal

argument in defense of doing so is telling.

### C.  The Government Fails To Justify Commerce's Use Of Monthly Costs And Price Comparisons In Its Quarterly Cost Calculations

Commerce adopted a methodology of using quarterly costs for respondents in all of the

*Raw Honey* investigations.[13]  *See* NEXCO Initial Br. at 30-31.  As Defendant admits, the basis

for adopting this methodology was its finding that costs varied by more than 25 percent for

selected CONNUMs on a *quarterly* basis.  Def.'s Br. at 33; *see also* PR Doc. 438 at 17-18.  As

discussed, Commerce computed NEXCO's COP based on acquisition prices for honey, and

beekeeper prices for honey in Argentina and in other investigated countries were moving in line

with international pricing of the honey because the their sales were overwhelmingly to exporters

who resold the honey in international markets.  CR Docs. 168-207 and 209-217 (PR Docs. 203-

205) at Exhibits B-1, C-1, and D-15.  However, in the case of Argentina, Commerce so modified

the methodology that it no longer bore any resemblances to a "*quarterly* costs" or "*quarterly*

---

[13] As previously noted in NEXCO's principal brief, if COP were based on the verified beekeeper costs or based on acquisition prices after subtraction of beekeeper profit, then the criteria for using quarterly costs would no longer be met in this case.  NEXCO's Initial Br. at 29 n.12.

sales comparison" which are the essential features of quarterly cost methodology.  *See* NEXCO Initial Br. at 31.[14]

Notwithstanding Commerce's claim to have applied its quarterly cost methodology, Defendant admits that Commerce did not compare quarterly costs to third country sales prices in the below-cost test nor did it compare third country prices to U.S. prices on a quarterly basis. The only element of the cost calculation that was done on a quarterly basis was that Commerce indexed the monthly costs for inflation on a quarterly basis rather than an annual basis.[15] Defendant contends this methodology was justified based on its inflation methodology, which requires that the sales-below-cost tests and the sales comparisons be done on a monthly, rather than quarterly, basis.  Def.'s Br. at 34-37.  To actually calculate quarterly costs, however, Commerce needed to take the final step of averaging by quarter the inflation indexed monthly cost to derive a quarterly cost.  NEXCO's Initial Br. at 33-34 and Exhibit 1.  Had Commerce properly applied its quarterly cost methodology to compute quarterly (inflation-adjusted) costs, it would then have compared NEXCO's third country sales prices to Germany with the appropriate inflation adjusted quarterly average costs, and the above-cost sales would then have been compared to U.S. sales prices on a quarterly average basis.

Defendant's only defense for the departure from Commerce's stated quarterly cost methodology is to repeat Commerce's statements below that the application of its high inflation methodology requires monthly costs and monthly sales comparisons.  Def.'s Br. at 36, 38-40.

---

[14] In its brief to the Court, Defendant avoids the use of the term quarterly costing, referring instead to Commerce's "alternative cost-averaging methodology." Def.'s Br. at 32-36.  However Commerce itself described the methodology it was adopting as "quarterly costing" and a "quarterly cost methodology" in its *Final Determination*.  PR Doc. 438 at 32-33, 54-55.

[15] Defendant-Intervenors argue that Commerce did construct quarterly average costs, Def.-Int.'s Br. at 31-33, but, as Commerce admits, it did not because its inflation methodology restricts costs and prices to monthly comparisons.  Def.'s Br. at 32-36.

But, as explained in NEXCO's initial brief, the quarterly cost methodology and the high inflation methodology are concerned with separate issues.  Quarterly costing is directed at the phenomenon of increases in *real* (*i.e.* inflation-adjusted) costs.  The high inflation methodology, in contrast, is directed at the phenomenon of rapid *nominal* changes in costs and prices. NEXCO's Initial Br. at 31-34.  Although Commerce claimed to have applied both methodologies in conjunction, in fact it used the high-inflation methodology as a cover for nullifying the quarterly cost methodology.  Defendant offers no response to NEXCO's argument that once Commerce had indexed the Argentine Peso-denominated COP (*i.e.*, acquisition prices) for inflation, the costs were stated on a constant currency basis (thus fully implementing the objectives of the high-inflation methodology) and should then have been averaged over each quarter to arrive at a quarterly cost.

### D.  The Government Fails To Justify Commerce's Refusal To Compare Dollar-Denominated Prices On A POI Weighted Average Basis

In its initial brief, NEXCO argued that because prices in both the U.S. and NEXCO's third country market (Germany) are dominated in U.S. dollars, they would not have been impacted by Peso inflation in Argentina and that Commerce therefore had no legitimate basis to restrict price comparisons to only the same month of the U.S. sale.  *See* NEXCO's Initial Br. at 36-39.  Defendant does not dispute that Commerce has interpreted the statute, the SAA, and its own regulations to prefer POI sales comparisons in investigations.  In support of Commerce's departure from that practice in this investigation, Defendant offers a series of *non sequiturs* that fail to address NEXCO's fundamental point: that where U.S. prices and the prices used to establish normal value are denominated in U.S. dollars, they are unaffected by Peso inflation and no restriction of sales comparisons to the same month is justified.

18

First, Defendant repeats Commerce's generic defense of its practice of restricting price comparisons on a monthly basis when it finds there is high inflation in the home market:

> Because 'gross unit price comparison market and U.S. market prices are not adjusted for inflation, Commerce maintains the closet contemporaneity by limiting the matches by month, to limit the impact of inflation on those prices.

Def.'s Br. at 37.  This response simply ignores the fact that here, normal value was based not on home market sales denominated in Pesos, but on third country sales to Germany, which, like U.S. prices, were denominated in U.S. dollars.  There is thus no need to adjust either set of prices for inflation.

Second, Defendant argues that although the comparison market sale prices were made in U.S. dollars, NEXCO's "costs 'incurred in operating in a high inflation economy were still impacted by inflation.'"  Def.'s Br. at 38 (quoting PR Doc. 438 at 27).  However, as discussed in the preceding section, Commerce had already adjusted NEXCO's costs (*i.e.*, the acquisition prices for the honey) for inflation and used those inflation-adjusted costs in the sales-below-cost test.  The sale prices that were used to define normal value thus were above-cost, U.S. dollar-denominated prices for honey sold to Germany.[16]  Neither economic logic nor record evidence support the assertion that those prices would have been distorted by Peso inflation in Argentina.

---

[16] Restricting above-cost German prices to normal value only for U.S. sales in the same month creates distortions because it creates more instances in which Commerce must revert to constructed value because there is no comparison sale in the month of the U.S. sale.  Commerce asserts that using constructed value is preferable to comparing to prices in a different month because constructed value would have been adjusted for inflation.  But, as discussed in text, the assertion that U.S. dollar price comparisons would be distorted by Peso price inflation in Argentina does not withstand scrutiny.  Moreover, this is contrary to Defendant's argument that Commerce has an established preference for price to price comparisons.  *Compare* PR Doc 438 at 27 *with* Import Admin., U.S. Dep't Commerce, Differences in Merchandise Calculations in Hyperinflationary Economies, Policy Bulletin 94.5 (Mar. 25, 1994) https://enforcement.trade.gov/policy/bull94-5.txt (last visited Mar. 23, 2023) (establishing a

In response to NEXCO's argument that the use of dollar-denominated third country sales prices to establish normal value fatally undermines Commerce's reliance on Peso inflation in Argentina as justification for limiting price-to-price comparisons to the same month, Defendant argues that Commerce's standard dumping margin program always converts normal value to U.S. dollars when calculating the dumping margin. Thus, Defendant argues the "basic premise of Commerce's high inflation practice is that U.S. dollar sales prices do not neutralize the impact of inflation." Def.'s Br. at 38. Defendant thus deliberately confuses the *conversion* of local-currency-denominated home market sales into U.S. dollars on the date of the U.S. sale with the practice of making sales in a third country market in U.S. dollars. Of course, NEXCO is not arguing that the inflationary impact on Peso-denominated sales prices would be "neutralized" by merely converting those Peso prices to U.S. dollars. Rather, the point is that the sales are negotiated and paid in U.S. dollars – there is no Peso price to be impacted by inflation. Those prices are then compared to U.S. prices, which are also negotiated and paid in U.S. dollars. Defendant's claim that such a comparison could be distorted by Peso inflation in Argentina simply does not stand up to serious scrutiny. Defendant's muddled and internally contradictory defenses of Commerce's monthly price average methodology merely underscore the absence of any supporting rationale for what Commerce did here.

Defendant's assertion that Commerce relied on 19 C.F.R. § 351.414(d)(3) as its authority to depart from period-wide average sales comparisons is not credible, and its citations to cases are misplaced. Def.'s Br. at 31, 34, 37. *Union Steel Mfg. Co. v. United States*, 190 F. Supp. 3d

---

means to calculate difference in merchandise adjustments in a hyperinflationary case to permit more price to price comparisons).

1326, 1336-37 (Ct. Int'l Trade 2016), did not involve inflation accounting, and it involved an administrative review not an investigation. Commerce always does price comparisons on a monthly basis in reviews. As discussed in NEXCO's brief, Commerce has relied on this regulation in a few cases mostly involving the implementation of its quarterly cost methodology and never involving its hyperinflationary methodology. NEXCO's Initial Br. at 40.

Defendant then muddies the waters further by trying to invoke its quarterly cost methodology, arguing that because Commerce found that quarterly cost differences in honey acquisition prices "far exceeded" inflation, record evidence supported Commerce's finding that even after adjusting to a constant currency NEXCO's costs "were still impacted by inflation." Def.'s Br. at 38-39. But, as discussed in the previous section, changes in real, as opposed to nominal, costs are properly addressed by Commerce's quarterly cost methodology, and have nothing to do with inflation. And, Commerce did not calculate quarterly costs or compare comparison market prices to quarterly costs in any event. As discussed in section I.A of this brief, Commerce erred in relying on acquisition prices rather than beekeeper costs. If the Court agrees that Commerce was obligated to use actual beekeeper costs, then the basis for quarterly costing disappears because beekeeper COP no longer shows the requisite relationship between quarterly costs and prices. NEXCO's Initial Br. at 36.

**II.**     **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court (i) hold that

Commerce's *Final Determination* is unsupported by substantial evidence and otherwise not in

accordance with the law; (ii) remand the case to Commerce with instructions to correct the errors

identified by the Court; and (iii) for such other relief that the Court deems just and proper.

<div style="margin-left: 50%;">

Respectfully submitted,

/s/ Julie C. Mendoza
Julie C. Mendoza
Donald B. Cameron
R. Will Planert
Brady W. Mills
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey

**MORRIS MANNING & MARTIN LLP**
1401 Eye Street, NW, Suite 600
Washington, D.C. 20005
(202) 216-4817

*Counsel to Plaintiff NEXCO S.A.*

</div>

Dated:  March 24, 2023

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned hereby certifies that the foregoing brief complies with the Standard

Chambers Procedures of the U.S. Court of International Trade in that it contains 6,900 words

including text, footnotes, and headings and excluding the table of contents, table of authorities

and counsel's signature block, according to the word count function of Microsoft Word 2016

used to prepare this brief.

/s/ Julie C. Mendoza
Julie C. Mendoza

Dated:  March 24, 2023

23

**Exhibit 1**

CR Doc. 646 (PR Doc. 373) Attachments 1-4

**RAW HONEY FROM ARGENTINA - NEXCO**
**Direct Beekeeper Supplier to NEXCO**
**Preliminary Cost Calculation Memorandum**

A-357-823
Business Proprietary
Attachment 1

***CONTAINS PUBLIC VERSION OF [          ]***

PUBLIC VERSION

**COMPARISON OF NEXCO'S ACQUISITION COST to HONEY COP**
Direct Beekeeper (BK) Supplier

| | | formula | Apr-20 | May-20 | Jun-20 | Jul-20 | Aug-20 | Sep-20 | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | PPI** | | 446.85 | 448.22 | 465.97 | 484.48 | 506.18 | 528.79 | 560.76 | 587.64 | 614.82 | 654.40 | 689.30 | 712.38 | |
| **DELIVERED HONEY SALES PRICE (NEXCO'S ACQUISITION COST)** | | | | | | | | | | | | | | | |
| Source: 10/26/21 NEXCO BK SDQR at Exhibit BD-17 Schedule 2&2a (Excel Row 57) & 9/20/21 NEXCO BK DQR at Exhibit BD-3 Totals by Month (Excel Row 18) | | | | | | | | | | | | | | | |
| NEXCO's Honey Acquisition Costs from Selected Beekeeper | ARP | K | [ | | | | | | | | | | | | ] |
| NEXCO's Honey Purchase Quantities from Selected Beekeeper | kg | L | [ | | | | | | | | | | | | ] |
| **Monthly NEXCO's Honey Acquisition Costs (from Selected Beekeeper)** | ARP/kg | K/L | [ | | | | | | | | | | | | ] |
| **HONEY PRODUCTION COSTS - As Reported by Selected Beekeeper** | | | | | | | | | | | | | | | |
| Source: 10/26/21 NEXCO BK SDQR at Exhibit BD-17 Schedule 2&2A (Excel Row 47) & Exhibit BD-24 (Excel Row 25) | | | | | | | | | | | | | | | |
| Monthly Honey COP (before inflation) | ARP | A | [ | | | | | | | | | | | | ] |
| Monthly Honey Costs Indexed to March 2021 Pesos | ARP | B** | [ | | | | | | | | | | | | ] |
| Honey Total Production Quantity | kg | C | | | | | | | | | | | | [ | ] |
| POI Annual Weighted Average Honey COP in March 2021 Pesos | ARP/kg | D=B/C | | | | | | | | | | | | [ | ] |
| **POI Weighted Ave Monthly Honey COP in Current Month Pesos** | ARP/kg | E** | [ | | | | | | | | | | | | ] |
| **ALTERNATIVE HONEY PRODUCTION COSTS** | | | | | | | | | | | | | | | |
| Source: Attachment 2 | | | | | | | | | | | | | | | |
| Monthly Honey COP (before inflation) | ARP | F | [ | | | | | | | | | | | | ] |
| Monthly Honey Costs Indexed to March 2021 Pesos | ARP | G** | [ | | | | | | | | | | | | ] |
| POI Annual Weighted Average Honey COP in March 2021 Pesos | ARP/kg | H=G/C | | | | | | | | | | | | [ | ] |
| **POI Weighted Ave Monthly Honey COP in Current Month Pesos** | ARP/kg | I** | [ | | | | | | | | | | | | ] |

** *Indexing:*
PPI from 10/26/21 NEXCO Middleman (MM) SDQR at Exhibit SBM-8 GNA-Intex (Excel Row 31)
B & G = Monthly COP (A & F) * (March 2021 PPI / Monthly PPI)
E & I = Annual Average COP (D & H) / (March 2021 PPI * Monthly PPI)

Barcode:4184005-01 A-357-823 INV - Investigation -

CR Doc. 646 (PR Doc. 373) Attachments 1-4

**RAW HONEY FROM ARGENTINA - NEXCO**                                                                                      A-357-823
**Direct Beekeeper Supplier to NEXCO**                                                                                   ~~Business Proprietary~~
**Preliminary Cost Calculation Memorandum**                                                                              **Attachment 2**

**\*\*\*CONTAINS PUBLIC VERSION OF [                        ]\*\*\***                                                    **PUBLIC VERSION**

**ALTERNATIVE CALCULATION Assuming ALL Common Costs (Including Admin) and Labor Costs are 100 Percent Related to Beekeeping Activities**

|  | formula | Apr-20 | May-20 | Jun-20 | Jul-20 | Aug-20 | Sep-20 | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL VAT Ledger Expenses | a | [ | | | | | | | | | | | | ] |
| Less:  Fixed Asset Purchases | b | [ | | | | | | | | | | | | ] |
| Less:  Farming Expenses | c | [ | | | | | | | | | | | | ] |
| Net | d=a-b-c | [ | | | | | | | | | | | | ] |

*Source:  10/26/21 NEXCO BK SDQR at Exhibit BD-17 Direct Costs and Variable OH (a, c = Excel rows 70 and 122); Fixed Overheads (b = Excel row 46)*

|  | formula | Apr-20 | May-20 | Jun-20 | Jul-20 | Aug-20 | Sep-20 | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL LABOR Expenses | | | | | | | | | | | | | | |
| Total Monthly Labor | e | [ | | | | | | | | | | | | ] |
| Less:  Labor Insurance Reimbursements | f | [ | | | | | | | | | | | | ] |
| Plus:  Imputed Owner Salary | g | [ | | | | | | | | | | | | ] |
| Net | h=e-f+g | [ | | | | | | | | | | | | ] |

*Source:  10/26/21 NEXCO BK SDQR at Exhibit BD-17 Labor (e, f,  g  = Excel rows 56, 58, and 78)*

|  | formula | Apr-20 | May-20 | Jun-20 | Jul-20 | Aug-20 | Sep-20 | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL Depreciation Expenses | | | | | | | | | | | | | | |
| Beekeeping | i | [ | | | | | | | | | | | | ] |
| Common | j | [ | | | | | | | | | | | | ] |
| Admin | k | [ | | | | | | | | | | | | ] |
| Net | o=i+j+k | [ | | | | | | | | | | | | ] |

*Source:  10/26/21 NEXCO BK SDQR at Exhibit BD-17 Depreciation (i, j, k = Excel cells V141, V137, and V146)*

|  | formula | Apr-20 | May-20 | Jun-20 | Jul-20 | Aug-20 | Sep-20 | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Other Expenses | | | | | | | | | | | | | | |
| Taxes on Assets | l | [ | | | | | | | | | | | | ] |
| No Gravado | m | [ | | | | | | | | | | | | ] |
| Net | n=l+m | [ | | | | | | | | | | | | ] |

*Source:  10/26/21 NEXCO BK SDQR at Exhibit BD-17 GNA&INTEX (l = Excel row 28) and COMPRAS04-2020 A 03-2021 (m = Excel cell H1280 divided by 12 months)*

| **TOTAL ALTERNATE BEEKEEPING COSTS** | p=d+h+o+n | [ | | | | | | | | | | | | ] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

CR Doc. 646 (PR Doc. 373) Attachments 1-4

| RAW HONEY FROM ARGENTINA - NEXCO | | | | | | | | | | | | | | | | A-357-823 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Middleman and Beekeeper Supplier to Middleman Costs | | | | | | | | | | | | | | | | Business Proprietary |
| Preliminary Cost Calculation Memorandum | | | | | | | | | | | | | | | | Attachment 3 |

***CONTAINS PUBLIC VERSION OF [           ] and [            ]***

PUBLIC VERSION

**COMPARISON OF NEXCO'S ACQUISITION COST to HONEY COP**

| Middleman (MM) Beekeeper Supplier | Bold | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Apr-20 | May-20 | Jun-20 | Jul-20 | Aug-20 | Sep-20 | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Totals |
| | | PPI** | 446.85 | 448.22 | 465.97 | 484.48 | 506.18 | 528.79 | 560.76 | 587.64 | 614.82 | 654.40 | 689.30 | 712.38 | |
| **DELIVERED HONEY SALES PRICE (NEXCO'S ACQUISITION COST)** | | | | | | | | | | | | | | | | |
| *Source: 10/26/21 NEXCO MM SDQR at Exhibit SBM-8 SV Schedule 1 & 1a (Excel Rows 71 and 75)* | | | | | | | | | | | | | | | | |
| NEXCO's Honey Acquisition Costs from Selected Middleman | ARP | K | [ | | | | | | | | | | | | | ] |
| NEXCO's Honey Purchase Quantities from Selected Middleman | kg | L | [ | | | | | | | | | | | | | ] |
| Monthly NEXCO's Honey Acquisition Costs (from Selected Middleman) | ARP/kg | K/L | [ | | | | | | | | | | | | ] | |
| | | | | | | | | | | | | | | | | |
| **HONEY PRODUCTION COSTS - As Reported by Selected Beekeeper** | | | | | | | | | | | | | | | | |
| *Source: 10/26/21 NEXCO MM SDQR at Exhibit SBM-8 SV Schedule 1 & 1a (A, C = Excel Rows 40, 72)* | | | | | | | | | | | | | | | | |
| Monthly Honey COP (before inflation) | ARP | A | [ | | | | | | | | | | | | | ] |
| Monthly Honey Costs Indexed to March 2021 Pesos | ARP | B** | [ | | | | | | | | | | | | | ] |
| Honey Total Production Quantities | kg | C | [ | | | | | | | | | | | | | ] |
| POI Annual Weighted Average Honey COP in March 2021 Pesos | ARP/kg | Q=B/C | | | | | | | | | | | | | [ | ] |
| POI Weighted Ave Monthly Honey COP in Current Month Pesos | ARP/kg | D** | [ | | | | | | | | | | | ] | | |
| | | | | | | | | | | | | | | | | |
| **MIDDLEMAN COLLECTION COSTS (without honey purchases)** | | | | | | | | | | | | | | | | |
| *Source: 10/26/21 NEXCO MM SDQR at Exhibit SBM-8 SV Schedule 1 & 1a (E, F, K = Excel Rows 50, 53, 70), Q7 GNA-Intex = Rates* | | | | | | | | | | | | | | | | |
| Labor Imputed for Owner | ARP | E | [ | | | | | | | | | | | | | ] |
| Transportation Costs | ARP | F | [ | | | | | | | | | | | | | ] |
| Total Middleman Collection Costs | ARP | G=E+F | [ | | | | | | | | | | | | | ] |
| G&A Expenses | ARP | H=G*rate | [ | | | | | | | | | | | | | ] |
| Financial Expenses | ARP | I=G*rate | [ | | | | | | | | | | | | | ] |
| Middleman Total Collection Costs (before inflation) | ARP | J=G+H+I | [ | | | | | | | | | | | | | ] |
| Monthly Middleman Collection Costs Indexed to March 2021 Pesos | ARP | L** | [ | | | | | | | | | | | | | ] |
| Honey Shipped Quantities | kg | K | [ | | | | | | | | | | | | | ] |
| POI Annual Weighted Average Middleman Collection Costs in March 2021 Pesos | ARP/kg | R=L/K | | | | | | | | | | | | | [ | ] |
| POI Weighted Ave Middleman Delivery COP in Current Month Pesos | ARP/kg | M** | [ | | | | | | | | | | | ] | | |
| **COP for Produced Honey (Delivered)** | ARP/kg | D+M | [ | | | | | | | | | | | | | ] |
| | | | | | | | | | | | | | | | | |
| **ALTERNATIVE HONEY PRODUCTION COSTS** | | | | | | | | | | | | | | | | |
| *Source: Attachment 4* | | | | | | | | | | | | | | | | |
| Monthly Honey COP (before inflation) | ARP | N | [ | | | | | | | | | | | | | ] |
| Monthly Honey Costs Indexed to March 2021 Pesos | ARP | O** | [ | | | | | | | | | | | | | ] |
| Honey Total Production Quantities | kg | P | [ | | | | | | | | | | | | | ] |
| POI Annual Weighted Average Honey COP in March 2021 Pesos | ARP/kg | S=O/P | | | | | | | | | | | | | [ | ] |
| POI Weighted Ave Monthly Honey COP in Current Month Pesos | ARP/kg | T** | [ | | | | | | | | | | | ] | | |
| **ALTERNATE COP for Produced Honey (Delivered)** | ARP/kg | T+M | [ | | | | | | | | | | | | | ] |

** *Indexing:*
PPI from 10/26/21 NEXCO MM SDQR at Exhibit SBM-8 GNA-Intex (Excel row 31)
B, I, & O = Monthly COP (A, I, & N) * (March 2021 PPI / Monthly PPI)
D, M & T = Annual Average COP (Q, R, & S) / (March 2021 PPI * Monthly PPI)

**RAW HONEY FROM ARGENTINA - NEXCO**                                                                                                                                       **A-357-823**
**Middleman-Beekeeper Supplier**                                                                                                                                            ~~Business Proprietary~~
**Preliminary Cost Calculation Memorandum**                                                                                                                                 **Attachment 4**

**\*\*\*CONTAINS PUBLIC VERSION OF [                        ] and [                        ]\*\*\***                                                    **PUBLIC VERSION**

**ALTERNATIVE CALCULATION Assuming ALL Common Costs (Including Administration) and Non-Middleman/Transport Labor Costs are 100 Percent Related to Beekeeping Activities**

|  | formula | Apr-20 | May-20 | Jun-20 | Jul-20 | Aug-20 | Sep-20 | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL VAT Ledger Expenses | a | [ | | | | | | | | | | | | ] |
| Less: Honey Purchases | x | [ | | | | | | | | | | | | ] |
| Less: Fixed Asset Purchases | b | [ | | | | | | | | | | | | ] |
| Less: Farming Expenses | c | [ | | | | | | | | | | | | ] |
| Less: Trucking Expenses* | d | [ | | | | | | | | | | | | ] |
| Less: Fuels Expense to Trucking* | e | [ | | | | | | | | | | | | ] |
| Less: Construction Expense to Trucking* | f | [ | | | | | | | | | | | | ] |
| **Net** | **u=a-x-b-c-d-e-f** | [ | | | | | | | | | | | | ] |

*Source: 10/26/21 NEXCO MM SDQR at Exhibit SBM-8 Expenses by Category (a, x, b, c, d = Excel columns g, k, i, j, m); Exhibit SBM-8 Rev SB-13 Transport (e, f = Excel rows 16, 28)*

| TOTAL LABOR Expenses | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Monthly Labor | y | [ | | | | | | | | | | | | ] |
| Less: Transport Salaries* | v | [ | | | | | | | | | | | | ] |
| Plus: Imputed Owner Salary | g | [ | | | | | | | | | | | | ] |
| Less: Owner Salary Allocated to Transport* | z | [ | | | | | | | | | | | | ] |
| Less: Owner Salary Allocated to Middleman** | w | [ | | | | | | | | | | | | ] |
| **Net** | **h=y-v+g-z-w** | [ | | | | | | | | | | | | ] |

*Source: 10/26/21 NEXCO MM SDQR at Exhibit SBM-8 Form 931 (y, v, g, z, w = Excel rows 55, 67, 77, 87, 86)*
*\* Picked up in Transport Expenses for Beekeeping below; \*\* Picked up in Middleman Expenses in Summary Sheet*

| TOTAL Depreciation Expenses | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beekeeping | i | [ | | | | | | | | | | | | ] |
| Common (Warehouse) | j | [ | | | | | | | | | | | | ] |
| Administration | k | [ | | | | | | | | | | | | ] |
| **Net** | **l=i+j+k** | [ | | | | | | | | | | | | ] |

*Source: 10/26/21 NEXCO MM SDQR at Exhibit SBM-8 Q2 Depreciation Revised (i, j, k = Excel cells T193, T191, and T192)*

| Other Expenses | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Vehicle Property Tax | t | [ | | | | | | | | | | | | ] |
| Municipal Taxes | m | [ | | | | | | | | | | | | ] |
| Taxes on Productive Assets | n | [ | | | | | | | | | | | | ] |
| Transport Expenses for Beekeeping | q | [ | | | | | | | | | | | | ] |
| **Net** | **o=t+m+n+q** | [ | | | | | | | | | | | | ] |

*Source: 10/26/21 NEXCO MM SDQR at Exhibit SBM-8 GNA-INTEX (t, m, n = Excel rows 21,22, and 23); Exhibit SBM - 8 Rev SB-13 Transport (q = Excel row 41)*

| **TOTAL ALTERNATE BEEKEEPING COSTS** | **p=u+h+l+o** | [ | | | | | | | | | | | | ] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

CR Docs. 531-538 (PR Doc. 325) Exhibit BD-17

**NEXCO S.A. BEEKEEPER RESPONSE: [          ]**
**Beekeeper Cost Calculations**

*Schedule II – Summary of all locations*

From Worksheet

| Honey Production Costs | Apr-20 202004 | May-20 202005 | Jun-20 202006 | Jul-20 202007 | Aug-20 202008 | Sep-20 202009 | Oct-20 202010 | Nov-20 202011 | Dec-20 202012 | Jan-21 202101 | Feb-21 202102 | Mar-21 202103 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | 1,088,681 |
| | | 52,335 | | | | | | | | | | | |
| | | | | | | | | | | | | | 4,314,987 |
| | | 202,464 | | | | | | | | | | | |
| | | 21,424 | | | | | | | | | | | |
| | | | | | | | | | | 14,104 | | | |
| | | | | | 35,256 | | | | | | | | |
| | | | | | 1,006,294 | | | | | | | | |
| | | | | | | | | | | | | | 1,230,745 |
| | | | | 1,121,735 | | | | | | | | | |
| | | 24,089 | | | | | | | | 23,962 | | | |
| | | 241 | | | 246 | | | | | | | | |
| | | 741,857 | | | | | | | | | | | 741,857 |

Public Version
Ranged Data

CR Docs. 531-538 (PR Doc. 325) Exh bit BD-17



**Calculation Methods**

A  Average Purchase Price in month of consumption * quantity consumed
B  Actual cost for each month
C  Imputed Wage based on Argentina Managerial Wage

CR Docs. 539-541 (PR Doc. 326) Exh bit SBM-8

Cost of Production Calculations
SV Schedule I & 1a

***Beekeeper & Middlemen Cost***
***Calculations - [        ]***

***Schedule I - Location Specific***
***Information***
***Summary of Costs***

| Honey Production Costs | Apr-20 202004 | May-20 202005 | Jun-20 202006 | Jul-20 202007 | Aug-20 202008 | Sep-20 202009 | Oct-20 202010 | Nov-20 202011 | Dec-20 202012 | Jan-21 202101 | Feb-21 202102 | Mar-21 202103 | Total | Source |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 485,079 | | | | | | 339,190 | | | | | | | |
| | | 17,364 | | | | | | | | | | | | |
| | | | | | | | | | | 157,049 | | | | |
| | | | | | | | | | | | | | 190,900 | |
| | | | | | | | 1,816,503 | | | | | | | |
| | | 32,323 | | | | | | | | | | | | |
| | 24,829 | | | | | | | | | | | | | |
| | | | | | | | | | | | | | 11,183,272 | |
| | | | | | | | 1,899,872 | | | | | | | |
| | | | | | | | | | | 1,929 | | | | |
| | | 44,584 | | | | | | | | | | | | |

Filed By: ethomas@mmmlaw.com, Filed Date: 10/27/21 12:55 PM, Submission Status: Approved

**This page is not susceptible to public summarization.**