Slip Op. 23-85

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **NEXCO S.A.,**<br><br>      **Plaintiff,**<br><br>**v.**<br><br>**UNITED STATES,**<br><br>      **Defendant,**<br><br>**and**<br><br>**AMERICAN HONEY PRODUCERS ASSOCIATION and SIOUX HONEY ASSOCIATION,**<br><br>      **Defendant-Intervenors.** | **Before: Claire R. Kelly, Judge**<br><br>**Court No. 22-00203** |

### <u>OPINION AND ORDER</u>

[Sustaining in part and remanding in part the results of the U.S. Department of Commerce's less-than-fair-value investigation of raw honey from Argentina.]

Dated: June 7, 2023

<u>Julie C. Mendoza</u>, <u>Edward J. Thomas III</u>, and <u>R. Will Planert</u>, Morris, Manning & Martin, LLP, of Washington, D.C., argued for plaintiff Nexco, S.A.  On the brief were <u>Donald B. Cameron</u>, <u>Brady W. Mills</u>, <u>Mary S. Hodgins</u>, <u>Eugene Degnan</u>, <u>Jordan L. Fleischer</u>, and <u>Nicholas C. Duffey</u>.

<u>Kara M. Westercamp</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant United States.  On the brief were <u>Patricia M. McCarthy</u>, Director, <u>Reginald T. Blades, Jr.</u>, Assistant Director, and <u>Brian M. Boynton</u>, Principle Deputy Assistant Attorney General.  Of Counsel was <u>Savannah Maxwell</u>, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Melissa M. Brewer, Kelley Drye & Warren LLP, of Washington, D.C., argued for defendant-intervenors American Honey Producers Association and Sioux Honey Association.  On the brief was R. Alan Luberda.

Kelly, Judge: Before the court is Nexco, S.A.'s ("Nexco") motion for judgment on the agency record challenging the U.S. Department of Commerce's ("Commerce") final determination in its 2020–2021 less-than-fair-value investigation of raw honey from Argentina.  Nexco challenges Commerce's decision to (1) use Nexco's acquisition costs as a proxy for costs of production, (2) apply a monthly inflation index when conducting the sales-below-cost test, and (3) restrict price comparisons of U.S. sales and third-country sales to Germany to the same month.  For the following reasons, the court sustains Commerce's determination in part, and remands in part for further explanation or reconsideration.

## BACKGROUND

On May 18, 2021, Commerce initiated an antidumping duty investigation of raw honey from Argentina.  See Raw Honey from Argentina, Brazil, India, Ukraine, and the Socialist Republic of Vietnam, 86 Fed. Reg. 26,897 (Dep't Commerce May 18, 2021) (initiation of less-than-fair-value investigation).  Commerce selected Nexco as a mandatory respondent.  See Selection of Additional Mandatory Respondent, A-357-823, PD 101, bar 4136282-01 (June 24, 2021).  Nexco indicated that it does not produce raw honey, but rather exports raw honey which it purchases from numerous small suppliers.  See Nexco's Request for Information Response, A-357-823, PD 89, bar 4135011-01 (June 17, 2021) ("Nexco RFI Resp.").  At this stage, both Nexco and

the Government of Argentina argued in favor of using Nexco's acquisition costs for

raw honey, rather than having Commerce solicit this information from individual

beekeepers, citing concerns over the sophistication of the beekeepers' recordkeeping.[1]

Id. at 3–6; Letter from the Government of Argentina at 3–4, A-357-823, PD 69, bar

4127047-01 (June 2, 2021) ("GOA Ltr.").

On November 23, 2021, Commerce published the preliminary determination of

its antidumping investigation.  See Decision Memo. for Prelim. Affirm. Determ. in

the Less-Than-Fair-Value Investigation of Raw Honey from Argentina, A-357-823,

PD 365, bar 4183570-02 (Nov. 17, 2021) ("Prelim. Results").  Commerce found that

the beekeepers, not Nexco, were the producers of honey, and issued questionnaires to

two of Nexco's beekeepers suppliers and one middleman.[2]  Id. at 26.  Based on the

questionnaire responses, Commerce determined that the beekeepers were not selling

to Nexco below cost, and it would be reasonable to use Nexco's acquisition costs as a

"proxy" for the beekeepers' costs of production ("COPs").  Id.  Commerce thus used

---

[1] Nexco concedes that it initially proposed that Commerce treat it as the producer of
honey, see Nexco RFI Resp. at 3–6, but explains that if Commerce decided to follow
its policy of treating Nexco's beekeepers as the producers, it should have based COP
on the beekeepers' costs.  See Oral Argument at 0:02:31–0:03:42, May 15, 2023, ECF
No. 41.  Nexco further explains that it was initially concerned that its beekeepers and
middlemen would not respond to Commerce in a verifiable manner, which is why it
argued that Commerce should use acquisition prices as COP.  See Nexco's Case Brief
to Commerce at 6–7, A-357-823, CD 801, bar 4202114-01 (Jan. 18, 2022).
[2] See [Beekeeper 1] Ltr., A-357-823, CD 130, bar 4151234-01 (Aug. 10, 2021);
[Middleman] Ltr., A-357-823, CD 131, bar 4151238-01 (Aug. 10, 2021); [Beekeeper 2]
Ltr., A-357-823, CD 166, bar 4153538-01 (Aug. 19, 2021).

Nexco's acquisition costs to calculate its COPs, rather than the costs of the beekeepers, for the purposes of the sales-below-cost test.  Id. at 25–27.  Commerce also found that, for certain products, Nexco's home market sales were below cost of production, and excluded these sales pursuant to 19 U.S.C. § 1677b(b)(1).  Id. at 28. Commerce also determined that certain of Nexco's home market sales of foreign like product were less than five percent of its aggregate sales, and pursuant to 19 U.S.C. § 1677b(a)(1)(C), based normal value on Nexco's sales to Germany.[3]  Id. at 22.

On April 14, 2022, Commerce issued its final determination, and calculated a 9.17 percent dumping margin for Nexco.[4]  See Raw Honey from Argentina: Final Determination of Sales at Less than Fair Value and Final Affirmative Determination of Critical Circumstances, 87 Fed. Reg. 22,179 (Dep't Commerce April 14, 2022) and accompanying issues and decision memo. ("Final Decision Memo.").  Commerce did not change its COP methodology from the Preliminary Determination, and again found that it was appropriate to use Nexco's acquisition costs as a "reasonable proxy" for the beekeepers' COPs.  Final Decision Memo. at 8–13.

---

[3] When Commerce determines that no contemporaneous sales of foreign like product are available, it bases normal value on constructed value.  See 19 U.S.C. § 1677b(b)(1); 19 C.F.R. § 351.405.  Here, Commerce used constructed value as normal value for some of Nexco's sales.  See Preliminary Margin Calculation Memorandum at 623–633, A-357-823, CD 639, bar 4183846-01 (Nov. 17, 2021).

[4] A dumping margin is "the total amount by which the price charged for the subject merchandise in the home market (the 'normal value') exceeds the price charged in the United States."  Koyo Seiko Co. v. United States, 258 F.3d 1340, 1342 (Fed. Cir. 2001).

Commerce also determined that it was appropriate to apply its high inflation and alternative cost methodologies to Nexco's COPs.  Id. at 15.  Commerce found that the alternative costs methodology was appropriate because (1) Nexco's direct material costs varied more than 25 percent during the period of investigation in real, inflation-adjusted terms, and (2) Commerce found evidence of a linkage between Nexco's sales prices and material costs.  Id. at 17; Prelim. Results at 24.  Commerce employed its high inflation methodology because Argentina experienced more than 25 percent inflation during the period of investigation.  Final Decision Memo. at 17, 26; Prelim. Results at 20.  Applying both methodologies, Commerce determined that more than 20 percent of Nexco's home market sales of certain products were made below cost.  Prelim. Results at 28.  Further determining that these sales did not provide for the recovery of costs during a reasonable period of time, Commerce excluded these sales from its normal value calculations.  Id.  Nexco moves for judgment on the agency record, and the court heard oral argument on May 15, 2023.  See [Nexco's] Mot. J. Agency Rec., Nov. 18, 2022, ECF No. 25.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2018), which grants the court authority to review actions initiated under 19 U.S.C. § 1516a(a)(2)(B)(i)[5] contesting the final determination in an antidumping duty order.  The court will

---

[5] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2018 edition.

uphold Commerce's determination unless it is "unsupported by substantial evidence

on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

Nexco argues that Commerce's decisions to (1) use acquisition prices as

production costs, (2) average production costs on a monthly basis, and (3) compare

third-country German sales with U.S. sales on a monthly basis, are unsupported by

substantial evidence and otherwise not in accordance with law.  See [Nexco's] Br.

Supp. Mot. J. Agency R. at 1, 7–45, Nov. 18, 2022, ECF No. 25-1 ("Pl. Br.").[6]

Defendant and Defendant-Intervenor argue that Commerce adequately supported

both its COP calculations and sales averaging periods.  See Def.'s Resp. Opp. Pl.'s

Mot. J. Agency R. at 15–21, 32–36, March 3, 2023, ECF No. 30 ("Def. Br."); Def.-Int.'s

Resp. Opp. Pl.'s Mot. J. Agency R. at 11–19, 36–46, March 6, 2023, ECF No. 32 ("Def.-

Int. Br.").   Commerce's decision to use monthly averaging for Nexco's costs is

supported by substantial evidence.  However, Commerce must either reconsider or

further explain its decisions to use Nexco's acquisition costs as COP, and compare

U.S. and German sales on a monthly basis.

---

[6] Nexco also argues that if the "Court finds that Commerce improperly relied on
acquisition prices in place of beekeeper costs or failed to adjust acquisition prices for
beekeeper profit, then quarterly costs are not justified as beekeepers' costs, after
adjusting for inflation, did not increase by more than 25 percent."  Pl. Br. at 36.
Because Commerce must either reconsider or further explain its determination, the
court does not reach this argument.

**Cost of Production Calculation**

Nexco claims that Commerce erred by using Nexco's acquisition costs as a proxy for COP. Pl. Br. at 7–28. Specifically, Nexco argues that (1) Commerce deviated from its longstanding practice of using producers' COPs in "raw" agricultural products cases without adequate explanation, (2) Commerce had no basis for rejecting the investigated beekeepers' and middleman's verified costs, and (3) acquisition costs were not a reasonable proxy for COPs, because they impermissibly included the beekeepers' profits. Id. Defendant and Defendant-Intervenor counter that Commerce's decisions conform with applicable law and prior practice. Def. Br. at 15–21; Def.-Int. Br. at 11–19. Because Commerce did not adequately explain its decision to use acquisition costs as a proxy for COP, the court remands this issue for further explanation or reconsideration.

In order to determine if merchandise is being sold at less than fair value, a "comparison shall be made between the export price . . . and normal value." 19 U.S.C. § 1677b(a). When determining normal value, Commerce may disregard sales that are not made in the "ordinary course of trade." 19 U.S.C. § 1677b(a)(1)(B)(i). The statute defines "ordinary course of trade" to specifically exclude sales made below the cost of production.[7] 19 U.S.C. § 1677(15)(A). Cost of production includes an exporter

---

[7] The statute specifically provides that:

(footnote continued)

or producer's material costs, amounts for selling and general expenses, and the cost

of containers.[8]  19 U.S.C. § 1677b(b)(3).  The statute does not specify the data upon

---

Whenever the administering authority has reasonable grounds to believe or suspect that sales . . . have been made at prices which represent less than the cost of production of that product, the administering authority shall determine whether, in fact, such sales were made at less than the cost of production. If the administering authority determines that sales made at less than the cost of production—

(A) have been made within an extended period of time in substantial quantities, and

(B) were not at prices which permit recovery of all costs within a reasonable period of time,

such sales may be disregarded in the determination of normal value.

19 U.S.C. § 1677b(b)(1).

[8] The statute specifies that the cost of production equals the sum of:

(A) the cost of materials and of fabrication or other processing of any kind employed in producing the foreign like product, during a period which would ordinarily permit the production of that foreign like product in the ordinary course of business;

(B) an amount for selling, general, and administrative expenses based on actual data pertaining to production and sales of the foreign like product by the exporter in question; and

(C) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the foreign like product in condition packed ready for shipment.

19 U.S.C. § 1677b(b)(3)(A)-(C).

which Commerce may rely in calculating these costs, but provides that Commerce

should normally base its calculations on the records of the exporter or producer, if

those records are kept in accordance with generally accepted accounting practices,

and reasonably reflect the cost of merchandise.[9]  See 19 U.S.C. § 1677b(f)(1)(A).  The

statute defines "exporter or producer" as either the exporter, producer, or both, "to

the extent necessary to accurately calculate the total amount incurred and realized

for costs, expenses, and profits."[10]  19 U.S.C. § 1677(28).

When a respondent sells unprocessed, raw agricultural products, Commerce's

practice is to use the cost of producing the raw goods as the respondent's COP, even

when the respondent is not the producer.  See, e.g., Final Determination of Sales at

Less than Fair Value: Fresh and Chilled Atlantic Salmon from Norway, 56 Fed. Reg.

7,661, 7,672 (Dep't Commerce Feb. 25, 1991) (unaffiliated salmon farmers' costs used

as COP for salmon exporter); Final Determination of Sales at Less than Fair Value:

Greenhouse Tomatoes from Canada, 67 Fed. Reg. 8,781 (Dep't Commerce Feb. 26,

---

[9] Commerce is not required to investigate all exporters or producers of a product.  See
19 U.S.C. § 1677f-1(c)(2).   Rather, Commerce may select a reasonable number of
exporters or producers which either account for the largest volume of subject
merchandise, or represent a statistically valid sample of such exporters or producers.
See id.

[10] The Statement of Administrative Action to the Uruguay Round Agreements Act
explains "the purpose of [§ 1677(28)] is to clarify that where different firms perform
the production and selling functions, Commerce may include the costs, expenses, and
profits of each firm in calculating cost of production and constructed value."  Uruguay
Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316,
vol. 1, at 835 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4178.

2002) and accompanying issues and decision memo. at Comment 7 (cost of farming tomatoes, rather than cost to exporter of purchasing tomatoes, used as exporter's COP).[11]  Commerce has historically followed this "raw goods" COP methodology with respect to raw honey from Argentina.  See, e.g., Raw Honey from Argentina: Preliminary Results of Antidumping Duty Administrative Review, 76 Fed. Reg. 2,655 (Dep't Commerce Jan. 14, 2011) (independent beekeepers' cost of producing honey used as COP for raw honey exporters).

First, Nexco challenges Commerce's decision to depart from its practice in raw agricultural products cases of using the producers', i.e., the beekeepers', costs as Nexco's COP.  Pl. Br. at 14–26.  Although Commerce explains that it followed its normal practice for raw agricultural products by treating Nexco's beekeeper suppliers

---

[11] In contrast, for processed agricultural products, Commerce treats the amounts a respondent spends acquiring raw agricultural inputs as a material cost.  See, e.g., Final Determination of Sales at Less than Fair Value: Canned Pineapple Fruit from Thailand, 60 Fed. Reg. 29,553, 29,561 (Dep't Commerce June 5, 1995) (pineapples treated as a material cost for producing canned pineapple); Final Results of Antidumping Duty Administrative Review: Individually Quick Frozen Red Raspberries from Chile, 70 Fed. Reg. 6,618 (Dep't Commerce Feb. 8, 2005) and accompanying issues and decision memo at 8–9 (raw raspberries a material cost for frozen raspberries) ("Red Raspberries").  Commerce has found that the acquisition price for a finished product is not the same as the product's cost of production. Certain Pasta from Italy: Final Results of the Sixth Antidumping Administrative Review, 69 Fed. Reg. 6,255 (Dep't Commerce Feb. 10, 2004) and accompanying issues and decision memo. at Comment 42. In a processed goods case, the profits of the raw product producers are included in the exporter's material costs.  See, e.g., Red Raspberries at 8–9 (in which Commerce used a respondent's purchase price for fresh raspberries as a material cost for frozen raspberries).  However, unlike in Red Raspberries, here Commerce does not assert that the honey sold by Nexco is a processed product.  See Final Decision Memo. at 8–9.

as the producers of honey, <u>see</u> Final Decision Memo. at 8, Commerce nonetheless departed from its practice when calculating the beekeeper's COP.  To explain its departure from its practice of using the beekeepers actual COP, Commerce points to several problems encountered in previous reviews of raw honey antidumping orders which compelled it to modify this practice.  <u>Id.</u> at 9.  Specifically, Commerce finds that the fragmented nature of the Argentinian honey industry made it difficult to select producers representing a large percentage of market share.  <u>Id.</u>  It also finds that beekeepers' operations were typically small and unsophisticated, such that their records were unreliable and technology limited.  <u>Id.</u>  Thus, when Commerce received responses to its questionnaires at all, it notes that it was "still plagued with incomplete or unreliable cost data that needed to be supplemented with public studies to calculate certain costs such as labor, land rent, and bee feed."  <u>Id.</u> at 10.  Citing these reasons from its experience in previous reviews, Commerce explains it does not have the resources to examine a statistically valid sample of beekeepers, and that even the largest beekeepers will not be representative.  <u>Id.</u>  Therefore, although Nexco disagrees with the result of its decision, Commerce has not failed to provide "reasoned analysis" for changing its practice of collecting cost data directly from beekeepers.  <u>See</u> <u>Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 42 (1983).

       Separately, Nexco argues that Commerce's decision not to use the verified questionnaire responses of its beekeepers as producers' costs pursuant to 19 U.S.C.

§ 1677f-1(c)(2) was contrary to law.  Pl. Br. at 20–26.  Nexco claims that Commerce did not support its finding that Nexco's beekeepers were not representative, given that Commerce frequently proceeds with two or three respondents, considering this number to be sufficiently "representative" under the statute.  Id. at 21–24.  Again, Commerce explains that due to the small size and irregular accounting of even the largest beekeepers in Argentina, it was not possible to take a representative sample.  Final Decision Memo. at 13.  Specifically with reference to Nexco's suppliers, Commerce found that "our ultimate selection from the pool of the largest middlemen and beekeeper suppliers still only represents a small portion of each respondent's total raw honey consumption during the POI."  Id.  Therefore, in order to meet its statutory obligation of ensuring that "all costs have been captured," Commerce reasonably concludes that it could not use the beekeepers' reported COP.  Id.

Nexco cites to § 1677f-1(c)(2), arguing that the statute does not allow Commerce to rely solely on "representativeness" to refuse to use the largest beekeepers' costs.  Pl. Br. at 20–23.  The relevant portion of the statute states that Commerce "may determine the weighted average dumping margins for a reasonable number of exporters or producers by limiting its examination . . . ."  19 U.S.C. § 1677f-1(c)(2).  Here, because Commerce is not determining dumping margins for the beekeepers, but rather using the beekeepers' COPs to confirm that Nexco's acquisition costs fully captured the costs of production, § 1677f-1(c)(2) is inapplicable.  Thus, Nexco's argument fails.

Finally, Nexco challenges, and Commerce fails to explain why, Nexco's acquisition costs are a reasonable proxy for the beekeepers' COP. Indeed Commerce explains that when dealing with a raw agricultural product, like Nexco's honey, it does not use the exporter's acquisition price as COP. Id. at 9 (citing Certain Pasta from Italy: Final Results of the Sixth Antidumping Administrative Review, 69 Fed. Reg. 6,255 (Dep't Commerce Feb. 10, 2004) and accompanying issues and decision memo. at Comment 42. Commerce does not explain why it deviates from its practice or state that it is adopting a new practice for these circumstances. Commerce simply reasons that because "the use of acquisition costs ensures the capture of all costs, expenses, and profits of the beekeepers and middlemen involved in the production and collection of raw honey," it may use acquisition costs as a proxy. Final Decision Memo. at 13. This explanation fails to engage with the question of how Nexco's prices are a reasonable substitute for cost values which are much lower. As Commerce's cost memorandum reveals, the prices Nexco paid to the two examined beekeepers for raw honey were two to three times higher than the beekeepers' COP. See Preliminary Cost of Production Memorandum, A-357-823, CD 646, bar 4184004-01 (Nov. 17, 2021) at Attachments 1 & 3 ("Prelim. Cost Memo."). Nexco's acquisition costs were significantly higher even when Commerce built in an assumption that the beekeepers' labor and other costs shared with other farming operations (e.g. cattle raising) were all allocated to beekeeping activities. Id. at 2–3. Although Commerce's methodology might ensure that all of the costs of production are included, see Oral

Argument at 0:16:31–0:19:31, 0:22:28–0:24:19, May 15, 2023, ECF No. 41; see Final Decision Memo. at 11–13, it is unclear from Commerce's explanation how its methodology is not overinclusive.  A lack of missing costs alone does not render Commerce's choice of a proxy reasonable, and Commerce gives no other justification for its choice.  Therefore, the court remands this issue for further explanation or reconsideration.

**Sales-Below-Cost Test**

Nexco claims that Commerce improperly used a monthly cost averaging period for the purposes of its sales-below-cost test.  Pl. Br. at 29.  Specifically, Nexco argues that Commerce's decision to use monthly, rather than quarterly averaging, is not supported by Commerce's high inflation methodology.  Id. at 32.  Defendant and Defendant-Intervenor counter that Commerce has discretion to choose the averaging period for respondents' costs, and that deflating Nexco's quarterly costs by month was supported by its high inflation methodology.  Def. Br. at 32–36; Def.-Int. Br. at 30–35.  Because Commerce has discretion to choose averaging periods for the sales-below-cost test, the court sustains Commerce's determination on this issue.

Pursuant to 19 U.S.C. § 1677b(b)(3), costs of production should be calculated "during a period which would ordinarily permit the production of that foreign like product." 19 U.S.C. § 1677b(b)(3)(A).  The statute does not specify what time periods Commerce must use when weight averaging a respondent's costs and comparison market prices for the sales-below-cost test.  See Thai Pineapple Canning Indus. Corp.

v. United States, 273 F.3d 1077, 1084 (Fed. Cir. 2001) (remanding to Commerce for

failure to modify averaging period in light of significant cost and price changes). As

a matter of practice, Commerce generally uses a weighted average COP for the entire

period of investigation, in order to even out fluctuations in production costs. See, e.g.,

Certain Cold Rolled Steel Flat Products from the Republic of Korea: Final Results of

Antidumping Duty Administrative Review, 84 Fed. Reg. 24,083 (Dep't Commerce

May 24, 2019) and accompanying issues and decision memo. at Comment 3 ("Our

normal practice is to calculate weighted-average costs for the period of

investigation").

One significant exception to this practice is Commerce's "alternative cost"

averaging methodology. Under the alternative cost methodology, Commerce shrinks

the cost averaging periods for material costs in order to mitigate certain distortions

during the period of investigation. See, e.g., Stainless Steel Plate in Coils from

Belgium: Final Results of Antidumping Duty Administrative Review, 73 Fed. Reg.

75,398 (Dep't Commerce Dec. 11, 2008) and accompanying issues and decision memo.

at Comment 4 ("[Commerce] has also established a long-standing practice of applying

alternative cost averaging methods in instances where the Department has

determined that its normal annual average costs would lead to skewed data and

inappropriate comparisons.") In deciding whether to apply the alternative cost

methodology, Commerce considers (1) whether cost changes during the period of

investigation were significant, and (2) whether there was a link between changing

costs and sales prices during that period.  Id.  For the purposes of this determination, Commerce measures cost changes in real, inflation-adjusted terms.  Final Decision Memo. at 16.  If these criteria are met, Commerce's practice is to use quarterly, rather than yearly, averages for a respondent's material costs.  See, e.g., Rubber Bands from Thailand: Final Determination of Sales at Less than Fair Value, 84 Fed. Reg. 9,304 (Dep't Commerce March 7, 2019) and accompanying issues and decision memo. at Comment 7.

A second exception to Commerce's practice of using yearly cost averaging periods is Commerce's "high inflation" methodology.  Commerce has recognized that in countries experiencing high inflation, increases in nominal costs could distort its sales-below-cost analysis, causing either excessive below-cost sales at the start of the period, or above-cost sales towards the end.  See Silicomanganese from Brazil: Final Results of Antidumping Duty Administrative Review, 69 Fed. Reg. 13,813 (Dep't Commerce March 24, 2004), and accompanying issues and decision memo. at Comment 4.  Therefore, Commerce has developed a practice of indexing costs on a monthly basis, rather than a period-of-investigation basis, if annual inflation exceeds 25 percent.  See Circular Welded Carbon Steel Standard Pipe and Tube Products from Turkey: Final Results of Antidumping Duty Administrative Review, 86 Fed. Reg. 15,190 (Dep't Commerce March 22, 2021) and accompanying issues and decision memo. at Comment 1 ("Pipe Turkey").

Section § 1677b(b)(3) gives Commerce discretion to determine cost averaging periods, see Thai Pineapple Canning Indus. Corp., 273 F.3d at 1084–85, and Nexco fails to show that Commerce's choice is unreasonable.   Nexco's challenge to Commerce's determination is narrow: it argues that Commerce should not have deflated Nexco's quarterly average costs by month for the purposes of the sales-below-cost test.  Pl. Br. at 35 ("Nexco is not disputing Commerce's indexing methodology. Nexco is arguing that once Commerce had indexed costs to the month in accordance with its high inflation methodology, then it needed to average those costs to derive quarterly average costs for use in the sales-below cost test").   Nexco claims that deflating to monthly values is not supported by Commerce's past practice, and that Commerce's methodology failed to fully capture the "dramatic increase in costs and prices in between quarters." Id. at 31.   Commerce admits that it has combined its alternative cost and high inflation methodologies, and that this simultaneous application adds complexity to its calculations.   Final Decision Memo. at 15. However, it is not apparent upon examination of Commerce's calculations how using both methodologies at once breaks with past practice, or is unreasonable based on the agency record.

Nexco appears not to dispute that Commerce should have applied its alternative cost methodology, and applied quarterly averages.  See Pl. Br. at 30–32. Therefore, the parties only contest Commerce's application of the high inflation methodology.  Commerce explains that, in situations with high inflation, its normal

practice is to instruct respondents to report costs on a monthly basis, rather than a

POI basis.  Final Decision Memo. at 16–17.  Commerce describes the remaining steps

as follows:

> Commerce uses monthly inflation indices to restate the reported
> monthly costs into a constant inflation-index level (e.g., at the end-of-
> period inflation-index level).  Once these costs reflect a constant
> inflation-index level, Commerce follows its normal practice of
> calculating an annual weighted-average cost for each CONNUM
> produced during the POI/POR.  Commerce then restates the annual
> weighted-average production cost for each CONNUM into the respective
> inflation-index level for each month of the POI/POR.

Id. at 17; see also Pipe Turkey at Comment 1 (describing Commerce's practice).

Commerce's cost calculation memo confirms that it followed its usual practice, as

described, with respect to Nexco.   See Prelim. Cost Memo. at Attachment 6.[12]

Therefore, Nexco's argument that Commerce has departed from its practice fails, as

Commerce's use of a quarterly rather than yearly average has not affected its high

inflation calculations in this case.

Nexco also argues that Commerce's decision to use monthly comparisons is

unsupported by substantial evidence.  Pl. Br. at 29.  Specifically, Nexco states that

Commerce's effective use of monthly costs failed to capture "the dramatic increase in

---

[12] Commerce calculated Nexco's final, quarterly average acquisition costs deflated by month ($F$) using the following formulae: $F = QTR\ AVE * (C/D)$, where $QTR\ AVE = (\Sigma E/\Sigma A)$; $C$ = monthly PPI; $D$ = quarter end PPI; $E = G * (D/C)$; $A$ = PRODQTY; $G = A * B$; and $B$ = honey unit acquisition cost.  See Prelim. Cost Memo. at Attachment 6  This final value was adjusted to calculate average consumption costs (also designated as $G$) with the following formula: $G = F * Acons/A$, where $Acons$ = monthly consumption quantities.  See id.

costs and prices between quarters." Id. at 31.  It is not clear how a shorter comparison period could fail to capture a quarterly increase in prices.   More importantly, however, Commerce has explained why using monthly comparisons was reasonable in light of inflation in Argentina during the POI.  It is readily discernable that Commerce applies this methodology to reduce the impact of changing nominal costs on its sales-below-cost test.  See Final Decision Memo. at 25 (citing Pipe Turkey issues and decision memo. at Comment 1).[13]  Therefore, because Commerce has reasonably explained why it used monthly comparisons for Nexco's costs, this determination is sustained.

---

[13] In Pipe Turkey, Commerce explained that:

> In countries experiencing high inflation, the nominal value of production costs increases over time, even where such costs, expressed in real terms, remain constant.  We recognize that this would cause distortions in the antidumping analysis because of our practice of comparing period-average COP and CV amounts to transaction-specific prices during the POR. As an illustration of this distortion, consider a sales-below-cost analysis where real production costs remain constant but, because of high inflation, nominal costs rise throughout the POR.  Under this scenario, a period-average COP figure based on monthly nominal cost amounts would tend to be higher than the individual home-market sale prices at the beginning of the period but lower than the prices at the end of the period.  Depending on the timing of the home-market sales, this could result in an excessive quantity of below-cost sales at the beginning of the period or, conversely, an overstatement of the number of above-cost sales at the end of the period.

Pipe Turkey issues and decision memo. at Comment 1 (quoting Silicomanganese from Brazil: Final Results of Antidumping Duty Administrative Review, 69 Fed. Reg. 13,813 (March 24, 2004), and accompanying issues and decision memo. at Comment 4).

**Normal Value Comparison**

Nexco claims that Commerce improperly compared its U.S. sales with third-country sales to Germany on a monthly basis, rather than a quarterly basis. Pl. Br. at 36–45. Specifically, Nexco argues that because both its U.S. sales and German sales were denominated in dollars, Commerce should not have applied its high-inflation methodology to Nexco's sales.[14] Id. Defendant and Defendant-Intervenor counter that Commerce properly compared sales in accord with its high inflation methodology, because Nexco's sales prices were affected by changing costs. Def. Br. at 32–39; Def.-Int. Br. at 36–46. Because Commerce has not adequately explained its use of month-to-month comparisons for Nexco's sales, the court remands this issue for further explanation or reconsideration.

Pursuant to 19 U.S.C. § 1677f-1(d)(1), Commerce normally determines whether merchandise is being sold at less than fair value in an investigation "by comparing the weighted average of the normal values to the weighted average of the export prices." 19 U.S.C. § 1677f-1(d)(1). The statute does not specify during what time period normal value and export price should be averaged for the purposes of comparison. Cf. SAA at 4178 (only specifying periods for average-to-transaction

---

[14] Nexco's argument appears to address only dollar-denominated third-country sales comparisons, and does not pertain to comparisons with peso-denominated constructed value home market sales. See Pl. Br. at 32–33, 35–43 (stating that "comparisons of U.S. dollar-denominated sales" by month are unsupported, and exclusively discussing third-country sales to Germany). Therefore, the court limits its analysis to the appropriate comparison period for dollar-denominated sales to Germany.

comparisons).  However, 19 C.F.R. § 351.414(d)(3) expresses a preference for period-of-investigation averaging, stating:

> When applying the average-to-average method in an investigation, the Secretary normally will calculate weighted averages for the entire period of investigation. However, when normal values, export prices, or constructed export prices differ significantly over the course of the period of investigation, the Secretary may calculate weighted averages for such shorter period as the Secretary deems appropriate.

19 C.F.R. § 351.414(d)(3).

As a matter of practice, Commerce makes month-to-month comparisons of normal value and export prices during periods of high inflation.  As with its practice in comparing costs, Commerce resorts to its high inflation practice in price comparisons if inflation exceeds 25 percent during the period of investigation.  See Pipe Turkey issues and decision memo. at Comment 1; see also Notice of Final Determination of Sales at Less than Fair Value: Certain Cut-to-Length Carbon-Quality Steel Plate Products from Indonesia, 64 Fed. Reg. 73,164, 73,170 (Dep't Commerce Dec. 29, 1999) (Commerce "make[s] sales comparisons on a monthly average basis, rather than on a POI average basis, in order to minimize the effects of inflation on our analysis").

Here, Commerce justifies its use of monthly comparisons for Nexco's prices on the same grounds it invoked for Nexco's costs: high inflation during the POI.  See Final Decision Memo. at 24–28.  However, Commerce's discretion to choose averaging periods for price comparisons is circumscribed by regulation.  See 19 C.F.R. § 351.414(d)(3) (providing that Commerce "may calculate weighted averages for such

shorter period as the Secretary deems appropriate" when  normal values "differ

significantly over the course of the period of investigation").  Commerce argues that

it has "statutory discretion to determine the time periods over which to calculate

weight-average U.S. prices and normal values," citing to 19 U.S.C. § 1677f-1(d)(1).

Final Decision Memo. at 24.   Section 1677f-1(d)(1) states that Commerce shall

"compar[e] the weighted average of normal values to the weighted average of export

prices . . . for comparable merchandise."  19 U.S.C. § 1677f-1(d)(1)(A)(i).  Commerce

also argues that, according to regulation, it "may calculate weight-averages over

shorter periods when normal values or U.S. prices change significantly over the

course of the POI," and that a country experiencing high inflation would satisfy this

requirement.  Final Decision Memo. at 24–25.  Commerce does not explain, and it is

not reasonably discernable, that either the normal value of sales to Germany or U.S.

prices underwent a significant change during the POI.  If Nexco's sales to Germany

had been denominated in Argentine pesos, it is evident that Nexco's normal value

prices would change significantly as a result of high peso inflation, which Commerce

found existed during the POI.  See id. at 17.  However, Commerce does not assert that

Nexco's German sales were denominated in pesos, and does not explain how Nexco's

prices "differ significantly" by pointing to evidence on the record.  Rather, Commerce

argues that Nexco's sales prices were "impacted" by high inflation "due to the impact

on the respondents' COP," and that this impact resulted in significant changes.  Id.

at 26.  However, Commerce does not specify what changes occurred in either German

prices or U.S. prices, e.g., whether the prices increased, and these changes are not discernable from the record.  See id. (citing Prelim. Cost Memo.); see also Preliminary Margin Calculation Memorandum at 221, 222, 234, 235, 585, A-357-823, CD 639, bar 4183846-01 (Nov. 17, 2021).

Commerce explains that it is following its ordinary high-inflation methodology, which is well-supported by administrative precedent.  Id. at 25.  The administrative precedent referenced by Commerce supports using shorter averaging periods when sales are denominated in local currencies, not U.S. dollars.  See id. at 25 n.122 (listing determinations).  Commerce also attempts to defend its choice of averaging period by discussing the impact of inflation on Nexco's costs.  Id. at 26–27.  It states that:

> Even though both the comparison market and the U.S. market sales were conducted in U.S. dollars, the sales prices of both mandatory respondents were impacted by high inflation during the POI due to the impact on the respondents' COP.  Because Argentina experienced high inflation during the POI, Commerce adjusted the respondents' COP by employing high inflation methodology, which requires that respondents report monthly replacement costs for direct materials costs and monthly averages for conversion costs. Commerce indexes these monthly costs to the end of the POI to calculate a constant currency annual weighted-average COP that is then restated in the respective POI monthly currency levels.  As we stated in the Preliminary Determination in this case, record evidence supports that even after the restatement of ACA's and NEXCO's costs into a constant currency level, both ACA and NEXCO experienced significant cost changes when measured by the difference between the highest quarterly COM and the lowest quarterly COM during the POI.  Thus, while sale prices may have been conducted in U.S. dollars, record evidence shows that the costs that ACA and NEXCO incurred in operating in a high inflation economy were still impacted by inflation.

Id.  It is unclear how Commerce's discussion of Nexco's costs, and its own COP

methodology, leads to its conclusion that Nexco's prices differed significantly.  The

regulation provides that when normal values or export prices differ significantly

shorter comparison periods may be appropriate.  See 19 C.F.R. § 351.414(d)(3).  It is

unclear whether or why Commerce believes Nexco's "significant cost changes,"

resulted in significant price changes.  Commerce also states that:

> While we do not base our decision to use monthly sales prices on our
> decision regarding beekeeper or acquisition costs, we find that our
> analysis of the significant changes in both the costs and prices of raw
> honey is informative and provides additional support for comparing
> prices within shorter time periods.

Id.  Commerce offers no further explanation as to how exactly cost analysis "provides

additional support" for price comparisons.[15]  Id.  Finally, Commerce argues that its

"standard margin calculation converts any foreign currency prices to USD on the date

of the U.S. sale when performing comparisons, and therefore, the basic premise of

Commerce's high inflation practice is that U.S. dollar sales prices do not neutralize

the impact of inflation."  Id. at 26.  Whether or not U.S. dollar sales "neutralize"

inflation, this argument does not explain how Nexco's prices differed significantly

over the POI, and it is not reasonably discernable from Commerce's explanation why

---

[15] Commerce also discusses how Nexco's costs and prices were "reasonably linked"
during the POI, but stops short of asserting that Nexco's prices increased
significantly.  Final Decision Memo. at 27.  Moreover, whether there is a "link"
between costs and sales appears to be the analysis Commerce undertakes when
deciding whether to apply its alternative cost test—which is not in dispute.  See
Prelim. Results at 24.

a shorter averaging period would be appropriate pursuant to 19 C.F.R. § 351.414(d)(3). Therefore, the court remands this issue for further explanation or reconsideration.

## CONCLUSION

For the foregoing reasons, the court sustains Commerce's determination to compare Nexco's costs on a monthly basis for the purposes of the sales-below cost test. Commerce's determination to use Nexco's acquisition costs as a proxy for the beekeepers' COP, and Commerce's determination to compare Nexco's third-country sales and U.S. sales on a monthly basis, are remanded for further explanation or reconsideration. In accordance with the foregoing, it is

**ORDERED** that the final results, see ECF No. 20-1, are remanded for further explanation or reconsideration consistent with this opinion; and it is further

**ORDERED** that Commerce shall file its remand redetermination with the court within 90 days of this date; and it is further

**ORDERED** that the parties shall have 30 days to file comments on the remand redetermination; and it is further

**ORDERED** that the parties shall have 30 days to file their replies to the comments on the remand redetermination; and it is further

**ORDERED** that the parties shall file the joint appendix within 14 days after the filing of replies to the comments on the remand redetermination; and it is further

Court No. 22-00203                                                          Page 26

     **ORDERED** that Commerce shall file the administrative record within 14 days

of the date of filing its remand redetermination.

 /s/ Claire R. Kelly
Claire R. Kelly, Judge

Dated:     June 7, 2023
            New York, New York