A-357-823
Remand
Slip Op. 23-85
Investigation
**Public Version**
E&C/OIV:  Team

*Nexco S.A. v. United States*,
**Court No. 22-00203, Slip Op. 23-85 (CIT June 7, 2023)**
**Raw Honey from Argentina**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.   SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of redetermination pursuant to the opinion and remand order from the U.S. Court of International Trade (CIT or the Court) in *Nexco S.A. v. United States*, Court No. 22-00203, Slip Op. 23-85 (CIT June 7, 2023) (*Remand Order*).  This remand concerns the *Final Determination* of the less-than-fair-value investigation of raw honey from Argentina.[1]

In its *Remand Order*, the CIT sustained Commerce's determination to compare Nexco S.A.'s (Nexco) costs on a monthly basis for the purposes of the sales-below-cost test.  Further, the CIT remanded for further explanation and reconsideration by Commerce of its determination to use Nexco's acquisition costs as a proxy for the beekeepers' cost of production (COP), and Commerce's determination to compare normal value based on Nexco's third-country sale prices and U.S. sale prices on a monthly basis, rather than a quarterly basis.

---

[1] *See Raw Honey from Argentina:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 87 FR 22179 (April 14, 2022) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM); *see also Raw Honey from Argentina:  Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 86 FR 66531 (November 23, 2021) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM).

On September 14, 2023, Commerce released the draft results of redetermination[2] and invited interested parties to comment on the Draft Redetermination.  On September 26, 2023, the petitioners[3] and Nexco each submitted comments regarding the Draft Redetermination.[4]

In accordance with the *Remand Order*, in these final results of redetermination, Commerce reconsidered the facts on the record.  For the reasons explained below, Commerce continues to use Nexco's acquisition costs for COP and further explains that, by using Nexco's acquisition cost, we are using the actual cost incurred by the price setter, *i.e.*, the mandatory respondent-exporter, when establishing its prices to the U.S. and comparison markets.  Further, Commerce continues to compare Nexco's U.S. sale prices with normal values based on Nexco's third-country sale prices on a monthly basis, and further explains that the price in Germany is driven by the costs in Argentina and that there is a correlation between the change in costs and the prices, and price adjustments are also dependent on monthly indexed values.

## II.   BACKGROUND

On April 14, 2022, Commerce published the *Final Determination* of the less-than-fair-value investigation of raw honey from Argentina.  Commerce selected four mandatory respondents, including Nexco.[5]

Early in the investigation, Nexco reported that it does not produce raw honey, but rather exports raw honey which it purchases from numerous small suppliers.[6]  Both Nexco and the

---

[2] *See* Draft Results of Redetermination Pursuant to Court Remand, Nexco S.A. v. United States, Court No. 22-00203, Slip Op. 23-85 (CIT June 7, 2023), dated September 14, 2023 (Draft Redetermination)

[3] The petitioners are the American Honey Producers Association and the Sioux Honey Association (collectively, the petitioners).

[4] *See* Petitioners' Letter, "Petitioners' Comments on the Draft Results of Redetermination Pursuant to Court Remand," dated September 25, 2023 (Petitioners' Comments); Nexco's Letter, "NEXCO S.A.'s Comments on Draft Results of Remand Redetermination," dated September 25, 2023 (Nexco's Comments).

[5] *See* Memorandum, "Less-Than-Fair-Value Investigation of Raw Honey from Argentina:  Selection of Additional Mandatory Respondent," dated June 24, 2021.

[6] *See* Nexco's Letter, "NEXCO's Notification of Reporting Difficulty – June 10, 2021 Request for Information," dated June 15, 2021, at 2 (Nexco June 15 Letter).

Government of Argentina argued in favor of using Nexco's acquisition costs for raw honey, rather than Commerce soliciting this information from individual beekeepers, citing concerns over the sophistication of the beekeepers' recordkeeping.  Commerce found that the beekeepers, not Nexco, were the producers of raw honey, and issued questionnaires to two of Nexco's beekeeper-suppliers and to one middleman.[7]  Based on the questionnaire responses, Commerce determined that the beekeepers were not selling to Nexco below cost, and it would be reasonable to use Nexco's acquisition costs as a "proxy" for the beekeepers' COP.[8]  Thus, Commerce used Nexco's acquisition costs to calculate its COP, rather than the production costs of the beekeepers.

Commerce also determined that it was appropriate to apply its alternative cost-period methodology to Nexco's COP.  Commerce found that the quarterly cost periods were appropriate because:  (1) Nexco's direct material costs varied more than 25 percent between quarters during the period of investigation (POI) in real, inflation adjusted terms;[9] and (2) Commerce found evidence of a linkage between Nexco's sale prices and its cost of manufacturing.[10]  For the *Final Determination*, Commerce did not change its COP methodology from the *Preliminary Determination*, and again found that it was appropriate to use Nexco's acquisition costs as a "reasonable proxy" for the beekeepers' COP.  Further, Commerce continued to use quarterly cost periods for the *Final Determination*.

Commerce also determined that certain of Nexco's home market sales of foreign like product were less than five percent of its aggregate sales, and pursuant to section 773(a)(1)(C) of

---

[7] *See Preliminary Determination* PDM at 25-27.
[8] *Id.*
[9] *See Final Determination* IDM at Comment 2.
[10] *Id.* at Comment 3.

the Tariff Act of 1930, as amended (the Act).[11]  Accordingly, Commerce based normal value on Nexco's sale prices to Germany.[12]

Commerce employed its high inflation methodology because Argentina experienced more than 25 percent inflation during the POI.[13]

## III.  DISCUSSION

### i.  Statutory and Regulatory Background

Acquisition Costs

Section 773(b)(3) of the Act states that the COP shall be the sum of:  (A) the cost of materials, fabrication, and processing to produce the merchandise; and (B) an amount for selling, general, and administrative expenses based on actual data pertaining to production and sales of the foreign like product by the exporter in question; and (C) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the foreign like product in condition packed ready for shipment.  In addition, section 773(f)(1)(A) of the Act states that costs shall normally be calculated based on the records of the exporter or producer of the merchandise and reasonably reflect the costs associated with the production and sale of the merchandise.  Section 771(28) of the Act defines "exporter or producer" as either the exporter, producer, or both, "to the extent necessary to accurately calculate the total amount incurred and realized for costs, expenses, and profits."  According to section 777A(c)(2) of the Act, Commerce is not required to investigate all exporters or producers of a product, but rather may select a reasonable number which either account for the largest volume of subject merchandise or represent a statistically valid sample of such exporters or producers.  Finally, while the statute

---

[11] *See* Memorandum, "Selection of Appropriate Third Country Market," dated August 11, 2021, at 2.
[12] *Id.*
[13] *Id.*

does not specify the data upon which Commerce must rely for COP, in the case of raw agricultural products, Commerce's practice has been to use the COP for the raw goods as the respondent's COP, even when the respondent is neither the producer, nor affiliated with the producer.[14]

## ii.  Factual Background

Acquisition Costs

As noted above, in the *Final Determination*, Commerce used Nexco's acquisition costs as a proxy for the beekeeper-suppliers' COPs, determining that, under the circumstances, such reliance was reasonable and did not contravene the calculation of an accurate margin.[15]  In particular, Commerce found that because the unaffiliated beekeeper-suppliers numbered in the thousands, Commerce could not reasonably solicit and obtain COP information from enough beekeeper-suppliers to perform an accurate sampling of the suppliers, nor could Commerce obtain representative coverage using the largest quantity suppliers.  Moreover, in both the current and past raw honey proceedings, Commerce found that when beekeeper-suppliers participated, they were comprised of families or small farms with limited and unsophisticated record-keeping.[16]  As a result, Commerce necessarily relied on assumptions and estimates to calculate the beekeepers' COPs.  Finally, Commerce reasoned that the actual intent of obtaining the unaffiliated producers' COPs is to ensure that there were no costs missing when calculating whether dumping had occurred.  Thus, based on the COP information obtained from the selected upstream suppliers in the instant investigation, Commerce concluded that use of acquisition costs

---

[14] *See, e.g.*, *Final Determination of Sales at Less than Fair Value:  Fresh and Chilled Atlantic Salmon from Norway*, 56 FR 7661, 7672 (February 25, 1991) (*Norwegian Salmon LTFV*); *Final Determination of Sales at Less than Fair Value:  Greenhouse Tomatoes from Canada*, 67 FR 8781 (February 26, 2002) (*Canadian Tomatoes LTFV*), and accompanying IDM at Comment 7.
[15] *See Final Determination* IDM at Comment 1.
[16] *See, e.g.*, *Notice of Final Determination of Sales at Less Than Fair Value:  Honey from Argentina*, 66 FR 50611 (October 4, 2001) (*Argentine Honey LTFV*), and accompanying IDM at Comment 1.

was not likely to understate the COPs for the merchandise under consideration and was therefore reasonable.

In the *Remand Order*, the Court found that Commerce provided a "reasoned analysis" for changing its practice of collecting cost data directly from beekeepers (Commerce explained that it did not have the resources to examine a statistically valid sample of beekeepers and that even the largest beekeepers would not be representative).[17]  The Court also found that in order for Commerce to meet its statutory obligation of ensuring that all costs have been captured, Commerce reasonably concluded it could not use the small quantity of reported beekeeper-supplier COPs as the COPs for all beekeeper-suppliers.[18]  Instead, Commerce used the reported beekeeper COPs to confirm that Nexco's acquisition costs fully captured the COPs of the beekeeper-suppliers.  However, the Court found that Commerce failed to explain why the prices Nexco paid its beekeeper-suppliers are a reasonable substitute for costs, when the costs obtained are much lower than the prices paid.[19]  Thus, the Court ordered that Commerce further explain or reconsider how the choice of acquisition cost as a proxy for the beekeeper-suppliers' actual costs is reasonable and not overinclusive of costs.[20]

### iii. Analysis

<u>Acquisition Costs</u>

Pursuant to the *Remand Order*, we have reconsidered the choice of acquisition cost in place of the beekeeper-suppliers' COPs and continue to find that the respondents' acquisition costs are a reasonable proxy for calculating the COP of the merchandise under consideration.  In this investigation, we devised and implemented a significantly curtailed beekeeper cost

---

[17] *See Remand Order* at 11.
[18] *Id.* at 12.
[19] *Id.* at 13.
[20] *Id.* at 14.

solicitation in an effort to balance our past practice and concerns.  Specifically, we sought to ensure that the in-country beekeeper-suppliers were not selling below their COP to the exporter-respondents.  Yet, we were faced with the fact that obtaining a representative population of beekeeper-supplier costs was not feasible, neither for Commerce to administer nor for the respondents to induce participation from multitudes of unaffiliated beekeeper-suppliers with unsophisticated and incomplete record-keeping.  Thus, our proposal was a reasonableness test to determine if the collected costs suggested the beekeeper-suppliers might be contributing to the dumping of raw honey by selling to the respondent-exporters below their own raw honey production costs.  The solicited information did not suggest such a fact pattern, but rather, for the beekeeper-suppliers selected, demonstrated that their prices to the respondent-exporters exceeded the costs that the beekeeper-suppliers could document by a generous margin.  However, based on these results, the Court requests that we address whether using the respondents' acquisition costs as a proxy for the COP for all beekeeper-suppliers is overinclusive of costs.

We do not find that relying on Nexco's own cost of the merchandise that it sold in the United States overstates the COP of such merchandise.  In calculating dumping margins in an investigation, we seek to determine whether the respondent sold the subject merchandise in the United States at a price below fair value, *i.e.*, below the price in the comparison market or below the COP.  For Nexco, COP is inclusive of the acquisition cost it paid for the raw honey plus the additional processing costs it incurred in preparing the raw honey for export.  Indeed, when setting its prices, Nexco knows what it paid for the raw honey, but is unlikely to have access to the actual COPs of unaffiliated beekeeper-suppliers.  Moreover, the exporter-respondent would not have a reason to set its prices based on the unaffiliated beekeeper-suppliers' costs.

Here, Commerce's rationale for obtaining the COPs of a limited number of unaffiliated

beekeeper-suppliers is to ensure that all costs have been captured, or stated another way, to confirm that the beekeeper-suppliers were not also contributing to dumping the merchandise in the United States by selling their product, *i.e.*, the raw honey, to the exporter-respondent below the beekeeper-suppliers' costs.  The limited test work we performed on the selected beekeeper-suppliers' costs did not suggest that the unaffiliated beekeeper-suppliers were selling to Nexco below their COPs of the raw honey.[21]  Thus, because we have no reason to believe that the unaffiliated beekeeper-suppliers were selling raw honey below cost to the exporter-respondent, *i.e.*, the U.S. price-setter, we find it reasonable to base our margin calculations on the acquisition costs actually paid by Nexco.

The *Remand Order* faults Commerce for "fail{ing} to engage with the question of how Nexco's purchase prices are a reasonable substitute for cost values which are much lower."[22] However, the *Remand Order* also acknowledges Commerce's explanation "that due to the small size and irregular accounting of even the largest beekeepers in Argentina, it was not possible to take a representative sample."[23]  Therefore, we do not find that the limited sample of beekeeper-supplier costs establishes that all beekeeper-supplier costs are necessarily "much lower" than Nexco's acquisition costs.  As previously explained, the limited sample of beekeeper-supplier costs were solicited merely to confirm, in what is essentially a spot-check, that the beekeeper-suppliers were not selling below their own COP; they were not solicited to be representative of all beekeeper-supplier costs.  The *Remand Order* further states, "Commerce has not failed to provide 'reasoned analysis' for changing its practice of collecting cost data directly from beekeepers{,}" and "in order to meet its statutory obligation of ensuring that 'all costs have been

---

[21] *See* Memorandum, "Cost of Production and Constructed Value Calculation Adjustments for the Final Determination – NEXCO S.A.," dated April 7, 2022.
[22] *See Remand Order* at 13.
[23] *Id.* at 12.

captured,' Commerce reasonably concludes that it could not use the beekeepers' reported COP."[24]   Therefore, the *Remand Order* supports Commerce's decision not to seek all beekeeper-supplier costs or rely on the limited beekeeper-supplier costs on the record as representative of all beekeeper-supplier costs.  Accordingly, to comply with the *Remand Order*, we have explained why we do not consider Nexco's acquisition costs to be overinclusive of COP.

As noted above, when setting its U.S. prices, Nexco knows what it paid the beekeeper-suppliers, but there is no record evidence to suggest that Nexco knows the costs that its unaffiliated beekeeper-suppliers incurred in producing the raw honey.  Even if Nexco were privy to such information, there is no evidence suggesting that Nexco would consider the costs of an unaffiliated party when setting its prices.  Thus, the pertinent cost data to Nexco is what is recorded in its own books and records, *i.e.*, the acquisition costs.  While Commerce is concerned with whether there are additional costs to be considered if the beekeeper-suppliers sold their product below their COPs, Nexco would not have such concerns.  Because Nexco sets the prices to the comparison and U.S. markets, we find that using Nexco's own COPs (or constructed values) for those sales is reasonable and does not overstate the costs of the products that were sold by Nexco.  Therefore, we find that using the raw honey acquisition costs in the calculation of Nexco's COP for the raw honey sold to the United States is not overinclusive of costs from the perspective of the company responsible for setting the U.S. price.

### iv.  Factual Background

<u>Appropriate Comparison Period to Compare Nexco's Third-Country Sale Prices and U.S. Sale Prices</u>

In the *Final Determination* Commerce applied its high inflation methodology[25] in

---

[24] *Id.*
[25] *Id.* at 5 (citing *Preliminary Determination* PDM at 24; and *Final Determination* IDM at 17 and 26).

conjunction with its alternative cost-period methodology[26] to calculate Nexco's weighted-average dumping margin, including each respondent's COPs.[27]  Commerce employed its high inflation methodology because it found that Argentina had experienced more than a 25 percent *per-annum* inflation rate during the POI.[28]  When utilizing the high inflation methodology in the margin calculations, Commerce compared Nexco's monthly weighted-average U.S. sale prices to a normal value based on either Nexco's monthly weighted-average third-country (*i.e.*, Germany) sale prices or Nexco's monthly indexed quarterly averaged COPs.[29]

Nexco argued that Commerce's use of the high-inflation methodology was in error because Nexco's U.S. and German sale prices were both denominated in U.S. dollars, and, thus, rather than comparing U.S. prices with normal value on a monthly basis, Commerce should compare the prices on a quarterly basis.  In the *Remand Order*, the Court notes that Nexco's argument appears to address normal values based only on U.S. dollar-denominated, third-country sale prices, and does not pertain to normal values based on Argentine peso (peso)-denominated constructed value (*i.e.*, monthly indexed COPs).[30]  Thus, the Court has limited "its analysis to the appropriate comparison period for {Nexco's U.S.} dollar-denominated sales to Germany."[31]

In the *Remand Order*, the Court explains that pursuant to section 777A(d)(1) of the Act, Commerce normally determines whether merchandise is being sold at less than fair value in an investigation "by comparing the weighted average of the normal values to the weighted average of the export prices."[32]  However, the Court acknowledges that the statute does not specify during what time period normal value and export price should be averaged for the purposes of

---

[26] *Id.* (citing *Preliminary Determination* PDM at 20, 24, and 28).
[27] *See Final Determination* IDM at 15.
[28] *Id*. at 17.
[29] *See* sections 773(a) and (e) of the Act.
[30] *See Remand Order* at 20, n.14.
[31] *Id*.
[32] *Id*. at 20 (citing section 777A(d)(1) of the Act).

the comparison.  The Court further notes that under 19 CFR 351.414(d)(3), in a less-than-fair-value investigation, Commerce prefers POI averages when applying the average-to-average method, but that Commerce may utilize a shorter averaging period if normal value, export prices, or constructed export prices differ significantly over the POI.[33]  The Court further explains that Commerce resorts to its high inflation practice when it determines that high inflation existed during the POI, as defined by an inflation rate that exceeds 25 percent *per-annum* during the POI.[34]  The Court explains that Commerce justified its use of monthly comparisons of Nexco's U.S. sale prices and U.S. dollar-denominated German sale prices based on the high inflation that Argentina experienced during the POI.[35]  However, the Court explains that Commerce's discretion to do so is circumscribed by 19 CFR 351.414(d)(3), which states that Commerce may calculate weighted averages for such periods as Commerce deems appropriate when normal values "differ significantly over the course of the period of investigation."[36]  The Court states that Commerce determined that the existence of high inflation satisfies the requirement under 19 CFR 351.414(d)(3).[37]  However, the Court found that Commerce did not explain in the *Final Determination* that either the normal value of U.S. dollar-denominated sales to Germany or U.S. prices underwent a significant change during the POI.[38]  The Court further explains that rather than point to record evidence demonstrating how Nexco's dollar-denominated sale prices to Germany differed significantly from its U.S. sale prices, Commerce found in the investigation that Nexco's sale prices were "impacted" by high inflation "due to the impact of the respondents' COP" and that this impact resulted in significant changes.[39]  However, the Court found that

---

[33] *Id.* at 21 (citing 19 CFR 351.414(d)(3)).
[34] *Id.*
[35] *Id.*
[36] *Id.* at 21-22.
[37] *Id.* at 22 (citing *Final Determination* IDM at 24-25).
[38] *Id.*
[39] *Id.* (citing *Final Determination* IDM at 26).

Commerce did not specify what changes occurred in either the German or U.S. sale prices.[40]

In the *Remand Order*, the Court found that the precedent Commerce relied on in the *Final Determination* to support its use of monthly comparison periods is not on point, as the cited precedent involved cases using shorter averaging periods for sales denominated in local currency, not U.S. dollars.[41]  The Court also took issue with Commerce's finding that the impact high inflation had on Nexco's costs justified Commerce's use of monthly comparison periods. Specifically, the Court found that it is unclear how Commerce's discussion of Nexco's costs, and Commerce's own COP methodology, leads to the conclusion that Nexco's U.S. dollar-denominator sale prices to Germany and the United States differed significantly.[42]  The Court also found that Commerce failed to adequately explain how its analysis of the significant changes in both the costs and prices of raw honey was "informative and provides additional support for" its monthly comparison method.[43]

The Court notes Commerce's argument that its "standard margin calculation converts any foreign currency prices to {U.S. dollars} on the date of the U.S. sale when performing comparisons, and therefore, the basic premise of Commerce's high inflation practice is that U.S. dollar sales prices do not neutralize the impact of inflation."[44]  However, the Court found that whether or not U.S. dollar-denominated sale prices "neutralize the impact of inflation" does not explain how Nexco's prices differed significantly over the POI and that it was not reasonably discernable from Commerce's explanation why its use of a shorter averaging period is appropriate under 19 CFR 351.414(d)(3).[45]  Accordingly, the Court remanded the issue for

---

[40] *Id*. at 22-23.
[41] *Id*. at 25.
[42] *Id*. at 24.
[43] *Id*. at 24 (citing *Final Determination* IDM at 26-27).
[44] *See Remand Order* at 24 (citing *Final Determination* IDM at 26).
[45] *Id*. at 24-25.

further consideration.

**v. Analysis**

<u>Appropriate Comparison Period to Compare Nexco's Third-Country Sale Prices and U.S. Sale Prices</u>

Section 777A(d)(1)(A) of the Act provides, in a less-than-fair-value investigation, that comparisons between U.S. prices and normal value be made on either an average-to-average or a transaction-to-transaction basis.[46]  Alternatively, if the conditions of section 777A(d)(1)(B) are satisfied, then Commerce may make comparison on an average-to-transaction basis.[47]

Leaving aside the transaction-to-transaction comparison method,[48] normal value, when based on comparison market prices, will be based on an average of such prices, and U.S. price will be based on either an average or transaction-specific value.  For a less-than-fair-value investigation, the statute does not specify a period over which to average comparison market or U.S. market prices, however, the regulations express a preference for a POI-wide average, but a shorter time period may be used.[49]  In a review,[50] the statute limits the averaging period to no longer than one calendar month.[51]

When normal value is based on constructed value, the COPs, as well as the respondent's

---

[46] *See* 19 CFR 351.414(b)(1) and (2), respectively.
[47] *See* 19 CFR 351.414(b)(3).
[48] *See* 19 CFR 351.414(c)(2) ("{Commerce} will use the transaction-to-transaction method in only unusual situations … .").
[49] *See* 19 CFR 351.414(d)(3).
[50] *See* section 751 of the Act.
[51] *See* section 777A(d)(2) of the Act.  Although section 777A(d)(2) of the Act only addresses the average-to-transaction method, at the time of enactment of the section 777A of the Act as part of the Uruguay Round Agreements Act, that was the only method used for comparisons of U.S. price with normal value in a review. Subsequently, Commerce has realigned its practice in an administrative review to follow its practice in a less-than-fair-value investigation.  *See Antidumping Proceedings:  Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings; Final Modification*, 77 FR 8101 (February 14, 2012).  Thus, for both an investigation and a review, the comparison methods under section 777A(d)(1)(A) are the standard comparison methodologies for calculating a respondent's weighted-average dumping margin, and where the comparison method under section 777A(d)(1)(B) may be used as an alternative comparison method when the two stipulated requirement are satisfied.

selling expenses and profit are calculated on a period-wide basis in either an investigation or a review.  When Commerce finds that shorter (*i.e.*, quarterly) cost averaging periods are warranted,[52] the quarterly weighted-average costs are used as the basis for constructed value. Independent of the cost-averaging period, when high inflation is present in the exporting country, the average costs are indexed to each month during the POI/POR, and constructed value is based on the monthly indexed weighted-average costs.  Note that normally the monthly indexed costs are for period-wide weighted-average costs; however, when quarterly cost-periods are used with the high inflation methodology, as for the first time in this investigation, the monthly indexed costs are for quarterly weighted-average costs.

When Commerce finds that shorter cost averaging periods are warranted in an investigation, the averaging periods for comparison market and U.S. market prices are also limited to quarters.  Thus, normal value will be based on either quarterly average comparison market prices, or on quarterly average COPs.  In a review, where the averaging period for prices is limited to no more than one month,[53] the use of quarterly cost averaging periods limits the contemporaneous time period,[54] *i.e.*, the 90/60 day window, to months within each quarterly cost averaging period.

When Commerce finds that the use of the high inflation methodology is warranted, it impacts both the sales and costs sides of the margin calculations.  The purpose of the high inflation methodology is to account for the significant change in the value of the prices and costs denominated in the currency of the exporting country, *i.e.*, the inflation in the exporting country. Inflation impacts the nominal value of revenues and expenses in relation to their real value.  This

---

[52] *See Remand Order* at 16.
[53] *See* section 777A(d)(2) of the Act.
[54] *See* 19 CFR 351.414(f).

change in the nominal value of the revenues and expenses over time may distort Commerce's margin calculations, which makes the assumption that the relationship between real value and nominal value remains constant through the POI or period of review (POR).  When inflation rises to the level where it is "high," Commerce finds that this assumption is no longer reasonable and must account for the potential for distortions based on the fluctuations of the nominal value of the revenues and expenses in its margin calculations.

Inflation is reported based on an index where the index measures the price level (or change in the price level) in a country based on its domestic currency relative to a given point in time.  An inflation index is normally calculated on a monthly basis.  For example, the price level may be set at 100 in January 1980, and the index then measures the change in the price level in a given month relative to January 1980.  Commerce's practice is to use the producer price index (PPI) as its measure of inflation in the margin calculations, which for Argentina, is reported by INDEC, National Directorate of Price Statistics, Directorate of Production Price Indices on a monthly basis.[55]

High inflation can distort the margin calculations whenever nominal values that are subject to inflation are aggregated across time or when nominal values from different time periods are compared.  Accordingly, Commerce's high inflation methodology holistically addresses the possible distortions of its margin calculations by resorting to a monthly analysis to account for the change in nominal values over the POI/POR.

Under the high inflation methodology, Commerce calculates a respondent's COPs based on nominal monthly expenses and replacement costs.  The respondent's costs are indexed to the last month of the averaging period, and then aggregated (*i.e.*, weighted averaged) on either a

---

[55] *See* Nexco's Letter, "Questions 2 and 3 of NEXCO S.A.'s 4th Supplemental Sections B-C Questionnaire Response," dated November 2, 2021, at Exhibit B-42 (Inflation-Adjusted Peso Variables:  PPI Source).

period-wide or quarter-wide basis, depending upon whether the cost averaging period is based on the POI/POR or is based on quarters within the POI/POR.  Then the period or quarterly weighted-average COPs are indexed to each month during the POI/POR.  These monthly indexed COPs are part of the foundation for Commerce's margin calculations, including as the basis for normal value based on constructed value,[56] as well as for adjustments to the normal value based on comparison market prices, such as the differences-in-merchandise (DIFMER) adjustment.[57]

Inflation also impacts the revenue (*i.e.*, the sales side) of a respondent's reported data and Commerce's margin calculations.  Both prices and expenses may be denominated in the domestic currency of the exporting country which is experiencing high inflation such that the nominal values are not comparable across the POI/POR.  When nominal values are compared, such comparisons are made on a monthly basis because the level of inflation (*e.g.*, the PPI) is measured on a monthly basis, and, accordingly, nominal values within each month are considered to be at a single level of inflation and comparable.  Further, when a value denominated in the inflating currency is averaged over the POI/POR (*e.g.*, for an allocated price adjustment), the nominal values must be indexed, aggregated, and then as appropriate, restated in nominal monthly values (*i.e.*, just as for the COP data).

Before Commerce in the underlying *Final Determination*, and before the Court in the litigation concerning the underlying determination, Nexco argued that Commerce cannot use its high inflation methodology "because both its U.S. sales and German sales were denominated in {U.S.} dollars."[58]  In the *Final Determination*, Commerce calculated monthly weighted-average

---

[56] *See Preliminary Determination* PDM at 23-24.
[57] *Id.* at 29.
[58] *See Remand Order* at 20.

prices that are used as the basis for the comparison of U.S. price with normal value.[59]  Nexco reasoned that Commerce does not need to account for high inflation when both the U.S. and comparison market prices are denominated in U.S. dollars, and "that Commerce improperly compared its U.S. {sale prices} with third-country {sale prices} to Germany on a monthly basis, rather than on a quarterly basis."[60]  We disagree with the proposition that the comparison of monthly average U.S. prices with normal value based on U.S. dollar-denominated comparison market prices is unreasonable or unlawful.  Nexco's simplistic argument focuses on a single aspect of Commerce's high inflation methodology, namely the comparison of "its U.S. {sale prices} with third-country {sale prices} to Germany on a monthly basis," and fails to recognize the context of Commerce's high inflation methodology to address the potential distortions in the margin calculations due to high inflation in the exporting country.

The foundation of Commerce's dumping analysis and margin calculations is the calculation of the dumping margin,[61] which is the comparison of U.S. price with normal value.[62] As discussed above, this comparison is normally either based on the comparison of a weighted-average or transaction-specific U.S. price with a weighted-average normal value.  In a market economy proceeding,[63] normal value is based first on comparison market prices,[64] or, alternatively, on constructed value, which itself is based on the COPs of the subject merchandise.[65]  Presently, the comparison of U.S. price with normal value is the same in both a

---

[59] *See Final Determination* IDM at 24.
[60] *See Remand Order* at 20.
[61] *See* section 771(35)(A) of the Act.
[62] *See* section 773(a) of the Act.
[63] In a non-market economy proceeding, prices, costs and inflation in the exporting country are found to not be reliable as a basis for normal value.  *See* section 773(c) of the Act.
[64] *See* section 773(a) of the Act.
[65] *See* sections 773(a)(4) and 773(e) of the Act.

less-than-fair-value investigation as well as a review,[66] with the exception that the averaging period for an investigation "normally will {be} for the entire period of investigation,"[67] and in a review may not exceed a month.[68]

Once Commerce determines that the high inflation methodology is warranted, whether in an investigation or a review, the basis for Commerce's margin calculations is based on a month-by-month dumping analysis.  First, the COPs are stated on a monthly, indexed basis.  Thus, the comparison of costs with prices must be on a month-by-month basis.  For example, when the dumping margin is based on a comparison of U.S. price with a normal value based on constructed value, the underlying COPs is a month-specific value, and the U.S. price can, at the most, be a monthly weighted-average U.S. price,[69] even in an investigation where the averaging period is normally the "entire period of investigation."  That use of a normal value based on constructed value normally is the result of an absence of a normal value based on weighted-average comparison market prices of identical or similar merchandise.[70]  The period of such a weighted-average normal value based on comparison market prices must be for an averaging period no greater than the period for which the COPs are defined, *i.e.*, a monthly weighted-average comparison market price.

The price-based normal value not only includes the weighted-average comparison market prices, but also adjustments to such prices[71] such as the DIFMER adjustment and other price adjustments which under the high inflation methodology are based on monthly indexed values.

---

[66] *See Antidumping Proceedings:  Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings; Final Modification*, 77 FR 8101 (February 14, 2012).
[67] *See* 19 CFR 351.414(d)(3).
[68] *See* section 777A(d)(2) of the Act ("the administering authority shall limit its averaging of prices to a period not exceeding the calendar month that corresponds most closely to the calendar month of the individual export sale.").
[69] Under the average-to-transaction method, the U.S. price would be a transaction-specific price where the normal value would be based on the indexed costs for the month of the U.S. sale.
[70] *See* sections 771(16) and 773(a) of the Act.
[71] *See* sections 773(a)(6) and (7) of the Act.

18

When the comparison market sale prices that are the basis for normal value is for merchandise which is similar to, but not identical to, the subject merchandise, then Commerce will make a DIFMER adjustment to account for the physical differences between the subject merchandise and the foreign like product.[72]  This difference is quantified as the difference in the variable cost of manufacture (VCOM) of the subject merchandise and the foreign like product.[73]  Under the high inflation methodology, the values of the VCOM, as with the COP, are monthly indexed value of either the period-wide or quarterly weighted-average VCOM.  Thus, the DIFMER adjustment is a month-specific adjustment which, because of high inflation, cannot be calculated as a difference between differing months because of the difference in the nominal, inflated, month values of VCOM.

Other price adjustments to either normal value or U.S. price may include expenses denominated in the inflating currency which are allocated over the POI/POR.  For example, in this investigation, Nexco reported [

] in pesos which were indexed to monthly price adjustment values.[74]  Under the high inflation methodology, such an allocated adjustment will be calculated similar to the calculation of the monthly indexed COPs where nominal monthly expenses will be indexed to a common point in the POI/POR, aggregated, and then indexed to each month during the POI/POR.  Such adjustments will be month-specific values that are used to adjust the comparison market or U.S. prices before the comparison of U.S. price and normal value.

Further, certain price adjustments may be based on the COPs of the sold merchandise.

---

[72] *See* section 773(a)(6)(C)(ii) of the Act.
[73] *See Preliminary Determination* PDM at 29.
[74] *Id.* at 21; *see also* Memorandum, "Preliminary Determination Margin Calculation for NEXCO S.A.," dated November 17, 2021 (Nexco Preliminary Analysis Memorandum), at 2.

For example, inventory carrying costs are an imputed expense based on the inventory value of the merchandise (*i.e.*, the monthly indexed COPs), the time in inventory, and the short-term interest rate for the respondent.  Such an adjustment also results in a month-specific value.

For normal value based on constructed value, the statute provides for the addition of selling expenses and profit "in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country."[75]  Commerce calculates these adjustments based on the respondent's sales of the foreign like product in the comparison market in the ordinary course of trade.[76]  Under the high inflation methodology, these calculations may include expenses denominated in the inflating currency which must be indexed before aggregation and allocated based on the COPs, which themselves must be indexed.[77]  Further, profit is dependent on the COPs, which also is indexed.[78]  Thus, selling expenses and profit adjustments for constructed value are month-specific values.

Further, with the exception of the DIFMER adjustment, certain adjustments that are made to the price-based normal value may also be applicable to the calculation of the normal value based on constructed value.[79]  Under the high inflation methodology, such adjustments may also be impacted by high inflation and be made on a monthly basis as with the calculation of the price-based normal value.

Lastly, as discussed above, though not directly relevant to an investigation, the same considerations must be accounted for in an administrative review despite the averaging period for prices being limited to no more than one calendar month.[80]  In a review, the monthly

---

[75] *See* section 773(e)(2)(A) of the Act.
[76] *See Preliminary Determination* PDM at 29; *see also* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. 1 (1994), at 839-40.
[77] *See* Nexco Preliminary Analysis Memorandum at 2.
[78] *See Preliminary Determination* PDM at 21, 23-24.
[79] *See* section 773(a)(8) of the Act.
[80] *See* section 777A(d)(2) of the Act.

weighted-average normal value, either based on comparison market prices or constructed value, must be contemporaneous with the monthly weighted-average or transaction-specific U.S. price.[81]  Under normal circumstances, the contemporaneous window includes three months before the month of the U.S. sale(s) and two months after the month of the U.S. sale(s) (*i.e.*, the 90/60 day window).  Under the shorter cost-period methodology, contemporaneity is limited by each quarter during the POI/POR, *i.e.*, the 90/60 day window is circumscribed within each quarter.[82]  Under the high inflation methodology, contemporaneity is limited to the month of the U.S. sale(s), *i.e.*, no 90/60 day window.[83]  Although this is not applicable to the instant *Final Determination*, it further demonstrates the wide-ranging and consistent implications of both the shorter cost-period methodology and the high inflation methodology and the limiting of the comparison of U.S. price with normal value.

We find that Nexco's argument—that Commerce must rely on quarterly average prices as the basis for normal value because the comparison market prices are not denominated in the inflating currency—fails to recognize the interrelationships of the margin calculations, the potential distortions which are addressed by high inflation, and the holistic approach of Commerce's high inflation methodology.  The high inflation methodology requires that the dumping analysis be reduced to a month-to-month analysis because of the change in the level of

---

[81] *See* 19 CFR 351.414(f).

[82] *See Circular Welded Carbon-Quality Steel Pipe from the Sultanate of Oman:  Final Results of Antidumping Duty Administrative Reviews; Deferred 2019-2020 Period and Concurrent 2020-2021 Period*, 88 FR 39227 (June 15, 2023), and accompanying IDM at 5-10.

[83] *See, e.g.*, *Circular Welded Carbon Steel Standard Pipe and Tube Products from Turkey:  Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2020–2021*, 87 FR 34242 (June 6, 2022), and accompanying PDM at 10 ("Because Turkey's economy experienced high inflation (*i.e.*, above 25 percent) during the POR, it is Commerce's practice to limit our comparisons of U.S. sale prices to {normal value} during the same month in which the U.S. sale occurred.  This methodology minimizes the extent to which calculated dumping margins may be overstated or understated due solely to inflation in the Turkish market." (internal citation omitted)), unchanged in *Circular Welded Carbon Steel Standard Pipe and Tube Products from Turkey:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020–2021*, 87 FR 75596 (December 9, 2022).

inflation in the exporting country as measured on a month-by-month basis, even in an investigation where 19 CFR 351.414(d)(3) states that "the Secretary normally will calculate weighted averages for the entire period of investigation."

For these reasons, we do not agree that, to use shorter averaging periods for U.S. and comparison market prices, Commerce must make a finding that either normal values, export prices, or constructed export prices differ significantly over the course of the POI pursuant to 19 CFR 351.414(d)(3). Although the regulations provide that Commerce "may calculate weighted averages for such shorter periods," the regulations do not stipulate that this is the *only* scenario in which Commerce may use shorter averaging periods for comparison market or U.S. prices. Indeed, as the *Remand Order* acknowledges, the "statute does not specify during what time period normal value and export price should be averaged for the purposes of comparison."[84] Further, the regulations state that Commerce "*normally* will calculate weighted averages for the entire period of investigation{.}"[85] Therefore, we do not interpret the regulations to strictly circumscribe the situations in which Commerce may resort to shorter averaging periods, but rather to provide Commerce's general approach. Here, we find that the use of the high inflation methodology and use of corresponding monthly indexed costs, including other aspects of the high inflation methodology where the margin calculations are based on the month-to-month inflation indices, provide an accurate and consistent basis upon which to use shorter averaging periods for prices as well, for the reasons outlined above.

Nevertheless, the *Remand Order* states that "Commerce's discretion to choose averaging periods for price comparisons is circumscribed by regulation,"[86] and further that "it is not

---

[84] *See Remand Order* at 20.
[85] *See* 19 CFR 351.414(d)(3) (emphasis added).
[86] *See Remand Order* at 21.

reasonably discernable from Commerce's explanation why a shorter averaging period would be appropriate pursuant to 19 CFR 351.414(d)(3)."[87]  For the reasons explained above, Commerce finds that the regulations do not strictly circumscribe the situations in which Commerce may resort to shorter averaging periods for prices; rather, the regulations provide guidance on Commerce's general approach.  However, because the Court has directed us to address 19 CFR 351.414(d)(3), we are doing so here.  Therefore, to comply with the *Remand Order*, we find that both normal values based on comparison market prices and U.S. prices differed significantly in this proceeding over the course of the POI.  Specifically, as previously explained, Nexco's sale prices correlate with changes in Nexco's cost of manufacturing,[88] which the *Remand Order* acknowledges were impacted by high peso inflation.[89]  The *Remand Order* notes that, although Commerce "discusses how Nexco's costs and prices were 'reasonably linked' during the POI, {Commerce} stops short of asserting that Nexco's prices increased significantly."[90]  Here, based on our analysis that "there is a correlation between changing costs and final net sale prices,"[91] combined with the significant cost changes due to high peso inflation, we conclude that Nexco's sale prices, in both the U.S. and comparison markets, differed significantly during the POI.  Moreover, we find that an examination of Nexco's sale prices themselves also demonstrates that such prices differed significantly during the POI,[92] and further supports our finding that using shorter averaging periods for prices are appropriate.

---

[87] *Id.* at 24-25.
[88] *See Final Determination* IDM at 27.
[89] *See Remand Order* at 22 ("If Nexco's sales to Germany had been denominated in Argentine pesos, it is evident that Nexco's normal value prices would change significantly as a result of high peso inflation, which Commerce found existed during the POI.").
[90] *See Remand Order* at 24, n.15.
[91] *See Final Determination* IDM at 27.
[92] *See* Nexco's Letter, "NEXCO S.A.'s Supplemental Section D Questionnaire Response," dated October 12, 2021, at 41 and Exhibit D-41-3 (Nexco's response to question 18(b)).

## VI.    INTERESTED PARTIES' COMMENTS ON THE DRAFT REDETERMINATION

On September 14, 2023, Commerce released the Draft Redetermination and invited

interested parties to comment on the Draft Redetermination.  On September 26, 2023, the

petitioners and Nexco each submitted comments regarding the Draft Redetermination.

**Comment 1:  The Use of Acquisition Costs in the Calculation of COP**

*Nexco's Comments*[93]

- Commerce's Draft Redetermination fails to appropriately respond to the Court's instructions to explain why acquisition costs, which are two to three times higher than the beekeepers' COPs, are not overinclusive of the actual COP of producing raw honey.
- Commerce attempts to characterize the verified beekeeper data as a mere "spot-check," yet this spot-check was the sole basis for Commerce's conclusion that the acquisition prices are a good surrogate for the beekeepers' costs.  However, the beekeeper data that Commerce verified and found reliable show that Nexco's acquisition costs significantly overstate the actual COP of the honey Nexco exports.
- Commerce concludes that using Nexco's acquisition costs is reasonable because Nexco has no knowledge of the beekeepers' costs when setting its prices for the exported honey. However, whether a respondent has knowledge of its suppliers' actual costs has never been suggested in any prior case as a rationale for whether to obtain supplier costs. Rather, Commerce has repeatedly rejected acquisition costs stating that its policy is to use the costs of the growers or gatherers of the product.[94]
- Acquisition costs include profit, which is not a statutory element of the cost of production.  Rather, profit is only added to the costs for constructed value because Commerce is constructing a price, not a cost.  Thus, Commerce wholly fails to demonstrate that the use of acquisition costs is not overinclusive of the actual COP of producing raw honey.

*Petitioners' Comments*[95]

- The statute grants Commerce the exclusive authority to select averages and statistically valid samples,[96] however, the beekeepers selected by Commerce are not a statistically valid sample.  Not only were the beekeepers not randomly selected, but they were selected at one end of the spectrum, *e.g.*, those having the "lowest sales prices" and, therefore, the beekeepers that likely have the lowest COPs.[97]
- Commerce has the discretion to consider only the costs of the price-setter (*i.e.*, the exporter).  According to the SAA, "{t}he purpose of section 771(28), which is consistent

---

[93] *See* Nexco's Comments at 1-5.
[94] *Id.* at 4 (citing *Canadian Tomatoes LTFV, Norwegian Salmon LTFV, and Argentine Honey LTFV*).
[95] *See* Petitioners' Comments at 2-6.
[96] *Id.* at 2 (citing section 777A(b) of the Act).
[97] *See* Petitioners' Comments at 3 (citing *Final Determination* and accompanying IDM).

with current Commerce practice, is to clarify that where different firms perform the production and selling functions, Commerce may include the costs, expenses, and profits of each firm in calculating cost of production and constructed value."[98]  In using the term "may," Congress intended Commerce to have discretion regarding how far beyond the exporter it will examine.  In this case, Commerce's use of the costs from Nexco's normal books and records directly flows from its statutory authority to examine the costs of the exporter of the subject merchandise.

- Commerce's use of acquisition costs complies with its statutory obligation to avoid imposing an unreasonable burden on respondents.[99]  In fact, Nexco invoked this section of the statute when it filed a notice of difficulty offering acquisition costs as a reasonable and verifiable alternative to obtaining cost data from its hundreds of beekeeper suppliers.[100]  As a result, Commerce did not attempt to obtain a representative sample, but rather significantly curtailed its beekeeper cost solicitation to merely confirm the reasonableness of the alternative form suggested by Nexco.  Accordingly, Commerce's use of Nexco's suggested alternative (acquisition costs) to avoid imposing an unreasonable burden on respondents is justified under the statute.

**Commerce's Position**:

We disagree with Nexco's contention that our Draft Redetermination is not responsive to the Court's remand instruction.  The Court questions whether using Nexco's acquisition costs overstates the COP of the honey that Nexco exported.  In our consideration of this question, we looked to the statute's intent for obtaining the costs from an unaffiliated producer-supplier to the exporter-respondent.  While Nexco correctly observes that Commerce has previously rejected the use of acquisition costs between such parties, we find the underlying statutory concern of this pursuit is to ensure that all elements of cost are captured.[101]  Section 771(28) of the Act defines "exporter or producer" as the exporter, the producer, or both where appropriate, and that for purposes of section 773, both the exporter and the producer are included "to the extent necessary to accurately calculate the total amount incurred and realized for costs, expenses, and profits in connection with the production and sale of the merchandise."  The SAA clarifies that where

---

[98] *Id.* at 4 (citing Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, vol. 1 (1994) (SAA) at 835).
[99] *Id.* at 5 (citing section 782(c)(1) of the Act).
[100] *Id.* (citing Nexco's July 16, 2021 Letter).
[101] *See* section 771(28) of the Act.

different firms perform the production and selling functions, Commerce may include the costs, expenses, and profits of each firm.[102]

Further, Commerce has also stated that "{i}f acquisition costs do not capture all of the actual costs of the manufacturer supplying the {subject merchandise} to the reseller, they are not an appropriate basis for the calculation of CV and … the use of such acquisition costs would distort the reseller's dumping margin due to the missing elements of cost."[103]  Thus, the concern is whether all costs have been captured.  The statute is not concerned with reducing the actual acquisition costs paid by the exporter to exclude the profits of an unaffiliated producer.  To the contrary, the SAA explains that for purposes of section 773 of the Act, Commerce may include the costs, expenses, and *profits* of each firm, *i.e.*, the exporter and the producer.[104]

Further, as noted by the petitioners, in using the term "may" when explaining section 771(28) of the Act, Congress intended Commerce to have discretion regarding how far beyond the exporter it will examine.  Indeed, the courts have stated that "the statute does not mandate that Commerce must use actual cost data."[105]  Moreover, the acquisition costs are the price-setter's or exporter's actual costs.  Thus, to the extent that costs are a factor in Nexco's pricing decisions, it would be the acquisition costs and not the beekeepers' costs that Nexco considers.  Contrary to Nexco's assertions, this is not a new criterion for whether Commerce must request costs from unaffiliated producers, but merely an observation.  Hence, we do not find that using Nexco's own costs to calculate the COP of the honey that Nexco sold and exported unreasonably overstates COP of that honey.

---

[102] *See* SAA at 835.
[103] *See Ball Bearings and Parts Thereof from France, Germany, Italy, Japan, Singapore, and the United Kingdom: Final Results of Antidumping duty Administrative Reviews and Rescission of Review in Part,* 72 FR 58053 (October 12, 2007), and accompanying IDM at Comment 6.
[104] *See* SAA at 835 (emphasis added).
[105] *See SKF USA Inc v. US,* 630 F3.d 1365, 1371 (Fed. Cir. 2011).

In fact, as petitioners point out, in the initial stages of this investigation, the Government of Argentina (GOA) and respondents notified Commerce of difficulties in responding to the questionnaires and repeatedly urged Commerce to use their acquisition costs as an alternative to actual cost data from the beekeepers.[106]  Commerce found that due to the vast number of producers supplying the respondents in this case, the alternatives offered by the statute, *i.e.*, a statistically valid sample or selecting the producers supplying the largest volume of honey,[107] were not feasible since they still would have resulted in an unmanageable number of beekeeper respondents.  Thus, we determined to rely on the alternative form initially suggested by Nexco, *i.e.*, acquisition costs, but with a limited testing of beekeeper costs to satisfy the statute's concern that there were no missing costs.[108]  Nevertheless, this significantly curtailed and purposeful selection of two beekeepers neither reflects a statistically valid sample (*e.g.*, stratified, random or systematic sampling) nor covers a meaningful percentage of the population of beekeeper-suppliers to Nexco.  Moreover, we selected those specific beekeepers due to their lower prices to Nexco.[109]  In fact, because Commerce intentionally selected specific beekeepers due to their lower prices to Nexco, it is not surprising that the Nexco's acquisition costs exceeded the beekeeper's costs.  Moreover, this methodology, which ultimately relied on the exporter's acquisition costs in place of beekeeper COPs after limited testing of selected beekeeper costs, was upheld in a recent CIT decision.[110]  This decision addressed the *AD Investigation of Raw*

---

[106] *See* Nexco's Letter, "NEXCO's Notification of Reporting Difficulty – June 10, 2021 Request for Information," dated June 15, 2021, at 4; *see* Nexco's Letter, "NEXCO's Response to June 10, 2021 Request for Information," dated June 17, 2021, at 3; *see* Nexco's Letter, "Notification of Reporting Difficulty – Initial Antidumping Duty Questionnaire Response," dated July 15, 2021, at 2; *see also* Asociación de Cooperativas Argentinas C.L and Nexco's Letter, " Asociación de Cooperativas Argentinas C.L. and NEXCO S.A.'s Response to Request for Comments on Cost of Production Reporting Methodology," dated July 29, 2021, at 2; *see* GOA's Letter, "Comments on the Raw Honey Cost of Production Reporting Methodology," dated July 29, 2021, at 1.
[107] *See* section 777A(c)(2)(A) and (B) of the Act.
[108] *See Final Determination* IDM at Comment 1 and *Preliminary Determination* PDM at 26.
[109] *Id.*
[110] *See American Honey Producers Ass'n v. United States*, Slip Op. 23-128, (CIT Sept. 1, 2023).

*Honey from India*, in which Commerce similarly obtained beekeeper cost information from honey producers that were most likely to be selling below cost merely as a test and, based on that test work, Commerce found reliance on the exporter's acquisition costs did not result in missing costs.[111]  Now, Nexco argues for the use of these limited but advantageous beekeeper costs. However, had we selected beekeepers under a statistically valid sampling method or with the intent of obtaining costs that reflect a representative sample from the largest beekeepers, the number of beekeepers responses required would have been vastly different.   Moreover, as explained in the draft redetermination, the *Remand Order* also acknowledges Commerce's explanation "that due to the small size and irregular accounting of even the largest beekeepers in Argentina, it was not possible to take a representative sample."[112]  Therefore, we do not find that the limited sample of beekeeper-supplier costs establishes that all beekeeper-supplier costs are necessarily "much lower" than Nexco's acquisition costs.  The pertinent cost data is what Nexco recorded in its own books and records, *i.e.*, the acquisition costs.  Because Nexco sets the prices to the comparison and U.S. markets, we find that using Nexco's own COPs (or constructed values) for those sales is reasonable and does not overstate the costs of the products that were sold by Nexco.  Therefore, we continue to find that using the raw honey acquisition costs in the calculation of Nexco's COP for the raw honey sold to the United States is not overinclusive of costs from the perspective of the company responsible for setting the U.S. price.  Based on the foregoing, we have continued to rely on Nexco's acquisition costs in the calculation of the COP of the honey that Nexco exported.  Our limited test work of beekeeper costs satisfies the statute's

---

[111] *Id*. at 17 ("Commerce reasoned "that these were the suppliers with the highest risk to be selling at below their COP…and were actual supplies to the exporter-respondents" and, thus, "Commerce could reasonably determine that reliance on acquisition costs would not result in missing costs…" citing *Raw Honey from India:  Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances,* 87 FR 22188 (April 14, 2022)*,* and accompanying IDM at 26)).
[112] *See Remand Order* at 12.

concern that the unaffiliated producers who supplied the exporter respondent were not

contributing to the dumping of merchandise in the United States by selling below their own

costs.  Thus, we have found no evidence that our cost calculations have resulted in any missing

elements of cost.  Finally, because the acquisition costs represent what the exporter actually paid

for the honey that it sold, we do not find that it results in an unreasonable or overstated COP for

the honey that Nexco exported.

**Comment 2:  Monthly Averaging Periods for U.S. and Comparison Market Prices**

*Nexco's Comments*:

- Commerce's explanations in the Draft Redetermination simply repeat its prior arguments
  which the Court has already rejected.  The Court has already rejected Commerce's
  reliance on its past precedents for using monthly averaging periods, and the impact of
  inflation on Nexco's COP, support the use of monthly price averaging.[113]
- Commerce "ruminates" that its high inflation methodology "'holistically addresses' … a
  number of theoretical concerns and hypothetical scenarios" but does not explain how
  these issues are relevant to this investigation where both the U.S. and comparison market
  prices are denominated in U.S. dollars and not the inflating Argentine pesos.[114]
- Commerce's explanation that inflation involves changes in the nominal, rather than real,
  values of prices or costs stated in a particular currency is irrelevant, since "the prices at
  issue are not 'nominal values' but real values, denominated in a non-inflationary
  currency."[115]  Thus, the explanation fails to support the use of monthly averaging in this
  investigation.
- Commerce also argues that because costs are impacted by high inflation, and Nexco's
  sale prices correlate with costs incurred in pesos, that "Nexco's prices were also impacted
  by inflation and thus 'differ significantly' during the POI."[116]  Commerce's argument
  fails on two accounts.
  - First, Commerce, as part of its quarterly cost methodology, "is concerned with
    *real* not nominal, price changes."[117]  The changes in costs between quarters was
    measured after "re-stating those costs on a constant currency basis."[118]
    Accordingly, such costs were not costs "affected by high inflation" as asserted by
    Commerce, and, "Consequently, {Commerce's} invocation of the effect of
    inflation on peso-denominated costs does not support its use of shorter averaging

---

[113] *See* Nexco's Comments at 5.
[114] *Id.* at 6.
[115] *Id.*
[116] *Id.*  (citing 19 CFR 351.414(d)(3)).
[117] *Id.* at 6-7 (emphasis in original).
[118] *Id.* at 7 (internal citation omitted).

periods for dollar-denominated prices."[119]

- o Second, Commerce "fails to explain how any correlation between movements in prices and costs is relevant to determining whether prices 'differ significantly'…"[120]  "Nowhere does {Commerce} explain how such above-cost dollar-denominated sales prices are impacted by peso inflation."[121]

*Petitioners' Comments*:

- In the Draft Redetermination, Commerce's analysis was based on the change of U.S. and German prices denominated in Argentine pesos.[122]  Commerce should refer additionally to record evidence showing that Nexco's German and U.S. prices changed significantly over the period of investigation when denominated in U.S. dollars.[123]
- In *Union Steel*, "the CIT upheld {Commerce's} practice to match U.S. sales {prices} to normal value using the same shorter time periods that {Commerce} uses to match comparison market sales to costs."[124]  "While *Union Steel* addressed {Commerce's} quarterly cost-averaging methodology, not its high inflation methodology, the same principle should apply in high inflation circumstances."[125]
- Regardless of the market or currency, "Nexco earns sales revenue, and Nexco has to return that sales revenue to Argentina and convert it into Argentine pesos in order to recoup its inflation-driven, {peso}-denominated costs."[126]  "Nexco's denominating its selling prices in {U.S. dollars} does not immunize those prices from inflationary pressures because the devaluation of the {peso} with respect to the {U.S. dollar} did not keep pace with Argentine inflation."[127]  The petitioners' analysis shows that "the effect of high inflation on a company's costs puts inflationary pressure on its selling prices, even when those selling prices are denominated in {U.S. dollars}."[128]  This is confirmed because Commerce found "that Nexco's costs are 'reasonably linked' with its selling prices."[129]  "Finally, Petitioners also submitted regressions showing that Nexco's U.S. dollar-denominated selling prices were driven by Argentine inflation."[130]

---

[119] *Id.*
[120] *Id.*
[121] *Id.*
[122] *See* Petitioners' Comments at 7 (internal citations omitted).
[123] *Id.* at 7-8 (internal citations omitted).
[124] *Id.* at 8 (citing *Union Steel Manufacturing Company, Ltd. v. United State*, 190 F. Supp. 3d 1326, 1339-41 (CIT 2016) (*Union Steel*).)
[125] *Id*. at 8-9.
[126] *Id.* at 9 (internal citations omitted).
[127] *Id.* at 9-10.
[128] *Id.* at 10 (referencing analysis in Petitioners' Letter, "Petitioners' Rebuttal Brief," dated (January 31, 2022) (Petitioners' Rebuttal Brief)).
[129] *Id.* (internal citations omitted).
[130] *Id*. (internal citation omitted).

- In *Turkey Rebar*[131] and *Turkey CRS*,[132] Commerce applied its standard high inflation methodology of using monthly price averaging periods for both U.S. prices and normal values where the comparison market sale prices were denominated in U.S. dollars.
- Commerce should continue to reject the idea that selling prices would only be impacted when such prices are denominated in the domestic currency. Specifically, "an Argentine company's U.S. dollar-denominated selling prices would face inflationary pressures from the company's {peso}-denominated costs, and there is plenty of record evidence establishing that this was the case with Nexco's selling prices."[133]

**Commerce's Position:**

Commerce disagrees with Nexco that it has simply recycled its prior arguments to support its use of monthly averaging periods for U.S. prices and for normal values based on comparison market prices. In the Draft Redetermination, Commerce walked through its margin calculations, and, specifically, explained how in an investigation,[134] the averaging period for U.S. prices and normal value is limited by the time period for which the respondent's COPs are determined.[135] Under Commerce's high inflation methodology, COPs are calculated as monthly indexed COPs, and, accordingly, Commerce finds that it is necessary to limit the averaging period of prices to each month. Nexco's only response was to argue that Commerce did not "explain how these ruminations are relevant to the issue presented in this case: price-to-price dumping margin calculations" when the prices in both U.S. and comparison market prices are denominated in U.S. dollars.[136] However, Commerce did explain that monthly weighted-average prices are warranted when COPs are quantified on a monthly basis, irrespective of the currency

---

[131] *Id.* at 11 (citing *Certain Steel Concrete Reinforcing Bars from Turkey; Preliminary Results of Antidumping Duty Administrative Review*, 66 FR 22525, 22527 (May 4, 2001), unchanged in *Certain Steel Concrete Reinforcing Bars from Turkey; Final Results of Antidumping Duty Administrative Review*, 66 FR 56274 (November 7, 2001), and accompanying IDM at Comment 4 (*Turkey Rebar*).

[132] *Id.* at 12 (citing *Notice of Preliminary Determination of Sales at Less Than Fair Value; Certain Cold-Rolled Carbon Steel Flat Products from Turkey*, 67 FR 31264, 31265 (May 9, 2002), unchanged in *Notice of Final Determination of Sales at Less Than Fair Value; Certain Cold-Rolled Carbon Steel Flat Products from Turkey*, 67 FR 62126 (October 3, 2002), and accompanying IDM at Comment 2 (*Turkey CRS*)).

[133] *Id.* at 11.

[134] In a review, the statute limits the averaging period of prices to no longer than a calendar month. *See* section 777A(d)(2) of the Act.

[135] *See* Draft Redetermination at 13-21.

[136] *See* Nexco's Comments at 6.

in which the prices are denominated, and Nexco did not challenge this or substantially rebut this conclusion.

In the absence of using monthly price averaging periods, Nexco did not provide an alternative to address the distortions that potentially impact Commerce's margin calculations. However, as the Court noted in its *Remand Order*, Nexco argued before the Court that "Commerce improperly compared its U.S. sales with third-country sales to Germany on a monthly basis, rather than a quarterly basis."[137]  As such, Nexco's own position on whether Commerce has satisfied 19 CFR 351.414(d)(3) is inconsistent with its arguments before the Court.  Both quarterly and monthly averaging periods are shorter than the "normally" used POI averaging period of an investigation.  When Commerce uses quarterly cost averaging periods, the normal POI price averaging period is shortened to quarterly periods.  When Commerce uses the high inflation methodology, the normal POI price averaging period is shortened to monthly periods.  In this investigation, Commerce used both quarterly cost averaging periods and the high inflation methodology, and, instead of using the normal POI price averaging periods, before the court Nexco argued that Commerce should use quarterly rather than monthly price averaging periods.[138]  As Commerce uses both the shorter cost period methodology and the high inflation methodology in this investigation, monthly price averaging periods are warranted.

To the extent that 19 CFR 351.414(d)(3) may limit Commerce's authority to use shorter price averaging periods as held by the CIT,[139] the record evidence does demonstrate that prices differed over the POI.  Nexco's argument is unpersuasive that the prices and costs used in the shorter cost period analysis (*i.e.*, exhibit D-41) are "*real,* not nominal."[140]  First, costs are

---

[137] *See Remand Order* at 20 (internal citation omitted).
[138] *Id.* at 20 (internal citation omitted).
[139] *Id.* At 21-22.
[140] *See* Nexco's Comments at 6-7 (emphasis in original).

indexed and therefore in real terms, but changes in costs are not at issue.  Second, the prices in

exhibit D-41 are not indexed, and, therefore, are nominal values in pesos.  Only the change in

prices is required to address 19 CFR 351.414(d)(3).  Further, as noted by the petitioners, the U.S.

dollar gross unit prices that Nexco reported also differ over the POI, [

].[141]  For

example, Nexco's product with the largest sales volume sold in the U.S. market saw an

[                                                                                  ] over the

POI,[142] while Nexco's product with the largest sales volume sold in the comparison market saw

an [                                                                                  ] over the

POI.[143]  Commerce's own analysis in the *Final Determination* also reflects this trend with

respect to the monthly comparison market prices used in the calculation of normal value.[144]

Commerce agrees with the petitioners that *Union Steel* supports the use of shorter price

averaging periods when either quarter cost averaging periods or the high inflation methodology

is used in an investigation.  In response to arguments from respondents that Commerce

impermissibly departed from the hierarchy principle embodied in 19 CFR 351.414(e)(2)

(2010),[145] the Court explained that Commerce adopted the hierarchy principle as an exercise of

its rulemaking discretion in promulgating 19 CFR 351.414(e)(2) (2010), and had included the

word "normally" in the text of the regulation.[146]  The Court held that in doing so, "Commerce

---

[141] *See* Petitioners' Comments at 7-8 (citing Petitioners' Letter, "Petitioners' Case Brief," dated January 14, 2022 (Petitioners' Case Brief) at Attachment 2).
[142] *Id.* at .pdf page 103.
[143] *Id.* at .pdf page 108.
[144] *See* Memorandum, "Final Determination, NEXCO S.A.," dated April 7, 2022 at Attachment 1 (comparison market output, pages 74-76).
[145] *See* 19 CFR 351.414(e)(2) (2010) is now 19 CFR 351.414(f) (2012), but the relevant language remained unchanged ("Contemporaneous Month.  Normally, the Secretary will select as the contemporaneous month the first of the following months which applies …").
[146] *See Union Steel*, 190 F.Supp. at 1340.

has reserved for itself the discretion as to whether or not to depart from that principle."[147]

Similarly, 19 CFR 351.414(d)(3) provides that "{w}hen applying the average-to-average method

in an investigation, the Secretary normally will calculate weighted averages for the entire period

of investigation."  Here, Commerce has likewise used its discretion and explained why it is

necessary to depart from applying a POI price-averaging period, and instead use a monthly price-

averaging period when the high inflation methodology is applied.  In this investigation,

Commerce reasonably found that costs may be defined by month rather than by the entire period

because of the presence of high inflation in the domestic market, similar to the situation in *Union*

*Steel* where Commerce found the costs may be defined by quarter.  The Court found that "it was

reasonable for Commerce to regard changing production costs, as generally reflected in prices, to

relate to the question of the timing, *i.e.*, the contemporaneity, of price-to-price comparisons

between U.S. and home market sales."[148]  The Court agreed that cost averaging period, *i.e.*,

quarters in *Union Steel*, reasonably limited the period of contemporaneity for the comparison of

U.S. price with normal value.  Namely, the Court held:

> In the context of comparing normal value to U.S. price, as a matter of consistency
> Commerce permissibly preferred that U.S. sales occurring in an established quarter
> of the POR be compared with a sale or sales of the foreign like product occurring
> in that same quarter.[149]

In this investigation, where the costs are defined as monthly values, Commerce reasonably limits

the contemporaneity period to that same calendar month, which necessitates monthly price

---

[147] *Id.* 190 F.Supp. at 1340-1 (wherein the Court explained it would be substituting its own judgement for that of the agency if it were to accept abstract objections to the Department's methodological choice of comparison period. Further "because Commerce must be allowed discretion in its choice of methodology, the question posed by its choice is not whether a reviewing court, were it to exercise its own judgment as to what would be an ideal approach for shortening the comparison window and thereby departing from the normal procedure of *§ 351.414(e)(2)*, would have preferred Commerce to have used a different method. Instead, the question is whether Commerce has acted within its discretion in making that methodological choice and. . . has provided a rational explanation for it.").
[148] *Id.* 190 F.Supp. at 1340.
[149] *Id*. 190 F.Supp. at 1341.

averaging periods.

Commerce agrees with the petitioners that high inflation impacts the margin calculations even when the invoiced sale prices are not denominated in the respondent's domestic currency. Not only are there many interconnections within the margin calculations, as described in the Draft Redetermination, which impact how prices may be treated in the high inflation methodology, but also the respondent's own recordkeeping will be impacted by high inflation. Nexco maintains its books and records in Argentine pesos, which is subject to the domestic high inflation.[150]  Nexco's production costs would be subject to this inflation which would impact Nexco's pricing decisions, no matter in which currency the sale price is denominated.  Further, when the sale revenue is realized by Nexco, that amount must be converted back into pesos for Nexco's books and records.[151]  Indeed, as the petitioners demonstrate by example using 2020 exchange rates, the conversion of the sale revenue denominated in other currencies does not compensate for the inflation in the Argentine market because the change in the Argentine peso – U.S. dollar exchange rate did not keep pace with Argentine inflation.[152]  Therefore, Commerce concludes that high inflation impacts all of Nexco's business operations, including the setting of prices in U.S. dollars, because Nexco's books and records are based on the Argentine peso, which experienced high inflation over the POR.

---

[150] See, e.g., Nexco's Letter, "NEXCO S.A.'s Sections B-D Questionnaire Response," dated August 25, 2021 (Nexco B-D Response) at D-29 through D-31 and Exhibit D-12 (cost reconciliation).
[151] Id. at B-30, C-28 (describing how NEXCO has to convert the USD-denominated sales revenue it earns from selling in Germany and the United States into pesos).
[152] See Petitioners' Comments at 10 (citing Petitioners' Rebuttal Brief at 52-54 and Att. 1).

## V.      FINAL RESULTS OF REDETERMINATION

Pursuant to the Court's *Remand Order*, and based on the above analysis, Commerce has

made no changes to NEXCO's weighted-average dumping margin.  Accordingly, the weighted-

average dumping margin for NEXCO is 9.17 percent *ad valorem*.

10/13/2023

X   
_____

Signed by: LISA WANG

Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance