**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE**

| | |
|---|---|
| NEXCO S.A., )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES, )<br><br>Defendant, )<br><br>AMERICAN HONEY PRODUCERS )<br>ASSOCIATION AND SIOUX HONEY )<br>ASSOCIATION, )<br><br>Defendant-Intervenors. ) | Court No. 22-00203 |

**PLAINTIFF NEXCO S.A.'S COMMENTS ON
COMMERCE'S REMAND REDETERMINATION**

Julie C. Mendoza
Donald B. Cameron
R. Will Planert
Brady W. Mills
Mary S. Hodgins
Eugene Degnan
Jordan L. Fleischer
Nicholas C. Duffey
Stephen A. Morrison

November 13, 2023

**MORRIS, MANNING & MARTIN, LLP**
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005
(202) 216-4817

*Counsel to Plaintiff NEXCO S.A.*

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

    A.  Commerce's Redetermination Fails To Demonstrate That Nexco's Acquisition Prices Are A Reasonable Proxy For The Cost of Production Of Raw Honey ..................................... 2

        1.  Commerce Has Improperly Shifted Its Analysis from Beekeeper COP to Nexco's COP ..................................................................................................................... 4

        2.  Commerce Has Again Failed To Take Into Account The Record Evidence Showing That Beekeeper Costs Are Substantially Below Acquisition Prices............................ 9

    B.  The Redetermination Again Fails to Support The Use of Monthly Averaging Periods For U.S. And Third Country Sales Denominated In U.S. Dollars .......................................... 12

        1.  Commerce's Regulation on Price Averaging Periods Circumscribes Its Authority To Deviate From Its Normal Practice of Using Full POI Averages ................................ 14

        2.  Commerce's Hyperinflationary Methodology Does Not Justify Shorter Averaging Periods When The Prices Used to Determine Normal Value Are In U.S. Dollars..... 15

        3.  The Remaining Arguments Offered By Commerce Likewise Fail To Support That Prices Differed Significantly Within The Meaning of 19 C.F.R. § 351.414(d)(3)..... 19

II.  CONCLUSION................................................................................................... 26

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Nexco S.A. v. United States*,
639 F. Supp. 3d 1312 (Ct. Int'l Trade June 7, 2023) ...................................... *passim*

*SKF USA Inc. v. United States*,
630 F.3d 1365 (Fed. Cir. 2011)...........................................................................8

*Union Steel v. United States*,
190 F. Supp. 3d 1326 (Ct. Int'l Trade 2016) ................................................20, 21

**Statutes**

19 U.S.C. § 1677(16) ...........................................................................................3

19 U.S.C. § 1677(28) ...........................................................................................7

19 U.S.C. § 1677b...................................................................................3, 8, 9, 22

**Regulations**

19 C.F.R. § 351.414(d)(3)............................................................................ *passim*

19 C.F.R. § 351.414(e)(2)...................................................................................21

19 C.F.R. § 351.414(f)........................................................................................21

**Other Authorities**

*Antidumping Proceedings: Calculation of the Weighted-Average Dumping
Margin and Assessment Rate in Certain Antidumping Duty Proceedings;
Final Modification*, 77 Fed. Reg. 8,101 (Dep't Commerce Feb. 14, 2012) ...........................21

*Carbon and Certain Alloy Steel Wire Rod from Mexico: Notice of Final Results of
Antidumping Duty Administrative Review*, 73 Fed. Reg. 13,532 (Dep't
Commerce Mar. 13, 2008) ...........................................................................................18

*Certain Carbon and Alloy Steel Cut-To-Length Plate From Belgium: Final
Determination of Sales at Less Than Fair Value and Final Determination of
Critical Circumstances, in Part*, 82 Fed. Reg. 16,378 (Dep't Commerce Apr.
4, 2017) ...........................................................................................................................18

*Citric Acid and Certain Citrate Salts From Canada: Preliminary Results of
Antidumping Duty Admin. Review*, 76 Fed. Reg. 5,782, (Dep't Commerce,
Feb. 2, 2011) ................................................................................................................19

*Final Determination of Sales at Less than Fair Value: Fresh and Chilled Atlantic Salmon from Norway*, 56 Fed. Reg. 7,661, (Dep't Commerce Feb. 25, 1991)..........................7

*Final Determination of Sales at Less than Fair Value: Greenhouse Tomatoes from Canada*, 67 Fed. Reg. 8,781 (Dep't Commerce Feb 26, 2002)....................................6-7

*Notice of Final Determination of Sales at Less Than Fair Value; Honey From Argentina*, 66 Fed. Reg. 50,611 (Dep't Commerce Oct. 4, 2001).............................................7

*Notice of Final Determination of Sales at Less Than Fair Value: Live Swine From Canada*, 70 Fed. Reg. 12,181 (Dep't Commerce Mar. 11, 2005) ..........................................24

*Notice of Final Determination of Sales at Less Than Fair Value: Polyvinyl Alcohol from Taiwan*, 61 Fed. Reg. 14,064, 14,069 (Dep't Commerce Mar. 29, 1996) ...............................................................................................................23

Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, reprinted at 1994 U.S.C.C.A.N. 4040 ......................7,8

*Welded Carbon Steel Standard Pipe and Tube Products From Turkey: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015–2016*, 82 Fed. Reg. 49,179 (Dep't Commerce Oct. 24, 2017) ...............................................................................................................................18

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE**

|  |  |  |
|---|---|---|
| NEXCO S.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | Court No. 22-00203 |
| | ) | |
| Defendant, | ) | |
| | ) | |
| AMERICAN HONEY PRODUCERS | ) | |
| ASSOCIATION AND SIOUX HONEY | ) | |
| ASSOCIATION, | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

**PLAINTIFF NEXCO S.A.'S COMMENTS ON
COMMERCE'S REMAND REDETERMINATION**

## I.   INTRODUCTION

In accordance with the Court's August 25, 2023 scheduling order, Plaintiff NEXCO S.A.

("Nexco"), hereby submits its comments on the U.S. Department of Commerce's ("Commerce")

Final Results of Remand Redetermination Pursuant to Court Remand ("Redetermination") in this

action.[1]  This action challenges Commerce's final determination in *Raw Honey from Argentina:*

*Final Determination of Sales at Less than Fair Value and Final Affirmative Determination of*

*Critical Circumstances*, 87 Fed. Reg. 22,179 (Dep't Commerce Apr. 14, 2022), Public Record

---

[1] Final Results of Redetermination Pursuant to Court Remand, *Nexco S.A. v. United States*,
Court No. 22-00203, Slip Op. 23-85 (CIT June 7, 2023), (Oct. 13, 2023) ("Redetermination"),
ECF No. 49, Confidential Remand Record ("CRR") 3.

("PR") 444 ("*Final Determination*"), and accompanying Issues and Decision Memorandum

("I&D Mem."), PR 438, as amended by the Redetermination.

For the reasons discussed herein, Commerce's Redetermination fails to comply with the

Court's instructions and misinterprets or disregards the court's reasoning and holdings in *Nexco*

*S.A. v. United States*, 639 F. Supp. 3d 1312 (Ct. Int'l Trade June 7, 2023). Accordingly, Nexco

requests that the Court hold that the Redetermination is unsupported by substantial evidence and

contrary to law, and that the Court again remand this action to Commerce.

### A. Commerce's Redetermination Fails To Demonstrate That Nexco's Acquisition Prices Are A Reasonable Proxy For The Cost of Production Of Raw Honey

In *Nexco S.A.*, the Court reviewed Nexco's argument that Commerce's determination to

calculate the cost of production ("COP") of the honey exported by Nexco as the acquisition prices

paid by Nexco to its unaffiliated beekeeper suppliers. The Court noted that Commerce's policy in

cases involving unprocessed raw agricultural products such as raw honey is to base COP on the

cost of producing the raw goods, even when the respondent is not the producer. *Nexco S.A.*, 639

F. Supp. 3d at 1317. This policy is premised on Commerce's recognition that the acquisition price

paid for a finished product is not the same as the product's cost of production. *Id.* at 1317 n.11.

This is in contrast to Commerce's policy regarding processed agricultural products where the

exporter is the producer. There, Commerce's policy is to treat the acquisition prices for the raw

agricultural inputs as a material cost. *Id.*

Commerce's policy reflects the requirements of the antidumping statute. The cost of

production is defined by the statute as follows:

### Calculation of cost of production

For purposes of this part, the cost of production shall be an amount equal to the
sum of—

**(A)** the cost of materials and of fabrication or other processing of any kind employed in producing the *foreign like product*, during a period which would ordinarily permit the production of that foreign like product in the ordinary course of business;

**(B)** an amount for selling, general, and administrative expenses based on actual data pertaining to production and sales of the *foreign like product* by the exporter in question; and

**(C)** the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the *foreign like product* in condition packed ready for shipment.

19 U.S.C. § 1677b(b)(3) (emphasis added).  Here the raw honey exported by Nexco already meets the definition of the foreign like product at the time of its purchase by Nexco because it is identical in physical characteristics with, and produced in the same country as, the subject merchandise.  *See* 19 U.S.C. § 1677(16)(A); I&D Mem. at 8 ("The scope of this investigation covers raw honey as it exists in the hive.").  Thus, Commerce has clearly determined that the beekeepers and middlemen, and not Nexco, are the producers of the foreign like product, and that it is their costs, and not the acquisition prices paid by Nexco, that constitute the COP of the foreign like product.  I&D Mem. at 9 ("Commerce has come to interpret this section of the statute to mean that it is necessary to use the producer's costs of production to accurately calculate the total costs and expenses incurred in producing subject merchandise and further that an acquisition price for a finished product does not translate into a cost of production.") (internal citations omitted).

In view of these findings by Commerce, which have not been challenged, the Court recognized that Commerce's objective in the investigation was to determine "the beekeeper's COP."  *Nexco S.A.*, 639 F. Supp. 3d at 1318.  The Court held that given the difficulties experienced in previous investigations in obtaining reliable cost data from beekeepers, Commerce had provided a reasoned basis for departing from its normal practice of using the beekeepers' actual costs to compute the beekeeper's COP.  *Id.* at 1318–19.  The Court held

however, that Commerce had failed to demonstrate that Nexco's acquisition prices are a "reasonable proxy for the beekeepers' COP." *Id.* at 1319. Noting that the only record evidence concerning the beekeepers' actual costs showed that the prices that Nexco paid to those beekeepers were two to three times higher than the beekeepers' COP, the Court concluded that Commerce had failed to "to engage with the question of how Nexco's prices are a reasonable substitute for cost values which are much lower." *Id.*[2] The Court found that while Commerce's methodology might ensure that all of the costs of production are included, Commerce's explanation failed to demonstrate how its methodology was not "overinclusive" of the actual COP of the honey, and the Court held that a lack of missing costs alone does not render Commerce's choice of proxy reasonable. *Id.*

<blockquote>

**1.  Commerce Has Improperly Shifted Its Analysis from Beekeeper COP to Nexco's COP**

</blockquote>

In the Redetermination, Commerce continues to rely on Nexco's acquisition prices for honey paid to the beekeepers without adjustment. Commerce contends that using these acquisition prices does not overstate the COP of the merchandise. Commerce offers two grounds for this conclusion. First, Commerce argues, in essence, that it does not matter whether the acquisition prices substantially overstate the beekeepers' actual costs. Commerce is only concerned with capturing all the costs. Redetermination at 25. Commerce notes that "Nexco's "COP is inclusive of the acquisition cost it paid for the raw honey plus the additional processing costs it incurred in preparing the raw honey for export." Redetermination at 7. Commerce

---

[2] If the Court finds that Commerce has provided no reasonable basis for using acquisition prices that include profit, then the costs will not exceed 25 percent and there is no basis for quarterly costs. *See* Pl. Nexco S.A.'s Br. in Supp. of its Mot. For J. on the Agency R. at 29 n.12, 36, ECF No. 25; *see also NEXCO S.A.*, 639 F. Supp. 3d at 1316 n.6 (not reaching this argument because the Court was remanding Commerce's determination to use acquisition costs for reconsideration or further explanation).

reasons that "when setting its prices, Nexco knows what it paid for the raw honey, but is unlikely to have access to the actual COPs of unaffiliated beekeeper-suppliers. Moreover, the exporter-respondent would not have a reason to set its prices based on the unaffiliated beekeeper-supplier costs." *Id.* Commerce goes on to explain that:

> {W}hen setting its U.S. prices, Nexco knows what it paid the beekeeper-suppliers, but there is no record evidence to suggest that Nexco knows the costs that its unaffiliated beekeeper-suppliers incurred in producing the raw honey. Even if Nexco were privy to such information, there is no evidence suggesting that Nexco would consider the costs of an unaffiliated party when setting its prices. Thus, *the pertinent cost data to Nexco is what is recorded in its own books and records, i.e., the acquisition costs.* While Commerce is concerned with whether there are additional costs to be considered if the beekeeper-suppliers sold their product below their COPs, Nexco would not have such concerns. Because Nexco sets the prices to the comparison and U.S. markets, *we find that using Nexco's own COPs (or constructed values) for those sales is reasonable and does not overstate the costs of the products that were sold by Nexco.* Therefore, we find that using the raw honey acquisition costs in the calculation of Nexco's COP for the raw honey sold to the United States is not overinclusive of costs *from the perspective of the company responsible for setting the U.S. price.*

*Id.* (emphasis added).

Nexco's COP, however, is irrelevant in this case because Nexco is not the producer of the foreign like product. To the extent that Commerce is now purporting to determine that the COP in this case is properly calculated with reference to Nexco's own COP, rather than the COP of the beekeepers, that determination would be in direct contradiction of its finding that the producers of the raw honey sold by Nexco are the beekeepers, and would constitute a departure from Commerce's settled practice for calculating COP in raw goods cases. The Court did not remand that issue, and Commerce throughout this proceeding has maintained that the beekeepers were the producers and insisted that it had not changed its long-standing methodology on raw honey COP. Thus, any attempt to revisit the issue of which entity is the producer of the raw honey for purposes of computing the COP of the foreign like product should be rejected as contrary to the Court's remand instructions, which were limited to explaining why Nexco's

acquisition prices are a reasonable proxy for the COP *of the beekeepers*. The issue on remand

was not whether acquisition costs overstate *Nexco's costs*, but rather whether they overstate the

costs of the beekeepers. Commerce' attempt to dodge the analysis required by the Court should

be rejected.

Furthermore, the rationale offered in the Redetermination stands on its head Commerce's

longstanding practice regarding unprocessed agricultural products, which Commerce confirmed,

before this court. It will virtually *always* be the case that exporters who are not producers of raw

agricultural goods will not know the actual production costs of the growers or gatherers

supplying them with the product. As discussed above, it is nevertheless Commerce's

longstanding, consistent policy that in cases where the goods the exporter is acquiring already

constitute the foreign like product, Commerce bases COP on the actual cost of production of the

grower or gatherer of the raw agricultural product, not on the acquisition cost of the exporter. In

no prior case has Commerce suggested that the appropriate source of COP data turns on whether

the exporter is aware of, or sets its prices according to, the costs of the grower/gatherers of the

product.[3]

Further, Commerce's contention that its raw goods policy exists merely to determine

whether there are additional costs, beyond those of the exporter, to be included in COP is without

merit.[4] *See* Redetermination at 25 ("While Nexco correctly observes that Commerce has

---

[3] Commerce's claim that it is appropriate to use Nexco's acquisition prices for calculating the COP of raw honey because those prices are "recorded in its books and records" is also risible under the facts of this case. Redetermination at 9. The acquisition prices calculated by Commerce for use as COP in this case have been indexed and re-stated pursuant to Commerce's hyperinflation methodology and thus bear no relation to the values actually recorded in Nexco's books and records. *Id*. at 15–16.

[4] Commerce has repeatedly rejected the use of acquisition prices in raw goods cases without any consideration of whether those prices were above the growers' actual costs. *See e.g.*, *Final Determination of Sales at Less than Fair Value: Greenhouse Tomatoes from Canada*, 67 Fed.

previously rejected the use of acquisition costs between such parties, we find the underlying statutory concern of this pursuit is to ensure that all elements of cost are captured.").  In support of this assertion, Commerce cites to 19 U.S.C. § 1677(28), which defines the term "exporter or producer":

> The term "exporter or producer" means the exporter of the subject merchandise, the producer of the subject merchandise, or both where appropriate. For purposes of section 1677b of this title, the term "exporter or producer" includes both the exporter of the subject merchandise and the producer of the same subject merchandise to the extent necessary to accurately calculate the total amount incurred and realized for costs, expenses, and profits in connection with *production and sale* of that merchandise. (emphasis added)

This statutory definition, however, merely clarifies that references to "exporter or producer" can mean either or both, where appropriate, and that for purposes of computing normal value Commerce may include data gathered from both entities to the extent needed to "accurately calculate" costs, expense and profits in connection with the *production and sale* of subject merchandise.

Section 1677(28) does not purport to define *which* costs, expenses, or profits of *production and sales* are appropriate to include in the calculation of any particular element needed for the determination of normal value.[5]  The substantive provisions detailing the costs,

---

Reg. 8,781 (Dep't Commerce Feb 26, 2002) and accompanying issues and decision mem. at Comment 7 (cost of farming tomatoes, rather than cost to exporter of purchasing tomatoes, used as exporter's COP); *Notice of Final Determination of Sales at Less Than Fair Value; Honey From Argentina*, 66 Fed. Reg. 50,611 (Dep't Commerce Oct. 4, 2001), and accompanying issues and decision mem. at Comment 2 (declining to use acquisition costs as proxy for COP); *Final Determination of Sales at Less than Fair Value: Fresh and Chilled Atlantic Salmon from Norway*, 56 Fed. Reg. 7,661, 7,672 (Dep't Commerce Feb. 25, 1991) (same).

[5] Commerce also relies on a statement in the Uruguay Round Agreements Act Statement of Administrative Action ("SAA") explaining that the purpose of § 1677(28) "is to clarify that where different firms perform the production and selling functions, Commerce may include the costs, expenses, and profits of each firm in calculating cost of production and constructed value." Redetermination at 25–26.  This underscores Nexco's point that §1677(28) is merely concerned with clarifying that Commerce may rely on values incurred by both the producing and exporting

expenses, or profits that are to be captured are placed in 19 U.S.C. § 1677b, and include specific

substantive requirements for the computation of normal value based on home market sales

(§ 1677b(a)(1)(B)); the computation of normal value based on third country sales

(§ 1677b(a)(1)(C)); the calculation of cost of production (§ 1677b(b)); and the calculation of

constructed value (§ 1677b(e)).[6]  As already discussed, Section 1677b provides that in

calculating COP Commerce is to include the materials, fabrication, and selling and general and

administrative expenses (but not profit) for producing the *foreign like product*.[7]  *Id*.

§ 1677b(b)(3)  Here, Commerce has determined that the producer of the foreign like product is

the beekeepers.  Commerce's assertion that "the statute is not concerned with reducing the actual

acquisition costs paid by the exporter to exclude the profits of an unaffiliated producer,"

Redetermination at 26, completely ignores the actual terms and requirements of Section 1677b.

By the statute's plain language, profits cannot be characterized as part of the cost of materials

and fabrication of the foreign like product (COP)  Commerce makes no attempt to explain why

beekeeper profits are reasonably so characterized, and instead impermissibly attempts to shift the

---

entities, and has nothing to say about the types of costs or expenses to be included in the
computation of cost of production or constructed value.

[6] The court in *SKF USA Inc. v. United States*, 630 F.3d 1365, 1371 (Fed. Cir. 2011),
specifically cited to the provisions of Section 1677b(e) for its guidance on the proper elements
and calculation of constructed value and COP.

[7] As Nexco has argued to this court, that statute does not allow profit as an element of COP.
Profit is included in CV "{b}ecause constructed value serves as a proxy for sales price . . .
constructed value must include an amount . . . for profit."  Statement of Administrative Action
accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, reprinted at 1994
U.S.C.C.A.N. 4040 at 4175; *see also* I&D Mem. at 9 ("{C}ost of production" . . .  means the cost
to produce { } merchandise, not the cost of purchasing { } merchandise.") (citing *Notice of Final
Results of the Sixth Administrative Review of the Antidumping Duty Order on Certain Pasta from
Italy and Determination Not to Revoke in Part*, 69 Fed. Reg. 6,255 (Dep't Commerce Feb. 10,
2004), and accompanying issues and decision mem. at Comment 42).

focus to whether acquisition costs are "a factor in Nexco's pricing decisions." *Id.*[8]

Consequently, Commerce's explanation that the use of Nexco's acquisition costs is reasonable because they do not exceed *Nexco's own* COP is entirely non-responsive to the Court's instructions on remand and should be rejected.

> ### 2. Commerce Has Again Failed To Take Into Account The Record Evidence Showing That Beekeeper Costs Are Substantially Below Acquisition Prices

Commerce's second explanation for why it does not believe that the acquisition prices overstate beekeeper COP is that it does not agree that the beekeeper costs on the record establish "that all beekeeper-supplier costs are necessarily 'much lower' than Nexco's acquisition costs." Redetermination at 8. Commerce reiterates its position that the beekeeper costs that were requested and verified during the investigation were intended only to serve as a "spot-check" that beekeepers were not selling below their COP, and that they were not solicited to be representative of all beekeeper costs. *Id*. Once again, the issue on remand is not whether the beekeeper costs on record are "necessarily" representative of "all" beekeeper costs. Rather, the issue is, given these verified costs, which indisputably are only one-half and one-third of the prices those producers charged to Nexco, whether record evidence supports the conclusion that acquisition prices are a reasonable proxy for such beekeeper costs. Commerce's Redetermination fails to identify any such evidence and thus implicitly concedes that there is none.

First, Commerce's assertion that it cannot use the beekeeper costs on record for the limited purpose of determining whether Nexco's acquisition prices are a reasonable surrogate for

---

[8] Commerce fully understood that when it was referring to capturing all costs that included the profits of the beekeepers and middlemen. *See* I&D Mem. at 13 ("{T}he use of acquisition costs ensures the capture of all costs, expenses, and profits of the beekeepers and middlemen involved in the production and collection of raw honey.").

beekeeper COP is disingenuous. Commerce's explanation for soliciting such costs in the first

place—"to satisfy the statute's concern that there are no missing costs,"—Redetermination at 27,

demonstrates that it considered those costs probative of whether all beekeeper acquisition prices

were above cost.[9] The fact that Commerce went to the trouble of comparing those costs to the

acquisition prices and preparing worksheets that calculated the difference between the

beekeepers' cost and the acquisition prices (i.e., profit) on their sales to Nexco makes it

abundantly clear that had these beekeeper costs turned out to be higher than acquisition prices,

Commerce would have adjusted the actual acquisition prices of all the beekeepers upwards

without regard to whether those beekeeper costs could be shown to be representative of "all"

such costs. Commerce wholly fails to explain why, based on the *only evidence* on the record

used by Commerce to determine whether Nexco's acquisition prices were above cost, it cannot

use those same costs to adjust downward the prices to eliminate profit. Commerce certainly was

prepared to rely on these "sample" beekeeper costs to adjust Nexco's acquisition prices upward,

since Commerce would have concluded that the prices were "missing costs." Reasonably,

Commerce should rely on those same sample costs to adjust Nexco's acquisition prices

downward in order to calculate a more reasonable proxy for actual beekeeper costs.

Commerce also attempts to undermine the probative value of the beekeeper profit

amounts it calculated by arguing that it intentionally selected the beekeepers to whom it issued

COP questionnaires because they were among the lowest priced suppliers to Nexco, and

therefore "it is not surprising that Nexco's acquisition prices exceeded the beekeeper's costs."

Redetermination at 27. This argument depends upon the entirely untested assumption that these

---

[9] *See* Decision Mem. for the Preliminary Affirmative Determination in the Less-Than-Fair-Value Investigation of Raw Honey from Argentina (Nov. 17, 2021) ("PDM") at 26, PR 364 ("{W}e find that NEXCO's acquisition costs plus its own processing costs are a reasonable proxy for the total COP of the merchandise under consideration.").

beekeepers have the lowest prices because they have the lowest costs, and not because they are selling below cost.  In fact, there is no record evidence to support the assumption that lower-priced suppliers have lower costs than other beekeepers.  Differences in beekeeper prices are just as likely to simply reflect market conditions and differences in timing.  Moreover, in explaining why it intentionally selected lower-priced suppliers in the *Final Determination*, Commerce claimed to be operating on the opposite assumption: that these beekeepers would be the ones *most likely* to be selling below cost (and thus likely to be earning the lowest profits).[10]  *See* I&D Mem. at 12; *see also* PDM at 26.  This would indicate that using the profit margins calculated for these beekeepers to adjust Nexco's acquisition costs would be a *conservative* estimate of actual beekeeper costs.

In sum, Commerce in the Redetermination has improperly shifted the analysis from whether acquisition prices are a reasonable surrogate for beekeeper costs to whether Nexco would have relied on beekeeper prices to set prices.  Additionally, Commerce's attempt to diminish the significance of the beekeeper costs, which remain the only evidence in the record of actual beekeeper costs, is without merit.  Accordingly, the Court should hold that Commerce's determination to again base Nexco's COP on the unadjusted acquisition prices for raw honey paid by Nexco to the beekeepers remains unsupported by substantial evidence.  On remand, the Court should direct Commerce to adjust Nexco's acquisition prices in a manner that removes beekeeper and middleman profit so that the acquisition prices are a reasonable surrogate for beekeeper costs.

---

[10] Commerce explained why it selected beekeepers with the lowest prices:  "Our logic was that these were the suppliers with the highest risk to be selling at below their COP for the raw honey . . . .  Therefore, if these beekeepers were selling above their COP . . . Commerce could reasonable determine that a reliance on acquisition costs would not result in missing costs."  I&D Mem. at 12.

**B.    The Redetermination Again Fails to Support The Use of Monthly Averaging Periods For U.S. And Third Country Sales Denominated In U.S. Dollars**

In the underlying investigation, Commerce based normal value for Nexco on third country sales to Germany.  Selection of Appropriate Third Country Market (Aug. 11, 2021) at 2, Confidential Record ("CR") 132.  Those sales, like Nexco's U.S. sales, were denominated in U.S. dollars.  Because Argentina was experiencing high inflation, Commerce applied hyperinflationary methodology to index and re-state costs and prices denominated in Argentine Pesos ("pesos") to adjust for the impact of inflation.  *See* I&D Mem. at 16–17.  After having applied this methodology, Commerce averaged above-cost German sales by month and U.S. sales by month, and limited the price-to-price comparison of those German sales to only U.S. sales made in the same month, claiming that this shorter period was justified by its use of its hyperinflationary methodology.  *Id.* at 17.  As a result, numerous U.S. sales could not be compared to above-cost German sales and were instead forced to be matched to constructed value, substantially increasing Nexco's dumping margin.

Nexco challenged Commerce's use of monthly price averaging for price-to-price comparisons and argued that Commerce had no legitimate reason for deviating from its normal practice of comparing weighted average prices over the entire period of investigation as provided for in 19 C.F.R. § 351.414(d)(3).  *See Nexco S.A.*, 639 F. Supp. 3d at 1322.  The Court held that Commerce's invocation of its high inflation methodology failed to adequately support its use of monthly price averaging when comparing U.S. sales prices (denominated in U.S. dollars) to third country sales prices that were also denominated in U.S. dollars.  *Id.* at 1324.  The Court found Commerce's citation of its precedents for using monthly averaging periods for sales denominated in local currencies, and its discussion of the use of monthly values when adjusting cost of production for inflation, both failed to satisfactorily explain how Commerce's methodology in

this case comports with the regulation. *Id.* at 1323-1324. The Court held that Commerce's discretion to use shorter price average periods is circumscribed by 19 C.F.R. § 351.414(d)(3), and that Commerce's references to its hyperinflationary methodology in general, and to its use of monthly averages for purposes of the below-COP test in particular, both failed to demonstrate why its use of monthly price averaging periods and monthly price-to-price comparisons comports with the regulation. *Id.*

On remand, Commerce denies that 19 C.F.R. § 351.414(d)(3) circumscribes Commerce's discretion to use shorter averaging periods. According to Commerce, while the regulation provides that Commerce may calculate weighted averages for a shorter period than the entire period of investigation ("POI") when normal values, export prices, or constructed export prices differ significantly over the course of the POI, "the regulations do not stipulate that this is the *only* scenario in which Commerce may use shorter averaging periods." Redetermination at 22 (emphasis in original). Commerce therefore concludes that its use of the its high inflationary methodology independently provides "an accurate and consistent basis upon which to use shorter averaging periods for prices as well," without regard to the terms of Section 351.414(d)(3). *Id.* Although Commerce goes on to grudgingly defend its position that third country market and U.S. prices "differed" over the course of the POI, as discussed further below, Commerce's discussion of U.S. dollar pricing data is entirely perfunctory, and it is clear that Commerce has continued to rely on the use of its inflationary methodology as the sole justification for using monthly, rather than POI, averages when comparing U.S. dollar prices to dollar-denominated German prices.[11] Because Commerce fails to demonstrate that Nexco's U.S. dollar prices to Germany and the United States differ significantly within the meaning of 19 C.F.R. § 351.414(d)(3), the Court

---

[11] Had third market prices been in pesos, then the inflation methodology would have supported the use of monthly averages.

should once again find that Commerce's use of monthly averages for price-to-price comparisons is unsupported by substantial evidence.

### 1. Commerce's Regulation on Price Averaging Periods Circumscribes Its Authority To Deviate From Its Normal Practice of Using Full POI Averages

In the Redetermination, Commerce asserts that its discretion to use alternative averaging period in investigations is not constrained by 19 C.F.R. § 351.414(d)(3). That regulation provides that:

> When applying the average-to-average method in an investigation, the Secretary normally will calculate weighted averages for the entire period of investigation. However, when normal values, export prices, or constructed export prices differ significantly over the course of the period of investigation, the Secretary may calculate weighted averages for such shorter period as the Secretary deems appropriate. When applying the average-to-average method in a review, the Secretary normally will calculate weighted averages on a monthly basis and compare the weighted-average monthly export price or constructed export price to the weighted-average normal value for the contemporaneous month.

19 C.F.R. §351.414(d)(3). Commerce argues that while the regulation authorizes Commerce to use shorter averaging periods when prices differ significantly, it does not state that this is the only circumstance under which shorter averaging periods is permitted. *See* Redetermination at 22.

> For the reasons explained above, Commerce finds that the regulations do not strictly circumscribe the situations in which Commerce may resort to shorter averaging periods for prices; rather, the regulations provide guidance on Commerce's general approach.

*Id.* at 23. Put another way, Commerce would read the first half of the second sentence of 19 C.F.R. § 351.414(d)(3) out of the regulation as if it stated without qualification that "the Secretary may calculate weighted averages for such shorter period as the Secretary deems appropriate." Based on that interpretation, Commerce concludes that:

> {W}e find that the use of the high inflation methodology and use of corresponding monthly indexed costs, including other aspects of the high inflation methodology where the margin calculations are based on the month-to-month

inflation indices, provide an accurate and consistent basis upon which to use shorter averaging periods for prices as well, for the reasons outlined above.

*Id.* at 22.

The Court should once again reject the notion that Commerce has unfettered discretion to shorten the price averaging periods without satisfying the criteria set forth in the regulation for doing so. As the Court already ruled, Commerce's finding of hyperinflation would support the use of a shorter price averaging period for sales denominated in pesos, but is not a sufficient basis for shortening the price averaging period for sales denominated in U.S. dollars. Commerce once again fails to demonstrate that the existence of hyperinflation in Argentina during the POI is a sufficient ground for using monthly rather than full POI averages when comparing prices that are both denominated in U.S. dollars and thus unaffected by inflation.

### 2. Commerce's Hyperinflationary Methodology Does Not Justify Shorter Averaging Periods When The Prices Used to Determine Normal Value Are In U.S. Dollars

Commerce's justification for continuing to use monthly price averaging in this case is premised almost entirely on the fact that it always uses monthly averages in cases involving hyperinflation. *See* Redetermination at 13-18. According to Commerce, "{o}nce Commerce determines that the high inflation methodology is warranted, whether in an investigation or a review, the basis for Commerce's margin calculations is based on a month-by-month dumping analysis." *Id.* at 18. Although Commerce provides a lengthy exegesis on its inflationary methodology in general, at no point does it actually explain why the existence of high inflation in pesos requires the use of monthly averaging of prices where both the comparison market and U.S. market prices are denominated in U.S. dollars.

Commerce begins with a discussion of the below-cost test under its high inflation methodology and explains that in this case it used monthly indexed costs by quarter, because it

applied its high inflationary methodology in conjunction with the use of quarterly costs. *Id.* at 13.

Commerce then turns to an explication of the underlying rationale for its high inflation

methodology:

> When Commerce finds that the use of the high inflation methodology is warranted, it impacts both the sales and costs sides of the margin calculations. The purpose of the high inflation methodology is *to account for the significant change in the value of the prices and costs denominated in the currency of the exporting country*, i.e., the inflation in the exporting country. Inflation impacts the nominal value of revenues and expenses in relation to their real value. This change in the nominal value of the revenues and expenses over time may distort Commerce's margin calculations, which makes the assumption that the relationship between real value and nominal value remains constant through the POI or period of review (POR). When inflation rises to the level where it is "high," Commerce finds that this assumption is no longer reasonable and must account for the potential for distortions based on the fluctuations of the nominal value of the revenues and expenses in its margin calculations.

*Id.* at 14–15 (emphasis added). Here, however, the prices used to determine normal value are not

"denominated in the local currency," but in U.S. dollars. Commerce converted those U.S. dollar

prices into pesos for purposes of the below-cost test (and fully applied its high inflation and

quarterly cost methodologies in so doing). However, once it has determined which sales to

Germany are above cost based on those methodologies, what is the rationale for insisting on

limiting the price averaging period for those above-cost, dollar denominated sales to a single

month, rather than use a POI average as it does in any other case? Commerce does not say.

Rather than explain why the use of POI averaging is inappropriate when comparing U.S.

dollar prices to U.S. dollar prices, Commerce continues to offer up abstractions and platitudes.

Thus it informs the Court that "{h}igh inflation can distort the margin calculations whenever

nominal values that are subject to inflation are aggregated across time." *Id.* at 15. But, again,

U.S. dollar-denominated prices are not "nominal values subject to inflation." Rather than address

the precise issue presented—the use of dollar denominated, above-cost sales to calculate normal

value—Commerce merely avers that its "high inflation methodology holistically addresses the

*possible distortions* of its margin calculations by resorting to a monthly analysis to account for the change in nominal values over the POI/POR." *Id.* (emphasis added).

When Commerce finally turns to the specific issue at hand—restricting price-to-price comparisons to monthly averages within the same month—Commerce can only manage the following:

> We disagree with the proposition that the comparison of monthly average U.S. prices with normal value based on U.S. dollar-denominated comparison market prices is unreasonable or unlawful. Nexco's simplistic argument focuses on a single aspect of Commerce's high inflation methodology, namely the comparison of 'its U.S. {sale prices} with third-country {sale prices} to Germany on a monthly basis,' and fails to recognize the context of Commerce's high inflation methodology to address the potential distortions in the margin calculations due to high inflation in the exporting country.

*Id.* at 17. Exactly what these "potential distortions" would be in the context of comparing U.S. dollar-denominated sales is not explained.[12] Rather, Commerce simply asserts that "{o}nce Commerce determines that the high inflation methodology is warranted, whether in an investigation or a review, the basis for Commerce's margin calculations is based on a month-by-month dumping analysis." *Id.* at 18. Commerce concludes by stating that:

> We find that Nexco's argument—that Commerce must rely on quarterly average prices as the basis for normal value because the comparison market prices are not denominated in the inflating currency—fails to recognize the interrelationships of the margin calculations, the potential distortions which are addressed by high inflation, and the holistic approach of Commerce's high inflation methodology.

*Id.* 21.

Commerce's double-talk about "potential distortions" and the need for a "holistic approach" fails to mask the fact that it is simply unable to demonstrate any connection between the impact of inflation—which it implicitly concedes affects only those costs and prices denominated in local currency—and the U.S. dollar-denominated sales prices used to establish

---

[12] Commerce's remand no longer relies on its earlier argument before this court that dollar prices were impacted by peso inflation.

normal value.  In other words, the explanations do not explain why the dollar-to-dollar comparisons must be restricted to monthly comparisons. As Commerce said in this case: "there is no prerequisite that the averaging period for home market/third country prices or for U.S. prices to correspond with the averaging period for production costs."[13]

Commerce has consistently compared dollar-to-dollar prices to calculate dumping margins in other cases where the respondent sells in dollars in the home market and it converts the expenses to dollars on the date of the U.S. sale.  As explained in the 2015-2016 antidumping duty administrative review of *Standard Pipe from Turkey*,

> Here, we have converted the dollar-denominated home market sales into Turkish lira only for purposes of the sales-below-cost test. For purposes of calculating the margin, we have left the dollar-denominated home market sales in U.S. dollars.

*Welded Carbon Steel Standard Pipe and Tube Products From Turkey: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015– 2016*, 82 Fed. Reg. 49,179 (Dep't Commerce Oct. 24, 2017) and accompanying issues and decision mem. at 10; *see also Carbon and Certain Alloy Steel Wire Rod from Mexico: Notice of Final Results of Antidumping Duty Administrative Review*, 73 Fed. Reg. 13,532 (Dep't Commerce Mar. 13, 2008) and accompanying issues and decision mem. at comment 3 ("{N}o currency conversion was required with respect to the home market sales that were denominated in U.S. dollars.");  *Certain Carbon and Alloy Steel Cut-To-Length Plate From Belgium: Final Determination of Sales at Less Than Fair Value and Final Determination of Critical Circumstances, in Part*, 82 Fed. Reg. 16,378 (Dep't Commerce Apr. 4, 2017), and accompanying issues and decision mem. at comment 2 ("Section 773A(a) of the Act states that, in general, in antidumping duty proceedings, Commerce "shall convert foreign currencies into

---

[13] Commerce states this in response to Petitioners' argument to use monthly costs for the quarterly cost test.  I&D Mem. at 18.

United States dollars using the exchange rate in effect on the date of sale of the subject merchandise."); *Citric Acid and Certain Citrate Salts From Canada: Preliminary Results of Antidumping Duty Admin. Review*, 76 Fed. Reg. 5,782, 5,786 (Dep't Commerce, Feb. 2, 2011). Simply invoking the mechanics of its high inflation methodology and asserting, in essence, that "this is how we do it" wholly fails to support the use of shorter price averaging periods under the facts of this case.

### 3. The Remaining Arguments Offered By Commerce Likewise Fail To Support That Prices Differed Significantly Within The Meaning of 19 C.F.R. § 351.414(d)(3)

Other than the general invocation of its high inflation methodology, Commerce offers only a handful of reasons supporting the use of shorter averaging periods for price-to-price comparisons, none of which satisfy the criteria set forth in § 351.414(d)(3). First, Commerce invokes its quarterly cost finding and argues that because it found that real, inflation-adjusted costs varied by quarter, this furnishes a basis for finding that prices differ significantly and thus for limiting the price comparison period. Redetermination at 23. The analysis Commerce is referring to was a comparison performed for purposes of the quarterly cost test, in which Commerce converted the dollar-denominated sales to Germany into pesos on the date of the sale and then adjusted those prices and the costs for inflation.[14] Based on that analysis, Commerce found there were real (*i.e.* not merely nominal) differences in costs by quarter, after adjusting for inflation and that the converted peso prices were correlated with those cost changes. This was the basis for Commerce's determination to use quarterly costs for purposes of the below-cost test. I&D Mem. at 26.; PDM at 24.

---

[14] "To determine whether a reasonable correlation existed between the sales prices and underlying COM during the POI, we compared inflation-adjusted weighted average quarterly prices to corresponding inflation-adjusted weighted-average quarterly COM." PDM at 24.

Commerce now tries to use that finding, and in particular the fact that converted peso prices were correlated with quarterly cost movements, to support a finding that Nexco's dollar-denominated third country prices differed significantly within the meaning of 19 C.F.R. § 351.414(d)(3).[15] This argument fails for several reasons. First, as already discussed, the issue here is not the use of monthly peso prices for performing the below-cost test. Rather, the issue is what happens with the sales that Commerce finds, after application of its high inflation methodology and its quarterly cost methodology, are above cost sales that are eligible for comparison to U.S. sales. Those sale prices remain denominated in U.S. dollars. Second, Commerce's finding of a correlation between movements in costs (after adjusting for inflation) and prices for purposes of the quarterly cost analysis was based on a comparison to prices converted to pesos.

As further support for its position that it can bootstrap its findings regarding quarterly costing to support the use of monthly sales averaging periods, Commerce cites to *Union Steel v. United States*, 190 F. Supp. 3d 1326 (Ct. Int'l Trade 2016). According to Commerce, "*Union Steel* supports the use of shorter price averaging periods when either quarter cost averaging periods or the high inflation methodology is used in an investigation." Redetermination at 33. *Union Steel* is, however, inapposite. First, and most importantly, *Union Steel* involved an antidumping administrative review, not an investigation as Commerce implies. In reviews, Commerce always averages prices on a monthly basis. *See* 19 C.F.R. § 351.414(d)(3) ("When applying the average-to-average method in a review, the Secretary normally will calculate

_____

[15] Commerce rejected Petitioners' argument that peso costs varied by quarter, not by month. I&D Mem. at Comment 2. So even assuming that Commerce's finding that converted peso prices were correlated with quarterly changes in peso costs could be equated with a finding that Nexco's dollar-denominated prices differed significantly within the meaning of §351.414(d)(3), this would at most support averaging prices by quarter, not by month.

weighted averages on a monthly basis and compare the weighted-average monthly export price or constructed export price to the weighted-average normal value for the contemporaneous month."). Thus the issue of shortening the price averaging period was not presented, nor did *Union Steel* involve Commerce's high inflation methodology.

Rather, the issue in *Union Steel* involved a different regulation, which is currently codified at 19 C.F.R. § 351.414(f).[16] That regulation defines what constitutes the "contemporaneous month" for purposes of making monthly average price comparisons in reviews. The court in *Union Steel* affirmed Commerce's determination to limit price comparisons to contemporaneous months falling within the same quarter when Commerce applies its quarterly costing methodology because there was a demonstration that prices were reasonably linked to quarterly changes in the costs. 190 F. Supp. 3d at 1337-1339. Because *Union Steel* did not present the question of using a shorter averaging price averaging period in an investigation or call upon the court to interpret 19 C.F.R. § 351.414(d)(3), it cannot support Commerce's methodology in this case.

Next, Commerce argues that for comparisons where normal value is based on constructed value, it has no choice but to use a monthly average because the COP that will be used to establish constructed value is monthly. Redetermination at 18. However, as the Court noted previously, the issue Nexco raises concerns the dollar-denominated sales comparisons and does not pertain to comparisons were normal value is based on peso-denominated constructed value. *Nexco S.A.*, 639 F.Supp.3d at 1322 n.14. Thus, the fact that Commerce is continuing to use monthly values for constructed value comparisons is of no moment, and in no way explains why monthly averages are appropriate for price-to-price comparisons where both sales are

---

[16] 19 C.F.R. § 351.414(f) was previously codified at 19 C.F.R. § 351.414(e)(2). *See Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings; Final Modification*, 77 Fed. Reg. 8,101, (Dep't Commerce Feb. 14, 2012).

denominated in U.S. dollars.[17]  Commerce also points to the fact that even for U.S.-dollar denominated sales, some selling expenses are incurred in pesos.  Redetermination at 19. However, Commerce has already calculated monthly, inflation-adjusted values for those expenses, and Commerce would simply convert the applicable monthly value to U.S. dollars on the date of the U.S. sale.

Finally, and only in response to comments on the draft redetermination filed by defendant-intervenors, Commerce asserts that Nexco's U.S. dollar  prices "differed" over the POI and generally increased in both the United States and the comparison market. (citing Pet'rs' Cmts. on the Draft Results of Redetermination Pursuant to Court Remand (Sept. 25, 2023) ("Pet'rs' Draft Remand Cmts.") at 7–8, CRR 2.  In support of this contention, Commerce surprisingly cites defendant-intervenors' case brief before Commerce including Attachment 1 and 2, where it argued that Commerce should use monthly costs for the quarterly cost test, an argument Commerce rejected.  I&D Mem. at Comment 2.  Commerce objected to Petitioners' exhibits on which it relies here, because the data was "based on a flawed annualized analysis that does not reflect Commerce's well-established approach for evaluating cost changes in this context."  I&D Mem. at 18.  The only additional evidence cited by Commerce are samples of comparison (third country) market output pages from its dumping margin calculation program, which it asserts, without explanation or analysis, "also reflects this trend." *Id.* (citing Mem. to the File, Final Determination, NEXCO S.A. (Apr. 7, 2022) at Attachment 1 (comparison market output pp. 74–

---

[17] Commerce's invocation of constructed value in this context is nevertheless instructive.  It is important to bear in mind that that the "costs" being used to determine constructed value are not costs at all, but rather are the raw honey acquisition prices Nexco pays to the beekeepers.  As discussed in Part I.A, those prices are already two to three times the actual COP of the beekeepers.  In calculating constructed value, Commerce then layers on top of this "cost" profit pursuant to 19 U.S.C. § 1677b(e)(2).  It is not surprising that restricting price-to-price comparisons using monthly averaging—and thereby forcing more U.S. sales to be compared with constructed value—has the effect of significantly inflating Nexco's dumping margin.

76), CR 808).  This citation to price trends for a handful of products does not begin to satisfy the requirements of 19 C.F.R § 351.414(d)(3).

Commerce's evidence and analysis is perfunctory.  At most, some comparison market prices "differed" over the POI in dollar terms.  It does not show that prices "differed significantly."  Indeed, Commerce does not even attempt to demonstrate why the observed price differences should be considered significant within the meaning of the regulation.  To the best of Plaintiff's knowledge the Court has not previously had occasion to interpret what is meant by "differ significantly" under the regulation.  Commerce's own previous interpretations of the regulation clearly indicate, however, that significance should be viewed through the lens of distortion.  That is, whether observed price changes are such that comparing prices on a POI-average basis could result in a distorted comparison.

In *Polyvinyl Alcohol from Taiwan,* Commerce declined to employ a shorter price averaging period when comparing U.S. and third country prices, despite observed price changes, because it concluded that when prices in the two markets moved in tandem, there was no distortion and a shorter period of comparison was only justified by price trends that differed in the two markets:

> The monthly averaging proposed by petitioner is unnecessary. Because price trends in both markets closely tracked each other except in the last 6 weeks of the POI, as described above, the evidence indicates that price comparability is unaffected by time in the first ten and half months of the POI. . . .  As a result, we have concluded that the monthly averages proposed by petitioner are unwarranted.

*Notice of Final Determination of Sales at Less Than Fair Value: Polyvinyl Alcohol from Taiwan*, 61 Fed. Reg. 14,064, 14,069 (Dep't Commerce Mar. 29, 1996).

Similarly, in *Live Swine From Canada,* Commerce explained the intent of § 351.414(d)(3) as follows:

The Department's practice has been to use averaging periods of less than one year only when the comparisons may be distorted because general price levels change in a way that renders prices at one part of the period of investigation not equivalent to other prices for the same merchandise at other parts of the period of investigation. . . . In contrast, the Department declined to use shorter averaging periods in the *Notice of Final Determination of Sales at Less Than Fair Value: Certain Polyester Staple Fiber From the Republic of Korea*, 65 FR 16880 (March 30, 2000) at Comment 3, stating, among other things, that "we were seeking to examine whether there was an overall general trend in prices of all subject merchandise sold by the respondents" and "price changes during the POI were neither significant nor consistent."

*Notice of Final Determination of Sales at Less Than Fair Value: Live Swine From Canada*, 70 Fed. Reg. 12,181 (Dep't Commerce Mar. 11, 2005), and accompany issues and decision mem. at 31.

Here, as in *Polyvinyl Alcohol from Taiwan*, Commerce does not dispute that prices moved in the same direction and by comparable amounts in both markets. *See* Redetermination at 33 & n.141–143 (citing Pet'rs' Draft Remand Cmts. at 7–8) (showing prices in both U.S. market and comparison market increased at a similar rate over the POI). Consequently, there are no grounds for concluding that using the full POI weighted average would be distortive. Commerce does not even attempt to argue that the use of the POI weighted average comparison period would be distortive, nor does it grapple with the intent of the regulation or what thresholds or findings Commerce should consider in determining whether observed price movements are numerically or substantively "significant." Commerce never even attempts a fulsome analysis of observed price changes in conjunction with the intent and purpose of the regulation. The Court is left with no basis for affirming that Commerce's conclusory assertions that price trends during the POI establish that Nexco's prices "differed significantly" within the meaning of the regulation.

*       *       *       *       *

In summary, the Redetermination fails to provide a reasoned explanation why a shorter averaging period is appropriate when comparing U.S. dollar-denominated prices to Germany with

U.S. prices.  Commerce's explanations make clear that while it gives lip service to considering its regulation on price averaging, the real reason it has continued to use monthly averages for price-to-price comparisons in this case is simply the fact that Commerce prefers to use monthly price averages in all cases in which it applies its high inflation methodology.  Commerce is unwilling to deviate from that "holistic" methodology even in cases where normal value is based on U.S. dollar-denominated third country prices that are unaffected by the inflation in the home market. Commerce's Redetermination makes clear that it believes that it has discretion under the statute to shorten the price averaging period when it deems it appropriate to do so, and that that authority is not circumscribed by its regulation, which it views as merely offering "guidance" on Commerce's "general approach."  Redetermination at 22.  Because Commerce has failed to provide the requested explanation of why monthly price averaging comports with the requirements of the regulation, the Court should remand this issue to Commerce with instructions to re-calculate Nexco's dumping margin by comparing POI average prices to POI average prices in accordance with 19 C.F.R. § 351.414(d)(3).

## II. CONCLUSION

For the foregoing reasons, Nexco respectfully requests that this Court hold that Commerce's Redetermination is unsupported by substantial evidence and otherwise not in accordance with the law and remand the case to Commerce with instructions revise its calculation of Nexco's dumping margin by (1) adjusting the acquisition prices to the beekeepers to remove beekeeper profit and (2) perform price-to-price comparisons of U.S. dollar-denominated sales on a POI average basis.

Respectfully submitted,

/s/ Julie C. Mendoza
Julie C. Mendoza
Donald B. Cameron
R. Will Planert
Brady W. Mills
Mary S. Hodgins
Eugene Degnan
Jordan L. Fleischer
Nicholas C. Duffey
Stephen A. Morrison

**MORRIS, MANNING & MARTIN, LLP**
1401 Eye Street, N.W., Suite 600
Washington, D.C. 20005
(202) 216-4817

*Counsel to Plaintiff NEXCO S.A.*

**CERTIFICATE OF COMPLIANCE**

The undersigned hereby certifies that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 8,321 words including text, footnotes, and headings and excluding the table of contents, table of authorities and counsel's signature block, according to the word count function of Microsoft Word 2016 used to prepare this brief.

/s/ Julie C. Mendoza
Julie C. Mendoza

Dated: November 13, 2023