**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE**

|  |  |  |
|---|---|---|
| NEXCO S.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No. 22-00203 |
| | ) | Business Proprietary |
| UNITED STATES, | ) | Information in [ ] |
| | ) | PUBLIC VERSION |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| AMERICAN HONEY PRODUCERS | ) | |
| ASSOCIATION, ET. AL., | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

## DEFENDANT'S COMMENTS IN SUPPORT OF REMAND REDETERMINATION

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

OF COUNSEL

REGINALD T. BLADES, JR.
Assistant Director

SAVANNAH MAXWELL
Attorney
Office of the Chief Counsel
 For Trade Enforcement and Compliance
U.S. Department of Commerce
Washington, D.C.

KARA M. WESTERCAMP
Trial Attorney
U.S. Department of Justice
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-7571
Fax: (202) 514-8264
Email: kara.m.westercamp@usdoj.gov

December 22, 2023

*Attorneys for Defendant United States*

## TABLE OF CONTENTS

**PAGE**

BACKGROUND ........................................................................................................2

    I.     Administrative Determination Under Review ........................................2

    II.    Remand Order...............................................................................................5

    III.   Remand Redetermination..........................................................................6

ARGUMENT ...........................................................................................................8

    I.     Standard Of Review ....................................................................................8

    II.    Commerce's Remand Redetermination Complies With The Court's Remand Order .........................................................................................8

          A.    Commerce's Reliance On Nexco's Honey Acquisition Costs In The COP Calculation Complies With The Court's Remand Order ............................9

          B.    Commerce's Reliance On Monthly Averaging Periods For U.S. Prices Is Supported By Substantial Evidence And In Accordance With The Court's Remand Order .......................................................................................14

CONCLUSION ......................................................................................................21

i

# TABLE OF AUTHORITIES

**CASES**                                                                                                     **PAGE(S)**

*Am. Honey Producers Association v. United States*,
   653 F. Supp. 3d 1329 (Ct. Int'l Trade 2023) ..........................................................12

*MacLean-Fogg, Co. v. United States*,
   100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015) .......................................................... 8

*Nexco, S.A. v. United States*,
   639 F. Supp. 3d 1312 (Ct. Int'l Trade 2023) ................................................... passim

*Union Steel Manuf'g Co. v. United States*,
   190 F. Supp. 3d 1326 (Ct. Int'l Trade 2010) ...................................................19, 20


**STATUTES**

19 U.S.C. § 1516a(b) ........................................................................................... 8

19 U.S.C. § 1677(28) ...................................................................................... 6, 11

19 U.S.C. § 1677b .......................................................................................... passim

19 U.S.C. § 1677f ............................................................................................ 13


**REGULATIONS**

19 C.F.R. § 351.414 .....................................................................................17, 18, 19


**OTHER AUTHORITIES**

*Polyvinyl Alcohol from Taiwan*,
   61 Fed. Reg. 14,064 (Dep't of Commerce Mar. 29, 1996)...................................... 21

*Live Swine from Canada*,
   70 Fed. Reg. 12,181 (Dep't of Commerce Mar. 11, 2005)...................................... 21

*Honey from Argentina*,
   66 Fed. Reg. 50,611 (Dep't of Commerce Oct. 4, 2001)......................................... 4

*Raw Honey From Argentina*,
   86 Fed. Reg. 66,531 (Dep't of Commerce Nov.23, 2021) .......................................................2

*Raw Honey from Argentina*,
   87 Fed. Reg. 22,179 (Dep't of Commerce Apr. 14, 2022) .......................................................2

Statement of Administrative Action,
   H.R. Doc. No. 103-316, *reprinted in* 1994 U.S.C.C.A.N. 4040 (1994) ..................................11

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:     THE HONORABLE CLAIRE R. KELLY, JUDGE

|  |  |
|---|---|
| _____ ) | |
| Nexco S.A., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Court No. 22-00203 |
| ) | Public Version |
| UNITED STATES, ) | [BPI on pages 7, 16, 19] |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| AMERICAN HONEY PRODUCERS ) | |
| ASSOCIATION, ET AL., ) | |
| ) | |
| Defendant-Intervenors. ) | |
| _____ ) | |

## **DEFENDANT'S COMMENTS IN SUPPORT OF REMAND REDETERMINATION**

Defendant, the United States, respectfully submits this response to the comments filed by plaintiff Nexco, S.A. (Nexco), ECF No. 56, and defendant-intervenors American Honey Producers Association, *et al.* (AHPA), ECF No. 54, concerning the Department of Commerce's final results of redetermination filed in accordance with this Court's decision and remand order in *Nexco S.A. v. United States*, 639 F. Supp. 3d 1312 (Ct. Int'l Trade 2023), ECF No. 43.  *See* Final Results of Redetermination Pursuant to Court Remand, ECF No. 49, Oct. 13, 2023 (Remand Results).  The Court should sustain Commerce's remand results because they comply with the remand order, are supported by substantial evidence, and otherwise in accordance with law.

**BACKGROUND**

I.    **Administrative Determination Under Review**

The administrative determination under review is the final affirmative determination in the antidumping duty investigation covering raw honey from Argentina. *See Raw Honey from Argentina*, 87 Fed. Reg. 22,179 (Dep't of Commerce Apr. 14, 2022) (final LTFV determ.) (P.R. 444),[1] and accompanying Issues and Decision Memorandum (IDM) (P.R. 438).

On November 17, 2021, Commerce published the preliminary determination. *See Raw Honey From Argentina*, 86 Fed. Reg. 66,531 (Dep't of Commerce Nov. 23, 2021) (prelim. LTFV determ.) (P.R. 364), and accompanying Preliminary Determination Memorandum (PDM) (P.R. 365). In evaluating how to approach the cost calculation methodology, Commerce considered the interested party's comments, the fact that the beekeeper suppliers are the producers of the raw honey, the dispersed nature of the honey industry, and Commerce's limited resources. PDM at 25. Commerce also determined that both sampling and the selection of the largest beekeepers were either impossible or ineffective options for obtaining a representative cost of production (COP) for the raw honey Nexco had purchased. *See* Nexco Prelim. Cost Memo. (Nov. 18, 2021) (C.R. 646).

Consequently, as an alternative, Commerce adopted Nexco's proposal to rely on its acquisition costs as a proxy for COP. PDM at 25-26. To confirm the COP, Commerce also selected and requested cost information from a small number of raw honey suppliers, with the aim of determining whether reliance on Nexco's acquisition costs as a proxy for the actual COP of the raw honey purchased was reasonable. *See id.* at 25-26. In doing so, Commerce focused

---

[1] Citations to the public record (P.R.) and confidential record (C.R.) refer to the record of the antidumping duty investigation.

on the largest suppliers and those Commerce determined would have the highest likelihood of selling raw honey below their COP. *Id.* at 26. Specifically, of Nexco's larger suppliers, Commerce selected those with the lowest average period of investigation sales prices to Nexco (or Nexco's acquisition costs). *See* Nexco Preliminary Cost Memo. After examining the data, Commerce preliminarily determined that it was reasonable to rely on using acquisition costs as a proxy for the cost of producing honey because "the acquisition prices paid by Nexco were higher than the actual COP incurred by its raw honey suppliers." PDM at 26.

Commerce also utilized both its high inflation and alternative cost methodology in calculating Nexco's rate to account for: (1) high inflation in Argentina during the period of investigation, and (2) to calculate quarterly-average costs for direct materials (DIRMAT), which were the inputs that experienced significant cost changes and annual average costs for all other cost elements. *Id.* at 23-24.

In the final determination issued on April 14, 2022, Commerce continued to rely on Nexco's acquisition costs to calculate the COP and continued to apply both its high inflation methodology and alternative cost methodology. IDM at 15-19. First, in determining that Nexco's acquisition cost was a reasonable proxy for the beekeepers' COP, Commerce determined that because Nexco "sourced all raw honey from thousands of unaffiliated and middlemen and beekeepers during" the period of investigation, and considering the "significant problems encountered in prior honey cases," "it would be more appropriate to consider the alternative of relying on the acquisition costs as a proxy of the honey COP." *Id.* at 8. In particular, Commerce found that, because there were thousands of unaffiliated beekeeper-suppliers, it could not reasonably solicit and obtain COP information from enough beekeeper-suppliers to perform an accurate sampling of the suppliers, nor could Commerce obtain

representative coverage using the largest quantity suppliers. *Id.* Moreover, in both the current and past raw honey proceedings, Commerce found that when beekeeper-suppliers had participated, they were comprised of families or small farms with limited and unsophisticated recordkeeping. *See, e.g.*, *Honey from Argentina*, 66 Fed. Reg. 50,611 (Dep't of Commerce Oct. 4, 2001) (final LTFV determ.), and accompanying IDM at Cmt. 1. As a result, Commerce necessarily relied on assumptions and estimates to calculate the beekeepers' COP. IDM at 11-12. Thus, based on the COP information obtained from the selected upstream suppliers in the investigation, Commerce concluded that use of acquisition costs was not likely to understate the COP for the merchandise under consideration and was therefore reasonable. *Id.* at 13.

Next, Commerce explained that its use of "both the high inflation and alternative cost average methods" to calculate COP was not arbitrary. *Id.* at 15. With respect to Commerce's use of the alternative cost averaging method, Commerce explained that it was appropriate to calculate quarterly-average costs for direct materials (DIRMAT), which were the inputs that experienced "significant cost changes and annual average costs for all other cost elements." *Id.* at 34. Commerce declined to use quarterly-average costs for all costs, as Nexco had advocated for, because such a method would introduce "distortions in the calculations by failing to appropriately allocate expenses to total production." *Id.* at 35-36.

Additionally, because of the high inflation in Argentina, Commerce utilized its high inflation methodology in calculating Nexco's margin. This methodology matched U.S. sales prices to normal value within the same month. *Id.* at 24. Commerce explained that not only were the honey acquisition costs changing significantly during the period of investigation, but the respondents' sales prices also experienced significant changes that corresponded with the changes in input costs. *Id.* In such an environment, comparing period of investigation average

sales prices could have a distortive impact on Commerce's margin calculations that would be dependent on the timing of the sale rather than pricing behavior. *Id.* Relatedly, Commerce explained that Commerce's standard margin calculation converts any foreign currency prices to U.S. dollars on the date of the U.S. sale when performing comparisons, and therefore, the basic premise of Commerce's high inflation practice is that U.S. dollar sales prices do not neutralize the impact of inflation. *Id.* at 26.

## II.    **Remand Order**

On June 7, 2023, the Court ordered Commerce to provide additional explanation or reconsider its reliance on Nexco's acquisition costs as a proxy for COP, and to provide additional explanation or reconsider its use of month-to-month comparisons for Nexco's U.S. sales and third country sales to Germany. *Nexco*, 639 F. Supp. 3d at 1319-20, 1322, 1324-25. The Court sustained Commerce's application of a monthly inflation index when conducting the sales-below-cost test. *Id.* at 1321, 1324.

First, although the Court held that Commerce's use of a sample of Nexco's beekeepers to discern their cost of production was reasonable, *id.* at 1318, the Court held that Commerce failed to explain *why* Nexco's acquisition costs were a "reasonable proxy" for the beekeepers' COP. *Id.* at 1319. For example, the Court noted that "{a}lthough Commerce's methodology might ensure that all of the costs of production are included . . . it is unclear from Commerce's explanation how its methodology is not overinclusive." *Id.* In other words, "{a} lack of missing costs alone does not render Commerce's choice of a proxy reasonable, and Commerce gives no other justification for its choice," and the Court therefore remanded this "issue for further explanation or reconsideration." *Id.*

Second, regarding Commerce's month-to-month comparisons for Nexco's U.S. sales and

third country sales to Germany, the Court held that "Commerce does not explain, and it is not reasonably discernable, that either the normal value of sales to Germany or U.S. prices underwent a significant change during the {period of investigation}." *Id.* at 1323. Put another way, "{w}hether or not U.S. dollar sales 'neutralize' inflation, this argument does not explain how Nexco's prices differed significantly over the POI, and it is not reasonably discernable from Commerce's explanation why a shorter averaging period would be appropriate pursuant to 19 C.F.R. § 351.414(d)(3)." *Id.* at 1324. Thus, this issue was also remanded for further explanation or reconsideration. *Id.*

## III.  <u>Remand Redetermination</u>

On October 13, 2023, Commerce filed the remand results and provided further explanation on both remanded issues.

First, Commerce explained that using Nexco's acquisition costs did not overstate COP of the honey because "to the extent that costs are a factor in Nexco's pricing decisions, it would be the acquisition costs and not the beekeepers' costs that Nexco considers." *Id.* at 26. Commerce emphasized that as it was impractical to issue questionnaires to the "vast number of producers," it had adopted the "alternative form initially suggested by Nexco, *i.e.*, acquisition costs, but with a limited testing of beekeeper costs to satisfy the statute's concern that there were no missing costs." *Id.* at 27.

Commerce also explained that the focus in 19 U.S.C. § 1677(28) "is whether all costs have been captured" and "{t}he statute is not concerned with reducing the actual acquisition costs paid by the exporter to exclude the profits of an unaffiliated producer." *Id.* at 26. Moreover, Commerce acknowledged that Nexco preferred the "limited but advantageous beekeeper costs," but it did not find that "the limited sample of beekeeper-supplier costs

establishes that all beekeeper-supplier costs are necessarily 'much lower' than Nexco's acquisition costs{.}" *Id.* at 28. This was because had Commerce "selected beekeepers under a statistically valid sampling method or with the intent of obtaining costs that reflect a representative sample from the largest beekeepers, the number of beekeepers responses required would have been vastly different." *Id.* at 28. Thus, Commerce determined that the "pertinent cost data is what Nexco recorded in its own books and records, *i.e.*, the acquisition costs," and "because the acquisition costs represent what the exporter actually paid for the honey that it sold, {Commerce did} not find that it results in an unreasonable or overstated COP for the honey that Nexco {had} exported." *Id.* at 28-29.

Second, Commerce explained that "monthly-weighted-average prices are warranted when COPs are quantified on a monthly basis, irrespective of the currency in which the prices are denominated{.}" *Id.* at 31-32. Commerce explained that using monthly price averaging periods was warranted because it used "both the shorter cost period methodology and the high inflation methodology in this investigation" and "record evidence does demonstrate that prices differed over the POI." *Id.* at 32.

For example, "the U.S. dollar gross unit prices that Nexco reported also differ over the POI, [████████████████████████████████████████████ ████ ]." *Id.* at 33. Moreover, "Nexco's product with the largest sales volume sold in the U.S. market saw an [████████████████████████████████████████████████ ] over the POI, while Nexco's product with the largest sales volume sold in the comparison market saw an [████████████████████████████████████████████ ] over the POI." *Id.*

Commerce "used its discretion and explained why it is necessary to depart from applying a POI price-average period, and instead use a monthly price-averaging period when the high inflation methodology is applied." *Id.* at 34. Finally, Commerce concluded that "high inflation impacts all of Nexco's business operations, including the setting of prices in U.S. dollars, because Nexco's books and records are based on the Argentine peso, which experienced high inflation over the PO{I}," and "Nexco's production costs would be subject to this inflation which would impact Nexco's pricing decisions, no matter in which currency the sale price is denominated." *Id.* at 35.

## ARGUMENT

### I.  Standard Of Review

In remand proceedings, the Court will sustain Commerce's determinations if they are "in accordance with the remand order," and are "supported by substantial evidence, and are otherwise in accordance with law." *MacLean-Fogg Co. v. United States,* 100 F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).

### II.  Commerce's Remand Redetermination Complies With The Court's Remand Order

The Court ordered Commerce on remand to: (1) provide additional explanation or reconsider its reliance on Nexco's acquisition costs as a proxy for cost of production, and (2) to provide additional explanation or reconsider its use of month-to-month comparisons for Nexco's U.S. sales and third country sales to Germany. *Nexco*, 639 F. Supp. 3d at 1319-20, 1322, 1324-25. As explained below, Commerce complied with the remand order and Nexco's arguments to the contrary are without merit.

**A.** **Commerce's Reliance On Nexco's Honey Acquisition Costs In The COP Calculation Complies With The Court's Remand Order**

Pursuant to the remand order, Commerce reconsidered the choice of acquisition cost in place of the beekeeper-suppliers' COPs and continued to find that Nexco's acquisition costs are a reasonable proxy for calculating the COP of honey and was not overinclusive of costs. *See* Remand Results at 25-29; *Nexco*, 639 F. Supp. 3d at 1319-20.

In this investigation, Commerce "devised and implemented a significantly curtailed beekeeper cost solicitation in an effort to balance {its} past practice and concerns." Remand Results at 6-7. Specifically, Commerce "sought to ensure that the in-country beekeeper-suppliers were not selling below their COP to the exporter respondents," but "obtaining a representative population of beekeeper-supplier costs was not feasible." *Id*. Instead, Commerce performed a "reasonableness test to determine if the collected costs suggested the beekeeper-suppliers might be contributing to the dumping of raw honey by selling to the respondent-exporters below their own raw honey production costs." *Id*. The selected beekeeper-suppliers' costs "demonstrated that their prices to the respondent-exporters exceeded the costs that the beekeeper-suppliers could document by a generous margin." *Id.* Consistent with the Court's remand order, Commerce explained that using Nexco's acquisition costs did not overstate the COP of the subject merchandise. *Id.* at 7-8, 25-29; *see Nexco*, 639 F. Supp. 3d at 1319-20.

In calculating dumping margins in an investigation, Commerce seeks to determine whether the respondent sold the subject merchandise in the United States at a price below fair value, *i.e.*, below the price in the comparison market or below the COP. *See generally* 19 U.S.C. § 1677b. As Commerce explained, "COP is inclusive of the acquisition cost {Nexco} paid for the raw honey plus the additional processing costs it incurred in preparing the raw honey for export." Remand Results at 7. "Indeed, when setting its prices, Nexco knows what it paid for

the raw honey, but is unlikely to have access to the actual COPs of unaffiliated beekeeper-suppliers" and nor would there be a reason for Nexco "to set its prices based on the unaffiliated beekeeper-suppliers' costs." *Id.*; *id.* at 9 (explaining Nexco would not be concerned with whether the unaffiliated beekeeper-suppliers sold below their own COP). Indeed, Commerce explained that although the selected unaffiliated beekeeper-suppliers' costs were lower than Nexco's, there is no record evidence that the costs are "necessarily 'much lower' than Nexco's acquisition costs" because Commerce essentially did a "spot-check" of the beekeepers' costs and "they were *not* solicited to be representative of *all* beekeeper-supplier costs." *Id.* at 8 (emphasis added).

Indeed, "Commerce's rationale for obtaining the COPs of a limited number of unaffiliated beekeeper-suppliers {wa}s to ensure that all costs have been captured, or stated another way, to confirm that the beekeeper-suppliers were not also contributing to dumping the merchandise in the United States by selling their product, *i.e.*, the raw honey, to {Nexco} below the beekeeper-suppliers' costs." *Id.* at 7-8. This limited test confirmed that the unaffiliated beekeeper-suppliers were not selling to Nexco below their own COPs of the raw honey. *See* Cost Analysis Memorandum for Nexco. Thus, Commerce found it reasonable to use Nexco's raw honey acquisition costs because "Nexco sets the prices to the comparison and U.S. markets" and using Nexco's acquisition costs "is not overinclusive of costs from the perspective of the company (Nexco) responsible for setting the U.S. price." Remand Results at 9; *see also id.* at 28-29 ("{Commerce's} limited test work of beekeeper costs satisfies the statute's concern that the unaffiliated producers who supplied the exporter respondent were not contributing to the dumping of merchandise in the United States by selling below their own costs.").

Nexco argues that Commerce's redetermination is not responsive to the Court's remand instruction because Commerce allegedly improperly shifted its analysis from beekeepers COP to Nexco's COP. *See* Nexco Cmts. at 4-9. This argument misinterprets the Court's order because the Court questioned whether using Nexco's acquisition costs overstates the COP of the honey that *Nexco* had exported. *See Nexco*, 639 F. Supp. 3d at 1319-20.

In its consideration of this question, Commerce necessarily considered the purpose of the statute for obtaining the costs from an unaffiliated producer-supplier to the exporter-respondent. Remand Results at 25-26. In the remand results, Commerce explained that the statutory concern when examining the acquisition costs between parties is to ensure that all elements of cost are captured. *See id.*; *see also* 19 U.S.C. § 1677(28). The Statement of Administrative Action clarifies that where different firms perform the production and selling functions, Commerce may include the costs, expenses, and profits of each firm. *See* Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, vol. 1 (1994) (SAA), at 835.

Thus, the concern is whether all costs have been captured, and not with reducing the actual acquisition costs the exporter paid to exclude the profits of an unaffiliated producer. To the contrary, for purposes of 19 U.S.C. §1677b, "Commerce may include the costs, expenses, and *profits* of each firm," *i.e.*, the exporter and the producer, "in calculating the cost of production and constructed value." SAA at 835 (emphasis added).

Further, we agree with AHPA that in using the term "may" when explaining 19 U.S.C. § 1677(28), Congress intended to provide Commerce with discretion to determine how far beyond the exporter it will examine. *See* AHPA Cmts. at 6. Indeed, "the statute does not mandate that Commerce must use *actual* cost data." *SKF USA Inc v. United States*, 630 F3.d

1365, 1371 (Fed. Cir. 2011) (emphasis added). As Commerce explained, "the acquisition costs are the pricesetter's or exporter's actual costs," *i.e.*, Nexco, and "to the extent that costs are a factor in Nexco's pricing decisions, it would be the acquisition costs and not the beekeepers' costs that Nexco considers." Remand Results at 26. Putting aside that Nexco and the Government of Argentina (GOA) had originally requested that Commerce use Nexco's acquisition costs as a proxy to actual cost data from the beekeepers[2], Commerce reasonably determined that "using Nexco's own costs to calculate the COP of the honey that Nexco sold and exported" did not overstate that honey's COP. *Id.*

Indeed, this Court recently sustained Commerce's reliance on the respondent's acquisition costs in place of beekeeper COPs after limited testing of selected beekeeper costs. *Am. Honey Producers Association v. United States*, 653 F. Supp. 3d 1329, 1339-41 (Ct. Int'l Trade 2023). Although the Court noted that the domestic industry's challenge to the COP differed in that the domestic industry preferred that Commerce use data from the National Horticultural Board of India, rather than acquisition costs as a proxy, the Court nonetheless held that "Commerce has reasonably explained its determination that the acquisition costs capture the full cost of producing the raw honey." *Id.* at 1341 n.11.

Nexco argues that Commerce again failed to consider that the beekeeper costs are substantially below Nexco's acquisition costs of the honey, and that Commerce failed to explain why it could not use the sample costs to adjust Nexco's acquisition costs downward by the beekeepers' profit. *See* Nexco Cmts. at 9-11. But Commerce addressed this issue.

---

[2] GOA Virtual Meeting Response Letter (June 2, 2021) (P.R. 69); Nexco RFI Resp. at 3; ACA RFI Resp. at 2; ACA and Nexco Comments on Cost of Reporting Methodology at 3 (July 29, 2021) (P.R. 148).

For example, Commerce explained that "due to the vast number of producers supplying the respondents in this case, the alternatives offered by the statute, *i.e.*, a statistically valid sample or selecting the producers supplying the largest volume of honey, were not feasible since they still would have resulted in an unmanageable number of beekeeper respondents." Remand Results at 27; *see* 19 U.S.C. § 1677f(c)(2)(A) and (B). Thus, the purpose of the limited testing of the beekeepers was only to confirm that there were no *missing* costs, such that the beekeepers were also contributing to dumping. Remand Results at 27. And while Nexco argues that Commerce should have excluded the beekeepers' profit from Nexco's acquisition price, Nexco Cmts. at 10, Commerce explained why it declined to do so: the "selection of {only} two beekeepers neither reflects a statistically valid sample (*e.g.*, stratified, random or systematic sampling) nor covers a meaningful percentage of the population of beekeeper-suppliers to Nexco." Remand Results at 27. "In fact, because Commerce intentionally selected specific beekeepers due to their lower prices to Nexco, it is not surprising that Nexco's acquisition costs exceeded these beekeeper's costs." *Id.*

Moreover, although Nexco prefers the lower beekeeper-supplier costs, Commerce explained that the "limited sample" does not mean that "*all* beekeeper-supplier costs are necessarily 'much lower' than Nexco's acquisition costs." *Id.* at 28 (emphasis added). Indeed, "{t}he pertinent cost data is what Nexco recorded in its own books and records, *i.e.*, the acquisition costs," and "{b}ecause Nexco sets the prices to the comparison and U.S. markets," it was reasonable for Commerce to determine that "using Nexco's own COPs (or constructed values) for those sales was reasonable and does not overstate the costs of the products that were sold by Nexco." *Id.*

Nexco's complaint that had Commerce determined that there were missing costs, then it would have "adjusted Nexco's acquisition prices upward," Nexco Cmts. at 10, is entirely speculative and misunderstands the purpose for which Commerce used the two beekeeper-suppliers' data: to ensure that there were no missing costs, as contemplated by the statute. Remand Results at 27; IDM at 10. Nothing more, nothing less. Nexco points to no authority, and nor are we aware of any, that a curtailed, limited, non-statistically meaningful sample—when there was no possibility of even getting responses from the vast number of beekeepers—should somehow also provide enough meaningful data for Commerce to deduct the beekeeper-suppliers' profit *from* Nexco's own acquisition costs. Remand Results at 8-9, 27-28.

Therefore, based on this expanded explanation, Commerce continued to find that using the raw honey acquisition costs in the calculation of Nexco's COP for the raw honey sold to the United States was not overinclusive of costs from the perspective of the company responsible for setting the U.S. price. *Id.* at 28-29.

B.     **Commerce's Reliance On Monthly Averaging Periods For U.S. Prices Is Supported By Substantial Evidence And In Accordance With The Court's Remand Order**

The Court remanded Commerce's determination to use shorter averaging periods for not "specify{ing} what changes occurred in either German prices or U.S. prices, *e.g.*, whether the prices increased" and for "not explain{ing} how Nexco's prices differed significantly over the POI{.}" *Nexco*, 639 F. Supp. 3d at 1323-25.

On remand, Commerce provided further explanation as to why it was necessary to use the month-to-month comparison period for Nexco's U.S. sales and third country sales prices, which allows for Commerce to make an apples-to-apples comparison in instances when there is high inflation, as is the case here. Remand Results at 15-16. Commerce explained how high inflation

can distort the margin calculations whenever nominal values that are subject to inflation are aggregated across time or when nominal values from different time periods are compared. *See id.* Accordingly, Commerce's high inflation methodology holistically addresses the possible distortions of its margin calculations by resorting to a monthly analysis to account for the change in nominal values over the POI. *Id.*

Commerce further explained why it found unpersuasive Nexco's argument that Commerce does not need to account for high inflation when both the U.S. and comparison market prices are denominated in U.S. dollars. *See id.* at 17, 33. Commerce explained that Nexco overly focused only on "the comparison of its U.S. sale prices with third-country sale prices to Germany on a monthly basis," but the high inflation methodology is intended "to address the potential distortions in the margin calculations due to high inflation in the *exporting* country." *Id.* at 17 (emphasis added). Commerce also explained that once it "determines that the high inflation methodology is warranted, whether in an investigation or a review, the basis for Commerce's margin calculations is based on a month-by-month dumping analysis." *Id.* at 18. Commerce starts by stating the COPs on a monthly, indexed basis, which means that the comparison of costs with prices must be on a month-by-month basis. *Id.* In the absence of an inflationary environment, the averaging period would normally be the entire POI, but "when the dumping margin is based on a comparison of U.S. price with a normal value based on constructed value, the underlying COP is a month-specific value, and the U.S. price can, at the most, be a monthly weighted-average U.S. price{.}" *Id.* at 18 & n.69. Use of a normal value based on constructed value normally is the result of an absence of a normal value based on weighted average comparison market prices of identical or similar merchandise. 19 U.S.C. §§ 1677(16), § 1677b(a). In other words, when Commerce uses comparison market prices, the

period or duration of the weighted-average normal value "must be for an averaging period no greater than the period for which the COPs are defined, *i.e.*, a monthly weighted average comparison market price."  Remand Results at 18.

Moreover, Commerce explained why certain price adjustments required the comparison period to be month-to-month under the high inflation methodology.  *See id.* at 18-20. Specifically, the price-based normal value not only includes the weighted-average comparison market prices, but also adjustments to such prices such as the DIFMER adjustment which, under the high inflation methodology, are based on monthly indexed values.  *Id.* at 18; *see also* 19 U.S.C. § 1677b(6), (7).  "When the comparison market sale prices that are the basis for normal value is for merchandise which is similar to, but not identical to, the subject merchandise, then Commerce will make a DIFMER adjustment to account for the physical differences between the subject merchandise and the foreign like product."  Remand Results at 19; *see* 19 U.S.C. § 1677b(a)(6)(C)(ii).  The resulting difference is in the variable cost of manufacture (VCOM) of the subject merchandise and the foreign like product.  Remand Results at 19.  And when Commerce uses the high inflation methodology, "the values of the VCOM, as with the COP, are monthly indexed values of either the period-wide or quarterly weighted-average VCOM."  *Id.* "Thus, the DIFMER adjustment is a month-specific adjustment which, because of high inflation, cannot be calculated as a difference between differing months because of the difference in the nominal, inflated, month values of VCOM."  *Id.*

Commerce also explained that other price adjustments to either normal value or U.S. price may include expenses denominated in the inflating currency which are allocated over the POI.  *Id*. at 19-20.  For example, in this investigation, Nexco reported [ ███████████████

████████████████████████████████████████████████ ] in pesos which

were indexed to monthly price adjustment values.  *See* PDM at 29; Nexco Prelim. Analysis

Memo. at 2 (C.R. 639).  "Under the high inflation methodology, such an allocated adjustment

will be calculated similar to the calculation of the monthly indexed COPs where nominal

monthly expenses will be indexed to a common point in the POI, aggregated, and then indexed to

each month during the POI."  Remand Results at 19.  "Such adjustments will be month-specific

values that are used to adjust the comparison market or U.S. prices before the comparison of U.S.

price and normal value."  *Id.*  Additionally, "certain price adjustments may be based on the COPs

of the sold merchandise."  *Id.*  "For example, inventory carrying costs are an imputed expense

based on the inventory value of the merchandise (*i.e.*, the monthly indexed COPs), the time in

inventory, and the short-term interest rate for the respondent."  *Id.* at 20.  Commerce explained

that such an adjustment also results in a month-specific value.  *See id.* at 19-20.  Thus,

Commerce explained how Nexco's argument does not account for the nuances of using the same

comparison period, in this instance month-to-month, to avoid distortions in the margin

calculation.  *See* Nexco's Cmts. at 15-19.

   Moreover, Commerce explained why it was necessary under the high inflation

methodology to reduce the dumping analysis to a month-to-month analysis because of the

change in the level of inflation in the exporting country as measured on a month-by-month basis.

Remand Results at 21-23.  In other words, Commerce explained why it was not necessary to

make a finding that either normal values, export prices, or constructed export prices differ

significantly over the course of the POI pursuant to 19 C.F.R. § 351.414(d)(3), in order to use

shorter averaging periods for U.S. and comparison market prices.  *See id.* at 23, 32-33.  For

although 19 C.F.R. § 351.414(d)(3) provides that Commerce "may calculate weighted averages

for such shorter periods," the regulations do not stipulate that this is the *only* scenario in which

Commerce may use shorter averaging periods for comparison market or U.S. prices.  Indeed, the Court acknowledged that the "statute does not specify during what time period normal value and export price should be averaged for the purposes of comparison." *Nexco*, 639 F. Supp. 3d at 1317.

Further, although Commerce "*normally* will calculate weighted averages for the entire period of investigation," 19 C.F.R. § 351.414(d)(3) (emphasis added), Commerce explained that it did not interpret the regulations to strictly circumscribe the situations in which it may resort to shorter averaging periods, but rather to provide parameters for Commerce's general approach. *See* Remand Results at 22-23, 32.  However, even if the regulation were to be interpreted to limit the instances in which Commerce may use shorter comparisons periods, Commerce satisfied the regulation here.

Specifically, Commerce found that both normal values based on comparison market prices and U.S. prices differed significantly in this proceeding over the course of the POI.  *Id*. at 22-23, 32-33.  To wit, Nexco's sale prices correlate with changes in Nexco's cost of manufacturing, which the Court acknowledged were impacted by high peso inflation.  *See* IDM at 27; *Nexco*, 639 F. Supp. 3d at 1323 ("If Nexco's sales to Germany had been denominated in Argentine pesos, it is evident that Nexco's normal value prices would change significantly as a result of high peso inflation, which Commerce found existed during the POI.").  But the Court explained that, although Commerce "discusses how Nexco's costs and prices were 'reasonably linked' during the POI, {Commerce} stops short of asserting that Nexco's prices increased significantly." *Nexco*, 639 F. Supp. 3d at 1324 n.15.  Here, based on Commerce's analysis that "there is a correlation between changing costs and final net sale prices," combined with the significant cost changes due to high peso inflation, Commerce concluded that Nexco's sale

prices, in both the U.S. and comparison markets, differed significantly during the POI. Remand Results at 23, 33; *see also* Nexco Suppl. Section D Questionnaire Resp. (Oct. 12, 2021), at 41 and Exh. D-41-3 (P.R. 297-298).

Moreover, despite Nexco's arguments to the contrary, Nexco Cmts. at 22-24, Commerce explained that record evidence demonstrated that prices differed significantly over the POI. For example, the U.S. dollar gross unit prices that Nexco reported also differed over the POI, [█████████████████████████████████████████████████████████████████████████████ █████████] *See* Remand Results at 33 (citing AHPA Admin. Case Br. at Att. 2) (C.R. 802)). Also, Nexco's product with the largest sales volume sold in the U.S. market saw an [███████████ ████████████████████████████████████████████████████ ] over the POI, while Nexco's product with the largest sales volume sold in the comparison market saw an [███████████████ ████████████████████████████████████████████ ] over the POI. *See Id*. at 33 nn.142-43. Commerce's analysis in the final determination also reflects this trend with respect to the monthly comparison market prices used in the calculation of normal value. *See* Nexco Final Analysi*s* Memo. at Att. 1 (comparison market output, pages 74-76) (C.R. 817). Thus, substantial evidence supports Commerce's analysis that Nexco's sale prices, in both the U.S. and comparison markets, differed significantly over the POI. *See* Remand Results at 33.

Finally, Nexco contests Commerce's reliance on *Union Steel Manufacturing Company Ltd. v. United States*, 190 F. Supp. 3d 1326 (Ct. Int'l Trade 2016), as support for its methodology selection here. Nexco Cmts. at 20-21. Contrary to Nexco's assertion, *Union Steel* is informative to Commerce's interpretation of 19 C.F.R. § 351.414(d)(3).

In *Union Steel*, in response to arguments from respondents that Commerce impermissibly departed from the hierarchy principle embodied in 19 C.F.R. § 351.414(e)(2) (2010), the Court

explained that Commerce adopted the hierarchy principle as an exercise of its rulemaking

discretion in promulgating the regulation and had expressly included the word "normally" in the

text of the regulation. *See Union Steel*, 190 F. Supp. 3d at 1340. The Court held that in doing

so, "Commerce has reserved for itself the discretion as to whether or not to depart from that

principle." *Id.* at 1340-41. Indeed, the Court held that "it was reasonable for Commerce to

regard changing production costs, as generally reflected in prices, to relate to the question of the

timing, *i.e.*, the contemporaneity, of price-to-price comparisons between U.S. and home market

sales." *Id*. at 1340. The Court agreed that the cost averaging period, *i.e.*, quarters in *Union Steel*,

reasonably limited the period of contemporaneity for the comparison of U.S. price with normal

value. *Id*. at 1341.

Similarly, 19 C.F.R. § 351.414(d)(3) provides that "{w}hen applying the average-to-

average method in an investigation, {Commerce} normally will calculate weighted averages for

the entire period of investigation." And here, Commerce has likewise exercised its discretion to

depart from applying a POI price-averaging period, and instead to use a monthly price averaging

period when the high inflation methodology is applied. Remand Results at 33-34. In this

investigation, Commerce reasonably found that costs may be defined by month rather than by the

entire period because of the presence of high inflation in the domestic market, like the situation

in *Union Steel* where Commerce found the costs may be defined by quarter. *Id.* In this

investigation, where the costs are defined as monthly values, Commerce "reasonably limits the

contemporaneity period to that same calendar month, which necessitates monthly price averaging

periods." *Id.* at 34-35.

Finally, Nexco argues that the Court should rely on decades-old investigations as the

basis for determining Commerce's practice on whether something "differs significantly" such

that shorter comparison periods are appropriate under the regulation. *See* Nexco Cmts. at 23-24

(citing *Polyvinyl Alcohol from Taiwan*, 61 Fed. Reg. 14,064 (Dep't of Commerce Mar. 29, 1996)

(final LTFV determ.); *Live Swine from Canada*, 70 Fed. Reg. 12,181 (Dep't of Commerce Mar.

11, 2005) (final LTFV determ.)). However, both investigations pre-date Commerce's current

high inflation methodology as well as Commerce's quarterly cost methodology. *See Dioctyl*

*Terephthalate from the Republic of Korea*, 82 Fed. Reg. (Dep't of Commerce June 26, 2017)

(final LTFV determ.), and IDM at Cmt. 1. For example, in *Dioctyl Terephthalate*, Commerce

did not rely on *Live Swine from Canada* precisely because it predated Commerce's adoption of

its current quarterly cost methodology, and Commerce explained that its current practice was to

"compare prices using the same shorter periods as are used for deriving costs." *Id.*; *see also*

*Union Steel*, 190 F. Supp. 3d at 1339. Accordingly, these cited administrative proceedings no

longer represent Commerce's practice.

Thus, because Commerce has provided further explanation that addresses the Court's

concerns, and its determination is supported by substantial evidence, the Court should sustain

Commerce's determination. *See* Remand Results at 13-23, 31-35.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's remand

redetermination and enter final judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Reginald T. Blades, Jr. by Tara K. Hogan
REGINALD T. BLADES, JR.

21

Assistant Director

OF COUNSEL:                          /s/ Kara M. Westercamp
                                     KARA M. WESTERCAMP
SAVANNAH MAXWELL                     Trial Attorney
Attorney                             Commercial Litigation Branch
Office of the Chief Counsel          Civil Division
    for Trade Enforcement & Compliance   U.S. Department of Justice
U.S. Department of Commerce          P.O. Box 480, Ben Franklin Station
                                     Washington, D.C. 20044
December 22, 2023                    Email: kara.m.westercamp@usdoj.gov

<u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains 6,031 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

<u>s/ Kara M. Westercamp</u>
KARA M. WESTERCAMP
Trial Attorney

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:      THE HONORABLE CLAIRE R. KELLY, JUDGE

_____
                                            )
Nexco S.A.,                                 )
                                            )
            Plaintiff,                       )
                                            )
      v.                                    )          Court No. 22-00203
                                            )
UNITED STATES,                              )
                                            )
            Defendant,                       )
                                            )
      and                                   )
                                            )
AMERICAN HONEY PRODUCERS                     )
ASSOCIATION, ET AL.,                        )
                                            )
            Defendant-Intervenors.          )
_____)

## **ORDER**

Upon consideration of plaintiff's comments regarding the remand redetermination,

defendant's response thereto, and all other pertinent papers, it is hereby

ORDERED that the remand redetermination is sustained in its entirety.


Dated: _____, 2023     _____
        New York, New York                                JUDGE