Slip Op. 24-22

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **NEXCO S.A.,** | |
| **Plaintiff,** | |
| **v.** | **Before: Claire R. Kelly, Judge** |
| **UNITED STATES,** | |
| **Defendant,** | **Court No. 22-00203** |
| | **PUBLIC VERSION** |
| **and** | |
| **AMERICAN HONEY PRODUCERS ASSOCIATION AND SIOUX HONEY ASSOCIATION,** | |
| **Defendant-Intervenors.** | |

## OPINION

[Sustaining the Department of Commerce's Remand Redetermination.]

Dated: February 26, 2024

Julie C. Mendoza, Donald B. Cameron, R. Will Planert, Brady W. Mills, Mary S. Hodgins, Eugene Degnan, Jordan L. Fleischer, Nicholas C. Duffey and Stephen A. Morrison, Morris, Manning & Martin, LLP, of Washington, D.C., argued for plaintiff Nexco, S.A.

Kara M. Westercamp, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant United States. Also on the brief were Patricia M. McCarthy, Director, Reginald T. Blades, Jr., Assistant Director, and Brian M. Boynton, Principal Deputy Assistant Attorney General for defendant United States. Of Counsel was Savannah Maxwell, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Court No. 22-00203                                                      Page 2
**PUBLIC VERSION**

<u>Melissa M. Brewer</u> and <u>R. Alan Luberda</u>, Kelley Drye & Warren LLP, of Washington, D.C., for defendant-intervenors American Honey Producers Association and Sioux Honey Association.

Kelly, Judge:  Before the Court is the U.S. Department of Commerce's ("Commerce") Final Results of Redetermination Pursuant to Court Remand, Oct. 13, 2023, ECF No. 49 ("Remand Results") in the 2020-2021 antidumping duty investigation in its 2020–2021 less-than-fair-value investigation of raw honey from Argentina.  In <u>Nexco S.A. v. United States</u> ("<u>Nexco I</u>"), this Court remanded to Commerce to reconsider or further explain its decision: (1) to use Nexco, S.A.'s ("Nexco") acquisition costs as a proxy for the beekeepers' costs of production ("COP"); and (2) to compare Nexco's third-country sales and U.S. sales on a monthly basis.  639 F. Supp. 3d 1312, 1324–25 (Ct. Int'l Tr. 2023).  On remand, Commerce continues to use Nexco's acquisition costs for the purposes of determining sales below COP, <u>see</u> Remand Results at 2, and continues to compare Nexco's U.S. prices with normal values based on Nexco's third-country sales prices on a monthly basis.  <u>Id.</u>  For the reasons that follow, the Court sustains Commerce's use of acquisition costs as a proxy for beekeepers' COP and its price comparison on a monthly basis.

## BACKGROUND

The Court presumes familiarity with the facts of this case as set out in full in the previous opinion ordering remand to Commerce, <u>see</u> <u>Nexco I</u>, 639 F. Supp. 3d. at 1314–15, and here summarizes the facts relevant to its review of the Remand Results. On May 18, 2021, Commerce initiated an antidumping duty investigation of raw

honey from Argentina.  See <u>Raw Honey from Argentina, Brazil, India, Ukraine, and
the Socialist Republic of Vietnam</u>, 86 Fed. Reg. 26,897 (Dep't Commerce May 18,
2021) (initiation of less-than-fair-value investigation).   Nexco, a mandatory
respondent, reported early on that it exports, rather than produces, raw honey which
it purchases from numerous small suppliers.  See Nexco's Request for Information
Response, A-357-823, PD 89, bar 4135011-01 (June 17, 2021) ("Nexco RFI Resp.").

    In its preliminary determination, Commerce found that the beekeepers, not
Nexco, were the producers of honey, and issued questionnaires to two of Nexco's
beekeepers and one middleman.  See Decision Memo. for Prelim. Affirm. Determ. in
the Less-Than-Fair-Value Investigation of Raw Honey from Argentina at 26, A-357-
823, PD 365, bar 4183570-02 (Nov. 17, 2021) ("Prelim. Results").   Commerce
determined that the beekeepers were not selling to Nexco below cost, and it would be
reasonable to use Nexco's acquisition costs as a "proxy" for the beekeepers' COPs.  Id.
Commerce thus used Nexco's acquisition costs to calculate its COPs, in lieu of the
costs of the beekeepers', for the purposes of the sales-below-cost test.  Id. at 25–27.
Commerce also found over 20 percent of Nexco's home market sales were below COP
for certain products during the POI and excluded these sales pursuant to 19 U.S.C.
§ 1677b(b)(1).  Id. at 28.  Furthermore, Commerce determined that certain of Nexco's
home market sales of foreign like product were less than five percent of its aggregate

sales, and pursuant to 19 U.S.C. § 1677b(a)(1)(C), based normal value on Nexco's

sales to Germany.[1]  Id. at 22.

On April 14, 2022, Commerce issued its final determination.  Commerce

calculated a 9.17 percent dumping margin for Nexco,[2] and continued use of the COP

methodology from the Preliminary Determination, again using Nexco's acquisition

costs as a "reasonable proxy" for the beekeepers' COPs.  See Raw Honey from

Argentina: Final Determination of Sales at Less than Fair Value and Final

Affirmative Determination of Critical Circumstances, 87 Fed. Reg. 22,179 (Dep't

Commerce April 14, 2022) and accompanying issues and decision memo at 8–13

("Final Decision Memo.").  Commerce also applied its high inflation and alternative

cost methodologies to Nexco's COPs.  Final Decision Memo. at 15.  Commerce found

that the alternative costs methodology was appropriate because (1) there was more

than 25 percent variance of Nexco's direct material costs during the period of

investigation ("POI") in real, inflation-adjusted terms, and (2) Commerce found

evidence of a linkage between Nexco's sales prices and material costs.  Id. at 17;

---

[1]  When Commerce determines that no contemporaneous sales of foreign like product
are available, it can base normal value on a respondent's sales of the foreign like
product to a third country market as the basis for comparison market sales.  See 19
U.S.C. § 1677b(a)(1)(C); 19 C.F.R. § 351.404.  Here, Commerce used Nexco's sales to
a third country, specifically Germany, as the basis for Nexco's normal value.  See
Prelim. Results at 22–23.
[2]  A dumping margin is "the total amount by which the price charged for the subject
merchandise in the home market (the 'normal value') exceeds the price charged in the
United States."  Koyo Seiko Co. v. United States, 258 F.3d 1340, 1342 (Fed. Cir. 2001).

Prelim. Results at 24. Commerce employed its high inflation methodology because Argentina experienced more than 25 percent inflation during the POI. Final Decision Memo. at 17, 26; Prelim. Results at 20. Applying both methodologies, Commerce determined that more than 20 percent of Nexco's home market sales of certain products were made below cost. Prelim. Results at 28. Further determining that these sales did not provide for the recovery of costs during a reasonable period of time, Commerce excluded these sales from its normal value calculations. Id.

Nexco moved for judgment on the agency record, challenging Commerce's use of Nexco's acquisition costs as a proxy for the beekeepers' COP; Commerce's use of its alternative cost methodology, which used average production costs on a monthly rather than quarterly basis; and Commerce's determination to compare Nexco's third-country sales and U.S. sales on a monthly basis. See [Nexco's] Mot. J. Agency Rec. at 7–46, Nov. 18, 2022, ECF No. 25. This Court sustained Commerce's determination to compare Nexco's cost on a monthly basis for the purposes of sales below cost. Nexco I, 639 F. Supp. 3d at 1322. The Court remanded for further consideration or explanation Commerce's decision to use Nexco's acquisition costs as proxy for beekeepers' COP. Id. at 1316. In particular, the Court concluded that Commerce merely explained that the acquisition costs were not underinclusive but did not address, in light of record evidence, why they were not overinclusive. Id. at 1319. The Court also remanded for further consideration or explanation Commerce's determination that high inflation in Argentina justified its use of monthly

Court No. 22-00203                                                                    Page 6
**PUBLIC VERSION**

comparisons of Nexco's sales with third country sales when the relevant sales were
all made in U.S. dollars.  Id. at 1324.

Commerce filed its Remand Results on October 13, 2023.  In the Remand
Results, Commerce persists that Nexco's acquisition costs are a reasonable proxy for
calculating the beekeepers' COP.  Remand Results at 6.  Commerce also continues to
justify a month-to-month comparison for its high inflation methodology because it is
consistent with 19 C.F.R. § 351.414(d)(3) and Commerce's practice.  Id. at 21–23.
Commerce further rejects reliance on quarterly average prices because using
quarterly averages "fails to account for the interrelationships of the margin
calculations, the potential distortions addressed by high inflation, and the holistic
approach of Commerce's high inflation methodology."  Id. at 21.

On November 13, 2023, Nexco filed its comments on Commerce's Remand
Results.  [Nexco's] Cmts. on [Remand Results] at 27, Nov. 13, 2023, ECF No. 56
("Nexco Cmts.").  Nexco argues that the Remand Results fail to show that Nexco's
acquisition prices are a reasonably proxy for the COP of raw honey and that
Commerce's use of month-to-month averaging periods for Nexco's U.S. and third-
country sales to Germany is unsupported.  Id. at 2, 12.  That same day, Defendant-
Intervenors American Honey Producers Association and Sioux Honey Association
("Defendant-Intervenors") filed their comments supporting Commerce's
redetermination, submitting that Commerce's explanations in the Remand Results
comply with Nexco I, are supported by substantial evidence, and in accordance with

**PUBLIC VERSION**

law.  [Def.-Int.] Cmts. in Supp. [Remand Results] at 1, Nov. 13, 2023, ECF No. 54

("Def.-Int. Cmts.").

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction pursuant to Section 516A of the Tariff Act of 1930,[3]

as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c) (2018),[4] which

grants the Court authority to review actions contesting the final determination in an

antidumping duty order.  The Court will uphold Commerce's determination unless it

is "unsupported by substantial evidence on the record, or otherwise not in accordance

with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  "The results of a redetermination pursuant

to court remand are also reviewed 'for compliance with the court's remand order.'"

Xinjiamei Furniture Co. v. United States, 968 F. Supp. 2d 1255, 1259 (Ct. Int'l Tr.

2014) (quoting Nakornthai Strip Mill Pub. Co. v. United States, 587 F. Supp. 2d 1303,

1306 (Ct. Int'l Trade 2008).

## DISCUSSION

On remand, Commerce maintains the reasonableness of its determinations in

Nexco I.  Commerce explains that using acquisition prices for raw honey as a proxy

for beekeepers' COP is reasonable because acquisition costs capture all the actual

manufacturing costs of the honey Nexco exports.  Remand Results at 7–8; 25–29.

---

[3] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2018 edition.
[4] Further citations to Title 28 of the U.S. Code and Code of Federal Regulations are to the 2018 edition.

Further, Commerce explains that month-to-month averaging of Nexco's U.S. sale prices with normal values based on Nexco's third-country sales prices is reasonable because it is permitted by 19 C.F.R. § 351.414(d)(3) and in accordance with department practice. Id. at 13–23. Nexco counters that Commerce's Remand Results fail to support either conclusion. Nexco Cmts. at 26. For the following reasons Commerce's use of Nexco's acquisition costs as a proxy for beekeepers' COP and its use of a monthly averaging period for its comparison of normal value based on comparison sales and U.S. prices is sustained.

## I.    Acquisition Costs

On Remand, Commerce continues to use Nexco's honey acquisition costs as a proxy for the beekeepers' COP, arguing that its choice is reasonable because the use of acquisition costs ensures that all costs have been captured. Remand Results at 6–9; Def.-Int. Cmts. at 3–8. Nexco challenges Commerce's redetermination, arguing that the Remand Results improperly shift Commerce's analysis from beekeepers' COP to Nexco's COP. Nexco Cmts. at 4–9. Nexco also asserts Commerce failed to address record evidence showing beekeeper costs substantially below Nexco's acquisition costs. Id. at 9–11.

Commerce imposes an antidumping duty on foreign merchandise that "is being, or is likely to be, sold in the United States at less than its fair value," and results in material injury or threat of injury to a U.S. domestic industry. 19 U.S.C. § 1673. The antidumping duty imposed is "an amount equal to the amount by which

the normal value exceeds the export price (or the constructed export price) for the

merchandise." Id. To determine whether merchandise is being sold at less than fair

value, Commerce compares export price or U.S. price against "normal value." 19

U.S.C. § 1677b(a). Normal value in this context is calculated based on the subject

merchandise's home market sales occurring "in the ordinary course of trade." 19

U.S.C. § 1677b(a)(1)(B)(i). As a corollary, Commerce may disregard those sales not

made "in the ordinary course of trade," including those sold below COP, i.e., dumped

merchandise. 19 U.S.C. § 1677b(b)(1); see 19 U.S.C. § 1677(15)(A).

> Under the statute, COP is determined by calculating the sum of
>
> (A) the cost of materials and of fabrication or other processing of any
> kind employed in producing the foreign like product . . .; (B) an amount
> for selling, general, and administrative expenses based on actual data
> pertaining to production and sales of the foreign like product by the
> exporter. . .; and (C) the cost of all containers and coverings of whatever
> nature, and all other expenses incidental to placing the foreign like
> product in condition packed ready for shipment.

19 U.S.C. § 1677b(b)(3)(A). Although the statute does not require specific data

Commerce must use in its COP calculations, it does prescribe that Commerce should

ordinarily do so "based on the records of the exporter or producer of the

merchandise,"[5] provided the records are kept pursuant to "generally accepted

---

[5] An "exporter or producer," for purposes of the statute, is defined as the exporter,
producer, or both "to the extent necessary to accurately calculate the total amount
incurred and realized for costs, expenses, and profits." 19 U.S.C. § 1677(28).

(footnote continued)

**PUBLIC VERSION**

accounting principles of the exporting country" and reasonably reflect the "costs associated with the production and sale of the merchandise."    19 U.S.C. § 1677b(f)(1)(A).

By practice, when Commerce measures COP for a respondent that sells raw, unprocessed agricultural products, it looks to the producer's COP rather than the respondent's COP.  See, e.g., Final Determination of Sales at Less than Fair Value: Fresh and Chilled Atlantic Salmon from Norway, 56 Fed. Reg. 7,661, 7,672 (Dep't Commerce Feb. 25, 1991) (using costs of random sample of salmon farmers as a proxy for salmon exporter's COP); compare Final Determination of Sales at Less than Fair Value: Greenhouse Tomatoes from Canada, 67 Fed. Reg. 8,781 (Dep't Commerce Feb. 26, 2002) and accompanying issues and decision memo. at Comment 7 (cost of farming tomatoes used as surrogate for tomato exporter's COP), with Notice of Final Results of Antidumping Duty Administrative Review: Individually Quick Frozen Red Raspberries From Chile, 70 Fed. Reg. 6,618 (Dep't Commerce Feb. 8, 2015) and accompanying issues and decision memo. at Comment 1 (purchase price from unaffiliated growers used as COP for raspberry processors).  Commerce has applied this practice to determine exporter COP for raw honey from Argentina.  See Raw

---

"Commerce may include the costs, expenses, and profits of each firm in calculating [COP] and constructed value."  Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 835 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4172 ("SAA").

<u>Honey from Argentina: Preliminary Results of Antidumping Duty Administrative Review</u>, 76 Fed. Reg. 2,655, 2,659 (Dep't Commerce Jan. 14, 2011) (unaffiliated beekeepers' COP used as unprocessed honey exporter's COP).

In its final determination, Commerce explained it departed from its practice of calculating the beekeepers' COP as Nexco's COP.  Final Decision Memo. at 8. Because of the fragmented nature of honey producers in Argentina, as well as their unsophisticated operations and record-keeping practices, Commerce could not obtain COP data from beekeepers that held a large percentage of market share, and thus was unable to establish a reliable and complete beekeepers' COP record.  <u>Id.</u> at 9. Commerce determined that the circumstances warranted using Nexco's acquisition costs as a proxy for the beekeepers' COP.  <u>Id.</u>[6]

In <u>Nexco I</u>, the Court concluded that Commerce had adequately explained its decision to depart from its practice, but remanded to Commerce to reconsider or further explain its decision to use Nexco's raw honey acquisition cost as a proxy for the beekeepers' COP.  <u>Id.</u> at 6; <u>see</u> <u>Nexco I</u>, 639 F. Supp. 3d at 1319.  The Court found

---

[6] Rather than selecting a representative number of producers to calculate COP information, Commerce resorted to soliciting COP information from one beekeeper supplier, one middleman, and one middle-man-beekeeper supplier to Nexco to test whether reliance on Nexco's acquisition costs was reasonable.  Final Decision Memo. at 12.  Commerce chose the suppliers because they had the lowest sales prices to Nexco and therefore the highest risk to sell below their own COP and thus contribute to dumping.  <u>Id.</u>  Commerce found that the beekeepers sold to Nexco above their COP. <u>Id.</u>  Thus, Commerce proceeded to use Nexco's acquisition costs as a proxy for the beekeepers' COP, explaining that its choice was reasonable because all production and collection costs were captured pursuant to 19 U.S.C. § 1677(28).

Commerce's explanation that "use of acquisition costs ensures the capture of all costs, expenses, and profits of the beekeepers and middlemen involved in the production and collection of raw honey" was insufficient to justify its decision to use acquisition costs as a proxy for beekeepers' COP.  Nexco I, 639 F. Supp. 3d at 1319 (citing Final Decision Memo. at 13).  Specifically, the Court concluded that although Commerce explained that its use of Nexco's cost would adequately capture all costs, it failed to address whether the costs used were overinclusive of the actual COP of the raw honey.  Id.  Record evidence indicated that Nexco's acquisition costs were much higher than the costs of its producers.  Id.; see Prelim. Cost Prod. Memo. at attachs. 1, 3, A-357-823, PD 373, CD 646, bar 4184004-01 (Nov. 17, 2021) ("Prelim. Cost Memo."); Final Decision Memo. at 11–13.  Thus, the Court concluded Commerce's explanation that the proxy was reasonable due to "a lack of missing costs alone" was unsupported by substantial evidence and required reconsideration or further explanation.  Nexco I, 639 F. Supp. 3d at 1319.

Commerce reasserts that use of Nexco's acquisition costs serves as a reasonable proxy for calculating the beekeepers' COP for Nexco's goods subject to investigation.  Remand Results at 6.  Commerce explains

> [W]hen setting its U.S. prices, Nexco knows what it paid the beekeeper-suppliers, but there is no record evidence to suggest that Nexco knows the costs that its unaffiliated beekeeper-suppliers incurred in producing the raw honey.  Even if Nexco were privy to such information, there is no evidence suggesting that Nexco would consider the costs of an unaffiliated party when setting its prices.  Thus, the pertinent cost data to Nexco is what is recorded in its own books and records, i.e., the

> acquisition costs. While Commerce is concerned with whether there are
> additional costs to be considered if the beekeeper-suppliers sold their
> product below their COPs, Nexco would not have such concerns.
> Because Nexco sets the prices to the comparison and U.S. markets,
> [Commerce] find[s] that using Nexco's own COPs (or constructed values)
> for those sales is reasonable and does not overstate the costs of the
> products that were sold by Nexco. Therefore, [Commerce] find[s] that
> using the raw honey acquisition costs in the calculation of Nexco's COP
> for the raw honey sold to the United States is not overinclusive of costs
> from the perspective of the company responsible for setting the U.S.
> price.

Id. at 9. Thus, Commerce again asserts that its use of Nexco's acquisition costs

ensures that all costs are included.

With respect to whether Commerce's determination is unreasonable because

the use of Nexco's costs is overinclusive, it is reasonably discernible that Commerce

is not concerned with whether the use of acquisition costs is overinclusive in this

instance. Id. at 9 (explaining the costs are not overinclusive "from the perspective of

the company responsible for setting the U.S. price"). Commerce explains that "in

calculating dumping margins in an investigation, [Commerce] seek[s] to determine

whether the respondent sold the subject merchandise in the United States at a price

below fair value." Id. at 7. Commerce explains further that when capturing cost of

production, Section 1677(28) reveals that Congress intended Commerce to have the

"discretion regarding how far beyond the exporter it will examine." Id. at 26. Section

1677(28) allows Commerce to use Nexco's production costs and the costs of beekeeper

producers "to the extent necessary to accurately calculate the total amount incurred

and realized for costs, expenses, and profits" of the raw honey Nexco exports, see 19

Court No. 22-00203                                                              Page 14
**PUBLIC VERSION**

U.S.C. § 1677(28), and that it can rely upon Nexco's own records to calculate this value.  <u>See</u> Remand Results at 25–26; 19 U.S.C. §§ 1677b(b)(3), 1677b(f)(1)(A). Commerce further invokes the SAA's statement that it may include both producers' and exporters' costs.  Remand at Results at 25–26 (citing SAA at 4172) ("The SAA clarifies that where different firms perform the production and selling functions, Commerce may include the costs, expenses, and profits of each firm").  Thus, Commerce posits that because it is concerned with ensuring all costs are captured pursuant to Congress' broad grant of discretion to achieve this purpose, and because it reasonably deviates from its practice of using producers' costs, any over-inclusiveness of total cost calculation does not affect the reasonableness of its choice of exporter's acquisition cost as a proxy for beekeepers' COP.  <u>Id.</u> at 25.  Because the statute emphasizes determining whether merchandise is sold below fair value, Commerce's determination, in this instance, where it reasonably deviates from its normal practice, is justified.[7]  <u>See</u> 19 U.S.C. § 1673; 19 U.S.C. § 1677b(b); 19 U.S.C. § 1677(28) ("term 'exporter or producer' includes both the exporter . . . and the producer [of the good] . . . to accurately calculate the total amount incurred and

---

[7] Nexco argues that 19 U.S.C. § 1677(28) simply clarifies that "exporter or producer" can mean either or both the exporter or producer for the purposes of determining normal value, and does not inform how Commerce should identify COP here.  Nexco Cmts. at 7–8.  Nexco's argument is unpersuasive.  Commerce invokes 19 U.S.C. § 1677(28) not because it identifies how to calculate COP in any given case, but to demonstrate that Congress intended it to have broad discretion in ensuring that all costs were captured.

realized for costs, expenses, and profits in connection with production and sale of that merchandise"); SAA at 4172 ("Commerce may include the costs, expenses, and profits of each [producer or exporter] in calculating [COP] and constructed value").

Commerce also addresses the record evidence that Nexco's acquisition costs were much higher than the costs of its producers. Nexco I, 639 F. Supp. 3d at 1319; see Prelim. Cost Memo. at attachs. 1, 3; Final Decision Memo. at 11–13. Commerce responds that this record evidence does not detract from its determination because these suppliers were chosen "to satisfy the statute's concern that there were no missing costs" and thus because their prices were low. Remand Results at 27. The very limited number of producers represent neither a statistically valid sample nor a meaningful percentage of the population of suppliers. See Final Decision Memo. at 10, 12 (explaining that of the over 15,500 beekeeper producers in Argentina, Commerce used data from one direct beekeeper, one middleman and one middleman-beekeeper supplier from Nexco to gauge if Nexco's acquisition costs were a reasonable proxy for beekeepers' COP); Remand Results at 27 (acknowledging that the "curtailed and purposeful selection of two beekeepers" was not a statistically valid sample and did not cover a meaningful population of Nexco's beekeeper-suppliers). Thus, Commerce acknowledges the evidence, but concludes, given the reason these

**PUBLIC VERSION**

particular producers were selected, that the evidence does not detract from its

conclusion.[8]  Remand Results at 27.  The Court cannot disagree.

Nexco argues that Commerce has impermissibly shifted its analysis to focus

on Nexco's own COP, rather than the COP of the beekeepers.  Nexco Cmts. at 4.

Commerce has indeed shifted to using Nexco's own costs; but, contrary to Nexco's

argument, such a shift in this instance is not impermissible given its reasonableness

under the circumstances.  In <u>Nexco I</u>, the Court already concluded that Commerce

justified its departure from its practice of using the producers' costs for COP of

unprocessed agricultural goods.  639 F. Supp. 3d at 1318.  The only question

remaining is whether its use of Nexco's acquisition costs is a reasonable alternative.

Commerce's explanation in light of Commerce's objective in identifying costs and the

information available to it is reasonable.  <u>See</u> 19 U.S.C. § 1677(28); 19 U.S.C.

§§ 1677b(b)(3), 1677b(f)(1)(A); SAA at 4127; Remand Results at 7–9, 25–29.

## II.    High Inflation Month-to-Month Comparisons

Commerce continues to compare normal value, based on third country sales

prices and U.S. sales prices, on a monthly rather than quarterly basis in its

---

[8] Commerce's sample of the beekeepers with the lowest sale prices to Nexco is reasonable, given its determination that such beekeepers are the most likely to contribute to dumping and the unobtainability of actual beekeepers' COP.  <u>See</u> Remand Results at 7 ("obtaining a representative population of beekeeper-supplier costs was not feasible, neither for Commerce to administer nor for the respondents to induce participation from multitudes of unaffiliated beekeeper-suppliers with unsophisticated and incomplete record-keeping").

redetermination.  Remand Results at 13–23.  Commerce maintains that 19 C.F.R.

§ 351.414(d) does not "strictly circumscribe" its ability to adopt a monthly averaging

period.  Id. at 22.  Nonetheless, and to comply with the Remand Order, Commerce

explains that month-to-month averaging is consistent with the 19 C.F.R. § 351.414(d)

because the normal values and U.S. prices differed significantly over the POI.  Id. at

21–23.  Commerce also argues that the Court should sustain its use of monthly

averaging regardless of whether prices differ significantly because its high inflation

methodology, which includes month-to-month averaging, is a "holistic" approach to

combat the distortions caused by high inflation in dumping calculations more

generally.  Id. at 14–21 (detailing Commerce's high inflation methodology).  Nexco

argues Commerce has not demonstrated that normal values and U.S. prices differed

significantly over the POI warranting month-to-month averaging under 19 C.F.R.

§ 351.414(d)(3), and further adds that Commerce's description of its high inflation

methodology fails to demonstrate that monthly averaging is justified.  Nexco Cmts.

at 12–25.

     In an antidumping investigation, Commerce ordinarily determines whether

goods are being sold at less than fair value "by comparing the weighted average of

the normal values to the weighted average of the export prices (and constructed

export prices) for comparable merchandise." 19 U.S.C. § 1677f-1(d)(1)(A)(i). Although

the statute is silent as to the time period Commerce should use when comparing

normal value and U.S. prices, see Nexco I, 639 F. Supp. 3d at 1322 (citing the SAA at

4178), 19 C.F.R. § 351.414(d)(3) favors averaging during the POI.  Moreover, the

regulation provides:

> When applying the average-to-average method in an investigation, the
> Secretary normally will calculate weighted averages for the entire
> period of investigation.  However, when normal values, export prices, or
> constructed export prices differ significantly over the course of the
> period of investigation, the Secretary may calculate weighted averages
> for such shorter period as the Secretary deems appropriate.

19 C.F.R. § 351.414(d)(3).

   As explained in its Final Results, Commerce employs its high inflation

methodology in price comparisons if inflation exceeds 25 percent in the exporting

country during the POI.  Final Decision Memo. At 18–19.[9]  Commerce explains the

reasoning behind its high inflation price comparison practice:

> The purpose of the high inflation methodology is to account for the
> significant change in the value of the prices and costs denominated in
> the currency of the exporting country, i.e., the inflation in the exporting
> country.  Inflation impacts the nominal value of revenues and expenses
> in relation to their real value.  This change in the nominal value of the

---

[9] See Circular Welded Carbon Steel Standard Pipe and Tube Products from Turkey:
Preliminary Results of Antidumping Duty Administrative Review and Preliminary
Determination of No Shipments; 2020–2021, 87 Fed. Reg. 34242 (June 6, 2022), and
accompanying issues and decision memo. at 10 ("Because Turkey's economy
experienced high inflation (i.e., above 25 percent) during the POR, it is Commerce's
practice to limit our comparisons of U.S. sale prices to [normal value] during the same
month in which the U.S. sale occurred.  This methodology minimizes the extent to
which calculated dumping margins may be overstated or understated due solely to
inflation in the Turkish market" (internal citation omitted)); see also Notice of Final
Determination of Sales at Less than Fair Value: Certain Cut-to-Length Carbon-
Quality Steel Plate Products from Indonesia, 64 Fed. Reg. 73,164, 73,170 (Dep't
Commerce Dec. 29, 1999) (explaining that Commerce "make[s] sales comparisons on
a monthly average basis, rather than on a POI average basis, in order to minimize
the effects of inflation on our analysis").

> revenues and expenses over time may distort Commerce's margin calculations, which makes the assumption that the relationship between real value and nominal value remains constant through the POI . . . When inflation rises to the level where it is "high," Commerce finds that this assumption is no longer reasonable and must account for the potential for distortions based on the fluctuations of the nominal value of the revenues and expenses in its margin calculations.

Remand Results at 14–15.  Previously, the Court concluded Commerce failed to reasonably justify monthly averaging periods where both the U.S. and third-country sales were dominated in U.S. dollars.[10]  <u>Nexco I</u>, 639 F. Supp. 3d at 1323.  The Court found that "Commerce's discretion to choose averaging periods for price comparisons is circumscribed by regulation," <u>Id.</u>, and in particular that "Commerce 'may calculate weighted averages for such shorter period as the Secretary deems appropriate' when normal values 'differ significantly over the course of the period of investigation.'"  <u>Id.</u> (quoting 19 C.F.R. § 351.414(d)(3)).

On remand, Commerce maintains that its month-to-month comparison period for Nexco's third-country sales prices and U.S. sales prices is reasonable, because the regulation does not "strictly circumscribe" Commerce's discretion and, in any event, differing prices justifies its use of monthly averaging.  Remand Results at 22. Commerce also argues its high inflation methodology, which includes month-to-month averaging, is a "holistic" methodology combating the distortions caused by

---

[10]  The Court explained that the administrative precedent referenced by Commerce supported the use of shorter averaging periods when sales were denominated in local currencies, not U.S. dollars.  <u>Nexco I</u>, 639 F. Supp. 3d at 1323.

high inflation in dumping calculations more generally. Id. at 15. Finally, Commerce points to record evidence to demonstrate that prices differed significantly throughout the POI. Id. at 33–34.

Commerce rejects the view it may only shorten the average period by demonstrating that prices differ significantly. Id. at 22 ("[Commerce does] not agree that, to use shorter averaging periods for U.S. and comparison market prices, Commerce must make a finding that either normal values, export prices, or constructed export prices differ significantly over the course of the POI pursuant to 19 C.F.R. § 351.414(d)(3)"). Commerce argues the use of the word "normally" in the first sentence of 19 C.F.R. § 351.414(d)(3) frees it to deviate and use a shorter period when it chooses, not merely "when normal values, export prices, or constructed export prices differ significantly over the course of the period of investigation" as the second sentence would seem to imply. Assuming for the purposes of argument that Commerce has broader discretion to deviate from the normal practice than that which is provided for in the second sentence of the regulation, it would still need to act reasonably. See Vicentin S.A.I.C. v. United States, 466 F. Supp. 3d 1227, 1243 (Ct. Int'l Trade 2020) (citing Huaiyin Foreign Trade Corp. v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003)) (stating that even where Commerce has discretion to develop a methodology, it must still act reasonably). Thus, Commerce must still explain why its use of a shorter averaging period is reasonable. Here, Commerce offers two reasons for deviating from the norm established in its regulations.

**PUBLIC VERSION**

First, Commerce explains that high inflation affects margin calculations regardless of whether the currency denomination is in U.S. dollar or Argentine Peso. Remand Results at 35; Def.-Int. Cmts. at 10. Commerce highlights the "holistic" nature of its high inflation methodology in the Remand Results by explaining the need for monthly averaging in a number of antidumping computations involving high inflation. See Remand Results at 14–21. For example, Commerce explains that it determines a respondent's COPs under high inflation practice based upon nominal monthly expenses and replacement costs. Id. at 15. A respondent's costs are indexed to the last month of the averaging period, aggregated, and then indexed again so that the weighted-average COPs are linked to each month during the POI, which then serve as a core function of Commerce's margin calculations. Id. at 16. Commerce's margin calculations and the revenue of a respondent's reported data are also impacted by inflation, which might preclude comparison of nominal price and expense values across a POI if the prices and expenses are denominated in the domestic currency of the exporting country experiencing high inflation. Id. Commerce explains that when nominal values are compared, they are made on a monthly basis because the level of inflation is likewise measured monthly, and thus comparable at a single level of inflation. Id. Commerce explains that even where sales are not denominated in local currency and not based on constructed value, the comparison sales will still be subject to price adjustments—such as differences-in-merchandise adjustments—based on monthly indexed values using the high inflation

methodology.  Id. at 18.  Other price adjustments made either to normal value or U.S.

prices will also be made on a monthly basis.  Id. at 18–19 (listing examples of other

adjustments made on monthly bases).  Thus, Commerce explains that similar use of

a monthly averaging period when comparing U.S. and third-country market prices

promotes accuracy and consistency in its high inflation methodology.  Id. at 22.

Therefore, where Commerce confronts high inflation, it argues, it shifts to this

methodology.   Commerce contends that the discretion afforded it in 19 C.F.R.

§ 351.414(d)(3) permits it to resort to month-to-month averaging based solely on its

finding of high inflation as part of its "holistic" approach to high inflation.  Id. at 21–

22.

At the same time, Commerce also finds that Nexco's sales prices correlate with

Nexco's changing costs due to high peso inflation.  Id. at 23, 33–35.  Consequently,

Commerce concludes that Nexco's sales prices in the U.S. and comparison markets

differed significantly during the POI.  Id. at 33.  Specifically, Commerce asserts the

U.S. dollar gross unit prices reported by Nexco differ over the POI, reflecting changes

in both the U.S. and comparison market prices.  Id. at 33.[11]  To support its claim,

Commerce cites Defendant-Intervenors' comments, which Commerce asserts its

---

[11]  Commerce notes Nexco's reported prices "[[

                                                                    ]]."  Remand Results at

33.

**PUBLIC VERSION**

determination that prices differed during the POI warranting monthly averaging.[12]

Id. (citing Def.-Int. Cmts. at 7–8).  Moreover, Defendant-Intervenors' expound upon

the same findings in their comments.[13]  Def.-Int. Cmts. at 8 (citing Pet. Reb. Br. at

attach. 2).  Because Commerce's second reason for using month-to-month averaging

is specifically articulated in its regulations, it is a sufficient basis for Commerce's

redetermination to be sustained.  The Court need not reach the question of whether

triggering of Commerce's high inflation methodology, without more, is sufficient for

it to adopt a month-to-month averaging period when all sales are denominated in

U.S. dollars, rather than local currency.[14]  Therefore, Commerce has explained how

---

[12]  Specifically, Commerce asserts:

> Nexco's product with the largest sales volume sold in the U.S. market
> an [[
>
>                   ]] over the POI, while Nexco's product with the largest
> sales volume sold in the comparison market saw an [[
>
>                                    ]] over
> the POI.

Remand Results at 33 (citing Def.-Int. Cmts. at 7–8).

[13]  Defendant-Intervenors explain that "[i]n aggregate (i.e. all sales), Nexco's [U.S. dollar]-denominated U.S. prices [[         ]] by [[       ]] percent over the POI and its [U.S. dollar]-denominated comparison market prices [[          ]] by [[       ]] percent over the POI."  Def.-Int. Cmts. at 8 (citing Petitioners' Rebuttal Brief at attach. 2, PD 426, CD 804, bar code 4207373-01 (Jan. 31, 2022) ("Pet. Reb. Br.")).

[14]  Defendant-Intervenors explain in a practical sense that in all likelihood prices will necessarily differ significantly where there is hyper-inflation, regardless of whether sales are denominated in local currency:

> [I]f an Argentine company kept its [U.S. dollar]-denominated selling
> prices constant in September and October 2020, then its ARS-
> denominated sales revenue would have increased by 2.6860 percent

(footnote continued)

its choice to use a monthly averaging period for U.S. and comparison market prices

is reasonable. Accordingly, the Remand Results are sustained.

## CONCLUSION

Commerce has provided a reasonable explanation for its use of Nexco's

acquisition costs as a proxy for beekeepers' COP and its decision to use a monthly

averaging period for its normal value comparisons. In light of its explanation, and

consistent with Nexco I, 639 F. Supp. 3d 1312, Commerce's remand redetermination

is sustained. Judgment will enter accordingly.

 /s/ Claire R. Kelly
Claire R. Kelly, Judge

Dated:          February 26, 2024
                New York, New York

---

from September to October due to the devaluation of the ARS with
respect to the [U.S. dollars] based on the record data for exchange rates.
Petitioners also explained that by contrast, the Argentine company's
costs would have increased by 6.0455 percent from September to October
based on the record data for Argentine due to inflation. This means that
in order to maintain the same profitability level in September and
October, the Argentine company would have to increase its [U.S. dollar]-
denominated selling prices by 3.2716 percent from September to
October, which is an annualized increase of 47.1536 percent.
Consequently, the effect of high inflation on a company's costs puts
inflationary pressure on its selling prices, even when those selling prices
are denominated in [U.S. dollars].
Def.-Int. Cmts. at 11 n.5 (citing Pet. Reb. Br. at 52–54, attach. 1) (internal citations
omitted).